```
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
 2
      -------------------------------x
 3    EQUAL EMPLOYMENT OPPORTUNITY   :   CASE NO.
      COMMISSION,                    :
 4         Plaintiff,                :   WDQ-02-CV-648
              AND                    :
 5    KATHY C. KOCH,                 :
           Plaintiff-Intervenor,     :
 6                                   :
              VS.                    :
 7                                   :
      LA WEIGHT LOSS,                :
 8         Defendant.                :
      -------------------------------x
 9
10         Oral deposition of KRISTI O'BRIEN,
11    held at the offices of the Equal
12    Employment Opportunity Commission, Bourse
13    Building, Suite 400, 111 South
14    Independence Mall East, Philadelphia,
15    Pennsylvania, on Thursday, August 28,
16    2003, beginning at 9:35 a.m., before
17    Debra J. Weaver, a Federally Approved
18    Registered Professional Reporter,
19    Certified Realtime Reporter and Certified
20    Shorthand Reporter.
21
              ESQUIRE DEPOSITION SERVICES
22          1880 John F. Kennedy Boulevard
                     15th Floor
23             Philadelphia, PA   19103
                   (215) 988-9191
24
```

Page 2

```
 1   APPEARANCES:
 2     RONALD I. PHILLIPS, ESQUIRE
       TRACY HUDSON SPICER, ESQUIRE
 3     U.S. EQUAL EMPLOYMENT
       OPPORTUNITY COMMISSION
 4     Baltimore Area Office
       City Crescent Building, 3rd Floor
 5     10 South Howard Street
       Baltimore, MD  21201
 6     410.962.4628
       ron.phillips@eeoc.gov
 7     tracy.spicer@eeoc.gov
 8     --Representing the Plaintiff
 9
       PAMELA J. WHITE, ESQUIRE
10     OBER, KALER, GRIMES & SHRIVER
       120 East Baltimore Street
11     Baltimore, MD  21202-1643
       410.685.1120
12     pjwhite@ober.com
13     --Representing the
        Plaintiff-Intervenor
14
15     DAVID E. LANDAU, ESQUIRE
       WOLF, BLOCK, SCHORR AND
16     SOLIS-COHEN, LLP
       1650 Arch Street
17     22nd Floor
       Philadelphia, PA  19103
18     215.977.2335
       dlandau@wolfblock.com
19
       --Representing the Defendant
20
     ALSO PRESENT:
21
       KATHY KOCH
22     KAREN SIEGEL
23
24
```

Page 3

```
 1       INDEX
       WITNESS              PAGE
 2
     KRISTI O'BRIEN
 3
       BY MR. PHILLIPS        6
 4     BY MS. WHITE         410
 5
 6       EXHIBITS
 7   MARKED   DESCRIPTION     PAGE
 8   O'Brien-1  Notice of      11
             Deposition
 9
     O'Brien-2  Various employee  108
10           change forms,
             Bates LA 0010566,
11           0010567, 0010555,
             0010561, 0010564,
12           0010560, 0010559,
             0010558, 0010562,
13           0010551
14   O'Brien-3  New Employee    194
             Pre-Training Kit,
15           Bates LA
             0009210-0009215
16
     O'Brien-4  Weight Loss Centre  200
17           East Coast
             Training Manual,
18           Bates EEOC
             02510-02736
19
     O'Brien-5  Service Training   246
20           Agenda, Bates EEOC
             02488-02492
21
     O'Brien-6  Employee change   337
22           forms for Sherri
             Morgan dated
23           9/27/99, Bates LA
             0010508 and
24           0010518
```

Page 4

```
 1   MARKED   DESCRIPTION     PAGE
 2   O'Brien-7  Employee change   340
             form for Jean
 3           Byrne dated
             11/9/98, Bates
 4           EEOC 00804
 5   O'Brien-8  Employee       342
             performance
 6           evaluation for
             Sherri Morgan,
 7           Bates LA
             0010516-0010517
 8
     O'Brien-9  Letter dated     364
 9           3/8/98 to Lynne
             Portlock from
10           Kathy Koch, Bates
             LA 0010332-0010334
11
12
...
24
```

Page 5

```
 1        DEPOSITION SUPPORT INDEX
 2
 3
 4   Direction to Witness Not to Answer
 5   Page   Line  Page   Line   Page   Line
 6
 7   416   18    418   18     418   24
 8
 9   Request for Production of Documents
10   Page   Line  Page   Line   Page   Line
11
12   417   16
13
14   Stipulations
15   Page   Line  Page   Line   Page   Line
16
17   (NONE)
18
19   Question Marked
20   Page   Line  Page   Line   Page   Line
21
22   (NONE)
23
24
```

2 (Pages 2 to 5)

O'brien, Kristi - 08/28/03 - Marci B. Goldshlack

Page 134

1  directly. So I'll give you an example.
2  I'm looking at the New Jersey market and
3  I think the East Brunswick center needs
4  help and I would like to send my trainer
5  over to that East Brunswick center to
6  help them. She would say, well, where
7  does the supervisor want her to be?
8  Well, the supervisor might want her in
9  Edison to help in Edison. And that's
10 where she would go then, Edison. Versus,
11 in Elaine's territory, if I thought that
12 the trainer needed to be in East
13 Brunswick, she would be in East
14 Brunswick.
15     Q.  Okay. Would Eileen -- would
16 you make recommendations to Eileen?
17     A.  Sure.
18     Q.  What was her -- what did you
19 observe as far as her attitude with
20 respect to those recommendations? Was it
21 deferential? Was it combative?
22     A.  Sometimes appreciated.
23 Sometimes thanks, but this is what we're
24 going to do and this is what I think

Page 135

1  needs to be done.
2     Q.  So with respect to the -- I
3  guess it would have been the trainers in
4  Eileen's territory -- well, first of all,
5  let me ask you, had that always been
6  Eileen's practice?
7     A.  Yes.
8     Q.  Even back when you were a
9  director of training?
10    A.  Yes. I think it's important
11 for me to define here because, although I
12 had the title, I was very limited in what
13 I was, let's say, allowed to do. So in
14 an ordinary situation, you would think a
15 director of training, she's totally in
16 charge of her trainers, totally in charge
17 of the training programs, dictated, you
18 know, when you would come in, when you
19 wouldn't, when you would have a training
20 program, when you wouldn't. I didn't do
21 that. She did that and her supervisors
22 did that. I really started doing those
23 types of things when I worked with, when
24 the company -- when I stepped out of the

Page 136

1  GM position and the company sort of was
2  split in half between Elaine and Eileen.
3  I did serve more in that function and
4  capacity with Elaine than I did Eileen.
5  Eileen sort of maintained that philosophy
6  that, hey, the trainers are in the field,
7  they're working with supervisors every
8  day and they need to report to them.
9     Q.  But you're not saying you
10 had no role with respect to the trainers
11 out in the field?
12    A.  No.
13    Q.  I'm sorry. I need to be
14 clear on this. With respect to Eileen
15 Stankunas's territory, you're not saying
16 you had no role with respect to trainers?
17    A.  I didn't have no role. It
18 just wasn't the role you would think a
19 director of training would have.
20    Q.  What was your role in terms
21 of supervising the --
22    A.  Basically --
23    Q.  Let me finish my question.
24    A.  I'm sorry.

Page 137

1     Q.  -- the trainers in Eileen's
2  territory?
3     A.  Basically she wanted me to
4  get them up and running and she wanted me
5  to train them to be, you know, competent,
6  effective trainers for her. Pretty much
7  beyond that, day-to-day requests,
8  day-to-day management came from her
9  regional supervisors.
10    Q.  So is it fair to say that,
11 with respect to day-to-day nuts and bolts
12 of where to go and who to see and what to
13 do, that that -- that Eileen had given
14 that authority to her supervisors?
15    A.  Yes.
16    Q.  Is it fair to say that with
17 respect to issues pertaining specifically
18 to training, that that is something that
19 Eileen had given to you as your
20 responsibility?
21       MR. LANDAU: Object to the
22       form of the question. Do you
23       understand it?
24       THE WITNESS: No, I don't.

Page 262

1    A.   She reported those three
2  performance areas in one conversation,
3  that these were her issues, that she had
4  employees that were in the field not
5  prepared to conduct and feeling competent
6  and comfortable conducting the daily
7  visits, the medical histories and the
8  chart work-ups.
9    Q.   Well, did you ever think to
10 ask Kathy Koch, what are you doing with
11 respect to chart work-ups? I mean, was
12 that ever something that -- do you recall
13 doing that? Do you recall asking her?
14   A.   I believe that Lynne had
15 some coaching sessions. At the point
16 that I got the call, Lynne had told me
17 that she already had these conversations
18 with Kathy and that these things were
19 being corrected.
20   Q.   Okay. But listen to my
21 question. Have you ever had any
22 conversation where you asked Kathy Koch,
23 what are you doing with respect to
24 training people on chart work-ups? I

Page 263

1  know about Lynne.
2    A.   I don't remember.
3    Q.   Okay. Let's talk about
4  medical histories. What was the problem
5  there with medical histories, training on
6  medical histories?
7    A.   The problem, from what I
8  understood, is that the employees leaving
9  Kathy's training program did not feel
10 prepared to conduct medical histories,
11 daily visits, chart work-ups, PEs.
12   Q.   How did you learn of that
13 problem?
14   A.   From Lynne Portlock. And,
15 evidently, I think at one point she had
16 employees put in writing that they
17 weren't prepared, like did a training
18 evaluation, how prepared were you coming
19 out of training class, is there anything
20 that we can do better, something like
21 that. So I had read training evaluations
22 from participants in Kathy's training
23 class.
24   Q.   Okay. Did you personally

Page 264

1  observe Kathy Koch performing training on
2  the issue of medical histories?
3    A.   No.
4    Q.   Did you ever look at a tape
5  of her performing training?
6    A.   No.
7    Q.   Artist's rendering of her
8  performing training?
9    A.   No.
10   Q.   Did you ever ask Kathy Koch,
11 what are you doing with respect to
12 training people on medical histories?
13   A.   I don't remember. I'm sure
14 I would have because, you know, I talked
15 to Kathy about Lynne calling me and
16 having these concerns.
17   Q.   But do you remember
18 specifically sitting here today asking
19 Kathy Koch, how are you training
20 employees on medical histories?
21   A.   I don't remember that. No,
22 I don't remember it.
23   Q.   Did you take any notes of
24 your telephone conversations with Ms.

Page 265

1  Koch?
2    A.   I don't remember if I did or
3  not. Most of the time I did. But I
4  don't remember specifically if I did
5  that.
6    Q.   Most of the time with Ms.
7  Koch or most of the time --
8    A.   In general.
9    Q.   With anybody?
10   A.   Yes.
11   Q.   Where did you keep those
12 notes?
13   A.   I had a notepad, similar to
14 that.
15   Q.   Did you have a procedure for
16 what you did with those notes?
17   A.   No.
18   Q.   Did you ever have
19 circumstances where you took notes of
20 conversations involving allegations of
21 training deficiencies other than Ms.
22 Koch? Do you recall taking notes during
23 any conversation --
24   A.   Yes.

O'brien, Kristi - 08/28/03 - Marci B. Goldshlack

Page 266

```
 1      Q.  -- other than Ms. Koch?
 2      A.  Yes.
 3      Q.  Okay.  What did you do with
 4  those notes?
 5      A.  Well, for a while I'd save
 6  those pads, but then eventually I'd
 7  probably discard them.  If it was a
 8  corrective counseling session, if it was,
 9  you know, something that I felt needed to
10  go into their employee file, I'd put it
11  in their employee file.
12      Q.  Would a training deficiency,
13  would that fall within the category of
14  things that need to go in an employee's
15  file?
16      A.  Yes.
17      Q.  Do you recall putting any
18  notes regarding Kathy Koch in her file?
19      A.  I don't believe I did.
20      Q.  Generally, how long would
21  you keep those notes?
22      A.  Not long.  A couple months.
23      Q.  Did you ever receive any
24  instruction from anybody at the company
```

Page 267

```
 1  that you need to keep all of your notes
 2  regarding Kathy Koch, if any?
 3      A.  No.
 4      Q.  Okay.  So it's fair to say
 5  that, with respect to medical histories
 6  then, that your recollection is that you
 7  got the information on training problems
 8  from Lynne Portlock?
 9      A.  Yes.
10      Q.  Okay.  What specifically was
11  it about the medical history that was
12  Lynne's concern?  Was it what you just
13  talked about with the employees
14  complaining that they were not adequately
15  prepared?
16      A.  Yes.
17      Q.  Well, you mentioned that you
18  reviewed the employee statements?
19      A.  Yes.
20      Q.  Did you talk to the
21  employees --
22      A.  No.
23      Q.  -- who wrote those
24  statements?
```

Page 268

```
 1      A.  No.
 2      Q.  Did you talk to Kathy about
 3  those statements?
 4      A.  I don't remember.
 5      Q.  And you testified earlier,
 6  you never actually went out and looked at
 7  how Kathy Koch was performing the medical
 8  history training, right?
 9      A.  Yes.
10      Q.  As a matter of fact, you've
11  never observed her performing any
12  training, correct?
13      A.  Correct.
14      Q.  So you were relying on what
15  Lynne Portlock was telling you, correct?
16      A.  Correct.  She was her active
17  supervisor.
18      Q.  Did you have other occasions
19  during that time frame where an area
20  supervisor contacted you and said, I've
21  got a problem with a trainer, with their
22  training performance?
23      A.  I don't recall.  No.  Not
24  right now.
```

Page 269

```
 1      Q.  Do you recall any instance
 2  ever of that happening in your entire
 3  career?
 4      A.  Sure.  Yes.
 5      Q.  Okay.  And are those some of
 6  the instances we talked about earlier,
 7  for example, Marci Goldshlack?  That's
 8  what we're talking about?
 9      A.  Yes.
10      Q.  Other than Marci Goldshlack,
11  do you remember any instances of an area
12  supervisor, or a regional supervisor or a
13  general manager, contacting you and
14  saying, got a problem with a trainer,
15  training performance is not good, or
16  words to that effect, there's a problem
17  with her training, other than Ms.
18  Goldshlack and Ms. Koch?
19      A.  Yes.
20      Q.  Okay.  Who are the trainers?
21      A.  One I'm thinking of right
22  now is Laura Terrell.  She was New York.
23  I'd have to think about it.  But, yes,
24  I've received calls in the past about
```