## EXHIBIT A

*2000 U.S. Dist. LEXIS 20002, *

SUSAN SADOWSKI HAYES, et al. v. MAZDA MOTOR CORP., et al.

CIVIL NO. WMN-97-4378

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

2000 U.S. Dist. LEXIS 20002

August 4, 2000, Decided
August 4, 2000, Opinion Filed

**DISPOSITION: [*1]** Plaintiffs' renewed motion to compel the production of witnesses and sanctions granted in part and denied in part.

### CASE SUMMARY

**PROCEDURAL POSTURE:** In plaintiffs' action against defendant motor corporation for alleged defects of defendant's air bags, pending before the court were the award of expenses for the plaintiffs' prior meritorious discovery motions and the adjudication of plaintiffs' renewed motion to compel the production of witnesses and sanctions.

**OVERVIEW:** In action involving alleged defects of defendant's air bags, before the court were the award of expenses for the plaintiffs' prior meritorious discovery motions and the adjudication of plaintiffs' renewed motion to compel the production of witnesses and sanctions. The court stated that defendant's response to discovery requests could only be characterized as obstructionist, deliberately ambiguous and plainly resistant. The court found that defendant still had not discharged its obligations under Fed. R. Civ. P. 30(b)(6), continuing its resistance to producing knowledgeable corporate designees in the areas of inquiry. Thus, a sanction was imposed for defendant's failure to properly and promptly respond to the Rule 30(b)(6) notice. Next, the court found that plaintiffs were denied a corporate designee knowledgeable on three of the four subject areas identified in a previous court order. The court reasoned that it was not sufficient for counsel to "surface" a witness, see what he or she had to say and wait to see the gaps in knowledge and whether opposing counsel kept a close enough score card to "call" opposing counsel on those gaps.

**OUTCOME:** Plaintiffs' renewed motion to compel the production of witnesses and sanctions granted in part and denied in part; court found that plaintiffs were denied a corporate designee knowledgeable on three of the four subject areas identified in a previous court order.

**CORE TERMS:** deposition, designee, depo, discovery, lawsuit, brochure, notice, air bag, airbag, preparation, memorandum, renewed motion, subpoena, driver, engineering, deployment, duty, federal agencies, responsive, fax, hourly rate, knowledgeable, prepare,

legal department, motion to compel, expenses associated, documents relating, designated, deponent, facsimile

**LexisNexis (TM) HEADNOTES - Core Concepts –** ◆ Hide Concepts

http://www.lexis.com/research/buttonLink?_m=6fcef98bfd2157a5043b82434355ab5a&_xfercite=%3ccite%20cc%3d%22USA%22%3e%3c%21%5bCDATA%5b2000%20U.S.%20Dist.%20LEXIS%2020002%5d%5d%3e%3c%2fcite%3e&_butType=1&_butStat=0&_butNum=39&_butInline=1&_butinfo=%3dWEBSSA%2000000445&_fmtstr=FULL&docnum=1&_startdoc=1&wchp=dGLbVtb-zSkAA&_md5=6e8589d5039680fced50e7ef952f3caaCivil Procedure > Discovery Methods > Oral Depositions
*HN1* The Federal Rules of Civil Procedure require that an organization named as a deponent shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify a person so designated shall testify as to matters known or reasonably available to the organization. Fed. R. Civ. P. 30(b)(6).  More Like This Headnote

http://www.lexis.com/research/buttonLink?_m=6fcef98bfd2157a5043b82434355ab5a&_xfercite=%3ccite%20cc%3d%22USA%22%3e%3c%21%5bCDATA%5b2000%20U.S.%20Dist.%20LEXIS%2020002%5d%5d%3e%3c%2fcite%3e&_butType=1&_butStat=0&_butNum=40&_butInline=1&_butinfo=%3dWEBSSA%2000000445&_fmtstr=FULL&docnum=1&_startdoc=1&wchp=dGLbVtb-zSkAA&_md5=b3b839bbcd7781d0c8fd7bae0bd6a2a7Civil Procedure > Discovery Methods > Oral Depositions
http://www.lexis.com/research/buttonLink?_m=6fcef98bfd2157a5043b82434355ab5a&_xfercite=%3ccite%20cc%3d%22USA%22%3e%3c%21%5bCDATA%5b2000%20U.S.%20Dist.%20LEXIS%2020002%5d%5d%3e%3c%2fcite%3e&_butType=1&_butStat=0&_butNum=41&_butInline=1&_butinfo=%3dWEBSSA%2000000807&_fmtstr=FULL&docnum=1&_startdoc=1&wchp=dGLbVtb-zSkAA&_md5=cd6f11616503ff8ed4b0ffb3816bb964Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities
*HN2* A corporation served with Fed. R. Civ. P. Rule 30(b)(6) notice of deposition has a duty to produce such number of persons as will satisfy the request and more importantly, prepare them so that they may give complete, knowledgeable and binding answers on behalf of the corporation. The individual(s) so deposed are required to testify to the knowledge of the corporation, not the individual. It necessarily follows that the corporation has a duty to prepare the designees so that they may give knowledgeable and binding answers for the corporation and that this duty goes beyond matters personally known to the designee or to matters in which that designee was personally involved.  More Like This Headnote

http://www.lexis.com/research/buttonLink?_m=6fcef98bfd2157a5043b82434355ab5a&_xfercite=%3ccite%20cc%3d%22USA%22%3e%3c%21%5bCDATA%5b2000%20U.S.%20Dist.%20LEXIS%2020002%5d%5d%3e%3c%2fcite%3e&_butType=1&_butStat=0&_butNum=42&_butInline=1&_butinfo=%3dWEBSSA%2000000445&_fmtstr=FULL&docnum=1&_startdoc=1&wchp=dGLbVtb-zSkAA&_md5=1db6bfa21909ae27043d92d2f056a521Civil Procedure > Discovery Methods > Oral Depositions
http://www.lexis.com/research/buttonLink?_m=6fcef98bfd2157a5043b82434355ab5a&_xfercite=%3ccite%20cc%3d%22USA%22%3e%3c%21%5bCDATA%5b2000%20U.S.%20Dist.%20LE

XIS%2020002%5d%5d%3e%3c%2fcite%3e&_butType=1&_butStat=0&_butNum=43&_butInline=1&_butinfo=%3dWEBSSA%2000000807&_fmtstr=FULL&docnum=1&_startdoc=1wchp=dGLbVtb-zSkAA&_md5=4f570aa0643552448f544309b625012f Business & Corporate Entities > Corporations > Directors & Officers > Management Duties & Liabilities

HN3 Upon receipt of a Fed. R. Civ. P. 30(b)(6) notice of deposition, the corporation has an obligation to investigate and identify a designee for each listed subject area and produce that designee as noticed. A party cannot "wait and see" what areas the designee might be able to cover. More Like This Headnote

http://www.lexis.com/research/buttonLink?_m=6fcef98bfd2157a5043b82434355ab5a&_xfercite=%3ccite%20cc%3d%22USA%22%3e%3c%21%5bCDATA%5b2000%20U.S.%20Dist.%20LEXIS%2020002%5d%5d%3e%3c%2fcite%3e&_butType=1&_butStat=0&_butNum=44&_butInline=1&_butinfo=%3dWEBSSA%2000000445&_fmtstr=FULL&docnum=1&_startdoc=1wchp=dGLbVtb-zSkAA&_md5=c7f69264afcd6cef5e1ab19b4fbb8e3b Civil Procedure > Discovery Methods > Oral Depositions

HN4 Fed. R. Civ. P. 30 provides that the persons so designated shall testify as to matters known or reasonably available to the organization. Fed. R. Civ. P. 30(b)(6). This language has been interpreted to impose a duty to prepare the witness to be able to provide meaningful information about any designated area(s) of inquiry. More Like This Headnote

**COUNSEL:** Steven A. Allen, Hodes, Ulman, Pessin & Katz, P.A., Towson, Maryland, for plaintiffs.

Michael S. Barranco, Pope & Hughes, Towson, Maryland, for defendants.

Wayne A. Graver, Lavin, Coleman, O'Neil & Ricci, Philadelphia, Pennsylvania, for defendants.

**JUDGES:** Susan K. Gauvey, United States Magistrate Judge.

**OPINIONBY:** Susan K. Gauvey

**OPINION: MEMORANDUM AND ORDER**

Presently pending before this Court are the award of expenses for the plaintiffs' prior meritorious discovery motions and the adjudication of plaintiffs' renewed motion to compel the production of witnesses and sanctions. For the reasons stated below, the Court awards expenses in the amount of $ 13,750.25 for the successful motion for sanctions for failure to produce Fed. R. Civ. P. 30(b)(6) deposition witness, and grants in part and denies in part the plaintiffs' renewed motion.

Discovery in this case has been contentious and prolonged. Discovery began in 1997. The deadline was June 1, 2000. Defendants' response to discovery requests can only be characterized as obstructionist, deliberately ambiguous **[*2]** and plainly resistant. By this Court's delay in resolution of these seemingly endless and complex disputes, the Court has become "part of the problem, rather than part of the solution." Judges, like discovering parties, grow weary of the "strum und drang" of discovery disputes. That does not mean, however, that the Court should abdicate its responsibility to the parties to assure them of the discovery to which they are entitled, without becoming mired in the minutiae and "who

struck John" of the dispute. With this opinion, the Court attempts to resolve all outstanding matters definitively, and establish a short time frame for the additional discovery it orders so as not to endanger the late November trial date.

## I. Background

On June 3, 1999, this Court held a hearing on plaintiff's Motion to Compel Answers to Interrogatories and Responses to First Request for Production of Documents to Mazda Motor Corporation, Inc. n1 (Paper No. 18), and plaintiff Susan Sadowski Hayes' Motion for Sanctions Against Mazda Motor of America for Failure to Produce Fed. R. Civ. P. 30(b)(6) Deposition Witness. (Paper No. 22). On June 4, the parties informed the Court that they had reached agreement **[*3]** as to some of the interrogatories and requests in dispute. (Paper No. 27). On June 11, the Court issued a Memorandum and Order adopting the agreed resolution of the parties as to some of the written discovery dispute and ruling on the remaining dispute. Additionally, the Court ruled that Mazda Motor of America, Inc. d/b/a Mazda North America Operation ("MNAO") had not properly responded to the Rule 30(b)(6) notice and ordered, inter alia, the defendants "to identify a designee for the four subject areas set forth in the plaintiff's reply memorandum n2 . . . and identify a designee for all subject areas identified in the corporate deposition of Kauzyuki Okada . . . if Mr. Okada is unable to answer for the corporation on all identified subject areas." n3 (Paper No. 28). The Memorandum and Order also requested that plaintiffs' counsel submit an affidavit of their fees and other expenses incurred in the motion for sanctions, but observed that the Court would consider defendants' efforts to properly respond to the 30(b)(6) notice in arriving at the amount of monetary sanction. n4 (Paper No. 28, 35-36). Counsel itemized $ 4,050.00 in fees for preparing and taking the deposition of Michael **[*4]** Ray, $ 1,765.10 in expenses for the Ray transcript and $ 6,150.00 in fees for preparation of the motion for sanctions. n5 (Paper No. 30).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 While each plaintiff also served written discovery on Mazda Motor of America and plaintiff Robert Hayes filed written discovery against Mazda Motor Corp., no motion to compel was filed as to this other discovery.

n2 Those subject areas are: (1) The decision as to who should be warned about a latent defect in the Mazda's side air bag; (2) the risks associated with the above described defect; (3) the defendant's communications with federal agencies concerning the deaths of Campo and Greenberg; and (4) lawsuits filed relating to driver's side air bag deployment, by June 18, 1999.

n3 The Rule 30(b)(6) notice included 62 areas of inquiry including a specific request for "all communications, and the content thereof, between Ford Motor Company, Inc., and Mazda Motor from January 1, 1989 to June 22, 1996, referring and/or relating to the Supplemental Restraint System and/or airbag installed and/or used in Mazda Automobiles, including but not limited to the Mazda Miata." (Paper No. 24). **[*5]**

n4 The Court did not invite any submission of attorneys' fees associated with the motion to compel. While many of Mazda's initial responses did not appear to be "substantially

justified," Mazda and plaintiffs did reach agreement on most of the disputes after the hearing and before the Court's ruling. Fed. R. Civ. P. 37(c)(1). In their May 11, 2000, submission, plaintiffs now ask for their expenses associated with the motion to compel. The plaintiffs did not ask for their expenses when the original motion was filed and the Court declined to award expenses in recognition of defendants' (belated) cooperation in resolution of the discovery dispute. (Paper No. 28, 27-28). The Court will not revisit the issue. Expenses are denied.

n5 Later, at the Court's request, plaintiffs' counsel submitted another affidavit, this time with contemporaneous timesheets, purporting to document the expenditure of 20 hours for a total of $ 4,700 in fees for himself and 35.2 hours for $ 5,632 in fees for his associate for the preparation of the motion for sanctions and additional fees for the hearing and related work. (Paper No. 59). In figuring fees, the Court utilized the later submission as it was based on contemporaneous timesheets. This later submission also requested $ 2,485.71 in expenses for the California trip to attend the corporate designee's deposition and other items which will be discussed later.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*6]**

Thereafter, the depositions were taken of Deborah Hjelstrom, as MNAO corporate designee, and Kauzyuki Okada, as Mazda Corporation's ("MC") corporate designee and MNAO corporate designee on several subjects.

On July 6, 1999 plaintiffs submitted a renewed motion to compel the production of witnesses and for sanctions, arguing that the defendants had violated the Court's June 11 Order by failing to produce in the persons of Ms. Hjelstrom and Mr. Okada, or otherwise, a corporate designee with knowledge of the designated subject areas. (Paper No. 34). Plaintiffs sought entry of a default judgment, or, in the alternative, entry of an order requiring defendants to produce responsive witnesses at defendants' expenses and awarding plaintiffs' fees and other expenses incurred in filing the renewed motion and taking the subsequent depositions. (Id.)

A telephone hearing was held on the renewed motion on September 1, 1999. The Court requested additional information from plaintiffs, which was provided. Subsequent letter submissions to the Court detail plaintiffs' continued complaints regarding defendants' failure to provide discovery, their attempts to locate the information from third parties **[\*7]** and defendants' responses. (Paper Nos. 47, 49, 50, 51, 52, 61, 62, 63 and 64). At the request of defendants, an additional telephone hearing was held on May 16, 2000.

For the reasons set forth below, the Court awards some expenses associated with the original motion for sanctions and grants in part and denies in part the renewed motion, but declines to award fees and expenses associated with the renewed motion with one exception, at this time.

## II. Initial Motion for Sanctions Against Mazda Motor of America for Failure to Produce Fed. R. Civ. P. 30(b)(6) Deposition Witness -- Award of Expenses and Sanctions

The Court awards plaintiffs' counsel's fees for preparation and argument of the original motion for sanctions, but declines to award all the fees for preparation and taking of the Ray deposition, because, as defendants note, "the preparation was directed to MNAO's corporate

designee(s) regardless of the identity of witnesses . . . and was utilized in the deposition of Linda Thomas the day after the Ray deposition." (Paper No. 33, 2). Nonetheless, MNAO's failure to marshal its designees in a timely fashion, undoubtedly resulted in considerable wasted effort on plaintiffs'  **[*8]**  part. Accordingly, the Court awards 75% of the value of the time devoted to the preparation and taking of the Ray deposition, $ 3,780, or $ 2,835.

Likewise, the Court denies the request for the entire cost of the Ray transcript, as some useful information was obtained, inter alia, regarding one of the brochures and the roles of various members of the Mazda organization in brochure development. Nevertheless, the Court awards 75% of such transcript costs, $ 1,323.75. The Court denies the request for travel expenses for the California depositions in June in its entirety for two reasons: (i) no itemization or documentary backup is provided for the $ 2,485.71 in expenses; and, (ii) plaintiffs' counsel was able to review documents at Foote, Cone & Belding's offices as well as take the depositions of Mr. Ray and Ms. Thomas, yielding useful information regarding the brochures.

Finally, as to the request for fees for preparation of the motion for sanctions, the Court grants fees of $ 8,511.50. Plaintiffs' counsel has submitted affidavits and contemporaneous timesheets detailing his and associate's credentials, and documenting his expenditure of 18.7 hours in preparation of the motion **[*9]** at his standard hourly rate of $ 235 an hour together with his associate's expenditure of 29.9 hours at his standard hourly rate of $ 160. Based on the Court's independent analysis of the time spent in light of the written motion papers, see generally Poole v. Textron, 192 F.R.D. 494 (D. Md. 2000), the Court finds that much of the time expended was reasonable and related to the sanctions motion, and, therefore, awards $ 225 per hour for all of plaintiffs' counsel's work and $ 160 per hour for 25.1 hours of his associate's work. n6 The Court also awards the time documented on Attachments 4 and 5 to plaintiffs' counsel's May 11, 2000 affidavit, at the same hourly rates, for time associated with the hearing of the motion -- $ 787.50 and preparation of the initial affidavit -- $ 292.50 -- for a total of $ 1,080.00.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n6 The Court eliminated 4.80 hours of plaintiff's counsel's associate's work as related to the motion to compel, for an intra office conference, as duplicative of plaintiffs' counsel's work or billing.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*10]**

While not by their terms applicable to attorneys' fees petitions in discovery disputes, the Rules and Guidelines for Determining Lodestar Attorneys' Fees in Civil Rights and Discrimination Cases of this Court (Appendix B to the Local Rules of the District of Maryland) provide a presumptively reasonable range of hourly rates in civil rights and discrimination cases. n7 As a 1975 law school graduate with extensive experience in products liability and other complex litigation, the Court finds an hourly rate of $ 225 for plaintiffs' counsel's services reasonable under the Guidelines and in line with the usual and customary hourly rate for products liability litigation in the Baltimore area. See e.g. Poole, 192 F.R.D. 494. Similarly, as a 1995 law school graduate with commensurate experience in products liability and other complex litigation, the Court finds an hourly rate up to $ 160 reasonable for Mr. Bathon's services under the Guidelines and in line with the usual and customary hourly rate for product liability litigation in the Baltimore area. See id. Consideration of the other relevant factors, that is, "the minimum to deter"; "the ability to pay"; and "factors **[*11]**

related to the severity of the Rule . . . violation," confirms that an award of this amount is appropriate. In re Kunstler, 914 F.2d 505, 522-23 (4th Cir. 1990).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n7 The guidelines provide the following presumptively reasonable hourly rates:
$ 135-$ 170 - attorneys with less than eight years experience
$ 190-$ 225 - attorneys with greater than eight years experience

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

First, in order to deter, a sanction amount must be large enough to give the party pause and discourage future misconduct. Second, the wealth and resources of both defendants n8 does not suggest a lesser monetary sanction than the reasonable expenses necessitated by defense's discovery misconduct. Moreover, there has been no suggestion of any inability of defense counsel or their firms to pay if a monetary sanction was awarded against them personally or their firms. n9 Finally, consideration of the severity of the violation as discussed above, does not suggest any deviation from an award of the reasonable expenses previously **[*12]** determined. Mazda utterly failed its obligations under Fed. R. Civ. P. 30(b)(6) initially.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n8 According to Hoover's Online, Mazda Motor Corporation had over $ 17,271 (mil) in sales in 1999 and $ 325 (mil) in net income in 1999. See Mazda Motor Corporation capsule (visited 7/12/00) <http://www.hoovers.com/co/capsule/0/0,2163,41860,00.html>. MNAO is a subsidiary of MC and controls the U.S. research and development sales and marketing and customer parts and service of Japan based Mazda Motor. Id.

n9 Defendants' counsel is a partner at Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray, a Philadelphia based firm, with offices in New Jersey and New York, to which the Martindale-Hubbell Law Directory has given its highest rating, AV. See Martindale-Hubbell Law Directory, Practice Profile Section (2000). Defendants' local counsel is a member of a smaller, but still AV-rated firm in Baltimore. See id.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

As set forth below, Mazda still has not discharged its obligations under Fed. R. Civ. P. 30(b)(6), **[*13]** continuing its resistance to producing knowledgeable corporate designees in the areas of inquiry. Accordingly, Mazda's conduct after the June 11 Memorandum and Order does not counsel a reduction in the monetary sanction.

Thus, the sanction of $ 13,750.25 in expenses is imposed for the defendants' failure to properly and promptly respond to the Rule 30(b)(6) notice, as found in the Court's earlier Memorandum and Order. (Paper No. 28).

HN1 The Federal Rules of Civil Procedure require that an organization named as a deponent

"shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify . . . a person so designated shall testify as to matters known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6).

Thus, _HN2_ a corporation served with a Rule 30(b)(6) notice of deposition has a duty to "produce such number of persons as will satisfy the request [and] more importantly, prepare them so that they may give complete, knowledgeable and binding answers on behalf of the corporation." Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126 (M.D.N.C. 1989). [*14]  Accord U.S. v. Taylor, 166 F.R.D. 356, 360 (M.D.N.C. 1996). The individual(s) so deposed are required to testify to the knowledge of the corporation, not the individual. Taylor, 166 F.R.D. at 361. See also SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992) (holding that Rule 30(b)(6) designees need not have first-hand knowledge of the events in question, but if designated must be adequately prepared to field and answer such questions). It necessarily follows that the corporation has a duty "to prepare the designees so that they may give knowledgeable and binding answers for the corporation" and that this duty "goes beyond matters personally known to the designee or to matters in which that designee was personally involved." Taylor, 166 F.R.D. at 361.

_HN3_ Upon receipt, the corporation has an obligation to investigate and identify a designee for each listed subject area and produce that designee as noticed. A party cannot "wait and see" what areas the designee might be able to cover as defendants did here. Such an approach results in delay and expense. By virtue of the investigation, counsel should know in what subject [*15]  areas a particular designee is competent to testify. Review of the Ray deposition demonstrates that he, MNAO's only designee (until the morning of his deposition), had little knowledge of any of the 27 subject areas. Indeed, plaintiffs' counsel laboriously questioned Mr. Ray as to his knowledge of the 27 subject areas, and with the possible exception of subject area nos. 22 and 25, he disclaimed any knowledge. See Paper No. 47, Ray depo., 127-130, 146, 155, 160-61, 164-65, 167-8, 187-189, 195-202. A second designee, Ms. Thomas, was offered only on the morning of Mr. Ray's deposition and only as a result of plaintiffs' counsel's efforts to locate her. n10 Ms. Thomas could only speak knowledgeably for MNAO on the 1993 and 1995 brochures -- just one of the 27 subject areas. (Paper No. 47, Thomas depo., 9-10). Her preparation was limited to a review of the two brochures and looking through Ms. Hjelstrom's file (Id., Thomas depo., 202-203). For these reasons, the Court previously found that the defendants failed in their duty under Fed. R. Civ. P. 30(b)(6) in its initial response to the corporate notice and now awards expenses, as set out above.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n10 MNAO strangely offers in its defense that "Ms. Thomas later agreed to serve as a corporate designee after MNAO's counsel met with her the evening prior to Mr. Ray's deposition." (Paper No. 33, 1 and n.1). This eleventh hour identification is damning rather than exonerating as a further demonstration of lack of defense diligence.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*16]**

### III. Renewed Motion to Compel Production of Witnesses and For Sanctions

At the Ray deposition, promises were made to produce other designees -- Ms. Hjelstrom and Mr. Okada at a future date. In the Court's Memorandum and Order dated June 11,

1999, the Court ordered defendants, "as a partial remedy for the [30(b)(6)] failure," to "identify a designee for the four subject areas set forth in plaintiffs' reply memorandum . . . and to identify a designee for all subject areas identified in the corporate deposition of Kauzyuki Okada . . . " (Paper No. 29 at 11). Those depositions have now been completed. The Court has read the depositions of all the MC and MNAO corporate designees (Ray, Thomas, Hjelstrom and Okada).

Plaintiffs complain in their renewed Motion to Compel the Production of Witnesses and for Sanctions that neither Ms. Hjelstrom nor Mr. Okada were prepared to testify on the subject matters identified in the Court's June 11, 1999 Memorandum and Order or in the MC corporate deposition notice. (Paper No. 34). That is not quite correct.

Defendants take the position that the production of Ms. Hjelstrom and Mr. Okada discharged their obligation under Fed. R. Civ. P. **[\*17]** 30(b)(6) and this Court's June 11, 1999 Order, explaining that there are "issues on which responsive information is no longer available except through counsel within the defendant corporations and [that] many of the issues on which plaintiffs now complain the Mazda witnesses were unprepared, were never the subject of actual questions posed at the deposition." That is also not quite correct. (Paper No. 37 at 2).

The Court finds fault on both sides. Defendants, rather than affirmatively "identifying a designee for the four subject areas set forth in plaintiffs' reply memorandum and . . . for all subject areas identified in the corporate deposition of Kauzyuki Okada" as ordered to do, resisted a clear definition of subjects to be covered by each deponent. Moreover, on subjects for which a deponent was offered or on subjects which he or she had some knowledge, that knowledge was limited, often based only on personal knowledge gained in the course of his or her job duties, rarely the result of any evident preparation or gathering of information to enable a comprehensive answer for the corporation. The defendants chide plaintiffs' counsel for expecting defendants' counsel "to predict **[\*18]** what their witness may or may not be able to address" (Paper No. 37 at 4). But, that, indeed, is what the Court order (and Rule) contemplate. The Court does not approve of a "hands off" approach to the production of witnesses for a corporate deposition. It is not sufficient for counsel to "surface" a witness, see what he or she has to say and wait to see the gaps in knowledge and whether opposing counsel keeps a close enough score card to "call" opposing counsel on those gaps. For their part, however, plaintiffs' counsel failed to methodically question each deponent, especially Mr. Okada, on the subject areas that he or she was prepared to testify, and carefully follow up on each subject area and each answer exhausting the deponent's knowledge.

The Court finds that the defendants continue to fail to comply with their duties under Rule 30(b)(6). Specifically, plaintiffs are denied a corporate designee knowledgeable on three of the four subject areas identified in the June 11, 1999 Order.

Each of these four subject areas will be discussed in turn.

## A. June 11, 1999 Order: Four Subject Areas

### 1. The decision as to who should be warned about a latent defect in the Mazda's side airbag  **[\*19]**  (airbag brochure distribution)

Mr. Ray was the first (and until the evening before his deposition, the only) MNAO corporate designee who offered some useful testimony on the relevant airbag brochures. His involvement, however, began with the 1998 airbag brochure. (Paper No. 47, Ray depo.,

175-76).

Ms. Thomas was offered on the 1993 and 1995 airbag brochures (Paper No. 47, Thomas depo., 9-10). But she had no recollection of any discussion regarding distribution to existing owners or any suggestion from Mazda Motor Corp regarding to whom the brochure should be sent. (Paper No., Thomas depo., 174; 243). While she was able to discuss the process of review and development, at least in part, she had no memory of distribution considerations. She was able to name others involved in the brochure development and distribution process, but she had not spoken with them to allow for a full response on the subject. While Ms. Thomas offered some testimony on the decision making regarding the content and distribution of the airbag brochure, it was limited to the 1993 and 1995 brochures and was incomplete even as to those brochures. It is clear from reading her deposition that Ms. Thomas did not **[*20]** prepare herself to speak on anything but her personal recollection as to the 1993 and 1995 brochures. (Paper No. 47, Thomas depo., 202). n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11
Q: Prior to coming to your deposition today, what did you do, if anything, to prepare yourself to testify?
A: I looked at a copy of -- I don't remember which one it was. It was either the '93 or '94 brochure that Mr. Barranco had given to me so I could refresh my memory. That was pretty much it. (Paper No. 47, Thomas depo., 202). Also she had reviewed Ms. Hjelstrom's file (Paper NO. 47, Thomas depo., 203).


Moreover, Mr. Ray, still with the company, made no effort to locate drafts, memoranda, etc. related to the 1993 or 1995 air bag brochures. (Paper No. 47, Ray depo., 94-96).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Ms. Hjelstrom was offered in a number of subject areas, but spoke most authoritatively on the 1996 airbag brochure. While she could identify a number of others within Mazda, especially MC, who had a role in brochure development, content and distribution, she could not describe their **[*21]** respective input and had not spoken with any of them in preparation for her deposition. (Paper No. 47, Hjelstrom depo., 9-10). n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12
Q. . . . what have you done as the corporate designee of Mazda North America to prepare for your deposition today?
A. I reviewed some of the documentation that was submitted as evidence that was in my control and met with our attorneys to just get a little bit familiar with the case.

(Paper No. 47, Hjelstrom depo., 9-10).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Notably, the defendants have produced no documents at the corporate depositions nor in

response to written discovery requests on this subject. n13 See Paper No. 47 at 2.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n13 None of the corporate designees testified to any inquiry for responsive documents outside their own offices or outside other departments of MNAO (Hjelstrom depo., 9-10); (Thomas depo., 102). Moreover, Ms. Thomas' files were not located. Mr. Barranco stated that he would "double check" that a review of legal department files had been made for relevant documents. (Thomas depo., 102). The record is silent as to whether such a review was done.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*22]**

The defendants shall file an affidavit of all efforts (past and as a result of this order) to locate responsive documents on airbag brochure development, content and distribution; those efforts shall include inquiry of David Orr, Tim Connelly and Mr. Gatsubo.

It is apparent from reading the defendants' designees' depositions that David Orr and, to a lesser extent, Tim Connelly of the legal department or a Mr. M. Gatsubo would be in the best position to testify as to all the relevant air bag brochures, both their content and distribution. (Paper No. 47, Hjelstrom depo., 20-21, 120; Thomas depo., 103, 119-120, 198-99.)

Accordingly, the Court orders the defendants to make available a corporate designee who shall be fully prepared regarding the decision as to who should be warned about a latent defect in the Mazda driver's side air bag, at a time and place convenient to plaintiffs' counsel, no later than September 15, 2000.

## 2. The risks associated with the above described defect

Having reviewed the questions posed and answers given, the undersigned finds the Mazda defendants have met their obligation under Rule 30(b)(6).

## 3. The Defendants' Communications With Federal Agencies  [*23]  Concerning the Deaths of Campo and Greenberg

Regrettably, plaintiffs' counsel neither specifically asked whether Mr. Okada was offered as the corporate designee on this subject nor posed any direct question on Mazda's communications with federal agencies regarding the deaths of Campo and Greenberg. However, from Mr. Okada's answers to questions in the general subject area (Paper No. 47, Okada depo., 187-195), it is reasonably clear Mr. Okada was not in a position to serve as corporate designee on this subject. n14 First, Mr. Okada is an engineer, working in MC's Safety Testing and Research Group in Japan. Second, Mr. Okada testified that MNAO (particularly the then Washington office) was the conduit between MC and the NHSTA regarding safety issues (Paper No. 47, Okada depo., 159, 187) and he (Mr. Okada) "didn't have anything to do with them [the individuals in the Washington office, doing safety work] because there was no engineering going on, there was no talk of engineering." (Paper No. 47, Okada depo., 194-195).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 From plaintiffs' counsel's careful inquiry of Ms. Hjelstrom at the outset, it was fairly clear that she was not offered on the subject. (Paper No. 47, Hjelstrom depo., 17-18). plaintiffs' counsel did not ask Hjelstrom about the communications with federal agencies regarding the death of Campo and Greenberg. Given her position in marketing (Paper No. 47, Hjelstrom depo., 53) and defendants' counsel's proffer of her areas of testimony (Paper No. 47, Hjelstrom depo., 6-7), it is reasonably clear that Ms. Hjelstrom was not prepared on this subject. Thus, Ms. Okada was the only other corporate designee possibly offered at that time to cover the subject. Defendants' counsel did not proffer all of Mr. Okada's areas of testimony during the deposition.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*24]**

## Campo Death

Counsel for Mazda represented at the beginning of the Okada deposition that Mr. Okada "probably" would not be able to testify as to "how [Mazda] found out [about the Campo accident], who investigated it, but he will be able to talk about in part [the results of the investigation]" (Paper No. 47, Okada depo., 10) (emphasis added). As to "how Mazda found out and who conducted the investigation," defendants' counsel advised plaintiffs' counsel that "we'll deal with that later." (Id.)

As to the Campo accident, Mr. Okada denied in the deposition knowledge about the incident involving Mr. Campo including the NHSTA report.
Q. Do you know anything about -- as we sit here today, do you know anything about the incident involving Mr. Campo?

A. At the present time I can't recall much about this left hand accident.

Q. Do you know whether Mazda or any department of Mazda conducted any investigation regarding Mr. Campo's incident?

A. I don't know.


(Paper No. 47, Okada depo., 190-191).

In its memorandum in opposition to the renewed motion, Mazda states that this response should have generated more questions from plaintiffs' counsel **[*25]** which would have resulted in a "technical analysis of vehicle's performance in the crash." (Paper No. 37 at 6). Mazda's position is untenable, given Mr. Okada's other answers. In the Okada deposition, plaintiffs' counsel referred the witness to a NHTSA report (plaintiffs' exhibit no. 7 to the deposition which referenced both the Campo and Greenberg accidents) and asked about his "familiarity with the accidents that are described in this report." Mr. Okada answered "I don't recall for sure, but I seem to have a recollection that our department was acquainted with one of them, but I am not even certain about that." (Paper No. 47, Okada depo., 189-190) (emphasis added). And in answer to further questions, he answered that that "one" "was the Greenberg case." (Id.)

## Greenberg Death

As to Greenberg, Mr. Okada did answer as to some investigation among his department, the

legal department, and the environmental and safety engineering department, but offered no details. n15 He stated after a meeting of his department, the legal department and perhaps the environmental and safety engineering, a conclusion was reached as to whether there was a problem. (Paper No. 47, Okada **[*26]** depo., 192). Surprisingly, plaintiffs' counsel did not ask what that conclusion was nor did he ever certify a question regarding the privileged status of the conclusions of the group.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n15 Q. Did your department conduct any investigation related to the Greenberg incident?

A. I believe what happened was having seen photographs and circumstances related to an investigation carried out in the United States, we had discussions with other relevant departments as to whether or not there was a problem with the automobile.
Q. What other departments do you recall discussing this with?
A. That would be the Legal Department.
Q. Any other departments besides Legal?
A. I have a feeling that the Environmental and Safety Engineering Department would have been present, but I'm just not sure about that.

* * *
Q. With respect to the Greenberg incident, did you - did your department come to any conclusions after its meetings with the Legal Department and with Environmental Safety and Engineering as to whether there was a problem?
MR. GRAVER: This is an area where I have to interject an objection. And I think it would be appropriate for me to consult with the witness as to whether or not any privilege may be implicated here because it was a meeting with the Legal Department.
MR. POVERMAN: My only question was whether they came to a conclusion, so he can answer yes or no.
MR. GRAVER: That's fine. He can answer.
THE WITNESS: Could I have the question again?

Q. (BY MR. POVERMAN, continuing) Certainly. Following your meetings with the Legal Department and Environmental Safety and Engineering, did you come to any conclusions as to whether there was a problem?
MR. GRAVER: And I'll instruct you you can answer yes or no at this point, but don't go into any details yet because we may have to consult on that.
THE WITNESS: I think a conclusion was reached.
Q. (BY MR. POVERMAN, continuing) Was any action taken as a result of that conclusion, again, yes or no?
MR. GRAVER: Same instruction. You can say yes or no.
MR. POVERMAN: That's what I asked him. I asked him to say only yes or no.
THE WITNESS: No.
MR. GRAVER: Off the record.

(A discussion was held off the record and a break was taken.)
(Paper No. 47, Okada depo., 190, 191-192). (emphasis added)


After the break, Mr. Poverman turned to a different subject, never asking what conclusion had been reached. The record is silent as to the subject of the "off the record" discussion. Presumably, it was a conference between Mr. Graver and his client.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*27]**

In its memorandum in opposition to plaintiffs' renewed motion to compel, Mazda states that regarding the Greenberg accident Mr. Okada was prepared to discuss "exactly what was reviewed, how Mazda reacted to the information received about their accident, what conclusion or conclusions were reached, who reached said conclusions and why those conclusions resulted in no action taken . . ." (Paper No. 37, 7). Defense counsel's assurances of the clarity and comprehensiveness of Mr. Okada's answers to questions on the findings of the Greenberg investigation if he had only been asked, appear optimistic in light of the tentative nature of Mr. Okada's answers in general. However, defense counsel is correct that for whatever reason, plaintiffs' counsel failed to complete this line of questioning on the Greenberg investigation. n16

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -


n16 Plaintiffs' counsel may have been distracted, as after Mr. Okada answered that Mazda took no action as a result of its conclusion after the Greenberg investigation, defendants' counsel asked to go "off the record," and then there was a break. Or perhaps more likely, plaintiffs' counsel assumed from defendants' counsel's objections and prior instructions, that the conclusions were privileged.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*28]**

While defendants' counsel did not assert an attorney-client or work product privilege on the record as this question was never posed; his objections, instructions and remarks as to the questions involving the investigation certainly would have left plaintiffs' counsel with the strong impression that this was an area about which he was not going to allow inquiry. See Paper No. 47, Okada depo., 191-192. However, at the end of the day it is plaintiffs' counsel's obligation to ask the questions and if an objection and instruction not to answer is asserted, to make a record and to seek a Court ruling on the discoverability. While defendants now vigorously assert Mr. Okada was offered to testify on how Mazda found out about the Greenberg accident and who investigated it and communications with federal agencies on the accident, nothing in defendants' counsel's proffer at the beginning of the deposition, or Mr. Okada's answers support that view.

Thus, the Mazda must produce a witness to testify to communications with federal agencies regarding the deaths of Randy Campo and Donna Greenberg and investigation of the deaths and subsequent claims. Mr. Okada easily identified the Mazda employees **[*29]** in charge of NHSTA and Mazda communications (Paper No. 47, Okada depo., 158-159). In preparing for his deposition, there was no suggestion that he spoke with them or reviewed any documents to be able to provide a full response for the corporation. His testimony about the single NHSTA-Mazda document was halting; he seemed unclear as to whether he even saw the final document. (Paper No. 47, Okada depo., 188-190). Accordingly, the Court orders Mazda to identify a corporate designee to speak about the Mazda communications with federal agencies including NHSTA, whether it is Mr. Nakatsuka, Mr. Strassburger or someone else who can be prepared to speak fully for the corporation on this subject, and make that corporate designee available for a deposition at a time and place convenient to plaintiffs, no later than September 15, 2000. See Poole, supra; Marker v. Union Fidelity Life Insurance Co., 125 F.R.D. 121, 126 (M.D.N.C. 1989). The designees thus far produced were

not sufficiently knowledgeable about the investigations of these two accidents and communications with federal agencies about them. If defendants fail to produce a corporate designee fully prepared **[\*30]** and knowledgeable as required by the Rule, precedent and this Memorandum and Order, the Court shall impose all reasonable attorneys' fees associated with the renewed motion to compel and will consider, under Fed. R. Civ. P. 37(b), imposition of additional sanctions by way of a fine, limitation of presentation of evidence or other remedy for willful violation of this Court's order.

Notably, the only document produced on Mazda-federal agency communications on these two fatal accidents is the December 22, 1995 letter from Mazda to NHSTA. (Paper No. 47, 2). As plaintiffs also note, no documents have been produced relating to how and when MNAO received information about the incidents and what information was obtained." (Id.) The defendants shall file an affidavit of all efforts (past and as a result of this order) to locate responsive documents on Mazda-federal agency communications concerning deaths of Campo and Greenberg no later than September 1, 2000; those efforts shall include inquiry of Messrs. Nakatsuka and Strassburger for responsive documents.

## 4. Lawsuits Filed Related to Driver's Side Airbag Deployment

The history of defendants' response to plaintiffs' written discovery **[\*31]** on the subject of prior lawsuits and claims is instructive of defendants' approach to discovery. Initially, defendants refused to produce any information about lawsuits and claims unless the lawsuit or claim had "the same allegations that plaintiff is making." In other words, MC has conducted a reasonable search of its business records and found no lawsuits or claims alleging that an air bag in a 1990 Miata involved in a frontal collision properly deployed but was defective in design or operation, or that the force of the deploying airbag was too great, or that MC failed to provide proper warnings related to the air bag resulting in personal injuries to the driver." (Paper No. 28 at 1) (emphasis added).

Thereafter, the defendants agreed to broaden their response to "all lawsuit and claim information relating to the Miata for model years 1990 through 1997." That definition yielded a handful of cases. The day after the hearing on plaintiffs' motion to compel, the defendants agreed to provide the information "as to all Mazda vehicles for the period 1990 through the date of the accident." (Paper No. 28, 11). That definition yielded 123 cases.

On the day of the Hjelmstrom deposition, **[\*32]** pursuant to court order, Mazda produced lawsuit and claim documents regarding injuries allegedly caused by airbag deployments. Plaintiffs' counsel asked whether Ms. Hjelstrom "is going to be talking about the claims?" (Paper No. 47, Hjelmstrom depo., 25). Defendants' counsel answered:
Other than provide information from her knowledge as to the fact that these were collected, and I can make the representation as well, that these were collected at my request and produced here today, she is not going to be able to provide - depends on what you want to know about them.

Plaintiffs' counsel: Alright. What you're saying is she can tell me that you asked to have them collected, but beyond that that's pretty much it?

Defendants' counsel: We'll have to wait and see what you ask. There is a possibility she may have some information, there is a possibility she won't have any. I don't know what you are going to ask.

Plaintiffs' counsel: Well can you tell me what it is she knows about these so we are not here until Friday?

Defendants' counsel: She has not reviewed these documents.

(Id.).

This kind of verbal jousting is unacceptable. While Fed. R. Civ. P.  **[*33]**  30(b)(6) only suggests, but does not mandate that a corporation "set forth, for each person designated, the matters on which the person will testify," id., it does not sanction such gamesmanship. Moreover, given the Court's finding of Mazda's failure to discharge its duty under Fed. R. Civ. P. 30(b)(6) and its affirmative language in the June 11, 1999 Memorandum and Order n17, the Court expected that defendants would have laid out - at a minimum - for which subjects Ms. Hjelstrom, as opposed to Mr. Okada, was offered to testify. Defense counsel did not do so. Instead, defendants' counsel engaged in a "cat and mouse game."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n17
The defendant shall name and make available for deposition, at the convenience of the plaintiff and at the expense of the defendant, corporate designee(s) that have knowledge of (1) the decision as to who should be warned about a latent defect in the Miata's driver's side air bag; (2) the risks associated with the above described defect; (3) the defendant's communications with federal agencies concerning the deaths of Campo and Greenberg; and (4) lawsuits filed relating to driver's side air bag deployment by June 18, 1999.
The defendant shall identify a designee for any subject areas identified for the Corporate Deposition Notice of Mazda Motor Corporation about which Mr. Okada is unable to answer by June 18, 1999.

(Paper No. 28). (emphasis added).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*34]**

As to the 123 complaints and notices, defendants are absolutely correct that plaintiffs' counsel never posed a question to Mr. Okada concerning this subject area. At the outset of the Hjelmstrom deposition, plaintiffs' counsel took a workmanlike approach and established the areas for which Mazda was offering Ms. Hjelmstrom as well as established for the record the nature of the preparation she had made for the corporate deposition. It is understandable that plaintiffs' counsel did not think he would cover lawsuits and claims because Mr. Okada had been touted as the expert in safety, design and engineering issues. For whatever reason, plaintiffs' counsel did not engage in the same careful inquiry in the Okada deposition sessions. n18

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n18 Reading the depositions, there was considerable contentiousness between defendants' counsel and plaintiffs' counsel. Defendants' counsel did object to a large number of questions and perhaps more critically plaintiffs' counsel believed that his stay in California was unnecessarily prolonged by counsel's actions. Apparently there was some miscommunication as to the starting time of Ms. Hjelmstrom's deposition, in plaintiffs' counsel's opinion, wasting much of the day.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*35]**

Nonetheless, discovery cannot be reduced to a game. While in their opposition, defendants assert that Mr. Okada was prepared to discuss "this issue," (Paper No. 37 at 16-17), the Court has no confidence in this assertion in light of the tentative and limited knowledge Mr. Okada had in subject areas where defendants also indicate his preparation. Moreover, the defendants' assertion that Mr. Okada was fully prepared to speak on subjects about which he did not have knowledge in the course of his engineering duties, including some 123 claims and lawsuits produced just the day before (and apparently collected by counsel), borders on the absurd. Defendants' counsel's "noted for the record that Mr. Okada can read some English, but he has some difficulty in doing so." (Paper No. 47, Okada depo., 154-155). When plaintiffs' counsel referred to one document, the interpreter had to translate the document word for word for Mr. Okada, before he answered any questions. (Okada depo., 155). Moreover, his spoken English is such that he required an interpreter for the deposition. That he is the appropriate or competent designee to discuss some 123 complaints/claims gathered by counsel and written in **[*36]**  English strains credulity. Finally, there was no evident preparation of Ms. Hjelstrom or Mr. Okada to address topics about which they lacked personal knowledge, and their knowledge on any topic was limited to their personal knowledge, with few exceptions. Accordingly, the defendants shall make available a fully prepared corporate designee on the 123 claims and lawsuits, including Greenberg and Campo and including specifically when those two accidents came to the attention of the defendants, at a time and place convenient to plaintiffs' counsel, but no later than September 15, 2000.

While defendants have suggested that the only individuals who may be able to address some of these areas are members of the General Counsel's office of Mazda, that fact does not preclude the identification of counsel as corporate designee. While privileged information, of course, need not be revealed in any such deposition, longstanding members of a General Counsel's office are in a unique position to pull together and prepare themselves for deposition in areas such as at issue here. The mere fact of a law degree or membership in the General Counsel's office does not, of course, in and of itself make that **[*37]**  individual inappropriate as a designee or indeed shield his or her knowledge automatically from inquiry. See Fed. R. Civ. P. 30(a)(1) ("A party may take the testimony of any person ..."); N.F.A. Corp. v. Riverview Narrow Fabrics, Inc., 117 F.R.D. 83 (M.D.N.C. 1987).

The Court agrees with plaintiffs that "there is nothing in the Federal Rules which prohibits defendants from designating someone from the respective defendant's corporate counsel's office to respond to the rule 30(b)(6) notices." (Paper No. 39 at 3-4). The Court also agrees with plaintiffs that "how, what and when the defendant corporations acquired this information relating to two confirmed deaths caused by driver's side airbags in 1992 and 1993 is not protected by the privilege; these matters do not involve the rendering of legal advice." (Paper No. 39, 2-3).

Finally, the Court agrees with plaintiffs that any questions or privilege can be addressed one-by-one if a Mazda lawyer is produced as a designee. The Court will make itself available during any depositions if that will facilitate a speedy resolution.

Because the Court has concluded that plaintiffs' counsel was responsible for the failure **[*38]**  to completely and aggressively cover some of these areas at deposition (but recognizing that defendants did not affirmatively proffer areas of testimony, preferring the

cloak of ambiguity), no award will be made for any expenses associated with the renewed motion nor expenses associated with the further deposition(s). This Court is of the view that all parties, as well as the integrity of the discovery process is better served when there is complete mutual understanding as to those subject areas for which a particular designee is being offered. However, Fed. R. Civ. P. 30(b)(6) does not require such specificity. Compare Rule 30(b)(6). ("The organization so named shall designate one or more offices, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.") (emphasis added). The Court's Order of June 11, 1999 did, however, direct defendants, "as partial remedy for the failure [under Fed. R. Civ. P. 30(b)(6)] . . . to identify a designee for the four subject areas set forth in plaintiffs' reply memorandum . . . and to identify a designee for all subject areas **[*39]** identified in the corporate deposition of Kauzyuki . . ." Because the Court had just found a failure of duty under Fed. R. Civ. P. 30(b)(6), defendants should have been absolutely scrupulous in the remaining depositions. They were not. Therefore, the Court orders the defendants to produce, no later than September 15, 2000, a fully prepared corporate designee on the issue of lawsuits and claims filed relating to driver's side air bag deployment, including the Campo and Greenberg accidents, and including when and how each defendant learned of the Campo and Greenberg claims or accidents.

## B. Other Alleged Failures in Discovery

In their later submissions, the plaintiffs ask the Court to award them the costs of obtaining from third parties documents that defendants should have provided to them in discovery: the TM Claims - Mazda documents on the Campo and Greenberg accidents and the Ford Co. documents. The Court will address each in turn.

### 1. TM Claims - Mazda: Notice to Mazda of Campo & Greenberg Accidents

Plaintiffs' request for, and entitlement to this discovery is beyond dispute.

On or about May 12, 1998, plaintiff Susan Hayes served document requests on Mazda **[*40]** Motor Corp. seeking, inter alia, all "documents relating or referring to any lawsuits and/or claims." (Paper No. 47 at Ex. 4). At about the same time, plaintiff Susan Hayes filed an interrogatory, seeking the same type of information on all lawsuits and claims involving air bag injuries or death. n19

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n19 Interrogatory No. 8: Identify all lawsuits and/or claims which have been made against Mazda Motor, or any Entity, from 1990 through the present, in which it was alleged that an occupant of a vehicle manufactured and/or assembled by Mazda Motor sustained personal injuries and/or death, in whole or in part, as a result of the deployment of a driver's side air-bag and for each lawsuit and/or claim, identify the Plaintiff/ Claimant, the attorney for the Plaintiff/Claimant, the Court, including case name and case number, in which each lawsuit was filed, the date of filing of each lawsuit and/or claim and the amount of each judgment and/or settlement.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

A discovery dispute arose between the parties regarding **[*41]** plaintiff's written discovery, including the document requests and interrogatory identified above, and plaintiff filed a

motion to compel. A hearing was held, after which the parties resolved a number of the disputes. (Paper No. 27). As to interrogatory no. 8 and document request no. 5, the parties agreed to provide copies of "all complaints" and claim letters for all Mazda vehicles for the period 1990 through the date of the accident, June 22, 1996." (Paper No. 27 at 1-2). As to document request no. 8, Mazda agreed to "search for and, if available, produce the requested information with regard to injuries associated with the deployment of airbags, including information relating to Donna Greenberg and Randy Campo." (Paper No. 27 at 3).

In their Notice of Rule 30(b)(6) Deposition dated October 22, 1998, plaintiffs asked MNAO to produce a corporate designee knowledgeable about the following subject areas:

P 3: "All information known to MNAO prior to June 22, 1996 concerning circumstances under which driver's side air bags could cause injury to occupants of a vehicle during the deployment of a driver's side air bag."

P 6: "All information known to MNAO prior to 6/22/96 concerning **[*42]** the risk and/or potential for injury from a deploying driver's side air bag to persons seated within the area where the air bag was designed to deploy."

P 9: "All lawsuits and/or claims made against MNAO from 1980 through June 22, 1996, in which it was alleged that an occupant of a vehicle manufactured and/or assembled by Mazda Motor Corp. and/or a vehicle marketed and/or distributed by or imported into the U.S. sustained personal injuries and/or death, in whole or in part, as a result of the deployment of a driver's side air-bag."

P 19:"How and when MNAO, or any one on its behalf, first learned and/or received notice that vehicle occupants of any size, including, but not limited to, vehicle occupants smaller in size than 50% males, could and/or might be injured, including seriously injured and/or killed, as a result of and/or from the deployment of a driver's side air-bag."

(Paper No. 22, Ex. 1). These requests would encompass any documents in the Mazda defendants' possession and control relating to the Campo and Greenberg accidents, and presumably would reveal the date and circumstances that Mazda was first put on notice of these alleged airbag injuries.

In the deposition **[*43]** of Michael Ray, Advertising Manager Creative, MNAO, the plaintiffs again inquired about claims and lawsuits and Mazda's notice and handling of them. Plaintiffs' counsel posed questions regarding the subject at P 3 (Paper No. 47, Ray depo., 147-153), but the witness was not prepared to discuss the topic. Similarly, plaintiffs' counsel questioned Mr. Ray about lawsuits and claims, the subject of P 9, (Ray depo., 161-164), but again the witness was not prepared to discuss the subject and admitted that he had not conducted any research on the subject. n20 Plaintiffs' counsel commented to defense counsel: "Well, I want to have everything that you have in each of these claims, what Mazda did with it, how Mazda processed it, what Mazda learned from it, et cetera." (Ray depo., 162-63). When Mr. Ray was asked "who are the people at [MANO] . . . who would know anything about the subject of P 9," Mr. Ray answered "Tim Conley . . . [and] David Orr." (Ray depo., 163). These are Mazda attorneys. On March 12, 1999, plaintiffs issued an Amended Notice of <u>Fed. R. Civ. P. 30(b)(6)</u> Deposition to Mazda Motor Corp. to take place on April 5, 1999, including the following subject areas:
P **[*44]** 34: "All information known to Mazda Motor prior to June 22, 1996, concerning the death of Donna Greenberg... This subject will include when Mazda Motor, or any person

and/or entity on its behalf, first learned about the death of Donna Greenberg and/or the circumstances thereof...." (emphasis added).

P 35: "All information known to Mazda Motor prior to June 22, 1996, concerning the death of Randy Campo ... This subject will include when Mazda Motor, or any person and/or entity on its behalf, first learned about the death of Randy Campo and/or the circumstances thereof...." (emphasis added).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n20 At that point, Mazda had provided documents relating to nine claims. After the Court's order, defendants provided documents relating to 123 claims.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

On June 17, 1999, pursuant to court order, defendant provided plaintiffs with a copy of a portion of a fax dated September 10, 1993, relating to an investigation of the Campo accident. n21 In his affidavit, Plaintiffs' counsel states that, shortly after the **[*45]** fax was produced, he "asked Mazda's counsel for the identity of the person and/or entity who sent the fax to Mazda and the identity of the person at Mazda who received it. [Defendants' counsel] told me he 'did not know.'" (Paper No. 59, 10-11). Plaintiffs' counsel also says he asked defendants' counsel about the fax on "general occasions . . . [and] never received a direct answer from Mr. Graver regarding any of my questions." (Paper No. 52 at 1-2).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n21 At the June 18, 1999 Okada deposition, defendant produced the following documents relating to the Campo accident, including photos of accident site: (i) a copy of complaint filed in Arizona but never served on Mazda; (ii) a copy of the police report. Mazda argued these documents were not originally provided because it did not turn up in the search for claims against Mazda, (i.e., Mazda learned of the accident independently and did its own investigation).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Plaintiffs' counsel reports defendants' counsel's "recollection [is] . . . that plaintiffs' counsel **[*46]** asked for that information verbally and defendants' counsel responded that he would look into the matter. Shortly thereafter, without waiting for a response, plaintiffs' counsel issued their subpoena to Pacific Bell." (Paper No. 51, 2).

While there is an apparent difference in recollection as to how many times plaintiffs' counsel asked for this information, the precise response of defense counsel and the amount of time plaintiffs' counsel waited before taking other actions to secure the identity of the sender of the fax, etc., it is not disputed that plaintiffs asked for this key information, and that Mazda has not provided it. Mazda has never: (i) identified the party who sent the facsimile; (ii) has never produced the first four pages of the facsimile, including cover sheet which would show from whom and to whom it was sent; (iii) identified who at Mazda received the facsimile;

(iv) admitted that the facsimile was actually sent to Mazda, or whether the facsimile was the first notice which Mazda received of the Campo accident. (Id. at 10).

In Mr. Okada's deposition, the following exchange occurred regarding the Campo accident: Plaintiffs' counsel: "Will Mr. Okada be **[*47]** able to testify as to who did the - how they found out who did the investigation and what the results were?"

Defendants' counsel: "He may be able to address some of those questions. You'll have to go through. I don't know what you're going to ask him, so you'll have to go through what you want to know."

Plaintiffs' counsel: "Does he know how they found out, who investigated it, and what the results of the investigation were?"

Defendants' counsel: "Well, probably not as to the first two, but he will be able to talk about, in part, the third."

Plaintiffs' counsel: "I'd like to know who - how Mazda found out and who conducted the investigation."

Defendants' counsel: "We'll deal with that later."


(Okada depo., 10) (emphasis added).

Thereafter, plaintiffs' counsel conducted an independent investigation of the fax ID number, serving a subpoena on Pacific Bell on or about September 21, 1999, (Paper No. 59, Att. 10) and learned that TM Claims, Mazda's insurance company, was the subscriber of the number. On or about October 22, 1999, plaintiffs served a subpoena and notice of deposition on TM Claims seeking documents relating to Mazda's notice of the **[*48]** Campo and Greenberg deaths. (Paper No. 59).

The subpoena lists ten categories of documents, including those relating to the following: (i) TM Claims' investigation of the Campo and Greenberg accidents; (ii) the first four pages of a fax between TM Claims and Mazda; (iii) TM Claims' communications with federal & state agencies and other claimants regarding accidents involving Mazda vehicles; (iv) ownership and corporate information regarding TM Claims, Tokio Marine and Mazda. (See TM Claims Service's Motion to Quash, Ex. B at 4-5, filed in the United States District Court for the Southern District of New York on May 23, 2000). Upon receipt of the subpoena, on November 2, 1999, defendants' counsel wrote plaintiffs' counsel urging him to withdraw the subpoena or face "attorneys' fees and sanctions." (Paper No. 52, 2).

TM Claims has objected to the subpoena and has moved to quash, arguing that the subpoena seeks "privileged material, is unduly burdensome and seeks material available from other sources," i.e., Mazda. The motion is pending in the United States District Court for the Southern District of New York and that Court has deferred ruling until this Court rules on the pending **[*49]** discovery matters.

On April 11, 2000, defendants offered to provide information to plaintiffs regarding "the date Mazda first learned of the Campo and Greenberg accidents." (TM Claims Service's Motion to Quash Subpoena, Ex. D at 2).

On April 17, 2000, plaintiffs responded, rejecting defendants' offer. "Your proposal to

provide us with the dates Mazda first learned of the Campo and Greenberg accidents is insufficient. We are entitled to a witness(s) who can testify about the identity of the persons at Mazda who were advised of the accident, the person(s) at Mazda who received the Campo facsimile, how your client Mazda learned about the Campo and Greenberg incidents, communications with representatives of the U.S. Government regarding the incidents, and the dates and contents of communications with the Campo and Greenberg families...." The Court agrees.

Plaintiffs' entitlement to this discovery is unquestionable. The plaintiffs are absolutely correct that they had long sought discovery regarding when the defendants first learned about the Greenberg and Campo accidents and what they learned, and the defendants had long stonewalled them on this subject. In ruling on the prior motion **[*50]** to compel information on lawsuits and claims, the Court held that
In the instant case what the defendant knew concerning the possibility of injury resulting from the deployment of an air bag and when it knew about the danger are extremely germane to this controversy.

(Paper No. 28, 12).

The Court continued:
The Court notes that the defendant asserts that it has already "conducted a reasonable search of its business records" but did not find any lawsuits conforming to its limited definition of the scope of discovery. The Court reminds the defendant that it is "under a severe duty to make every effort to obtain the requested information and, if, after an adequate effort [it] is unsuccessful, [its] answer should recite in detail the attempts which he made to acquire the information." Jackson v. Kroblin Refrigerated Xpress, Inc., 49 F.R.D. 134, 137 (N.D.W.Va. 1970). While the Court does not know what files constitute its "business" files, a search cannot be limited to corporate or legal files, but should encompass insurance files, product safety or research committee files. Similarly, billing and other financial records would certainly **[*51]** provide information on legal costs (and identification of law firms).

(Paper No. 28, 13). (emphasis added)

Finally, it is not clear that Mazda has done the requisite Rule 26(g) investigation in responding to discovery on this subject. TM Claims asserts as one basis of its motion to quash that Mazda has the information and plaintiffs should obtain it from Mazda. If so, Mazda should provide it. If not, Mazda should seek it from its agent, TM Claims.

The Court orders Mazda to produce the documents requested in the March 29, 2000 subpoena and deposition notice to its insurance company, TM Claims, by September 1, 2000. If Mazda is unable to locate any of these documents after an investigation mandated under Fed. R. Civ. P. 26(g), which would, of course, include inquiry to TM Claims, defendant shall file an affidavit of their efforts, signed by the appropriate Mazda employee or officer, not outside counsel, again by September 1. Finally, if Mazda believes that there are responsive documents that are privileged, Mazda shall file a privilege log and motion for protective order by September 1, and submit such documents to the Court for an in camera review, again by September 1. **[*52]**

Plaintiffs seek an award of $ 2,078.00 for the expenses they incurred in attempting to obtain the notice information and documents that Mr. Graver either "would look into but

apparently never did" or "did not know" about and never found out.

Plaintiffs' entitlement to the costs of acquisition of these documents by ancillary means depends on the answer to several questions: whether plaintiffs sought the discovery in this case, whether they were entitled to it in this case and whether defendants made the requisite efforts required under Rule 26(g) to locate such information.

As to the first and third questions, the Court considers this information to have been diligently sought by plaintiffs in this litigation and unreasonably withheld by defendants. Mr. Graver's response to plaintiffs' inquiries on this subject has been "I'll talk about it later" at Mr. Okada's deposition on June 18, 1999 (see Okada depo. at 10), "he would look into the matter" or "did not know" when asked about the phone number on the FAX header. (Paper No. 51, 2), and a threat of "attorneys' fees and sanctions" when the plaintiffs served the subpoena on TM Claims Service. (Paper No. 52, 2). As Mazda offered **[*53]** to provide "the date Mazda first learned of the Campo and Greenberg accidents," presumably Mazda has the documents (either the first four pages of the fax or some other document) which contains this information. Moreover, TM Claims has argued that the subpoenaed documents should be obtained directly from Mazda, again suggesting that there are responsive documents in Mazda's possession.

Plaintiffs are entitled to this discovery. Accordingly, the Court shall award plaintiffs the costs incurred in its efforts to obtain the information documents from TM Claims, which are $ 2,078.00. n22

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n22 Again, the Court has reviewed plaintiffs' counsel's affidavit and contemporaneous timesheets and finds the time expended reasonable to the task, with the exception of his associate's time entry of October 20, 1999 for 6.5 hours which appears to relate to the Ford documents. Additionally, the Court has figured the fees for plaintiffs' counsel, using a $ 225 hourly rate and fees for his associate using a $ 160 hourly rate.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## [*54]  2. Ford-Mazda Design and Safety Meetings Documents

Plaintiffs are also seeking reimbursement for expenses incurred in obtaining documents directly from Ford regarding certain Ford-Mazda meetings. (Paper No. 59, Attachment 10). While plaintiffs may be entitled to such documents, it does not appear that plaintiffs clearly and diligently sought such documents from Mazda in the discovery in this case.

Apparently plaintiffs learned about the meeting(s) between Mazda and Ford from an attorney in Texas sometime in March, 1999. (Paper No. 51). Plaintiffs' counsel began drafting a subpoena to Ford for the documents on June 2, 1999. (Paper No. 59, Att. 10).

On or about May 12, 1998, plaintiff Susan Hayes served her first request for production of documents on MC.
Document Request No. 7: All documents, including, but not limited to, research, studies, literature, memoranda prepared by an person and/or entity containing information which was reviewed and/or considered by Mazda Motor during the design and engineering of driver's side air bags used in Mazda automobiles, including the 1990 Miata.

Document Request No. 19: All documents relating and/or referring to **[*55]** information discussed and/or disseminated at an Meetings attended by Mazda Motor employees, representatives, agents, and/or trade representatives prior to June 22, 1996, where the subject of serious and/or fatal injuries associated with air bag deployment was mention and/or discussed.

While these document requests do not mention Ford Motor Corp. or its meetings with Mazda representatives specifically, these document requests encompass the general subject matter of the design and safety of air bags. Plaintiffs' counsel has asserted the documents pertaining to this meeting show the two companies had agreements relating to the development of air bags, including an air bag contract from the 1980s which was allegedly in place at least until the early 90s. Plaintiffs' counsel also asserts the companies exchanged information during the 1980s and 90s regarding engineering and safety issues of air bags. (Paper No. 59 at 14). Defendants have not produced any documents responsive to these two requests. (Paper No. 47 at 4).

Plaintiff did file a motion to compel regarding these two requests, but reached an agreement with defendants on additional search efforts but without any mention of Ford **[*56]** documents. (Paper No. 27 at 2-3).

Plaintiff Susan Hayes served an amended Rule 30(b)(6) notice on MC, including the following as Subject 19:
All communications, between Ford Motor Company, Inc., and Mazda Motor from January 1, 1989 to June 22, 1996, referring and/or relating to the Supplemental Restraint System and/or airbag installed and/or used in Mazda automobiles, including but not limited to the Mazda Miata.

In the Okada deposition, plaintiffs' counsel showed him a memorandum dated February 20, 1991, on Ford letterhead addressed to a K. Okada regarding Ford/Mazda Vehicle Safety Technical Meetings. Mr. Okada was unable to identify it but did testify in general terms about the Ford-Mazda safety discussions. (Paper No. 47, Okada depo., 154, et seq.). At no time in the deposition did plaintiffs' counsel ask the defendants for any other Ford-Mazda documents.

Shortly after the Okada deposition, plaintiffs served a subpoena on Ford for all documents relating to meetings between Ford and Mazda. Ford responded to the subpoena by providing an index of documents in CD-Rom format. After reviewing the index, plaintiffs' counsel went to Ford headquarters in Detroit on September **[*57]** 29th and 30th to review the documents, at their library. (Paper No. 51, 1). There is no evidence that plaintiffs asked Mazda to search for the indexed documents, prior to the research at the Ford library.

In its Response to plaintiffs' counsel's affidavit, Mazda Motor Corp. argues that, unlike Ford, Mazda does not retain records relating to engineering meetings conducted between the companies going back ten years:
As Mr. Okada would have testified, if asked, a cultural difference between Japanese and American product manufacturers has long manifested itself in record retention policies. Due to space limitations in Japan, it has long been the practice of most Japanese manufacturers to retain only those records relevant to the final design and manufacture of a particular model product and to discard non-production documents which are not useful to present manufacturing issues. That plaintiffs' counsel aggressively sought documents and

information from another source which was legitimately unavailable from Mazda is to their credit. However, Mazda should by no interpretation of the law, be required to pay for that activity.

(Paper No. 12, 12).

Accordingly, the defendants **[*58]**  are not responsible for the plaintiffs' expense in locating the Ford-Mazda documents. While plaintiffs complain that "Mazda never produced the [2/20/91] memorandum or anything else . . . [and] Mazda never told us anything about its interaction with Ford [and] as a result we were required to propound discovery requests to Ford." (Paper No. 59, 14). That is not true. The Court will not award plaintiffs their expenses in obtaining the Ford documents as plaintiffs did not seek the documents specifically from Mazda.

### 3. MC Corporate Designee on the Subject of Ford-Mazda Safety Meetings

Finally, plaintiffs complain in their renewed motion, that Mr. Okada was evasive and ill-prepared, specifically on P 19 - Ford-Mazda communications on airbags. (Paper No. 34, 11 et seq.) n23 While Mr. Okada was able to recall some information about safety meetings, it was not clear that he had prepared himself in any way on this topic. n24

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n23 In its November 19, 1999 submission to the Court (Paper No. 50), plaintiffs complain there has been no MC designee for several subjects identified in the Amended Rule 30(b)(6) notice to MC and, in response to the Court's inquiry, no documents produced on these same subjects, as requested in parallel document requests. (Paper No. 47, 3 et seq.). Plaintiffs' complaint about uncovered areas in the corporate deposition is too late. Plaintiffs did not raise in renewed motion in July (much less during the Okada deposition). **[*59]**

n24 The Court recognizes that plaintiffs identified 62 topics for the MC deposition - a huge number. Defendants did not object or seek any protective order or other relief so the duty to prepare on all subjects remained.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Accordingly, the defendants shall produce a corporate designee prepared to testify as to Ford-Mazda meetings and communications regarding airbag safety and design at a time and place convenient to plaintiffs, but no later than September 15, 2000. Plaintiffs' counsel suggests that the documents show considerable personal involvement of Mr. Nataksuka, Mr. Kayoda and Mr. Strassburger which might make any one of them suitable corporate designees on the subject. (Paper No. 50). If Mr. Okada is again designated (or any one else), he must review pertinent documents, discuss the topic with other knowledgeable people - in short do whatever he reasonably needs to do to fully respond to plaintiffs' questions in this area.

Mazda's hands off approach to deponent preparation is wholly unacceptable. _HN4_ The Rule provides that "the persons so designated shall testify as to matters known or

reasonably **[*60]** available to the organization." Fed. R. Civ. P. 30(b)(6). This language has been interpreted to impose a "duty to prepare the witness . . . to be able to provide meaningful information about any designated area(s) of inquiry." Civil Discovery Guidelines, 32-34 (ABA August, 1999). As the commentary to the Guidelines make clear, this means that "a designee who does not have personal knowledge 'is supposed to find out from those that do!,'" quoting Robert I. Weil and Ira A. Brown, Jr., California Practice Guide: Civil Procedure Before Trial P 8:475 (1998) and . . . "would require counsel to review with the witness materials that he or she may not previously have seen but are part of the organizational "mind," so that the witness will be in a position to answer "fully, completely, [and] unevasively" all questions on the designated subject matter, quoting Mitsui & Co. (USA) v. Puerto Rico Water Resources Authority, 93 F.R.D. 62, 67 (D.P.R. 1981).

**Conclusion**

For all these reasons, the Court awards plaintiffs certain expenses associated with the initial motion to compel the production of witnesses and sanctions as a monetary sanction for violation of Fed. **[*61]** R. Civ. P. 30(b)(6), awards plaintiffs their expenses associated with subpoena of TM Claims in New York to obtain the Mazda "notice" documents in the Greenberg and Campo cases but denies any further award of expenses to plaintiffs and grants some additional relief to plaintiffs to assure that all documents to which they are entitled have been received and to assure the availability of a fully prepared corporate designee on certain topics. A separate Order shall issue.

Date: 8-4-00

/s/

Susan K. Gauvey

United States Magistrate Judge

DSB:965293.1/LAW024-142120