1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF MARYLAND
3                     -    -    -
4   EQUAL EMPLOYMENT  OPPORTUNITY: CASE NO.
    COMMISSION,                     :
5          Plaintiff,              :  WDQ-02-CV-648
              AND                   :
6   KATHY C. KOCH,                  :
          Plaintiff-Intervenor, :
7                                   :
                V.                  :
8                                   :
    LA WEIGHT LOSS,                 :
9          Defendant                :
10
11                     -    -    -
12             September 25, 2003
13                     -    -    -
14
15          Oral deposition of LYNNE E.
    PORTLOCK, held in the offices of Esquire
16  Deposition Services, Suite 760, One
    Commerce Center, Wilmington, Delaware
17  19801 commencing at 10:10 a.m., on the
    above date, before Shenna M. Basye-Cara,
18  a Professional Reporter and a Notary
    Public in the State of Delaware.
19
                    -    -    -
20
21          ESQUIRE DEPOSITION SERVICES
          1880 John F. Kennedy Boulevard
22                  15th Floor
          Philadelphia, Pennsylvania 19103
23                (215) 988-9191
24

Page 234

1  employment you were?
2      A.   Uh-huh.
3      Q.   When did that change?
4      A.   Maybe -- didn't fully
5  change.  She would just relay and I let
6  her make -- I always knew before she
7  hired, who she was hiring, so probably
8  towards her last training.  I'm not sure.
9      Q.   So it's a fair statement
10  then that throughout Ms. Koch's
11  employment, her hiring conduct would
12  always be subject to your review before
13  someone would get hired?
14      A.   In some nature, yes.
15      Q.   How was her job performance,
16  in your view?
17      A.   At what period?  At any
18  given time?
19      Q.   Do you have different
20  opinions based on the time?
21      A.   Yes.
22      Q.   Okay.  Well, let's start
23  with the -- are we talking two different
24  periods or three or four?

Page 235

1      A.   Well, it progressively
2  declined, decreased.
3      Q.   How was it in the beginning?
4      A.   It was okay for someone
5  new.  It was fine.
6      Q.   Was there anything in
7  particular that was okay or fine?  I
8  mean, what are you basing that on?
9      A.   Basing it on her knowledge
10  of the program, what she came from, her
11  training, from her knowledge of what she
12  knew.  That was okay.  She had the gist
13  of what she needed to do from her
14  training.
15      Q.   Did you ever hold the
16  opinion that she was a good employee?
17      A.   I didn't have time to form
18  an opinion.  She wasn't employed that
19  long.
20      Q.   Did you ever tell anyone
21  that she was a good employee?
22      A.   Not that I remember, no.
23      Q.   Do you remember telling the
24  EEOC investigator who interviewed you

Page 236

1  that at the time you gave Ms. Koch a
2  written warning, you considered her to be
3  a good employee?
4      A.   I could have said that.  I
5  don't remember specifically.
6      Q.   Is that true?
7      A.   Is what true?
8      Q.   That statement.  That at the
9  time you gave Ms. Koch a written warning,
10  you considered her to be a good
11  employee.
12      A.   Well, if I said it, it would
13  be true.
14      Q.   Did you ever hear anyone
15  express an opinion -- first of all, did
16  you ever hear any of your superiors
17  express an opinion about Kathy Koch?
18      A.   Not that I remember, no.
19      Q.   Was Ms. Koch fired or did
20  she resign?
21      A.   I believe she was
22  terminated.
23      Q.   She was fired?
24      A.   Fired.

Page 237

1      Q.   Who fired her?
2      A.   I did.
3      Q.   Anyone else?
4      A.   No.
5      Q.   Did you consult with anyone
6  about her firing before you fired her?
7      A.   Consult meaning...
8      Q.   Did you have any
9  communication with anyone about her
10  status as an employee or your intention
11  to fire her before you fired her?
12      A.   Yes.
13      Q.   Who?
14      A.   Eileen Stankunas.
15      Q.   What was her position at the
16  time?
17      A.   She was above me, so I'm not
18  quite sure and I don't remember.
19      Q.   General manager?  Does that
20  sound right?
21      A.   Could be.
22      Q.   What was said during that
23  communication with Ms. Stankunas?
24      A.   I left her know that the

Page 238

```
 1   cards that we had did and the training
 2   was becoming a flop.  It wasn't working
 3   out the way it should be and Kathy was
 4   not following through with the training.
 5       Q.   We'll talk about that in a
 6   second.  What was Ms. Stankunas'
 7   reaction?
 8       A.   She asked me what I decided
 9   to do about it and I told her.
10       Q.   That you were going to fire
11   Ms. Koch?
12       A.   Correct.
13       Q.   Did you all talk about
14   anything else?
15       A.   As in reference I asked her
16   could she come and sit with me, because I
17   wanted to have a witness there.  She said
18   she couldn't make it down at that point.
19   When I did have Kathy, that she could get
20   someone for me to have as a witness on
21   speakerphone with me.
22       Q.   Why did you want a witness?
23       A.   Because I always want a
24   witness.  That way there's no
```

Page 239

```
 1   miscommunication of what happens or what
 2   is said in the middle of a firing.
 3       Q.   So you fired other people?
 4       A.   Maybe one, but that would
 5   be -- I had other jobs before LA Weight
 6   Loss Center.
 7       Q.   But at LA Weight Loss you
 8   fired other people?
 9       A.   Probably, yes.
10       Q.   Do you have recollection of
11   firing anyone?  Ms. Bartel?  Did you fire
12   Ms. Bartel?
13       A.   No.  I offered her another
14   position.  She declined the position.
15       Q.   Oh, so you did not --
16       A.   So I didn't fire her.  I
17   demoted her.
18       Q.   So your testimony is that
19   you offered Ms. Bartel another position,
20   she declined to take it, so then her
21   employment ended.
22       A.   Correct.
23       Q.   So you're contrasting that
24   with Ms. Koch.  You did not offer Ms.
```

Page 240

```
 1   Koch another position.
 2       A.   No.  I did not offer her
 3   another position.
 4       Q.   Was there a witness at this
 5   meeting with Ms. Bartel?
 6       A.   No.  I don't think so.
 7       Q.   Did you communicate with
 8   Christy O'Brien before you fired Ms.
 9   Koch?
10       A.   No.
11       Q.   Did you discuss Ms. Koch's
12   employment with Ms. O'Brien at all prior
13   to firing Ms. Koch?
14       A.   No.
15       Q.   Was there any discussion
16   with Ms. O'Brien of problems with Ms.
17   Koch?
18       A.   No.
19       Q.   Okay.  You fired her.  You
20   talked to Ms. Stankunas before you fired
21   Ms. Koch and then you fired her.  Why?
22   Why did you fire Ms. Koch?
23       A.   Should I tell the sequence
24   of events or just --
```

Page 241

```
 1       Q.   You're free to tell the
 2   sequence of events if you choose to do
 3   so.
 4       A.   The initial reason for
 5   firing was poor job performance after
 6   making an attempt for her to be
 7   successful at the second training.
 8       Q.   So there was a performance
 9   issue and then there was an attempt to
10   correct that that involved a second
11   training?
12       A.   Correct.
13       Q.   What were the performance
14   issues?  And I'm assuming -- well, I'm
15   not going to assume.  It's true, is it
16   not, that you gave -- before you fired
17   Ms. Koch you gave her a written warning?
18       A.   That is correct.
19       Q.   What were the concerns that
20   led to that warning?
21       A.   The knowledge of what the
22   staff had to come know to train (sic).
23       Q.   What about it?
24       A.   They didn't know anything.
```

Page 314

1    Q.   Because you read the letter?
2    A.   Yes.
3    Q.   Not following -- not
4 followed company hiring policy, what did
5 you understand her to mean by that?
6    A.   I didn't.  I didn't
7 understand, because this had nothing to
8 do with her warning.
9    Q.   Did you ask her what she
10 meant by that?
11    A.   I think I more or less
12 concentrated on the sexual harassment.
13    Q.   So you didn't -- you didn't
14 ask her --
15    A.   I may have.  I may not.  I
16 know I concentrated on the sexual
17 harassment.
18    Q.   Did she say what she meant
19 by following company hiring policy -- or
20 not following --
21    A.   I don't remember.  I don't
22 remember.
23    Q.   Did you ever receive
24 training on equal employment opportunity

Page 315

1 or discrimination law when you were an
2 employee at LA Weight Loss?
3    A.   Yes.
4    Q.   Was that -- when did you
5 receive that training?
6    A.   When Sandy Miller -- in the
7 very beginning when Sandy Miller was
8 still working the payroll department.
9    Q.   Did they talk about
10 retaliation in that training?
11    A.   I don't remember.  I know
12 it's -- she -- my training was, they --
13 the posters that you hang up.  We had to
14 read it.  You read it.  That was the
15 training.  We were told, every new
16 employee, make sure you read through it
17 with them.  So I'm assuming there was
18 retaliation on there.  I don't know.
19    Q.   Did you receive instruction
20 on equal employment opportunity or
21 discrimination other than what was in
22 that poster?  Other than reading the
23 poster, did you --
24    A.   At this time and date?

Page 316

1    Q.   Yes.
2    A.   No.
3    Q.   But you had training on it
4 in a class --
5    A.   Before.
6    Q.   -- prior to coming to LA
7 Weight Loss, correct?
8    A.   Yes.
9    Q.   And you knew that
10 discrimination was against the law,
11 correct?
12    A.   Yes.
13    Q.   And you knew that
14 discrimination against male job
15 applicants was against the law, correct?
16    A.   Yes.
17    Q.   From that class that you
18 took prior to coming to LA Weight Loss,
19 right?
20    A.   Yes.
21    Q.   And you also knew that
22 retaliation was illegal under federal
23 law, correct?
24    A.   Yes.

Page 317

1    Q.   You knew that, for example,
2 an employee could not be penalized in any
3 way because they contacted the EEOC,
4 correct?
5    A.   That's correct.
6    Q.   And you also knew that an
7 employee could not be penalized or
8 adversely affected in some way because
9 they had complained internally about what
10 they believed to be discrimination,
11 correct?
12    A.   That is correct.
13    Q.   You knew all of this at the
14 time that you fired Kathy Koch, right?
15    A.   But they weren't the reasons
16 why I fired Kathy Koch.
17    Q.   I didn't ask that.
18    A.   Okay.  Yes.
19    Q.   So you knew all this --
20    A.   Yes.
21    Q.   -- at the time you fired
22 Kathy Koch?  Yes?
23    A.   Yes.
24    Q.   What was it about the

Page 318

1　training -- there was a specific training
2　that you claim led to Kathy Koch's
3　firing, correct, her last training?
4　　　A.　Yes.
5　　　Q.　What was it about that
6　training?
7　　　A.　She didn't follow the
8　complete training, the cards, the --
9　everything was -- it was set there.  It
10　was right -- you couldn't have messed it
11　up.
12　　　Q.　What was it about the cards
13　that she didn't follow?  What were the
14　subjects that she didn't follow?
15　　　A.　I don't remember
16　specifically.
17　　　Q.　Did you ever know?
18　　　A.　Yes.
19　　　Q.　Just one or two more
20　questions and then I'm done, Ms.
21　Portlock.
22　　　　　How did you feel when you
23　read -- the first time you read Portlock
24　Exhibit-4, how did that make you feel?

Page 319

1　　　A.　I was confused.
2　　　Q.　Were you angry?
3　　　A.　No.
4　　　Q.　You were angry, weren't you?
5　　　A.　No.
6　　　Q.　You were being accused of
7　discrimination.
8　　　A.　I didn't understand.
9　What -- my first reaction, what you asked
10　me was that, how did you first feel, I
11　was confused.
12　　　Q.　Then when it was explained
13　to you, how did you feel?
14　　　A.　Well, it wasn't explained to
15　me.  I called and -- made a call to the
16　Department of Labor to ask them what my
17　rights were and what I could do.
18　　　Q.　And they explained to you
19　what sexual harassment could be, correct?
20　　　A.　Re-explained it to me yes.
21　　　Q.　Then how did you feel about
22　Kathy Koch's letter?
23　　　A.　I was still confused,
24　because then I had to talk to her to ask

Page 320

1　her specifically, what did she mean by
2　the sexual harassment.
3　　　Q.　Then she told you, right?
4　　　A.　Yes.
5　　　Q.　Then how did you feel about
6　it?  You were angry, weren't you?
7　　　A.　No.  I don't get angry.  Not
8　like that.
9　　　Q.　You're being accused of
10　discrimination, of sexually harassing a
11　fellow female worker, and you were not
12　angry?
13　　　A.　No.  Actually, what I did
14　was, I apologized to her because that's
15　what the law allows me to do, is to
16　rebuttal my statement and take it back,
17　because she misinterpreted it or she felt
18　one way and I had no idea.  And I'm
19　allowed to ask for the interpretation of
20　what she interpreted and what I
21　interpreted, and I apologized.  From
22　there, what happened after that had
23　nothing -- the conversation ended.
24　　　Q.　So you were not angry that

Page 321

1　she had made this allegation about you?
2　　　　　MR. LANDAU:  Asked and
3　　　answered.
4　　　　　THE WITNESS:  No.
5　BY MR. PHILLIPS:
6　　　Q.　Were you upset?
7　　　A.　What do you mean by upset?
8　　　Q.　Were you emotionally
9　troubled?
10　　　A.　No.
11　　　Q.　You were not emotionally
12　troubled about being called a sexual
13　harasser?
14　　　　　MR. LANDAU:  Objection.  It
15　　　says what it says.  That's not
16　　　what it says.
17　　　　　THE WITNESS:  What do you
18　　　mean by emotionally troubled?  I'm
19　　　sorry.
20　BY MR. PHILLIPS:
21　　　Q.　Sad.
22　　　A.　Sad isn't the word.
23　　　Q.　What is the word?
24　　　A.　I felt betrayed.

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF MARYLAND
 3                  -   -   -
 4   EQUAL EMPLOYMENT  OPPORTUNITY: CASE NO.
     COMMISSION,                    :
 5          Plaintiff,             : WDQ-02-CV-648
               AND                  :
 6   KATHY C. KOCH,                 :
            Plaintiff-Intervenor, :
 7                                  :
               V.                   :
 8                                  :
     LA WEIGHT LOSS,                :
 9          Defendant              :
10
11                  -   -   -
12          November 6, 2003
13                  -   -   -
14
15          Continued oral deposition of
     LYNNE E. PORTLOCK, held in the offices of
16   Esquire Deposition Services, Suite 760,
     One Commerce Center, Wilmington, Delaware
17   19801 commencing at 9:33 a.m., on the
     above date, before Shenna M. Basye-Cara,
18   a Professional Reporter and a Notary
     Public in the State of Delaware.
19
                    -   -   -
20
21        ESQUIRE DEPOSITION SERVICES
        1880 John F. Kennedy Boulevard
22               15th Floor
        Philadelphia, Pennsylvania 19103
23             (215) 988-9191
24
```

Page 420

1     Q.   Let me hand back to you --
2  I'm taking a minor detour here.  Let me
3  hand back to you a photocopy of the
4  transcript of your interview on April 27,
5  2000 with the EEOC attended by yourself,
6  Judy Navarro, Regina Andrew, and Amy
7  Miraglia.  I take it from your earlier
8  remarks that you have seen this document?
9     A.   Yes.
10     Q.   And you've reviewed it
11  recently?  You've read it?
12     A.   Not the entire -- I mean, I
13  don't -- not the entire packet, no.
14     Q.   Within this transcript I
15  have read your description of a
16  conversation with the Department of Labor
17  in Delaware where you appear to describe
18  questions about sexual harassment that
19  appear to you or occurred to you upon
20  your receipt of Exhibit-14.
21     A.   That would be correct.
22     Q.   Do you recall now what
23  subjects of discussion or subjects of
24  concern you raised with the Department of

Page 421

1  Labor in Delaware, if any, in addition to
2  or other than the issues or questions
3  about sexual harassment?
4     A.   I remember it vividly.  I
5  don't have to read that.
6     Q.   Describe the conversation
7  for me.
8     A.   I didn't understand -- I
9  called the Department of Labor because I
10  didn't understand where she was feeling
11  that way.  I didn't understand that, so I
12  called the Department of Labor to have
13  them clarify it for me, and I did.
14     Q.   What do you mean by "that"?
15     A.   Here it is right here.
16  Point 5.
17     Q.   Referring to the third
18  page.  Read it for me.
19     A.   Finally, when you've done
20  everything possible to break my morale,
21  then you subjected me to several
22  incidents of intolerable, humiliating
23  sexual harassment.
24          So I called the Department

Page 422

1  of Labor because I didn't understand what
2  she was clarifying as sexual harassment.
3  So when I called them up I read them the
4  letter, so they helped me clarify it.
5  And I said:  What do I do as the
6  employer, because apparently there's been
7  a miscommunication.  Apparently,
8  something broke down.
9          She said:  Well, you have
10  to -- you should call the person, have a
11  conversation with them, have them explain
12  to you what they meant by -- verbally
13  explain to you what they mean by "sexual
14  harassment" and then you have to recant
15  your statement, and that I did.
16     Q.   Did you read the entire
17  letter to the individual at the
18  Department of Labor or just Point No. 5
19  appearing on the third page of
20  Exhibit-14?
21     A.   I don't remember.
22     Q.   Did you share with the
23  individual you called at the Department
24  of Labor the information in the very

Page 423

1  first paragraph of this letter that Ms.
2  Koch believed that you were creating a
3  fallacious paper trail to achieve unknown
4  alternate purposes, since I have not
5  followed company hiring policy?
6     A.   I don't remember.
7     Q.   What did you understand that
8  to mean?
9     A.   That she thought I was doing
10  a paper trail on her because she wasn't
11  following company hiring policy.
12     Q.   How was she not --
13     A.   Whatever -- I have no clue
14  what she was interpreting that as.
15     Q.   Did you ask her?
16     A.   No, because I was concerned
17  about the sexual harassment which I
18  interpreted at that time was what she
19  felt bothered her, that -- that incident
20  that happened the day that she was given
21  the written warning.
22     Q.   Did you ask Ms. Koch or
23  discuss with Ms. Koch anything as to
24  points one, two, three, or four?

Page 432

1  paper.  She's only had one written
2  warning.  She's had verbal warnings.
3  She's telling you right here she's had a
4  verbal warning.  That's not a sexual
5  harassment.
6      Q.   Did you raise that objection
7  to the use of the term "fallacious paper
8  trail" with Ms. Koch when you called
9  her --
10     A.   No.  Wanted I --
11     Q.   -- after you -- after you --
12  after your --
13     A.   No.
14     Q.   -- receipt of this letter?
15     A.   No.
16     Q.   The only subject that you
17  expected to address with Ms. Koch about
18  this letter dated March 8 and that you
19  did address with her was your question
20  about the sexual harassment Point No. 5;
21  is that correct?
22     A.   Correct.
23     Q.   You spoke about this letter
24  and/or subjects within this letter with

Page 433

1  the Department of Labor.
2      A.   Yes.
3      Q.   And you asked about sexual
4  harassment.
5      A.   Correct.
6      Q.   You spoke about this letter
7  or subjects within this letter with
8  Eileen Stankunas.
9      A.   Correct.
10     Q.   When did you do that?
11     A.   Immediately when I received
12  the letter.  No.  After I called the
13  Department of Labor.  I called them
14  first.
15     Q.   Then you called Eileen
16  Stankunas?
17     A.   Yes.
18     Q.   Why did you call Eileen
19  Stankunas?
20     A.   Because she was my
21  supervisor and that's who I reported to.
22     Q.   Did you send her a fax copy
23  of this letter or arrange to get a copy
24  of this letter to Ms. Stankunas?

Page 434

1      A.   I would assume so, but I
2  can't definitely tell you.
3      Q.   Did you describe or
4  characterize the letter to Ms. Stankunas?
5      A.   I read the entire letter to
6  Ms. Stankunas.
7      Q.   And did she respond to the
8  recitation?
9      A.   Yes.  She said to get it to
10  human resources or give it to Karen or
11  call human resources and that's what I
12  did.
13     Q.   Do you recall that Karen
14  Siegel was not assigned to human
15  resources until long after March 8, 1998?
16         MR. LANDAU:  Object to the
17  form of the question.
18  BY MS. WHITE:
19     Q.   Do you recall when Karen
20  Siegel was assigned to human resources?
21     A.   No.
22     Q.   Would it refresh your
23  recollection that it wasn't until after
24  March of 1998?

Page 435

1      A.   Okay.
2      Q.   Have you spoken with Karen
3  Siegel at any point in time about Ms.
4  Koch's complaints and issues with the
5  company hiring policy?
6      A.   Yes.
7      Q.   When?
8      A.   Sometime after I -- I
9  believe -- well, I believe it was -- I
10  talked to someone from human resources
11  after she was terminated.
12     Q.   Who?
13     A.   I believe it was Karen
14  Siegel.
15     Q.   For what purpose did you
16  talk to someone?
17     A.   Because I have to send in
18  one of these forms saying they're
19  terminated and I have to make sure I hand
20  in any papers and who they went to.
21     Q.   Did anyone from human
22  resources --
23     A.   Yes.
24     Q.   -- ask you for

Page 436

1 documentation --
2     A.   Yes.
3     Q.   -- specifically?
4     A.   Yes.
5     Q.   Who asked you for
6 documentation?
7     A.   I don't remember.  I'm
8 saying it was Karen Siegel.  I could be
9 wrong.
10     Q.   What else did Ms. Stankunas
11 say about this letter or in response to
12 your reading the letter to her?
13     A.   There wasn't.  We didn't
14 have too much time to talk.
15     Q.   Did you have any subsequent
16 discussions with Eileen Stankunas about
17 either the contents of this letter or the
18 fact that Ms. Koch was making a complaint
19 to the EEOC?
20     A.   No.
21     Q.   Did you ever have a
22 conversation with Eileen Stankunas about
23 the fact that Ms. Koch was making a
24 complaint to the EEOC?

Page 437

1     A.   No.
2     Q.   Did Ms. Stankunas at any
3 time inform you that the company had
4 decided to undertake an investigation of
5 Ms. Koch's complaint?
6     A.   No.
7     Q.   Did Ms. Stankunas or anyone
8 at the company inform you that the
9 company was trying to decide whether to
10 undertake an investigation of Ms. Koch's
11 complaint?
12     A.   No.
13     Q.   Did counsel ever inform you
14 that an investigation was or was not
15 going to take place as a result of Ms.
16 Koch's complaint?
17     A.   No.  The only time I talked
18 to them was right before questioning, so
19 that could be a yes and a no.
20     Q.   Did anyone at the company or
21 counsel's office ever give you or show
22 you a copy of that document?
23     A.   No.
24     Q.   Was that your signature?

Page 438

1     A.   Yes.
2         MS. WHITE:  Let's mark this
3 as Exhibit No. 15.
4           -  -  -
5         (Exhibit Portlock-15 was marked
6     for identification.)
7           -  -  -
8 BY MS. WHITE:
9     Q.   That's your signature?
10     A.   Yes.
11     Q.   Is that your handwriting in
12 the text of the note?
13     A.   Yes.
14     Q.   Is it true that Kathy Koch
15 returned training material and four keys
16 to you on March 12, 1998?
17     A.   That would be true.
18     Q.   Do you recall now the volume
19 of training material, the amount, the
20 description, the characteristics of the
21 training material returned to you?
22     A.   No.
23     Q.   Do you recall that she
24 returned to you a flip chart on March the

Page 439

1 12th?
2     A.   No.  She did not return a
3 flip chart.
4     Q.   How do you know that?
5     A.   Because it's stated in the
6 center I had to complete the training.
7     Q.   So the flip chart that she
8 had been using in the training stayed in
9 the center for the final day of training
10 or the next ensuing days of training on
11 Friday the 13th and Saturday the 14th?
12     A.   The flip chart that she had
13 been using was the new flip chart that I
14 had delivered to the center that Sunday
15 night that I made.
16     Q.   You made the flip chart?
17     A.   Over the weekend.  That is
18 correct.
19     Q.   And you delivered it to Bel
20 Air --
21     A.   On a Sunday.
22     Q.   -- on Sunday night?
23         Sunday, March the 8th?
24     A.   It was actually in the