IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | * |
| | * |
| Plaintiff | * |
| and | * |
| KATHY C. KOCH | * |
| Intervenor/Plaintiff | * |
| v. | Civil No. Q-02-CV-648 |
| | * |
| LA WEIGHT LOSS | * |
| Defendant | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OF INTERVENOR PLAINTIFF KOCH OPPOSING OBJECTIONS OF LA WEIGHT LOSS TO FINDINGS AND RECOMMENDATION BY JUDGE GRIMM ON JUNE 29, 2004

Intervening Plaintiff Kathy C. Koch, by her attorneys, opposes LA Weight Loss' objections and supports Magistrate Judge Grimm's findings and recommendation on June 29, 2004: LA Weight Loss' spoliation of critical documents in this case must result in an adverse inference jury instruction.

Koch's Motion for Sanctions (Docket 94) complained that LA Weight Loss failed to preserve critical documents relevant to the case and sought evidence preclusion regarding LA Weight Loss' performance-based defense and/or an adverse inference instruction to the jury. Judge Grimm agreed but recommended only a spoliation instruction, an adverse inference

instruction.[1]  Judge Grimm expressly declined to recommend any relief pursuant to Fed. R. Civ. P. 37(b)(2), for example, by striking any pleadings, or ordering certain facts to be taken as established, or flatly precluding evidence by LA Weight Loss to support any defense  (June 29, 2004 Hearing Transcript at pp. 44-45, hereafter "Hrg. 44-45", attached as Exhibit A to LA Weight Loss' Objections).

LA Weight Loss now objects to Judge Grimm's findings and recommendation and relies on Fed. R Civ. P. 72(b) to do so.  Koch believes that Judge Grimm's recommendation was "not dispositive of a claim or defense of a party,. . .," Fed. R. Civ. P. 72(a), and that the Court, "shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law." *Id.* (emphasis added).[2]  However, LA Weight

---

[1] Koch's Motion and Judge Grimm's decision also addressed LA Weight Loss' failure to follow the discovery Order dated April 6, 2004.  Unchallenged by LA Weight Loss in its objections, Judge Grimm found that LA Weight Loss' supplemental interrogatory answers were deficient; Judge Grimm determined "to allow Koch some additional discovery in connection with Interrogatories 6, 7, 14 and 17" by requiring LA Weight Loss' designation of a Rule 30(b)(6) witness to testify for three hours on the subject of those interrogatories (Hearing Transcript at 46-49).

[2] Judge Grimm's authority to hear non-dispositive pre-trial matters such as Koch's Motion for Sanctions was determined by Judge Quarles' Order dated March 24, 2004 (Docket 65).  Nothing in Judge Quarles' Order, referring pre-trial matters to Judge Grimm's attention, suggests assignment of pre-trial motions identified in 28 U.S.C. § 636(b)(1)(A) or other matters that might warrant de novo review.  Judge Grimm's first decision on discovery issues followed Koch's Motion to Compel (Docket 58) with his Order dated April 6, 2004 (Docket 70).  Koch's subsequent Motion for Sanctions addressed apparent spoliation of documents otherwise expected to have been produced in discovery by LA Weight Loss.  The fact of LA Weight Loss' spoliation of evidence may well have an impact on the conduct of the Stage I trial of Koch's claim in this case but does not alter the nondispositive character of Judge Grimm's pre-trial and discovery decisions.  Jesselson 1983 Charitable Trust v. Outlet Assoc. of Williamsburg, 784 F. Supp 1223 (E.D. Va. 1991) is particularly instructive. In that case, the Magistrate's ruling on defendants' motion in limine to exclude certain testimony and documents from evidence was found not to be dispositive.  Jesselson, 784 F. Supp at 1228.  Despite the fact that the exclusion of certain evidence can "substantially effect a party's ability to present its case," the court held that the Magistrate did not reach the merits of the case and did not in anyway bar the plaintiff from continuing with the action.  See id.  Instead, the Magistrate merely made evidentiary rulings that did not dispose of any claims or defenses. See id.

Loss asserts its objections and Koch will oppose those objections as if the Court should undertake a de novo review of facts supporting Judge Grimm's finding of spoliation.

Pursuant to Rule 72(b), Judge Grimm made specific and accurate findings on which to conclude that spoliation of evidence had occurred and to recommend an adverse inference instruction to the jury.

- Koch claims retaliatory discharge after complaining of LA Weight Loss' gender-biased hiring practices. (Hrg. 14; Complaint, Docket 21).[3]

- LA Weight Loss asserts that Koch was fired for the legitimate nondiscriminatory business reason of Koch's poor performance as corporate trainer, and also asserts that LA Weight Loss complied with all antidiscrimination laws. (Hrg. 14; Docket 23; Portlock Dep. Ex 2[4]).

- Koch alleges that she was told of LA Weight Loss's anti-male hiring practices during her own corporate training at Horsham, Pennsylvania in November 1997. (Hrg. 15-16; Koch Dep. 60, 65-66[5]).

- Koch allegedly recommended hiring males as counselors, complained about the anti-male practice, and was subject to a disciplinary warning on Friday, March 6, 1998. (Hrg. 16-17; Portlock Dep. Ex. 2; Koch Dep. 109-10, Koch Dep. Ex. 9).

- Koch's letter dated March 8, 1998 to the EEOC allegedly complains about LA Weight Loss' discriminatory hiring practices. (Hrg. 17; Koch Dep. Ex. 12).

- Koch's letter dated March 8, 1998 to her supervisor, Lynne Portlock, informs LA Weight Loss that Koch was complaining to the EEOC to "protest the employment policies of LA Weight Loss Centers." (Hrg. 17, 353, 39; Portlock Dep. Exs. 4, 14). Koch's March 8 letter to Portlock complains that the disciplinary warning notice on March 6 was presented because Koch had not followed LA Weight Loss' hiring policy. (Hrg. 18; Portlock Dep. Exs. 4, 14; Koch Dep. 41, Koch Dep. Ex. 11).

---

[3] For the Court's convenience upon its de novo review and determination, citations are provided to Judge Grimm's findings, to key record citations on which Judge Grimm aptly relied, and to complete deposition texts and/or exhibits attached to LA Weight Loss' Objections and to this Memorandum filed on behalf of Koch

[4] A complete set of Portlock deposition exhibits are collectively attached hereto as Exhibit A. The Portlock deposition transcript was attached to LA Weight Loss' Objections as Exhibit C.

[5] Both the Koch deposition transcript and exhibits are collectively attached hereto as Exhibit B.

- Koch's March 8 letter to Portlock describes Koch's proper use of training materials, flip charts and training tools, explains that her students were prepared, rebuts Portlock's assertion that Koch had failed to properly train LA Weight Loss counselors, and refers to training tests. (Hrg. 19, 36; Portlock Exs. 4, 14; Koch Dep. 173 et. seq.).

- Portlock consulted with her supervisor, Eileen Stankunas (Portlock Dep. 237); Portlock further understood the gravity of the matter when she inquired of the Delaware Department of Labor about part of Koch's complaint letter. (Hrg. 23-24, 36-37; Docket 97, Ex. B; Portlock Dep. 420-22, 433-34).

- Koch was fired at the close of business on March 12, 1998. (Hrg. 17, 20; Complaint, Docket 21; Koch Dep. 41, 43-44).

- Koch returned her flip charts and trainee handouts and other training tools to Portlock when she was fired on March 12, 1998. (Hrg. 24-25; Portlock Dep. Ex. 15, Portlock Dep. 437-438; Koch Dep. 44, 45, 46, 194).

- Former Training Director Kristi O'Brien attended Koch's discharge meeting by telephone and had kept contemporaneous notes about Koch's training performance, as detailed by Portlock. (O'Brien Dep. 264-265[6]; Koch Dep. 44).

- Koch subsequently sought production of training documents in discovery and "all documents that may shed light on whether or not she did, indeed perform her duties as a corporate trainer properly or whether she was deficient." (Hrg. 20-21; *e.g.,* Docket 94 at p. 15).[7]

- Portlock cannot now recall the performance basis for her decision to discharge Koch, and is "very vague" on the details of Koch's training deficiencies. (Hrg. 22, 41; e.g., Portlock Dep. 486, 318).

- O'Brien's memory is "faded at best and evasive at worst." O'Brien could not recall her first awareness either of Koch's claim or preservation of documents relating to Koch's job performance; "nor was she told she was under any obligation to preserve any of her notes or records related to Ms. Koch's performance of her duties and termination." (Hrg. 22, 24, 31; O'Brien Dep. 263-65, 410-14).

- At some undetermined point in time, Portlock may have learned from center managers or asked several trainees of Koch to send her written notes about how "they were confused by the training they received." (Hrg. 26; O'Brien Dep. 263; Portlock Dep. Ex. 3; Portlock Dep. 305, see

---

[6] O'Brien deposition transcript is attached as Exhibit B to LA Weight Loss' Objections.

[7] Portlock testified at one point that it was her practice to document problems with "trainings". Portlock Dep. 271. No such documentation has been identified or produced by LA Weight Loss.

748211                                   4

Portlock Dep. 246-252).[8]  Such notes (see Portlock Dep. Ex. 3) make specific references to various training documents, tools and tests.

- Karen Siegel became LA Weight Loss HR Director in/or about April 1998 and conducted an investigation of Koch's complaint about that time by asking Portlock and O'Brien to send her any records about Koch, but without instructing Portlock or O'Brien to maintain their notes or any training materials. (Hrg. 28, 30-31; Siegel Affidavit, May 27, 2004, at Docket 97 Ex. E). Siegel's Affidavit identifies no instructions, to anyone, to preserve Koch's training materials or to preserve e-mail or records of any kind. (Hrg. 29, 40).

- On April 21, 1998, the letter of Koch's counsel to LA Weight Loss CEO Vahan Karabajakian detailed the basis of her claims and described her satisfactory work performance. (Hrg. 27-28; Docket 97 Ex. F). Among other points of information, the claim letter described Koch's training at Horsham, Portlock's favorable assessment of her performance, and the existence of trainees' proficiency tests. *Id..*  Siegel's investigation, if any was done, unreasonably failed to locate, preserve, or maintain such critical performance and training documents. (Hrg. 38-40).

- LA Weight Loss had a duty but failed to preserve training materials, and records of Koch's performance deficiencies, as material evidence. (Hrg. 32 et. seq.; citing Thompson v. HUD, 219 F.R.D. 93, 100 (D. Md. 2003); Silvestri v. General Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001); Zubulake v. UBS Warburg LLC, 2003 WL 22410619 (S.D.N.Y. Oct. 22, 2003).

- LA Weight Loss' policy to preserve only "personnel files" reasonably should have encompassed personnel notes and critical training documents (Hrg. 30-31). Nevertheless, examination of Koch's personnel file should have revealed terms of her "Employee Agreement" and confirmed employees' duty to return all business documents and copies "whether prepared by Employee or Employer" upon termination of employment. (Koch Dep. 199, Koch Dep. Ex. 18).

After Judge Grimm's attention to claims notice, preservation duties, and LA Weight Loss' gross negligence not to search or preserve documents, it was not necessary to address the

---

[8] See Exhibit C attached hereto. Copies of trainee notes produced by LA Weight Loss on May 28, 2004 reflect that the notes apparently were solicited by or for Portlock on March 10-12, 1998, collected and faxed by Portlock on March 24, 1998 (Portlock Dep. 456, Portlock Dep. Ex. 16), retained by HR Director Karen Siegel at least until her faxed transmittal to LA Weight Loss counsel on January 5, 1999, and also to the EEOC in January 1999. When Portlock looked at certain of these trainee notes at deposition, she recalled the trainees' "feedback" "because they were faxed to me." (Portlock Dep. 275; Portlock Ex. 3, Portlock Dep. 294-97). Portlock is "not quite sure" how employees "Julia and Missy" came to write their statements about their February training by Koch. (Portlock Dep. 296-97).

course of Koch's claim after April 1998 in order for Judge Grimm to find spoliation. However, LA Weight Loss' destruction or loss of critical documents was inexcusable in May 1998 when LA Weight Loss' counsel received Portlock's discharge notes[9] and began to correspond with Koch's counsel. The loss or destruction of documents was inexcusable in June, 1998 when LA Weight Loss began to correspond with the EEOC and defend Koch's charge of retaliatory discharge.

In this litigation filed by the EEOC in February 2002, Koch intervened and sought documents in discovery proceedings which, if produced, should have included (a) training programs and information from training programs conducted by O'Brien and Dawn Lang[10] in the Horsham corporate headquarters; (b) training guidelines and performance standards against which Portlock measured Koch's work in February and March 1998; (c) the training materials used by Koch or required by Portlock during Koch's last week of work and which were turned over to Portlock when Koch was discharged on March 12.[11] In the absence of LA Weight Loss's production of those contemporaneous training program materials, and upon the apparent loss or destruction of Koch's training materials returned to Portlock on March 12, 1998, an adverse inference instruction to the jury is necessary and appropriate in the trial of this matter. Judge Grimm's recommendation is based on a firm factual footing and clear legal authority.

The critical nature of training documents to address Koch's employment performance is apparent on the face of the documents attached to LA Weight Loss' current objections. For

---

[9] Portlock's discharge notes, not produced in this litigation until May, 2004, informs that Portlock was "terminating you…for poor perform of training" and appear to refer to training agendas. See last two pages of Exhibit C attached hereto. Koch's counsel is informed, by virtue of Mr. Landau's representation of Portlock, that Koch's counsel may not inquire about such matters and materials directly of Portlock.

[10] Koch received 5 days of training at Horsham Headquarters in November, from O'Brien and "Dawn". (Koch Dep. 60, 64).

[11] Koch Dep. 44-46, 193-95, 196-97; Portlock Dep. Ex. 15.

example, Portlock signed the Employee Warning Notice (Portlock Dep. Ex. 2) on Friday, March 6, 1998, labeling Koch's training work on February 23, 1998 "ineffective" as to role-playing by trainees offering "Program Explanation" or spending practice time on the phone script. The Notice suggests that Portlock solicited other employees, newly trained counselors at LA Weight Loss Centers, for information about Koch. LA Weight Loss has since produced a collection of notes by or about certain trainee reactions to their training conducted by Koch in late February 1998. The notes largely are dated (apparently faxed) on March 24, 1998. See Exhibit C attached hereto. The notes label or briefly describe the contents of February training exercises with Koch (e.g., phone script, Program Explanation or P.E., medical history, product price list, herb dosage, role-playing frequency) and also note whether the trainees would have "changed the training to make it more effective." Specific references were made in the solicited notes to phone scripts, pricing, flip charts, food lists, inventory sheets, peg sheets, and work-ups presented to both named and unnamed trainees in February 1998. No corresponding training documents have since been produced by LA Weight Loss.

Koch's March 8, 1998 letter faxed to Portlock[12] provides further and graphic examples of the critical nature of such training documents sought but not produced in discovery. In that letter, Koch painstakingly challenged the disciplinary Notice with stated points (a) taking Portlock to task for her direction how to work with individual trainees "on phone script and problem solving as well as Program Explanation…"; (b) reporting that "the class role-played medical histories, prep explanation, phone script and program explanation. Each student was assigned a flip chart and appropriate folder and tools…"; (c) noting that students who completed the training "had received [favorable] scores on the Service Training Exam"; (d) recalling that

---

[12] Portlock received the letter by fax on March 9, 10 or 11, 1998. (Portlock Dep. 312, Portlock Dep. Ex. 4.).

Portlock had disrupted training classes and removed students for actual client work; (e) repeating that Portlock had interrupted Koch's training instruction by removing Koch from class to perform on an actual Program Explanation, while Koch left her trainees with assigned role-playing exercises. No corresponding training documents have since been produced by LA Weight Loss. Nor have Koch's training documents been produced as used during her final week of work and handed to Portlock when Koch was discharged on March 12, 1998.

Argument

At the parties' hearing on June 29, 2004, Judge Grimm accurately found that the relevant facts mandated a spoliation conclusion and adverse inference jury instruction. Three things must be shown to warrant an adverse inference instruction for spoliation of evidence: (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;[13]" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence. Thompson v. HUD, 219 F.R.D., 93, 101 (D. Md. 2003). These factors exist on the face of the record in the present case.

Koch served her discovery requests on Defendant early in 2003 and the Court ordered substantial compliance with those requests by Judge Grimm's Order of April 6, 2004. LA Weight Loss continued to falter, failing to produce critical documents or complete interrogatory answers, in direct violation of that Order. Most telling in LA Weight Loss' Second and Third

---

[13] Three possible states of mind satisfy the culpability requirement: bad faith/knowing destruction; gross negligence; and ordinary negligence. Id. Sometimes even the inadvertent, albeit negligent, loss of evidence will justify severe sanctions because of the resulting unfairness. Silvestri v. General Motors Corp., 271 F. 3d 583, 595 (4th Cir. 2001). The expansion of sanctions for the inadvertent loss of evidence recognizes that such physical evidence often is the most eloquent impartial 'witness' to what really occurred, and further recognizes the resulting unfairness inherent in allowing a party to destroy evidence and then to benefit from that conduct or omission. Id.

Supplemental Responses to Discovery (Docket 97, Exs. D, G, H) was Defendant's apparent failure to preserve training and employment-related documents concerning Koch upon her termination in March, 1998. At the same time, LA Weight Loss failed to explain how and what the Defendant's managers and decision makers communicated in 1998 among themselves to learn and respond to the Koch claims, whether and how anyone was responsible for preserving relevant documents.

LA Weight Loss' affidavits and supplemental answers confirmed that Defendant did not retain relevant Koch training and employment materials. LA Weight Loss, however, was obligated to preserve all relevant evidence because it was on notice of Koch's discrimination and retaliation claims at the time of her termination. Hrg. 32-33; Thompson v. HUD, 219 F.R.D. 93, 100 (D. Md. 2003) (The duty to preserve evidence "is triggered when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."); Silvestri v. General Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001) (same).[14] Supervisor Lynne Portlock's deposition testimony confirms that Portlock received Koch's written notice dated March 8, 1998 of her complaint about retaliatory discipline after she had questioned gender-biased hiring practices. Portlock shared Koch's letter notice of her EEOC claim with her direct superior, Eileen Stankunus, and 'someone in human resources,' and then fired Koch three days later.

---

[14] Title VII also requires every employer, employment agency, and labor organization to 1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, 2) preserve such records for certain periods, and 3) make such reports therefrom as the Commission shall prescribe by regulation or order. 42 U.S.C. § 2000e-8. The applicable regulations further provide where a charge pursuant to Title VII has been filed against an employer, the employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or action. 29 C.F.R. § 1602.14. The term personnel records "relevant to the charge" includes personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held by the aggrieved person. See id.

LA Weight Loss' awareness of potential litigation and employee protests concerning its hiring policies was heightened with LA Weight Loss employee Sandra Brown-Talavera complaints made and formally investigated by counsel just a few weeks before Koch's termination.  A transcript of a recorded interview of Sandra Brown, conducted on February 2, 1998 (see Docket 94 at pp. 15), describes the circumstances of retaliation of which Ms. Brown complained.  Ms. Brown reported that she had told several co-workers and Kristi O'Brien: "[w]hen I was trying to hire, Lesia [Petrizzio, her supervisor] said that I couldn't hire males" [p.38].  LA Weight Loss Chief Operating Officer Scott Moyer noted his intention "to make sure that we talk to everybody.  I want to get all the facts out." [p.53]  Ms. Brown specifically urged that "the gender issue…needs to be investigated."  "I don't feel it is fair that men can't be on board…" [p.58].  Scott Moyer responded, for LA Weight Loss, that "the company does not have a policy against hiring men." [p.58].  Given these circumstances, Defendant's conscious and reckless disregard for preserving documents in view of clear notice of Koch's claims is patently inexcusable and has resulted in the spoliation of important evidence necessitating the adverse instruction.  See Silvestri, 271 F.3d at 591.[15]

The materiality and value of this suppressed evidence is significant. Hrg. 21-22 (documents not only relevant, but actually "critical");  see Thompson, 219 F.R.D. at 101.   Koch is prevented from discovering and exploring facts relevant to LA Weight Loss' defense based on her alleged performance deficiencies, especially in relation to the last week of her employment

---

[15]  See also Zimmerman v. Assoc. First Capital Corp., 251 F.3d 376, 383-85 ( 2d Cir. 2001), where the court upheld an adverse inference instruction in a Title VII claim because the employer threw out the employee's documents within 30-60 days after termination, failed to retain training documents from the period in question, and failed to contact other employees about said documents.  Because the employer failed to offer documentary evidence that the employee had been terminated for inferior performance and denied the employee the ability to compare her treatment to that of other employees, the jury charge permitting an adverse inference was fully warranted.  See Zimmerman , 251 F.3d at 379, 84.

and the final training program she presented to new counselors.  During essential depositions, Kristi O'Brien and Lynne Portlock refused to provide basic information and could not (or would not) recall relevant events and circumstances in 1997 and 1998.[16]  In her sworn testimony, Ms. O'Brien failed to recall most of the events relevant to Ms. Koch's employment, performance, discharge and complaints to the EEOC in 1998, and she refused to produce or describe relevant notes and documents prepared contemporaneously in 1997-98.   O'Brien acknowledged that there were instances, as she worked as Director of Training, when LA Weight Loss discharged trainers for their "performance in conducting training….  I have records on trainers that were – if anybody was let go, I mean, I keep records on the reasons why…" (O'Brien Dep. 147).   Nevertheless, "I wasn't asked to [provide such records to counsel]…but…all the trainers' records are kept at the corporate office." (Id. at 147).  The importance of O'Brien's lost records looms large in view of her responsibility for corporate training programs in Horsham (id. at 61-65), her recollection of the content of new employee service training (id. at 69-71) but failure to recall the 5 or 7-day length of training, in 1998[17] (id. at 76) or the certain topics to be covered on each of training days 1 through 5 (id. at 274-75).  Nor does O'Brien remember the identity of corporate trainers in 1998 (id. at 146), while she concedes that she engaged in very little follow-up among the employees that she trained. (Id. at 140-41).

---

[16] Portlock does not recall having conversations with Lesia Petrizzio about Petrizzio's interview in connection with the Sandra Brown-Talavera complaint.  (Portlock Dep. 349)  However, Portlock spoke daily with Petrizzio about personal and business matters.  (Id. at 349-350).  Lesia Petrizzio had taught Portlock how to recruit as a Center Manager.  (Id. at 57-58).   Petrizzio promoted Portlock to Area Supervisor in 1994 and trained her.  (Id. at 90-91).  When Petrizzio was Portlock's Regional Supervisor, Petrizzio was involved in hiring Portlock's counselors.  (Id. at 68).

[17] Portlock also could not recall how many training days were required of new employees for Koch's presentation, (Portlock Dep. 307, 309), and Portlock has no records of five or seven day training programs. (Id. at 445).

The importance of O'Brien's lost notes and records is heightened as O'Brien has no specific recollection of training Koch[18] (id. at 219-22), denies observing her performance (id. at 232), may have had weekly contact with Koch but does not recall the subjects of their discussions. (Id. at 228-29). O'Brien does seemingly recall Portlock's calls to her suggesting that Koch was not following the training agenda to prepare trainees (id. at 297, 302, 316, 232, 238-39), that Koch wanted to move some training subjects up on the agenda and may not have taught some points at all (id. at 300, 238-40). O'Brien noted what she might have discussed with Koch or what she expects – six years later – that she would have discussed with Koch: "just because it's not written on this agenda doesn't mean we didn't have guidelines…. I would give them guidelines on how much time to spend." (Id. at 248; O'Brien Dep. Ex. 5[19]). O'Brien's notes of her calls with Koch might have assisted her to recall those guidelines; O'Brien discarded those notes after a "couple months." (Id. at 264-67). O'Brien recalls no details as to particular training subjects of concern to Koch or to O'Brien, she recites Portlock's idea that Koch's efforts were inconsistent with the agenda for trainee role-playing practice, Program Explanations ("PE"), Chart Work-ups, medical histories. (Id. at 244-46, 241-43, 261-63).

The importance of lost or destroyed training program materials looms large in view of O'Brien's testimony that Portlock had met several times with Koch to discuss 'following the agenda' and that Portlock, herself, had gotten agenda information from employees trained by Koch. (Id. at 316, 302, 300).[20] While O'Brien recalled that Koch "admitted to me" that she had

---

[18] O'Brien, with Eileen Stankunas, interviewed Koch for employment and signed the job and $35,000 salary offer letter to Koch. (Koch Dep. 55-57, 59). Koch was to report to both Portlock and O'Brien, making weekly calls to O'Brien. (Id. at 76)

[19] O'Brien deposition Exhibits collectively attached hereto as Exhibit D.

[20] Portlock's recollection and testimony is no more definite; see pages 14-15, infra. For example, Portlock does not remember who trained or instructed her on being regional supervisor in 1997-98; it "could have been" Eileen

addressed one or more agenda topics out of order, that she didn't follow the agenda, it was Portlock who told O'Brien that training points were missing; O'Brien had no recollection of any particular subject. (Id. at 285-86, 291, 297, 288).

The importance of O'Brien's lack of specific recollections, her missing notes, and destroyed training materials, also looms large as O'Brien reports her presence on the telephone on March 12 when Portlock fired Koch.[21] Koch was fired for her "ineffective" performance with employees. (Id. at 347-49, 345).

Koch's own recollection of her communications with O'Brien and events surrounding her termination is much more vivid: Koch testified at deposition about the March 6 disciplinary warning, that she was "written up because…I had several discussions with Lynn [Portlock] and with Kristi O'Brien regarding the hiring practices of men." (Koch Dep. 41).[22] In January 1998, Koch had told O'Brien at Horsham that Koch "was having a problem with not being able to hire men, that I found it not only illegal but immoral. And her response to me was Lynn is your boss; do what she says." (Id. at 170). Koch did so, at her peril. "After the February 23rd training I had a conversation with Lynn on March 2nd and she was furious with me because I continued to hire men, to try to hire men." (Id. at 109-10). On March 3rd, "Kristi told me that my job was being phased out and that I would have to apply for a [traveling trainer] job and take a $10,000 cut, work on commission, and work Saturdays." (Id. at 112). Koch's written warning by Portlock

---

Stankunas. (Portlock Dep. 91-92). Portlock does not remember who gave her instruction on applicable standards (if any) for conducting new employee service training (id. at 261-62, 263); It "could have been" Stankunas. (Id. at 264).

[21] O'Brien apparently recalls no discussion with Koch or Portlock about Koch's March 8 letter of complaint. O'Brien Dep. 366, O'Brien Dep. Ex. 9).

[22] Portlock remembers that Koch once asked her whether the company hires men. (Portlock Dep. 208).

followed on March 6 and Koch's responsive letter dated March 8 detailed several points about her training work.  (Id. at 173 *et. seq.*; Koch Dep. Ex. 11).

During Koch's last week of employment, Portlock would not speak to Koch; Portlock "would not speak to me, would not take my calls for that whole week.  Everyone knew at all the different centers that Lynn was not answering my calls."  (Koch Dep. 43).  Then, late on the afternoon of Thursday March 12, Portlock told Koch: "Your job has been terminated; your services are no longer required."  (Id. at 44).  Portlock declined Koch's questions about administering tests to the class of trainees[23] and told her not to come in on Friday.  "I was shocked.  She then advised me to please return all of my training materials."  (Id. at 44).  Koch "got all of my training materials out of the car, a big expander file, the big flip chart, all the handouts.  It was a huge  box; loose-leaf binders, stickers and four keys to the centers."  (Id. at 445).  "I handed her the box, asked for the receipt."  (Id. at 46; see id. at 195-97, Portlock Ex. 15).  Portlock, however, does not have a specific recollection of the documents returned:  "I don't remember what she gave me and I turned it all over to corporate.  (Portlock Dep. 472).

Without adequately explaining the loss or destruction of the training and performance documents identified by Portlock, Koch and O'Brien, it is the testimony of Koch's direct supervisor, Lynne Portlock, on which LA Weight Loss relies to assert that Judge Grimm prematurely determined and "unfairly doubted" Portlock's credibility.  Responding to the EEOC's subpoena and Notice of her deposition (Portlock Ex. 1) and as arranged by her counsel,[24] Portlock testified under oath on September 25, 2003, and on November 6, 2003.

---

[23] Up until the week of February 23, 1998, after each training period, Portlock got a packet with test scores of the Koch trainees and, invariably, was pleased with the test scores. (Koch Dep. 109-10).

[24] Counsel representing both LA Weight Loss and Portlock produced her personnel file on November 5, 2003, just in advance of Portlock's second appearance at the deposition, which was scheduled for a total of seven hours at Mr. Landau's insistence (Portlock Dep. 350, 258-59, 413-14).

Portlock denied that there was any physical or mental reason affecting her ability "to fully and truthfully answer" the EEOC's questions on September 25 (Portlock Dep. 7), and to Koch's questions on November 6, 2003. ( See id. at 258-59, 337).

From her testimony, we learn that by the spring of 1998, Portlock was a long-time employee of Vahan Karabajakian and LA Weight Loss, and had been successively promoted to positions of greater responsibility and compensation reaching $100,000 annually. (Id. at 18, 20, 21-23, 24, 28, 93). However, on June 3, 1998, Eileen Stankunas[25] told Portlock that she had more than she could handle.[26] (Id. at 371-74, 399-400). Portlock was "not sure" if she considered the cut a demotion as she was assigned less responsibility and her compensation was cut: "I don't remember the specific conversation." (Id. at 377). With limited recollections of her discussions with Stankunas upon her reassignment (id. at 400-01, 30-39), Portlock remembers that it was her decision to demote herself to a medical assistant position "for personal reasons" (id. at 35-36), and she recalls the fact of her personal meeting with Vahan Karabajakian. (Id. at 40-43).

As Portlock lacks specific recollections of her discussion with Stankunas about her own personnel actions in mid-1998, she also lacks specific recollection of discussing the performance deficiencies resulting in Koch's termination on March 12, 1998. Over the course of two deposition days, Portlock testified about the scope of her decision to fire Koch:

- "I left her know that the cards that we had did and the training was becoming a flop. It wasn't working out the way it should be and

---

[25] Stankunas supervised Portlock and reviewed her hiring decisions as Portlock served as regional supervisor in 1997-98 (Id. at 84-85). Portlock "could have been" trained by Stankunas. (Id. at 91-92)

[26] Portlock's long time colleague and supervisor, Lesia Petrizio, verbally taught Portlock how to recruit counselors to work in Portlock's increasing number of centers, but does not remember particular instructions. (Id. at 57-58, 68, 90-91). Portlock, in turn, as an area supervisor (1994-97) and regional supervisor (1997-98) instructed her center supervisors on recruiting and made the hiring decisions (Id. at 349-50, 60-61, 62, 62-64, 70-71).

- Kathy was not following through with the training." (Id. at 237-38).

- "The initial reason for firing was poor job performance after making an attempt for her to be successful at the second training." (Id. at 241).

- Portlock gave Koch a written warning (Dep. Ex. 2) prompted by her concerns: "The knowledge of what the staff had come to know to train (sic)…they didn't know anything." (Id. at 241) Staff/trainees "[d]idn't know about certain areas. I can't remember what the specifics were." (Id. at 242).

- "Q: What was it about the training – there was a specific training that you claim led to Kathy Koch's firing, correct, her last training?"

  "A: Yes."

  "Q: What was it about the training?"

  "A: She didn't follow the complete training, the cards, the - everything was – it was set there. It was right – you couldn't have messed it up."

  "Q: What was it about the cards that she didn't follow?"

  "A: I don't remember specifically."

  "Q: Did you ever know?"

  "A: Yes" (Id. at 317-18).

- Portlock "couldn't be definite" about the contents of the training agenda to be followed by Koch (id. at 479-80) or her criticisms of Koch's performance (id. at 480-83). Portlock "can't remember" those criticisms, "can't remember" any agenda items she observed, "can't remember" specific elements of Koch's use of the flip chart or the cards with which Portlock had some issue. "I don't remember all the specifics, no." (Id. at 484-85).

- "Q: So you don't remember the basis for your decision to terminate her for poor performance, do you?"

  "A: No." (Id. at 486).

Similarly, when Portlock testified at some length about the text and context of her written warning to Koch dated March 6, 1998, her lack of direct knowledge or information about Koch's training subjects was striking. (Portlock Dep. Ex. 2, Portlock Dep. 243 et. seq., 307). According

748211                                16

to Portlock's recollection, two managers who "could be Brenda Gibbs, Jan Henderson" had relied on their employees to report "role play" in Koch's training about "P.E." or Program Explanation. (Portlock Dep. 245-47). Portlock did not recall a specific complaint or a manager or employee with whom Portlock had any discussion on that training subject. (Id. at 248-49, 250). Portlock was also "not sure" how she came to the conclusion that not enough training time was spent on the Phone Script. (Id. at 252, 257-58).[27] "It could have been" that somebody told her; "It could have been" one of the managers. (Id. at 252). Portlock cited company policy that every trainee must memorize the Phone Script (id. at 254) but could not identify who gave her that instruction[28] (id. at 263) or articulate how Koch failed to fulfill the policy. For example:

> "Q: In what respect was the amount of time spent on phone script deficient?"
>
> "A: I don't know."
>
> "Q: How much time was spent on it as opposed to how much time should have been spent on it?"
>
> "A: When they all know it." (Id. at 252-53).

For further example:

> "Q: [H]ow do we determine how much time is spent on the phone script – should be spent on it?"
>
> "A: I believe it is written down somewhere, I don't remember that right now. It may be 20 minutes a day. I don't remember right now, but –
>
> "Q: So you believe it is written down somewhere?"
>
> "A: It could be or it was trained somewhere, it was told to somebody."

---

[27] Nor did Portlock remember, one way or another, that anyone had raised a concern about Koch's attention to "work up" homework it - and "it could have been" documented because it was her practice to document training problems. Portlock did not remember any positive statements about Koch's training, although "there could have been." (Id. at 275).

[28] It "could have been Stankunas." "I'm not sure." (Id. at 264).

> "Q: Well, what was the problem here with respect to Ms. Koch's training? Was it that employees didn't know the phone script, or was it that she wasn't spending enough time on the phone script?"
>
> "A: It could have been both and I'm assuming it was both." (Id. at 264-65).[29]

There were certain subjects of her testimony on which Portlock was clear. Her testimony was quite specific as she described the qualifications and characteristics of counselors and other employees recruited for the centers, as well as undesirable characteristics. (Id. at 141-76). Portlock was quite definite that she performed her recruiting and hiring duties consistent with LA Weight Loss policies. (Id. at 174). Portlock was definite about the performance and qualifications of the area supervisors reporting to her in 1998. (Id. at 174-82). Portlock was considerably less definite as to whether men were desirable employees: "someone could have brought it up" (id. at 204-05); "It's possible that someone could have asked but she has "no recollection of any specific conversation." (Id.). Portlock "couldn't say definitely" and doesn't know whether she interviewed any male candidates (id. at 194-96) but remembers making a specific job offer to a man – her stepson – who did not go through the application process. (Id. at 197-200).

Nevertheless, in the face of Portlock's vague or non-existent recollections about Koch's training work and performance deficiencies, the absence of critical documents from Portlock, alone, provides sufficient basis for Judge Grimm's findings and recommendation.

<u>Conclusion</u>

LA Weight Loss has been unwilling or unable to produce the critical training and performance documents for more than two years since Koch intervened with her single-count

---

[29] Portlock similarly did not remember particulars about the other problems cited in employee warning the Notice to Koch. (Portlock Dep. Ex. 3, Portlock Dep. 265 et. seq.)

complaint in this case, more than sixteen months since Koch responded to LA Weight Loss' interrogatories and document requests, more than fifteen months since Koch first requested LA Weight Loss' production of those documents in this litigation[30], and well more than six years since Koch and her counsel corresponded with the EEOC, LA Weight Loss, and its counsel, and noted the existence of those documents in 1998.  Judge Grimm's finding of spoilation is well-founded and this Court is well-advised by Judge Grimm's recommendation to provide an adverse inference instruction to the jury in the Stage I trial of this case.

*Pamela J White* (signature)

---

Pamela J. White, Bar No. 00181
Carla N. Bailey, Bar No. 4714
Ober, Kaler, Grimes & Shriver
120 East Baltimore Street
Baltimore, Maryland  21201
Telephone Number: (410) 347-7323
Facsimile Number: (410) 547-0699
E-mail address: pjwhite@ober.com

Dated:  August 2, 2004

---

[30] LA Weight Loss first responded to Koch's document requests in February 2003, then with a 34 page production, with supplemental responses in October 2003 (after Koch served her Motion to Compel), then with its "second" and "third" supplemental responses in May 2004 (after Judge Grimm's order dated April 6).  LA Weight Loss also has been unwilling or unable to produce critical documents after attending the depositions of Portlock, O'Brien, Moyer, Lang, Siegel and Koch.