93 Fed.Appx. 530    Page 1
93 Fed.Appx. 530, 2004 WL 691429 (C.A.4 (Va.))
**(Cite as: 93 Fed.Appx. 530)**

Briefs and Other Related Documents

Golden Nugget, Inc. v. Chesapeake Bay Fishing Co., L.C.C.A.4 (Va.),2004.This case was not selected for publication in the Federal Reporter.UNPUBLISHEDPlease use FIND to look at the applicable circuit court rule before citing this opinion. Fourth Circuit Rule 36(c). (FIND CTA4 Rule 36(c).)

United States Court of Appeals,Fourth Circuit.
GOLDEN NUGGET, INCORPORATED; David Hickman; Indian Harbor Insurance Company,
Plaintiffs-Appellees,
v.
CHESAPEAKE BAY FISHING COMPANY, L.C.,
Defendant-Appellant.
No. 03-1339.

Argued Dec. 4, 2003.
Decided April 2, 2004.

**Background:** Fishing vessel and related entities sued the owner of a shipyard, claiming that the owner was liable for fire damage to the vessel on theories of negligence, breach of implied warranty of workmanlike performance, and breach of a bailment contract. The United States District Court for the Eastern District of Virginia, Richard L. Williams, J., entered judgment on a jury verdict against the owner, and the owner appealed.

**Holdings:** The Court of Appeals, Duncan, Circuit Judge, held that:

(1) disclosure of expert testimony is required even when it is offered in rebuttal;

(2) erroneous admission of non-disclosed expert testimony, that there was evidence that a thermal cutout existed in a fan which was the source of the fire, was harmless; and

(3) expert's testimony that excessive voltage caused the fire was properly admitted.

Affirmed.

Hamilton, Senior Circuit Judge, filed a dissenting opinion.
West Headnotes
**[1] Federal Civil Procedure 170A ⇌1274**

170A Federal Civil Procedure
   170AX Depositions and Discovery
      170AX(A) In General
         170Ak1272 Scope
           170Ak1274 k. Evidentiary Matters. Most Cited Cases

Disclosure of expert testimony is required even when it is offered in rebuttal; there is no basis in the governing rule for distinguishing disclosures of testimony to be used on direct examination or in rebuttal. Fed.Rules Civ.Proc.Rule 26(a)(2)(B), (e)(1), 28 U.S.C.A.

**[2] Federal Courts 170B ⇌900**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
           170Bk896 Admission of Evidence
              170Bk900 k. Expert and Opinion Testimony. Most Cited Cases

Erroneous admission of non-disclosed expert testimony, that there was evidence that a thermal cutout existed in a fan which was the source of a fire on a vessel, was harmless in an action by the vessel and related entities against a shipyard owner, despite the owner's claim that it was taken by surprise; the owner was clearly on notice of the expert's position that a cutout existed, and had the opportunity to cure any surprise; moreover, the excuse offered by the vessel for its failure to disclose, that it believed the fan remains were of no further importance after its first examination, and simply neglected to retrieve the fan until the week before trial, was supported by the facts. Fed.Rules Civ.Proc.Rule 26(a)(2)(B), (e)(1), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⇌1278**

170A Federal Civil Procedure

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170AX Depositions and Discovery
    170AX(A) In General
        170Ak1278 k. Failure to Respond; Sanctions. Most Cited Cases

Expert's report, although it could have been more clearly delineated, did provide notice that voltage spiking would be an issue in a suit against a shipyard owner arising from fire damage to a vessel, and thus, the expert's testimony that excessive voltage caused the fire was properly admitted; the expert stated, inter alia, that every ballast he looked at "was blown," which told him "that excessive voltage was cause [sic] of any electrical/electronics equipment defects." Fed.Rules Civ.Proc.Rule 26(a)(2)(B), 28 U.S.C.A.; Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

**\*531** Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Richard L. Williams, Senior District Judge. (CA-02-537).

**ARGUED:** John Early Holloway, Hunton & Williams, L.L.P., Norfolk, Virginia, for Appellant. Megan Elizabeth Burns, Williams Mullen, Newport News, Virginia, for Appellees. **ON BRIEF:** Benita W. Ellen, Hunton & Williams, L.L.P., Norfolk, Virginia, for Appellant. Christopher A. Abel, Williams Mullen, Newport News, Virginia; Frank L. Corrado, Jr., Stephen Barry, Rossi, Barry, Corrado, Grassi & Gibson, P.C., Wildwood, New Jersey, for Appellees.

Before WILKINSON and DUNCAN, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished opinion. Judge DUNCAN wrote the opinion, in which Judge WILKINSON joined. Senior Judge HAMILTON wrote a dissenting opinion.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

DUNCAN, Circuit Judge.

**\*\*1** Following trial, the jury found Appellant Chesapeake Bay Fishing Company, L.L.C. ("Chesapeake Bay") liable for damages to the GOLDEN NUGGET, a fishing vessel owned by Appellee Golden Nugget, Inc., captained by Appellee David Hickman, and insured by Appellee Indian Harbor Insurance Company (collectively, "GNI"). Chesapeake Bay challenges the district court's decision permitting GNI to introduce expert opinions that Chesapeake Bay contends were not previously disclosed to it and the denial of its motion for judgment as a matter of law or a new trial. Because we conclude that the evidentiary error was harmless and that the district court properly denied Chesapeake Bay's motion for judgment as a matter of law or a new trial, we affirm.

I.

In October 2000, GNI entered into a contract with Ampro Shipyard, owned by Chesapeake Bay, for routine repair and maintenance on the F/V GOLDEN NUGGET. On October 20, 2000, the GOLDEN NUGGET was placed on a marine railway **\*532** and removed from the water. In preparation for the repair work, an employee of Chesapeake Bay attempted to provide a shore power hookup to the vessel by plugging its shore power cable into a receptacle at the shipyard. When the cable was plugged in, the circuit breaker in the shore power facility tripped, as did the circuit breaker on the GOLDEN NUGGET. The shipyard employee reset the breakers and attempted to plug the shore power cable in again; the shore power circuit breaker tripped again. The shore power cable had four wires, colored white, red, black, and green, and on the third attempt an employee managed to provide shore power to the vessel by cutting the white wire. This time the breaker did not trip. Once power was connected, Captain Hickman closed the vessel cabin and departed.

Five days later, shipyard employees began welding work on the outside stern area of the GOLDEN NUGGET. Later that day, a yard employee noticed smoke coming from the cabin of the vessel, and a fire was discovered.

After the fire was extinguished, investigators found a burned appliance on a lower bunk in one of the bunk rooms. The parties later agreed that the appliance was a fan, that the fan was the source of the fire, and that the fan's switch was in the "on" position when the fire started.

At trial, Chesapeake Bay contended that the fan had

been left on and unattended while surrounded by flammable paper products. Chesapeake Bay theorized that the fan's blades were blocked and could not turn, and the eventual heat build-up of the fan caused the paper products to ignite. GNI argued that a voltage spike caused by the initial failed shore power hookup damaged the fan. Under GNI's theory of causation, the later voltage spiking related to the welding caused the damaged fan to spark and ignite the fire.

In a bifurcated trial, the jury found Chesapeake Bay liable for negligence, breach of implied warranty of workmanlike performance, and breach of a bailment contract. The court entered a final judgment against Chesapeake Bay in the amount of $425,558.

**\*\*2** During trial, Chesapeake Bay raised two objections to the admission of testimony by Frederick West, GNI's expert witness, that form the basis of this appeal. First, Chesapeake Bay objected to the admission of West's expert opinion that voltage spiking caused the fire. Chesapeake Bay argued that the opinion was not disclosed in West's Expert Report as required by Fed.R.Civ.P. 26.[FN1] Second, Chesapeake Bay objected to the admission of West's testimony regarding the existence of a thermal cutout on the fan that sparked the fire. A thermal cutout causes an appliance to turn off in the presence of heat or excessive current, but is not affected by excessive voltage. Confirmation of a cutout therefore undercut Chesapeake Bay's theory of causation. The district court overruled both objections.

> FN1. *See* Fed.R.Civ.P. 26(a)(2)(B) (requiring disclosure of a written report prepared and signed by an expert witness, which "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor....").

After the entry of judgment, Chesapeake Bay made a timely motion for judgment as a matter of law or alternatively for a new trial, again arguing that West's causation opinion was improperly admitted. The district court denied this motion, finding that West's expert testimony tracked information properly disclosed in his Expert Report. Additionally, the district court found that even if the testimony varied slightly from the disclosed information, that variation was harmless. The **\*533** district court further ruled that West's testimony about the thermal cutout was elicited during GNI's rebuttal case, and that the use of the undisclosed opinion on rebuttal did not violate Rule 26.

II.

A district court's evidentiary rulings, including rulings on the admissibility of expert testimony, are reviewed for an abuse of discretion. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141-42, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). An abuse of discretion occurs when a district court makes an error of law. *See United States v. Barile,* 286 F.3d 749, 753 (4th Cir.2002).

A.

We turn first to the more troubling issue of the admission of testimony about the existence of a thermal cutout. GNI stipulates that West examined the physical remains of the fan the day before the trial and formed the opinion at that time that evidence of such a thermal cutout existed. GNI did not disclose this new opinion to Chesapeake Bay.

Fed.R.Civ.P. 26(e)(1) imposes a duty on parties to supplement disclosures if the information disclosed is later found to be incomplete or incorrect. Further, Rule 26 requires disclosure of *all* expert opinion testimony. *See* Fed.R.Civ.P. 26(a)(2)(B) ("The report shall contain a complete statement of *all* opinions to be expressed and the basis and reasons therefor ...." (emphasis added)).

[1] There is no basis in the Rule for distinguishing disclosures of testimony to be used on direct examination or in rebuttal. The district court erred in holding that the disclosure of expert testimony is not required when it is offered in rebuttal. We turn, then, to a consideration of whether the error is harmless.[FN2]

> FN2. Fed.R.Civ.P. 37(c)(1) provides that information not disclosed pursuant to Rule 26 may not be used as evidence at trial "unless such failure is harmless...."

[2] We base an analysis of harmless error on the five

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

factors in *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.,* 318 F.3d 592, 597 (4th Cir.2003), considering: (1) the level of surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

**\*\*3** Chesapeake Bay argues that it was taken by surprise when GNI offered West's opinion about the existence of a thermal cutout. Based on a review of the discovery in this case, while we do not doubt that Chesapeake Bay was surprised by West's testimony regarding physical evidence of the existence of a cutout, it was on notice that the existence of a thermal cutout was a continuing issue for GNI. During his deposition taken two weeks before trial, William Harris, Chesapeake Bay's electrical expert, was asked by GNI's counsel whether it was possible that the fan had a thermal cutout. Additionally, during the deposition of joint forensic expert Dr. Richard Martin, he opined that "[t]his device did not have a thermal cutout" and that "[g]enerally [a thermal cutout] will survive a fire." *See* Martin Dep. at 134-35. In fact, the entire Martin deposition, taken just a week before trial, centered around verifying that the appliance was a fan, and whether there was evidence of a thermal cutout. Perhaps most telling, during the deposition of West taken two weeks before trial, counsel for Chesapeake Bay questioned him extensively about the existence of a thermal cutout. West testified **\*534** that "every fan I've looked at has a thermal cutout in it." When asked why Dr. Martin found no thermal cutout, West responded, "They didn't look good enough [sic] or it's burned out...." West Dep. at 61. Thus, although Chesapeake Bay was surprised when West testified that he found evidence of a thermal cutout, it was clearly on notice of his position that one existed.

With respect to the second factor, Chesapeake Bay argues that it lacked the ability to cure the surprise because it had "no rebuttal or response." Br. at 16. To the contrary, we find Chesapeake Bay had not only the ability to cure any surprise, but also the opportunity. Chesapeake Bay had expert testimony available to it opining that there was no physical evidence of a thermal cutout. At trial, GNI introduced a deposition summary of the findings of joint forensic expert Martin, who analyzed the remains of the fan.[FN3] The summary included the fact that Dr. Martin "did not find any signs of a thermal cutout, but acknowledged that does not mean that the fan did not have a thermal cutout." Since Dr. Martin was a joint expert, Chesapeake Bay also had access to his opinion that "[t]his device did not have a thermal cutout" and that "[g]enerally [a thermal cutout] will survive a fire." Martin Dep. at 134-35. Chesapeake Bay made no effort to have this testimony admitted. At the conclusion of the deposition summary presented by GNI, the district court specifically asked Chesapeake Bay if it had any cross summary. J.A. 264. Chesapeake Bay declined the opportunity.

> [FN3.] Although Dr. Martin did not testify at trial, GNI offered a deposition summary of his testimony.

The conclusion that Chesapeake Bay had the ability to cure the surprise but failed to capitalize on opportunities to do so is reinforced by three other instances during trial. Chesapeake Bay's electrical expert, Harris, had testified during trial that "[t]here is nothing that indicates that [the fan] ever had a thermal cutout." J.A. 324. Nevertheless, when GNI recalled West to testify about the existence of the thermal cutout in rebuttal, Chesapeake Bay declined the opportunity to cross-examine West. Further, after GNI rested its case, the court asked Chesapeake Bay, "Any surrebuttal?" J.A. 340. Chesapeake Bay also declined this opportunity. Finally, immediately after this, the court released the jury for the day but kept the attorneys in order to hear motions regarding jury instructions. Chesapeake Bay did not ask to be heard on the issue of surprise, and at no time asked for a continuance or extended recess in order to afford it the opportunity to cure the surprise.

**\*\*4** As to the third factor, the district court's willingness to hear further evidence from Chesapeake Bay is indicative that curative testimony would not have disrupted the trial. To the contrary, the district court, acting *sua sponte,* offered Chesapeake Bay the opportunity to introduce a cross summary of Dr. Martin's deposition, and offered Chesapeake Bay the op-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

portunity for surrebuttal following West's testimony.

With respect to the fourth factor, the existence of a thermal cutout in the fan was important to Chesapeake Bay's theory of causation for the reasons described above. The existence of a cutout weakened its claim that heat build up caused the fire.

Finally, we find the excuse offered by GNI for its failure to disclose to be supported by the facts in this case. GNI contends that it believed the fan remains were of no further importance after its **\*535** first examination, and "simply neglected to retrieve the fan from Martin until the week before trial." Br. at 16. This explanation is supported by the transcript of the Martin deposition, taken one week before trial. Counsel for GNI told Dr. Martin, "I'm going to give you an address and ask you to Fed-Ex [the fan remains] down to me so that we can have it for use at trial next week." Martin Dep. at 16.

Confirmation of the existence of a thermal cutout surprised Chesapeake Bay at trial, a result [Rule 26](#) is designed to avoid. Although we do not find that GNI acted in bad faith, that does not excuse its failure to notify Chesapeake Bay immediately upon its discovery of what it believed to be the remains of the thermal cutout. Further, our consideration of the fourth factor weighs in favor of Chesapeake Bay's claim; the evidence in question was certainly important to its theory of causation.

On the other hand, Chesapeake Bay was aware of Mr. West's contention that such a cutout existed, and the fan was in the possession of Dr. Martin until the week before trial. More significantly, however, Chesapeake Bay failed to avail itself of any of the opportunities that existed to cure the effect of the surprise. The district court offered Chesapeake Bay an opportunity for surrebuttal. Chesapeake Bay declined, even though its own expert was available to testify to the contrary. Dr. Martin, who had the fan in his possession until the week before trial, opined that such a cutout did not exist, and his deposition containing that testimony had been entered into evidence. Chesapeake Bay did not request a recess or a continuance to seek his testimony. It made no attempt to mitigate the effect of the surprise. Weighing these factors, we conclude that admitting the undisclosed expert testimony concerning the evidence of a thermal cutout on the fan constituted harmless error.

B.

[3] Chesapeake Bay's second issue on appeal is whether the district court erred when it allowed West to testify that excessive voltage caused the fire. Chesapeake Bay alleges that this theory of causation was not disclosed in West's Expert Report and must therefore be excluded pursuant to [Rules 26(a)(2)(B)](#) and [37(c)(1)](#).

**\*\*5** On October 25, 2002, GNI delivered West's Expert Report to Chesapeake Bay. This Report consisted of (1) his Investigative Report, (2) standard shipyard regulations and information, (3) National Electrical Code Requirements for Commercial Wiring, and (4) a letter from West to GNI's counsel, responding to the report of Chesapeake Bay's electrical expert Harris. On January 3, 2003, Chesapeake Bay filed a motion *in limine,* seeking to exclude West's opinions because Chesapeake Bay contended that West was unqualified as an expert, and that he failed to disclose his opinions in his Expert Report. The district court granted in part and denied in part this motion. The court held that West's expert testimony would be limited to what was disclosed in his Expert Report, but Chesapeake Bay's motion to exclude West's testimony was denied as untimely.

Chesapeake Bay contends that GNI originally attributed the fire solely to a voltage spike created by the absence of a ground in connection with the welding work. Therefore, Chesapeake Bay argues, the theory that voltage spiking, unrelated to the existence or absence of a ground during the welding work, caused the fan to burn up and ignite the fire was undisclosed and therefore inadmissible.

We agree with the district court's finding that West's report did provide notice that voltage spiking would be an issue at **\*536** trial, although it could have been more clearly delineated.[FN4] For instance, in his Report, West stated, "[T]he ballast did receive a voltage spike ... [the blown ballast] was not the starting point of the fire but was a good indication of voltage spik-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing." He wrote that "voltage was circulating through the ships [sic] hull with a floating return path, making it unstable.... The change in ARC's by the welder provided voltage spikes throughout ships [sic] electrical circuits and approximately 1 hour later the fire was found." He further stated, "The spike that caused the heater/appliance to create a spark was a high voltage spike.... The culprit was voltage not current.... Current causes breakers to trip, excessive voltage just burns equipment out due to dielectric breakdown." In West's letter in response to Harris' Report, which was included in West's Expert Report, he stated, "I disagree with the findings and feel [voltage spiking] is possible cause of damage [sic]." West further stated, "[That a voltage spike should not have any effect on equipment downstream] is unknown," and "[e]very ballast I looked at was blown which tells me that excessive voltage was cause [sic] of any electrical/ electronics equipment defects." In response to Harris' contention that excessive current caused the fan to ignite, West stated, "If rotor was stopped [sic], excessive *current* would be drawn. Breakers would have tripped. The external wires to this appliance showed no signs of wire melting inside out. But we know we had excessive voltage by testimony and evidence of blown ballast." J.A. 650-78.

> FN4. Additionally, in a letter to Chesapeake Bay dated September 21, 2001, GNI summarized its initial position: "The cumulative effect of these inexcusable errors on Ampro's part were that the GOLDEN NUGGET experienced a series of high voltage spikes (as indicated by an internally blown light ballast on board), particularly once Ampro began welding on the vessel, that led directly to the fire that gutted her." J.A. 545.

**\*\*6** We agree with the district court's conclusion that while GNI's theory of causation could have been articulated more definitively, it was generally disclosed in West's Expert Report. Thus, the district court did not abuse its discretion in allowing the testimony.

C.

Our conclusion as to the admissibility of GNI's causation testimony controls our analysis of Chesapeake Bay's contention that it was entitled to a directed verdict or a new trial. Because we find West's opinion to be admissible, we conclude that there was sufficient evidence for the jury to find Chesapeake Bay liable. Further, the district court did not abuse its discretion in denying the motion for a new trial in the interest of justice. See *Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996) ("[I]t is the duty of the [district court] to set aside the verdict and grant a new trial, if ... [1] the verdict is against the clear weight of the evidence, or [2] is based on evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.").

III.

For the foregoing reasons, the judgment in the district court in *Golden Nugget, Inc. v. Chesapeake Bay Fishing Company, L.C.,* No. 03-1339, is

AFFIRMED.

HAMILTON, Senior Circuit Judge, dissenting:

Because Chesapeake Bay did not receive anything close to a fair trial in this case, I respectfully dissent. I agree with the majority**\*537** that the district court erred in holding that West's expert rebuttal testimony, to the effect that he found physical evidence of a thermal cut-out on the remains of the fan, was excepted from the dictates of Federal Rule of Civil Procedure (Rule) 26(a)(2)(B) and (e)(1). However, I disagree with the majority's holding that the admission of such testimony constituted harmless error, and thus, was not subject to exclusion pursuant to Rule 37(c)(1). I also disagree with the majority's holding that GNI's two-step theory of causation, presented at trial, was sufficiently disclosed in West's expert report, such that the district court did not abuse its discretion in allowing West to testify to the theory at trial. For these reasons, I would vacate the judgment and remand for a new trial with the condition that, prior to trial, Chesapeake Bay be allowed to conduct further discovery regarding the evidence challenged in this appeal, in accordance with Rule 26.

I.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As part of its rebuttal case, GNI recalled West to give expert opinion testimony on the question of whether the physical remains of the fan contained evidence of a thermal cut-out. In relevant part, the transcript reveals the following exchange between counsel for GNI and West during West's direct testimony in rebuttal:

BY MR. ABEL:

Q Sir, you have had occasion to take a close look at the remains of the fan that is exhibit 63, right?

A Yes, sir.

Q Sir, is there anything there that leads you to believe that there was a thermal cut-out on that fan?

**7 A Yes, sir.

Q Can you tell us what that is?

* * *

[A] Crimp right here on this wire. That is consistent with how a thermal protector would be installed.

* * *

Q Is there anything else on there on any other wire also consistent with having been a thermal cut-out ought [sic] there?

* * *

[A] You can see where a switch was installed. This is a switch. There is some other wires somewhere. But this part of it is one side of a thermal cut-off.

* * *

Q Have you seen that sort of thing before?

A Yes, sir.

(J.A. 338-40).

Because expert testimony has the potential to "be both powerful and quite misleading," Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (internal quotation marks omitted), basic due process demands that expert testimony be subject to "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Id. at 596 (internal quotation marks omitted). Because GNI violated Rule 26(a)(2)(B) and (e)(1), Chesapeake Bay was prevented from subjecting the above quoted expert testimony to vigorous cross examination and prevented from presenting contrary evidence at trial.

With all due respect, the majority's assertions to the contrary do not withstand scrutiny. What the majority characterizes as Chesapeake Bay's declined opportunities to cure the effect of its surprise *538 amount to nothing. Such alleged declined opportunities include: (1) Chesapeake Bay's opportunity to submit Dr. Richard Martin's (Dr. Martin) deposition testimony that his pretrial examination of the fan debris did not reveal a thermal cut-out or any other switching elements or something as a separate thermal cut-out; (2) Chesapeake Bay's opportunity to recall its own expert William Harris (Harris) in surrebuttal to reiterate his previous testimony that there is nothing in the fan remains to indicate that the fan ever had a thermal cut-out; and (3) Chesapeake Bay's opportunity to *sua sponte* request a continuance or extended recess in order to afford it the opportunity to cure its surprise through further discovery.

With respect to the first two of these three alleged declined opportunities, the testimony of Dr. Martin and Harris is far too general to rebut West's detailed and specific trial testimony, while apparently holding the burnt fan in his hands, that what led him to believe the fan had a thermal cut-out was the "crimp right here on this wire. That is consistent with how a thermal protector would be installed." (J.A. 339). Moreover, without being armed with an expert witness opinion to rebut West's very specific and detailed testimony regarding the physical evidence of a thermal cut-out, Chesapeake Bay lacked the ability to effectively cross examine West on this point. Indeed, " 'the ability to simply cross-examine an expert concerning a new opinion at trial is not the ability to cure, ... [as] the rules of expert disclosure are designed to allow an opponent to examine an expert opinion for flaws and to develop counter-testimony through that party's own experts.' " Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 598 (4th Cir.2003).

**8 Moreover, to put the burden on Chesapeake Bay, at the very end of a jury trial, to *sua sponte* request a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

continuance or extended recess in order to conduct further discovery and develop a credible response to expert testimony submitted in blatant violation of Rule 26(a)(2)(B) is unjustifiable. By placing such a burden on Chesapeake Bay, the majority sends the clear message that compliance with Rule 26(a)(2)(B) and (e)(1) is merely discretionary; indeed, only a nice idea, with no real consequences from noncompliance.

Considering (1) Chesapeake Bay's lack of ability and opportunity to cure the prejudice of surprise that even the majority acknowledges Chesapeake Bay suffered when West testified during rebuttal regarding the physical evidence of the existence of a thermal cut-out on the fan, (2) the undisputed importance of such testimony in that it completely undercut Chesapeake Bay's sole theory of causation, and (3) the pitiful excuse offered by GNI for failing to comply with Rule 26(a)(2)(B) and (e)(1), the conclusion is inescapable that the district court abused its discretion in overruling Chesapeake Bay's objection to West's rebuttal testimony regarding physical evidence of a thermal cut-out on the fan. Accordingly, at a minimum, I would vacate the judgment and remand for a new trial, with the condition that, Chesapeake Bay be allowed to conduct further discovery on the matter prior to such new trial.

II.

On appeal, Chesapeake Bay also challenges the district court's admission of West's direct testimony setting forth his two-step theory of causation. On direct examination, West was asked if he had a professional opinion as to when, in the time line, the fan had its motor burn up? West answered: "On initial hook up of the shore power." (J.A. 282). West was then **\*539** asked, if he could "tell the jury why it is that if the motor fan burned up when the shore power was initially hooked up, the fire didn't occur until five days later?" *Id.* West responded:

Because when they initially had it operating improperly when they initially did the connection, the wrong connection, the high voltage, they burned up the fan. They opened it up. So the captain wasn't going to see anything running, because the fan wasn't working, because it was open. But when they hooked up the ground to it and they started arcing on it, they gave potential there, difference of potential for the fan to start receiving a signal and heating up again.

(J.A. 282-83). In his next answer, West explained that the arcing resulted from voltage spikes caused by the welding work on the ship.

Chesapeake Bay argued below, and continues to argue on appeal, that West's two-step theory of causation (*i.e.,* (step one) initial burnup of the fan's motor, which made possible (step two) the subsequent fire originating from the fan five days later following an hour after the welding work) should have been excluded pursuant to Rule 37(c)(1) and the district court's January 8, 2003 order granting Chesapeake Bay's motion *in limine* to the extent that such motion sought to limit West's expert testimony at trial "to what was disclosed in his expert report of October 25, 2002...." (J.A. 54). According to Chesapeake Bay, West's two-step theory of causation was not set forth in his expert report of October 25, 2002. Chesapeake asserts that West's report can only reasonably be read to opine that the fan caught fire solely because a "change in ARC's by the welder" created voltage spikes in the fan. (J.A. 651).

**\*\*9** The majority glosses over the crux of Chesapeake Bay's argument by merely concluding that it agrees "with the district court's finding that West's report did provide notice that voltage spiking would be an issue at trial, although it could have been more clearly delineated." *Ante* at 535-36. Notice that voltage spiking would be an issue at trial is hardly the point. No one disputes that West's report identified voltage spiking as a critical part of his theory of causation. Significantly, however, the report, when read in a straightforward manner, opines that the fan was ignited by a voltage spike caused by a "change in ARC's by the welder." (J.A. 651) ("The change in ARC's by the welder provided voltage spikes throughout [the] ship[']s electrical circuits and approximately 1 hour later the fire was found."). The critical point the majority fails to address is whether West's expert report disclosed his opinion, admitted as evidence at trial, that the initial hook up of shore power and the ship's exposure to the high leg instantly caused damage to the fan's motor through voltage spikes, such that the subsequent voltage

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

spikes from the welding work were able to cause the fan to ignite.

The answer to this question is clearly no. Indeed, when West was asked during his deposition, taken just two weeks before trial, whether, anywhere in his report, he "explicitly sa[id]" that he thought "the coils of the fan were burned out by a voltage spike when the high leg was hooked up ... ?", West answered, "Nowhere in this report, no." (J.A. 615). West admitted during cross examination at trial that this was indeed his deposition testimony. (J.A. 294). In a case where the expert witness himself admits that his own report does not explicitly express a critical part of the very causation theory that he espouses at trial, that Chesapeake Bay cannot reasonably be expected to have leapt such an informational chasm is axiomatic. Accordingly, I would hold that the **\*540** district court erred in overruling Chesapeake Bay's timely objection to the admission of West's two-step theory of causation during his direct testimony, and would remand for a new trial with the condition that Chesapeake Bay, at a minimum, be allowed to conduct further discovery on the matter prior to such new trial.

III.

In conclusion, I am constrained to express that the majority's affirmance in this case not only creates unfair consequences for Chesapeake Bay, it significantly weakens, if not obliterates, our civil discovery process and the intended bite of Rule 37(c)(1)'s exclusionary rule. GNI blatantly did not play by the discovery rules with regard to the expert testimony of West, and yet, suffered no adverse consequences. Indeed, GNI was able to use the effects of its own discovery violations to its very own significant tactical advantage. This court should not be in the business of readily countenancing such behavior. Accordingly, with the conditions which I have already set forth, I would vacate the judgment and remand for a new trial.

C.A.4 (Va.),2004.
Golden Nugget, Inc. v. Chesapeake Bay Fishing Co., L.C.
93 Fed.Appx. 530, 2004 WL 691429 (C.A.4 (Va.))

Briefs and Other Related Documents (Back to top)

• 03-1339 (Docket) (Mar. 24, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.