## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND, NORTHERN DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **and** | : | |
| | : | **CASE NO.: WDQ 02-CV-648** |
| **KATHY KOCH,** | : | |
| | : | |
| **Intervenor/Plaintiff,** | : | **JURY DEMANDED** |
| | : | |
| **v.** | : | |
| | : | |
| **LA WEIGHT LOSS CENTERS, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## LA WEIGHT LOSS CENTERS, INC.'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

                                                    **Page**

TABLE OF AUTHORITIES ................................................................................ iv

I.      INTRODUCTION ...........................................................................................1

II.    STATEMENT OF UNDISPUTED FACTS ....................................................2

       A.     Factual Background ..............................................................................2

            1.     LAWL is a Leading National Weight Loss Company ...............................2

            2.     The LAWL Diet and Counseling Program are Highly Successful .............2

            3.     The Ability to Connect Emotionally is Critical to Success at LAWL ......................................................................................4

            4.     Client Service and Counseling Determine LAWL's Operating Structure ................................................................................5
                  a.     Counselors and Medical Technicians .................................6
                  b.     Center Manager........................................................7
                  c.     Assistant Manager ....................................................8

            5.     LAWL's Hiring Process is Designed to Elicit Critical Hiring Criteria ....................................................................................8
                  a.     The Hiring Process Today ............................................8
                  b.     The Hiring Process Changed Over Time .........................10
                  c.     Applicant Tracking and Document Preservation ...............11

            6.     An Audit of LAWL's Hiring Practices Confirms They are Gender Neutral ....................................................................................12

            7.     A Higher Percentage of Women Possess the Relevant Traits Qualifying Applicants for Employment with LAWL ...............................14

            8.     LAWL's Applicant Flow is Predominantly Female .................................16

            9.     LAWL's Hiring Criteria is Clear, Objective and Measurable .................16

           10.    EEOC's Expert Analysis Does Not Account for Local Hiring and Relevant Job Qualifications ...................................................20

           11.    EEOC's Anecdotal Evidence Has Temporal and Geographic Restrictions ....................................................................22
                  a.     Former Employees ....................................................23
                  b.     Class Claimants.......................................................24

    B.    Procedural Background ..................................................................24

          1.    Intervenor Kathy Koch Filed a Charge with EEOC ..................24

          2.    EEOC's Amended Complaint Contains Three Distinct Claims ...............25
              a.    Kathy C. Koch .................................................26
              b.    Pattern or Practice of Discrimination ..............................26
              c.    Preservation of Applicant and Hiring-Related Materials ..............27

          3.    The Parties Engaged in Exhaustive Discovery ..........................27

III.    ARGUMENT ....................................................................................28

    A.    Standard Applicable to Summary Judgment ..................................28

    B.    Summary Judgment is Proper Because EEOC Cannot Make Out a Prima
        Facie Case of a Nationwide Pattern or Practice of Intentional
        Discrimination ...............................................................................29

          1.    The Analytic Framework and Burden of Proof ..........................29

          2.    EEOC's Expert Evidence Does Not Establish a Prima Facie Case ...........30
              a.    The Expert Evidence Does Not Reveal a Company-Wide
                    Gender Disparity .............................................31
               b.    The Expert Evidence Does Not Account for Hiring Criteria ........34

           3.    EEOC's Anecdotal Evidence is Insufficient to Establish a Prima
              Facie Case of Company-Wide Discrimination ..........................36

    C.    Summary Judgment as to Twelve Class Claimants is Proper Because they
        are Outside the Statutory Filing Period  ....................................................38

          1.    Title VII's 180-Day Statutory Filing Limitation is Applicable ................38

          2.    LAWL Received Notice of EEOC's Pattern or Practice Claims on
              September 14, 2000 ................................................................39

          3.    Twelve Class Claimants are Time Barred and Should be Excluded ........40

          4.    Excluded Class Members Cannot be "Recaptured" by Operation of
              the Doctrine of Continuing Violation ......................................41

    D.    Summary Judgment is Proper Because There is No Dispute That LAWL
        Complied With 29 C.F.R. § 1602.14 ....................................................42

          1.    It is Undisputed That LAWL in Good Faith Preserved All Records
              Relevant to the Claims in This Case ....................................43
              a.    Documents Relating to Kathy Koch ..............................43
               b.    Documents Relating to EEOC's Pattern or Practice Claim ..........44

IV.    CONCLUSION..................................................................................................46

# TABLE OF AUTHORITIES

## CASES

Beniushis v. Apfel, No. 98-C0395, 2001 U.S. Dist. LEXIS 3574 (N.D. Ill. Mar. 26, 2001) ...............43

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...............28

Chisholm v. United States Postal Serv., 665 F.2d 482 (4th Cir. 1981) ...............30, 36

Coker v. Charleston County Sch. District, No. 92-1589, 1993 U.S. App. LEXIS 20836 (4th Cir. Aug. 16, 1993) ...............30

Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867 (1984) ...............29

Delaware State College v. Ricks, 449 U.S. 250 (1980) ...............39

Diamond v. Colonial Life & Accident Insurance Co., 416 F.3d 310 (4th Cir. 2005) ...............28

Domingo v. New England Fish Co., 727 F.2d 1429 (9th Cir. 1984) ...............41

Favors v. Fisher, 13 F.3d 1235 (8th Cir. 1994) ...............43

Foster v. Tandy Corp., 828 F.2d 1052 (4th Cir. 1987) ...............36

Goff v. Continental Oil Co., 678 F.2d 593 (5th Cir. 1982) ...............37

International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977) ...............29, 34, 36

King v. General Elec. Co., 960 F.2d 617 (7th Cir. 1992) ...............30, 36

Lombard v. MCI Telecomm. Corp., 13 F. Supp. 2d 621 (N.D. Ohio 1998) ...............43

Lowery v. Circuit City Stores, Inc., 158 F.3d 742 (4th Cir. 1998) ...............29

Lumpkin v. Coca-Cola Bottling Co. United, Inc., 216 F.R.D. 380 (S.D. Miss. 2003) ...............42

Mathis v. John Morden Buick, Inc., 136 F.3d 1153 (7th Cir. 1998) ...............43

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) ...............28

Morgan v. UPS, 143 F. Supp. 2d 1143 (E.D. Mo. 2000) ...............29, 32

National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) ...............41

Park v. City of Chicago, 297 F.3d 606 (7th Cir. 2002)..................................................43

Rodriguez v. United States Department of Treasury, 131 F.R.D. 1 (D.D.C. 1990) .....................42

Sandoval v. Saticoy Lemon Association, 747 F. Supp.1373 (C.D. Cal. 1990) .............................42

EEOC v. Federal Reserve Bank, 698 F.2d 633 (4th Cir. 1983)......................................................37

EEOC v. General Electric Co., 532 F.2d 359 (4th Cir. 1976) ................................................38, 39

EEOC v. Optical Cable Corp., 169 F. Supp. 2d 539 (W.D. Va. 2001)....................................38, 41

EEOC v. Turtle Creek Mansion Corp., No. 3:93-CV-1649-H, 1995 U.S. Dist. LEXIS
    12788 ................................................................................................................................34, 35

Ste. Marie v. Eastern R. Association, 650 F.2d 395 (2d Cir. 1981) .............................................36

Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) ............................................................33

Warren v. Halstead Industries, Inc., 802 F.2d 746 (4th Cir. 1986)...............................................36

Williams v. Aluminum Co. of America, 457 F. Supp. 2d 596 (M.D.N.C. 2006)..........................28

## STATUTES

42 U.S.C. § 2000e-5.......................................................................................................................38

42 U.S.C. § 2000e-6.......................................................................................................................38

29 C.F.R. § 1602.14 ................................................................................................................. 42-44

## I.    INTRODUCTION

Even the casual observer can see that the personal appearance industry caters largely to women. Visit the cosmetics counter of a department store – nearly all the clients are women. It follows that in an industry where the clientele is mostly women, the people who service those clients are also women. Common sense dictates that men generally do not seek to help women purchase makeup. LA Weight Loss Centers, Inc. ("LAWL"), a leading national weight loss company, is a reflection of this reality. Its business is focused exclusively on personal appearance, and its primary method involves one-on-one weight loss counseling. LAWL's clients are roughly 90 percent female and applicants for jobs servicing those clients are 80 percent women. It should, therefore, come as no surprise that very few men work at LAWL.

In a case more about social engineering than statutory violation, EEOC contends that LAWL intentionally discriminates against men in its hiring and recruiting practices. EEOC does not, however, base its allegation on LAWL's method of soliciting applicants, which is indisputably gender neutral. It does not base its claim on LAWL's hiring policies and practices, which have been found by an independent audit to be gender neutral. EEOC does not base its contention on any detailed statistical analysis of the hiring decisions LAWL employees actually make. Rather, EEOC looks at the fact that LAWL hires few men nationally, and then verifies that fact through an expert whose approach is neither supported by evidence nor case law.

EEOC cannot even buttress its claim through anecdotal evidence of discrimination. Despite four years of discovery, EEOC has not uncovered the threshold anecdotal evidence necessary to show company-wide discrimination. Out of the nearly 60 class members deposed, only three have admissible testimony to support an allegation of intentional discrimination. The evidence is simply insufficient to demonstrate a pattern or practice of nationwide discrimination against men. Accordingly, LAWL is entitled to summary judgment.

II.    **STATEMENT OF UNDISPUTED FACTS**

    A.    <u>**Factual Background**</u>

        1.    **LAWL is a Leading National Weight Loss Company**

In just nine years, LAWL has become one of the world's leading weight loss companies in a highly competitive industry. Founded by Vahan Karian in 1997 by combining several weight loss companies – Quick Weight Loss Centers, Inc., Medical Weight Loss Centers of Central Pennsylvania and Weight Loss Centers of New York and New Jersey – under one banner, the company offers a unique weight loss program focusing on counseling, behavior modification and dietary supplements ("LAWL Diet"). Deposition of Vahan Karian at pp. 29-30, attached hereto as Exhibit A. It is LAWL's primary business purpose to sell nutritional plans to overweight people and provide them with counseling and diet aids resulting in long-term weight reduction. <u>Id.</u> at 12-13. Operating through a series of storefront centers with a single corporate office in Horsham, Pennsylvania, LAWL grew from 47 to approximately 400 centers since 1997. <u>Id.</u> at 33. <u>See also</u> Center List, attached hereto as Exhibit B. Today, LAWL is a national company selling the LAWL Diet and associated products from coast to coast.

        2.    **The LAWL Diet and Counseling Program are Highly Successful**

The cornerstone of LAWL's success is the LAWL Diet, which is based on individualized programming and support for each client. Unlike other weight loss programs, the LAWL Diet does not require the client to eat company-manufactured food. <u>See</u> Deposition of Joni Fabie at p. 96, attached hereto as Exhibit C. Rather, the client eats everyday food along with nutritional supplements pursuant to specific menu plans. <u>Id.</u> at 96-99. To assist LAWL's clients – 90 percent of whom are women – in their weight loss journey, trained Counselors provide ongoing guidance. <u>See, e.g.,</u> Deposition of Laurinda Beavers at pp. 117-18, attached hereto as Exhibit D (percentage female); Deposition of Lesia Petrizio at pp. 104-05, attached hereto as Exhibit E

(Counselor duties). Not only do Counselors teach clients how to eat healthier – both in the foods

they buy, the foods they cook and the foods they are served in restaurants – but they support

clients emotionally to help them achieve their weight loss target. Exhibit E at pp. 104-05.

Menstrual cycles, bowel movements, sexual relations, hygiene and self esteem are just some of

the issues regularly discussed with clients. Id. at 104-09. Deposition of William P. Doyle, III at

pp. 178-81, attached hereto as Exhibit F. Empathic Counselors are in fact the bedrock of client

success and distinguish LAWL from many of its commercial competitors. See Expert Report of

Robert L. Tanenbaum, Ph.D. at pp. 3, 8, attached hereto as Exhibit G.

> [W]e're dealing with people who are here trying to lose weight.
> And they come in to see us three times a week and every time they
> come in they have needs. We have to be able to service those
> needs…. Maybe they – they're not losing as quickly as they
> thought they would and they're extremely discouraged…. You're
> dealing with a person who got up in the morning, probably went to
> her closet and had absolutely nothing to put on for work. She
> probably received comments from her family or friends about her
> weight. She doesn't feel comfortable in her own skin. She's
> probably tried every diet out there known to man and now she's
> reaching out to you for help. And when she comes reaching out
> for help she's not offering it up on a silver platter because she's
> embarrassed. I mean I've had women tell me they can't even take
> their kids to the movies anymore because they can't fit in the seats.
> She's not going to volunteer that information to me the minute I sit
> down with her. It's a skill to learn to peel through those layers and
> be able to connect with the person on an emotional level. And
> that's the most important part of what we do….

Deposition of Elaine Bussoletti at pp. 32-34, attached hereto as Exhibit H. As LAWL's expert,

Robert L. Tanenbaum, Ph.D., a licensed psychologist, observed: "From the clients' perspective,

the counseling relationship and process promotes emotional privacy and creates a safe setting in

which clients can share personal issues related to their weight loss goals…. [I]n the eyes of the

LAWL clients, counseling is an invaluable aspect of the program." Exhibit G at pp. 3, 8.

### 3.    The Ability to Connect Emotionally is Critical to Success at LAWL

LAWL's insistence that its staff possess the ability to connect with clients on an emotional level is grounded in the reality of LAWL's product and counseling services.  Dr. Tanenbaum, who was asked to explore whether emotional connectedness has any impact on clients' experience and success with the LA Diet, opined that "the counseling relationship, which turns on the emotional connection between client and Counselor, is a very important component of clients' success...."  Exhibit G at p. 1.

Dr. Tanenbaum's opinion is based not only on his experience aiding clients with appearance issues and a review of relevant psychological literature, but also individual structured interviews with nearly 30 LAWL clients at five locations.  Id. at 2.  Dr. Tanenbaum's interview results underscore the legitimate need for LAWL to screen applicants for emotional connectivity.  "[A]n overwhelming majority (90.3%) of those LAWL clients interviewed identify the 'one-to-one counseling' as the element of the program they rely upon most in reaching their weight loss goals...."  Id. at 4.  Virtually all participants expressed frustration and concern about the insufficient structure, guidance, accountability, and inconsistent support they received during earlier weight loss experiences with other providers.  Id. at 3.  Because the LAWL program, however, requires clients and Counselors to jointly establish objective and measurable weight loss or appearance goals, empathic Counselors are essential – they are "critical to the clients' experience."  Id. at 3.

Further, Dr. Tanenbaum found that the emotional connection formed with LAWL employees inarguably has a significant and pronounced positive impact on clients' experience with the program, as well as individual outcomes with respect to weight loss and improved appearance.

> Q:  How well do you think you would meet your goals if you would use the supplements on your own and without the counseling?
>
> A:  It would be rough…
>
> A:  I don't think the loss of weight would be as dramatic…
>
> A:  Without the counseling it would be like every other diet, they keep you on track…
>
> A:  …[T]he counseling is essential at this point.

Id. at 6-7.

EEOC did not take any discovery concerning LAWL's clients.  It neither sought documents about nor deposed persons enrolled in the program.  EEOC did not even depose Dr. Tanenbaum.  Not one iota of evidence exists suggesting that emotional connectedness is anything other than a legitimate business-related component of the LAWL program.

**4.      Client Service and Counseling Determine LAWL's Operating Structure**

The Company's organizational structure must be viewed against the backdrop of the LAWL Diet's (sub)clinical counseling approach.  Id. at 3.  To deliver its program and provide a high level of support services to its clients, LAWL has hundreds of storefront centers spanning the country and requires an extensive management hierarchy.  See LAWL's Organizational Chart by Market, attached hereto as Exhibit I.  At present, the company is divided geographically into the following fourteen territories:

- Central Eastern Pennsylvania
- Maryland/DC and Virginia
- Texas
- Boston
- Northern New York
- New York Metro
- Pittsburgh/Ohio
- Florida
- Chicago

- St. Louis
- Indiana
- West Coast
- Las Angeles
- Michigan

Each territory is broken down into regions, each with a Regional Manager. Id. The Regional Manager reports to the Divisional Manager, the Divisional Manager to the Vice President of Operations, and the Vice President of Operations to LAWL's Chief Operating Officer. Id.

Each region is subdivided into areas, and each area is overseen by an Area Manager. Id. LAWL vests Area Managers with responsibility for nearly every aspect of center operations, including hiring, employee development and promotion. See Area Supervisor Job Description, attached hereto as Exhibit J.[1] There are approximately 65 areas nationwide, each containing multiple storefront centers. Exhibit I. Areas are organized along geographic lines, with center proximity being the defining feature. Id. Three tiers of employee levels exist below the area level – Counselors and Medical Technicians, Center and Assistant Managers.

### a.     Counselors and Medical Technicians

The LAWL center is the locus of all LAWL Diet sales and the site of all individualized counseling. LAWL clients check into their local centers several times per week to be weighed, to review food diaries, to receive counseling and individualized diet modifications, as well as to purchase LAWL products. Exhibit F at pp. 177-78. Empathic Counselors and Medical Technicians are critical to the success of any LAWL center. Not only are they charged with

---

[1]     In addition to overseeing the operations of several centers, Area Managers are expected to counsel clients and to develop the counseling skills of center-level staff. See Exhibit J; Deposition of Christiane Burnard at pp. 168-69, attached hereto as Exhibit K.

supporting overall center operations, but they are largely responsible for providing individualized counseling to ensure safe, healthy and effective weight loss.  See Guide to Selecting the Best at p. 16, attached hereto as Exhibit L.  For the reason that the LAWL Diet demands a large degree of client contact and because weight loss is exceedingly emotional in nature, it is essential that Counselors and Medical Technicians are excellent communicators with the ability to identify with LAWL's clientele.  Exhibit E at pp. 109-10.  They have to be willing to and capable of discussing highly personal issues with a broad range of people.  Id. at 104-09.  Counselors constitute the majority of all LAWL employees, as well as the bulk of the Company's applicants for employment.  See Report on the Hiring of Men by LA Weight Loss Centers, Inc. by Elvira Sisolak at pp. 7, 11, attached hereto as Exhibit M.

> **b.    Center Manager**

Center Managers are the driving force behind the LAWL program.  Not only are they responsible for overseeing center-level staff, which typically consists of one Assistant Manager, two Counselors and a Medical Technician, but they ensure their center is operating smoothly and they handle most incoming information calls, initial consultations, program explanations and sales.  Exhibit L at pp. 12-13.  Accordingly, Center Managers are experts in all aspects of the LAWL Diet.  Id.  It is vital that Center Managers have the ability to connect with LAWL's clients – to demonstrate empathy and a true desire to counsel the reluctant, because Center Managers counsel clients daily and coach Counselors.  Exhibit K at pp. 200-03.  Center Managers report directly to Area Managers and do not typically engage in the Company's hiring process.  See Deposition of Karen Siegel, September 19, 2002, Vol. II, at p. 224, attached hereto as Exhibit N (Area Managers supervise Center Managers); Deposition of Karen Siegel, November 11, 2004, at p. 120, attached hereto as Exhibit O (Center Managers do not engage in

hiring); Deposition of Nicola Fryer, November 22, 2005, at p. 193, attached hereto as Exhibit P (Center Managers do not engage in hiring).

### c.     Assistant Manager

Assistant Managers support Center Managers in meeting or exceeding revenue quotas and in observing, evaluating and analyzing center operations. Exhibit L at p. 14. They share in the responsibility of selling the LAWL Diet and they engage fully with clients. Id. Indeed, Assistant Managers function as Center Managers when necessary. Id.

### 5.     LAWL's Hiring Process is Designed to Elicit Critical Hiring Criteria

### a.     The Hiring Process Today

To sell and service the intangible LAWL Diet, applicants must possess a unique skill set combining an aptitude for closing commission sales and an ability to connect emotionally. To that end, LAWL engages in a selective and gender neutral hiring process involving a resume review, a telephone pre-screen and an interview. See Expert Report by Seymour Adler, containing Review of Recruitment and Selection Process at p. 3, attached hereto as Exhibit Q; Exhibit E at pp. 96-99. That three-step process results in fewer than three percent of *all* applicants being offered employment. See Exhibit M at p. 14.

The initial recruiting steps are performed by recruiters at LAWL's corporate office. Exhibit O at pp. 74-75. Each recruiter is assigned to particular geographic regions and reviews incoming resumes to determine who to contact for a telephone pre-screen.[2] Id. at 186-87. A recruiter's decision, which hinges largely on employment history and job relatedness, is made quickly. Exhibit Q at p. 26. The telephone pre-screen, also performed by in-house recruiters, is

---

[2]     Nearly all of LAWL's candidates apply online through one of three employment websites – Hotjobs.com, CareerBuilder.com or Monster.com. Exhibit O at p. 76.

more involved and seeks to assess personal and interpersonal skills, such as the ability to make

an emotional connection and provide client support. Exhibit L at p. 21. Recruiters seek answers

to questions such as: "How do you feel about working one on one with clients and supporting

them throughout their weightloss?.... If you woke up tomorrow and needed to lose 100 lbs –

how much would you pay to lose it?.... Do you have a personal weight loss story – either you, a

friend or a family member?" Id. Based on performance during the telephone pre-screen --

particularly with respect to phone demeanor and personal questions – a recruiter determines

whether to schedule a candidate for an interview with one of LAWL's 65 Area Managers.

The interview is the critical final step in LAWL's hiring process. It is at the interview

that a candidate's appearance, demeanor, communication skills, enthusiasm and emotional

connectedness are truly measured. Exhibit C at pp. 184-91; Exhibit E at pp. 117-21, 211-12.

Indeed, Guide to Selecting the Best ("Guide"), LAWL's primary tool for steering managers

through a uniform an unbiased interview process, even contains role-playing scenarios designed

to test empathic connection. Exhibit D at pp. 37-38; Exhibit L at p. 29; Exhibit C at pp. 188-89.

> Mary Jones arrives at your center for her very first appointment.
> She weights 250 lbs. She is very skeptical about LA Weight Loss
> as she has tried many other weight loss programs in the past and all
> have failed. She desperately wants to lose the weight but has lost
> hope that this will ever be possible. Pretend I'm Mary. Help me
> understand how joining LA Weight Loss is the right decision
> today.

Exhibit L at p. 29.

The Guide also provides a list of 26 industries as *potential* sources of qualified

applicants, as well as extensive guidance on evaluating candidate qualifications at the telephone

pre-screen and interview stages. Id. at 5-8; Exhibit Q at p. 26. Although not all hiring managers

look directly at or use the Guide in every interview, it is undisputed that they have been trained

in LAWL's hiring procedures and the Guide's contents. See Exhibit C at pp. 10-16; Exhibit D at

pp. 43-44, 184-86; Exhibit F at pp. 63-66, 166-69; Exhibit H at pp. 116-120, 123-126; Exhibit O

at p. 161; Deposition of Michelle Blum at pp. 87-89, 118-19, 268-75, attached hereto as Exhibit

R.  As one LAWL employee involved in hiring said, the Guide "is simply a guideline, more

geared towards a new supervisor, to help them sharpen and improve their interviewing skills" to

hire qualified people.  Exhibit C at p. 200.  See also Exhibit R at pp. 282-86.

### b.        The Hiring Process Changed Over Time

      Over the course of LAWL's rapid evolution from small "mom and pop" operation to a

company holding one of the largest market shares in the weight loss business, LAWL's

recruiting and hiring procedures changed considerably.  At times, recruiters were spread

throughout LAWL's territories.  Deposition of Karen Siegel, August 28, 2002, at pp. 70-71,

attached hereto as Exhibit S.  At others, recruiters were stationed in-house.  Exhibit O at pp. 84-

86.  For several years, LAWL operated without any recruiters.  From 1997 to 2000, center-level

hiring was handled exclusively by Area Managers.  Exhibit S at pp. 103-104.  They placed

employment advertisements in local newspapers and other media, conducted resume reviews and

telephone pre-screens, face-to-face interviews and rendered final post-interview hiring decisions

for all center staff in their areas.  Id. at 68-69, 103-04; Exhibit O at pp. 103-04, 110-12.

Notwithstanding these changes, a few practices remained constant.

      First, job advertisements are not necessarily specific to a vacancy.  Although the

Company posts in areas where vacancies exist, LAWL does not advertise only where there is an

opening.  Exhibit O at pp. 80-81.  Indeed, LAWL often advertises on a rolling basis in areas with

high turnover or anticipated growth, and may in fact over-staff a particular center when opening

additional storefront sites.  Id.

      Second, like many large businesses, LAWL has a policy of promoting from within its

ranks.  The company prefers to fill vacancies by advancing qualified and proven field employees

at all levels. "[I]t's always best to promote from within because the person already understands

what we do, how to motivate the client, they understand the operations of a center." Exhibit K at

p. 67. For example, a good Counselor may be promoted to the position of Assistant Manager, or

a valuable Center Manager to Area Manager. Id.

Third, since early 1999, LAWL's document retention policy requires all applicant-related

materials to be retained at LAWL's headquarters for preservation.[3] See Deposition of Karen

Siegel, March 31, 2005, Vol. II, at pp. 44-45, 57-58, attached hereto as Exhibit T; Exhibit N at

pp. 267-69; Exhibit K at pp. 14-15. See also Exhibit C at pp. 121-123.

Finally, LAWL has always employed a three-step process of resume review, telephone

pre-screen and face-to-face interview, and Area Managers have always had hiring responsibility

for center-level staff in their areas. Exhibit O at pp. 139-40.

### c.    Applicant Tracking and Document Preservation

In October 2004, LAWL implemented a new system for tracking and managing

applicants during the hiring process. Deposition of Nicola Fryer, February 2, 2006, at p. 7,

attached hereto as Exhibit U. Through use of a customized Access Database, each LAWL

recruiter inputs information concerning the applicants to their assigned areas. Id. at 47.

Objective information, such as recruiter and applicant names, application date, position applied

for, method of application, address, phone number, market, center, lead source and gender, is

recorded. See LACD 0275, Screen Prints from which is attached hereto as Exhibit V. Also

recorded is information or feedback from telephone pre-screens and interviews. Id.

Significantly, the Access Database reflects precisely where each candidate is in the application

---

[3]    The document retention policy was developed by LAWL's Human Resources
Department ("HR Department"). Exhibit T at pp. 44-45. LAWL's HR Department was formed
in 1998 and has grown coextensive with the Company. Exhibit S at p. 42.

process or where the process ended. If, for example, a candidate fails to pass the telephone pre-screen, the candidate is coded as "Pre-Screen Bad." Id. On the other hand, if an applicant passes the telephone pre-screen stage and advances to an interview, the applicant is coded as "Pre-Screen Good" and "Interview Scheduled." Id. The result of the interview will ultimately be reflected, as will information concerning an offer, if any, and the applicant's response to that offer. Id.[4]

Coincident with the Access Database, LAWL began a new system for saving applicant submissions – both hard copy and electronic. Specifically, all cover letters, resumes, applications and telephone pre-screen forms are reduced to electronic images and saved by computer in files corresponding to each of LAWL's hiring markets. Exhibit U at pp. 22-24. The market files are in turn broken down by sub-files according to certain stages in the hiring process – Rejected, Pre-Screen Rejected, Pre-Screen Good and Hired. See Sample Screen Print from Document Management System, attached hereto as Exhibit W. The sub-files are populated by candidate materials relevant to the hiring market and applicable step in the hiring process.

### 6. An Audit of LAWL's Hiring Practices Confirms They are Gender Neutral

To ensure that it recruits the most qualified candidates through unbiased practices, LAWL commissioned an audit of its hiring documents and procedures. In or around July 2005, LAWL engaged a consultant – Seymour Adler, Ph.D., Senior Vice President at Aon Consulting – to perform an extensive review and critique of its recruiting and selection procedures. See

---

[4]     Although LAWL has approximately 65 areas and Area Managers, there are roughly 165 hiring markets. For purposes of recruiting and hiring, areas may encompass more than one hiring market, and Area Managers may be responsible for multiple hiring markets. See LACD 0275.

Exhibit Q. Dr. Adler's review examined all components of the process for four target jobs: (1) Medical Technician; (2) Counselor; (3) Assistant Manager; and (4) Center Manager. Id. at 1.

Throughout the audit, which spanned several months, LAWL shared extensive written information with Dr. Adler and provided him with unfettered access to staff for observations, interviews and focus group meetings. Id. at 4. To achieve his objective, Dr. Adler reviewed all materials used by recruiters and managers in the selection process, including the Guide. Id. at 3. He also interviewed, both individually and in panel meetings, those responsible for administering the selection process – namely, Siegel, all in-house recruiters and several field managers with hiring authority. Id. Finally, Dr. Adler observed the three phases of the selection process: (1) application or resume review; (2) telephone pre-screen; and (3) face-to-face interview. Id.

In August 2006, Dr. Adler issued an independent report of his findings – "Review of Recruitment and Selection Processes." Dr. Adler found that there is an

> *absence* of any systematic gender bias in the *tools and processes* used in recruitment and selection. The company's policy on fair employment is clear and its commitment to that policy positively and clearly communicated in the recruitment and selection process and associated materials. The commitment to fairness and race- and gender- neutrality is expressed not just in policy but in practice.

Id. at 26 (emphasis added). In fact, Dr. Adler found that the initial application review is so quick and focused so narrowly on prior job history that recruiters are typically "*unaware* of the applicant's gender." Id. at 7, 26 (emphasis added). Further, Dr. Adler concluded that the interview questions and the guidelines used to evaluate candidates during the pre-screening and face-to-face interviews – both as designed and as executed – "reflect no gender bias of any kind…. Nothing in the protocols or evaluation standards, or how interviewers are trained or monitored in implementing those procedures, reflect any bias, explicitly or implicitly." Id. at 26.

No evidence refuting Dr. Adler's findings or conclusions exists. Indeed, EEOC did not even attempt to depose a single LAWL recruiter to learn about their practices or training. EEOC failed to depose anyone from LAWL's HR Department who is directly involved in reviewing resumes of screening candidates. Finally, EEOC only deposed one current Area Manager – William Doyle – despite the known facts that: (1) Area Managers are primarily responsible for center-level staffing; and (2) applicants for the position of Counselor constitute the majority of all candidates. Exhibit O at pp. 139-40 (Area Managers); Exhibit M at p. 7 (Counselors).

Another element in auditing the selection process was Dr. Adler's determination of the competencies required to perform the responsibilities of target positions – Medical Technician, Counselor, Assistant and Center Manager. Exhibit Q at p. 4. Knowing competency requirements enabled Dr. Adler to assess whether the procedures used by LAWL yield information relevant to evaluating candidates for hire. Id. By reviewing documents pertaining to the work performed in target positions, participating in focus groups with persons having in-depth knowledge of the jobs at issue and seeking feedback on competency models, Dr. Adler found that LAWL's telephone pre-screen and interview protocols measure relevant qualifications, including communication skills, ability to demonstrate compassion, empathy or emotional connectedness, as well as sales and management skills. Id. at 4-7. Here again, discovery does not yield any evidence to the contrary.

### 7.    A Higher Percentage of Women Possess the Relevant Traits Qualifying Applicants for Employment with LAWL

On July 5, 2006, LAWL submitted an expert report by Margaret S. Stockdale, Ph.D. examining the emotional connectedness and associated concepts pertaining to important job-related attributes of LAWL employees. See Expert Report by Margaret S. Stockdale, attached hereto as Exhibit X. Based on meta-analytic research exploring sex differences in the

psychological concepts underlying emotional connectedness, Dr. Stockdale concluded that sales experience alone does not qualify an LAWL applicant for employment and that a higher percentage of successful female candidates is to be expected.  Id. at 7-8.  Dr. Stockdale's report is unrebutted.

Taking into consideration extensive deposition testimony and hiring materials, Dr. Stockdale determined that emotional connectedness is defined by LAWL as the ability to smile genuinely, to show sincerity, empathy and warmth, to establish trust and have good listening skills to make and service emotional sales.  Id. at 6.  She also determined that emotional connectedness is a critical attribute of LAWL staff.  Id.  The constellation of personality characteristics comprising emotional connectedness, however, is not found in all members of the general population.  Id.  Given this fact, any exclusive reliance on sales worker-refined census data to determine gender disparity fails to describe the applicable labor pool from which center-level staff are selected by LAWL.  Id. at 7.

Dr. Stockdale opined that EEOC's reported gender difference in hiring ratios at LAWL is consistent with selection on the basis of emotional connectedness.  Id. at 7.  The psychological traits of smiling, expressiveness, empathy, self-disclosure, non-verbal decoding, trust and tender mindedness, all of which are critical to success at LAWL, are exhibited predominantly by women, particularly where gender-role expectations are salient.  Id. at 7.  LAWL's female-to-male hiring ratio is, therefore, within the expected range for hiring based on one or more attributes comprising emotional connectedness.  Id.

As with Dr. Tanenbaum, EEOC did not marshal any evidence to dispute Dr. Stockdale's conclusions and opinions.  EEOC neither presented a rebuttal expert nor did its affirmative

expert opine on whether gender differences in hiring ratios at LAWL are in harmony with LAWL's actual selection criteria.

### 8.     LAWL's Applicant Flow is Predominantly Female

Despite LAWL's tremendous growth over the years, applicant flow has remained relatively constant at approximately 75 to 80 percent female.  See Exhibit M at pp. 11-12.  Since 2001, LAWL began using the internet to recruit applicants.  Exhibit O at pp. 77-78.  Before that, LAWL relied on newspapers to post job openings.  Id.  Regardless of the method, EEOC's own analysis shows that female-male applicant flow is steady.  Exhibit M at pp. 11-12.

This undisputed fact is not surprising.  Indeed, according to EEOC, the labor classification most analogous to LAWL's business – Medical Assistants and Other Healthcare Support Occupations – is 88% female.[5]  See Exhibit M at p. 4; Labor Force 2000 Detailed Occupation by Residence by Sex by Race/Ethnicity, attached hereto as Exhibit Y.  Significantly, EEOC neither alleges, nor does discovery support, any argument that LAWL's method of soliciting applicants is gender-biased.  In fact, EEOC engaged in no discovery on the subject beyond seeking copies of hundreds of job postings and questioning a few LAWL managers and executives about creation and placement of employment advertising.

### 9.     LAWL's Hiring Criteria is Clear, Objective and Measurable

It is undisputed that LAWL receives thousands of responses to its job postings every month.  Just for the period of June 2004 to January 2006, the Access Database contains records for over 79,000 applicants.  See Exhibit V.  LAWL, however, extends offers of employment to only a minute fraction of all applicants.  The difficult nature of LAWL's product – an emotional

---

[5]     EEOC itself admits that a subgroup of the classification Medical Assistants and Other Healthcare Support Occupations is Weight-Reduction Specialists.  See Exhibit M at p. 5; Exhibit Y.

and intangible diet plan promising personal change and enhancement – demands that the criteria for employment at LAWL be identifiable and rigorously applied.

On the basis of extensive written information, staff observations, interviews and focus group meetings, Dr. Adler and LAWL's expert, David P. Jones, Ph.D., found LAWL's hiring process objective and measurable. In reviewing applications directly with the LAWL recruiters themselves, Dr. Adler noted a strong consensus around judgments concerning the relevance, recency and duration of job experience, as well as the types of positions most relevant to the target jobs. See Analysis of Report on the Hiring of Men by LA Weight Loss Centers, Inc. by Seymour Adler at pp. 6-7, attached hereto as Exhibit Z.

Dr. Adler also concluded that LAWL has a clear set of competencies specifying the dimensions on which candidates for center-level positions are evaluated. Exhibit Q at pp. 6-7. For Medical Technicians and Counselors, Dr. Adler found that, among other things, communication skills, emotional connection, openness, sales and technical skills are measured. Id. at 56-62. For Assistant and Center Managers, he found that among the competencies measured are business management, communication skills, emotional connection, leadership and sales skills. Id. Each of these factors is defined and described in Dr. Adler's Review of Recruitment and Selection Processes. Id. There is no evidence of record to dispute Dr. Adler's findings and conclusions.

Significantly, Dr. Adler found that center-level applicants to LAWL are assessed on their personal and interpersonal attributes. Id. at 56-57. In particular, candidates are evaluated for their ability to connect emotionally with LAWL's clients, many of whom are often reluctant and have suffered considerably because of their weight. In his Final Competency Models, Dr. Adler even defines the "Emotional Connection" assessed by LAWL:

> Genuinely cares about people; forms deep emotional connections
> with others; is concerned about their work and non-work problems;
> is available and ready to help; is empathetic to the plight of others;
> identifies and understands the feelings of others; relates
> emotionally to the personal appearance issues of others;
> demonstrates sincere empathy with others.

Id. at 56. Again, Dr. Adler's findings are not in dispute. Sisolak's report does not address this or

any other criteria that she describes as "subjective."

Dr. Jones similarly found that LAWL recruiters understand and use a consistent, job-

related set of standards in screening candidate resumes and in conducting telephone screening

interviews. See Expert Report of David P. Jones, Ph.D., attached hereto as Exhibit AA. "The

standards they use are clear, objective, and can be applied consistently, even when human

resources professionals from outside the company are asked to review candidate resumes and

pre-screening interview results." Id. at 3. Dr. Jones concluded that the standards LAWL applies

focus on candidates' prior experience

> particularly in sales settings, and move from a focus on experience,
> to an assessment of personal and interpersonal attributes at the
> telephone interview stage of the process…. [T]he Sales Counselor
> screening process appears to incorporate a structured, rational
> review of candidate qualifications…. [T]he candidate screening
> process yields an employee group that is demonstrably different
> from the incoming candidate group. The differences can be
> articulated clearly with respect to experience, skill, background,
> and work preferences.

Id. at 3-4.

Dr. Jones' conclusion is founded on first-hand research undertaken to investigate

whether, and to what extent, LAWL recruiters' past decisions were linked to specific, reliably-

assessed qualifications at each step of the screening process. Id. at 2. Dr. Jones studied the job

qualifications underlying success as a LAWL Counselor. Id. He reviewed job analyses and

competency studies prepared by Dr. Adler, and engaged in first-hand discussion with LAWL's

management and recruiters.  Id.  Dr. Jones also documented background and experience-related areas that recruiters consider in screening candidate resumes.  Id. at 4, 41, 45.

Using information about requirements for the Counselor position, Dr. Jones asked an independent group of human resources professionals from outside LAWL to review a sample of more than 2,000 candidates' resumes.  Id. at 3.  They were led by Dr. Jones through a structured process of rating each resume against the job qualifications areas identified by the job analysis research.  Id.  Finally, a group of six LAWL recruiters repeated the resume rating process, which resulted in structured, qualifications-based evaluations for candidates processed by LAWL.  Id.

> Representing 'a look backward in time,' the study methodology produced an independent 'post mortem' regarding the factors that appear to have played a role in the company's Sales Counselor screening and hiring decisions during late 2004-2005.  Held to rigid statistical standards, the methodology focused on explaining 'what LAWL recruiters appear to have considered and how they appear to have behaved' in the screening process... LAWL recruiters 'do what they say.'

Id. at 3, 48.

EEOC's only affirmative expert, Elvira Sisolak, opines that LAWL lacks concrete hiring criteria.[6]  In her Report on the Hiring of Men by LA Weight Loss Centers, Inc. ("Report"), Sisolak states that "subjective criteria [are] overwhelmingly important in the hiring of Counselors.... [and there is an] almost complete lack of objective criteria."  Exhibit M at p. 7. Sisolak did not, however, conduct any study of the qualifications she asserts are subjective, and she did not analyze the impact of subjective criteria upon LAWL's hiring divisions.  Further, Sisolak did not perform any audits like those of Drs. Adler or Jones.  Accordingly, her conclusion does not give rise to a factual dispute.

---

[6]    EEOC also disclosed Richard F. Tonowski, Ph.D., as an expert in rebuttal to Dr. Jones.

10.    **EEOC's Expert Analysis Does Not Account for Local Hiring and Relevant Job Qualifications**

Sisolak purportedly ran "statistical tests [showing] the likelihood of the occurrence of the differences between the expected and actual number of men" that apply to and are hired by LAWL. Exhibit M at p. 1. Sisolak's Report, which contains statistical test results, draws the sweeping conclusion that "men were hired in numbers substantially below those that would have been expected given their applicant rates, and the differences were statistically significant." Id. at 1, 16. Further, Sisolak opines that the differences "could not be expected to occur by chance." Id. at 12. Sisolak's "Supplemental Report on the Hiring of Men by LA Weight Loss Centers, Inc." ("Supplemental Report"), submitted after extensive discovery of LAWL's experts, neither modifies her opinion nor alters her methodology. See Supplemental Report on the Hiring of Men by LA Weight Loss Centers, Inc. by Elvira Sisolak, attached hereto as Exhibit BB.

To arrive at her conclusion that the proportion of suitable male applicants far exceeds the number of men hired by LAWL, Sisolak first draws upon census statistics to estimate the quantity of men available. Exhibit M at pp. 3-4. Sisolak's Report does not, however, identify prospective applicant populations likely to have interest, and the relevant competencies for performing effectively, in the target LAWL positions. She fails entirely to identify the attributes – knowledge, skills, empathy and other personal characteristics – sought by LAWL in new hires and does not determine which occupations are likely to be exemplified by those traits. Instead, Sisolak uses the 26 industries listed in the Guide as *the* sources for recruiting applicants for the target positions. Id. at 2. Sisolak also presents data from the 2000 Census on the percent of males across those industries, as if experience in any one of them is equally indicative of the likelihood of success at LAWL, concluding that "men hold about 60 percent of relevant

management positions in the US, so they are also qualified in large number for the LA Weight Loss management jobs." Id. at 15.

It is undisputed, however, that Sisolak's estimate of the proportion of qualified male applicants fails to distinguish between what LAWL believes are *potential* sources of good candidates and the experience criteria used to evaluate applicants during the selection process. Indeed, it is undisputed that most of the industries in the census tables presented in the Report, especially those with the higher proportion of male workers and virtually all of those with a proportion of male workers exceeding 30 percent, are not the industries viewed by LAWL as most relevant to the work performed at the Company – namely, personal image, high-cost discretionary retail sales, self-improvement and personal services. Id. at 2-5; Exhibit Z at p. 5. Sisolak also includes in her analysis retail industries that are not listed in the Guide, such as Building Materials and Equipment Sales (77.2 percent male) and Electronic and Appliance Sales (73.5 percent male). See Exhibit M at p. 3; Exhibit Y.

Here again, EEOC did not depose, interview or observe the recruiters. Sisolak also failed to reference the interview protocols or evaluation principles contained in the Guide and did not account for the vast majority of deposition testimony of LAWL management. See Exhibit M. Sisolak just relied on the Guide's industries list. Id. at 2.

Further, it is undisputed that Sisolak's statistical analysis does not even attempt to compare similarly-situated applicants. See An Analysis of the Supplemental Report of Elvira Sisolak by Leonard A. Cupingood, Ph.D. at p. 3, attached hereto as Exhibit CC. Despite ample discovery and applicant flow available data, her study does not account for the major measurable and legitimate non-discriminatory factors impacting LAWL's decision process. See An Analysis of the Statistical Report of Elvira Sisolak by Leonard A. Cupingood, Ph.D. at pp. 9-10, attached

hereto as Exhibit DD.  Sisolak does not account for the presence or extent of any relevant qualification factors, such as the requirement that Medical Assistants must be certified to and have experience drawing blood, and her analysis is devoid of any recognition that applicants seeking different positions at different LAWL centers at different times or at different points in time are not competing against one another.  Exhibit L at p. 16; Exhibit CC at pp. 3-4.

Sisolak also does not consider the incontrovertibly local hiring process in place at LAWL – namely, that center-level hiring decisions are made in the field by dozens of different Area Managers, each of whom oversees a small geographic area comprised of contiguous storefront centers.  Exhibit O at pp. 139-40.  Sisolak pretends that all applicants are reviewed at the same time and by the same person, and that candidates in Philadelphia are competing for precisely the same job openings as those in Palm Beach, Chicago, Dallas and Las Angeles.  Exhibit Z at p. 10; Exhibit CC at p. 3.

This bottom line approach compares anyone who ever applied for any position at any time in any market with every other applicant anywhere anytime.  Exhibit Z at p. 10.  When LAWL's expert, Leonard A. Cupingood, Ph.D., scrutinized Sisolak's data by area, however, he found a statistically significant shortfall of male job offers in just two LAWL hiring markets and no statistically significant shortfall for any field position from Medical Assistant to Area Manager.  Exhibit CC at p. 7.  Indeed, the data demonstrated some areas where there is a *surplus* of male job offers.  Id. at 8.

### 11.   EEOC's Anecdotal Evidence Has Temporal and Geographic Restrictions

Despite taking scores of depositions, receiving hundreds of thousands of LAWL business records and propounding dozens of interrogatories, EEOC has no direct evidence of discrimination and merely a scintilla of admissible anecdotal evidence to support its allegation of

company-wide discrimination from 1997 to the present. The anecdotal evidence, all of which is limited by time and place, is from two categories of witnesses: (1) former employees; and (2) class claimants.[7]

### a.    Former Employees

Just thirteen former employees provided admissible statements or testimony suggesting that LAWL has a policy of not hiring men. Their remarks, however, are confined to the years 1997 through 2000. Further, they are restricted to a finite territory on the east coast – Virginia, Maryland, Delaware, Pennsylvania, New Jersey and the District of Columbia – all of which was under the supervision of Eileen Stankunas, who left the Company in 2002. See Declaration of Joy Freathy at ¶ 2, attached hereto as Exhibit EE; Deposition of Joy Freathy at pp. 77-79, attached hereto as Exhibit FF; Affidavit of Eadie Faye at ¶ 6, attached hereto as Exhibit GG; Deposition of Patricia Burroughs at pp. 31-37, attached hereto as Exhibit HH; Written Statement of Patricia Burroughs at p. 1, attached hereto as Exhibit II; Declaration of Madeleine Bartel at ¶¶ 2-3, attached hereto as Exhibit JJ; Deposition of Madeleine Bartel at pp. 110-112, 160, attached hereto as Exhibit KK; Deposition of Nina Catagnus at pp. 9-13, 22-23, attached hereto as Exhibit LL; Deposition of Marci Goldschlak at pp.10-11, 23, attached hereto as Exhibit MM; Deposition of Sandra Brown-Talavera at pp. 20-26, 65-67, attached hereto as Exhibit NN; Deposition of Melinda Temple-Passin at pp. 9-12, 18-19, attached hereto as Exhibit OO; Deposition of Kathy Koch at pp. 65-66, 77-78, 109-110, attached hereto as Exhibit PP; Deposition of Mercedes Generette at pp. 53-56, attached hereto as Exhibit QQ; Deposition of

---

[7]    For purposes of summary judgment, LAWL does not dispute EEOC's anecdotal evidence. LAWL reserves all rights to and will dispute the evidence at the time of trial. Similarly, LAWL does not waive its right to challenge the admissibility of EEOC's anecdotal evidence.

Lynda Wellington at pp. 70-72, attached hereto as Exhibit RR; Deposition of Odia Stevenson at

pp. 19-21, attached hereto as Exhibit SS; Declaration of Lisa Yearwood, attached hereto as

Exhibit TT.  In substance, these former employees testified that Stankunas and her subordinates

had a policy against hiring men because clients "would not feel comfortable with male

counselors."  Exhibit LL at pp. 22-23, and because "[m]en just don't work in this job."  Exhibit

OO at pp. 18-19.

### b.    Class Claimants

Just three of sixty class claimants deposed provided admissible testimony suggesting that

LAWL discriminated against them on the basis of their gender.  Their remarks, however, suffer

the same defects as those of LAWL's former employees.  They are limited to the years 2000

through 2002, and they are confined to only one area in three states – Manassas, Virginia,

Bloomington, Illinois and St. Louis, Missouri.  See Deposition of Antonio Conway at pp. 22-24,

attached hereto as Exhibit UU; Deposition of James Gruber at pp. 98-103, attached hereto as

Exhibit VV; Deposition of James Paul at pp. 19-20, attached hereto as Exhibit WW.  In

substance, these class members have nothing more to offer than vague statements that LAWL

"didn't want any males working with women."  Exhibit UU at pp. 22-24.  They do not actually

know the reason they were not offered employment with the Company, whether persons more

qualified were hired for the jobs to which they applied, or even the gender of the applicants who

ultimately filled the positions.

### B.    Procedural Background

### 1.    Intervenor Kathy Koch Filed a Charge with EEOC

On June 22, 1998, Kathy Koch, a former LAWL employee, filed an amended Charge of

Discrimination ("Charge") against LAWL with EEOC's Baltimore regional office.  See Charge,

attached hereto as Exhibit XX. Koch's only allegation – that she was discharged for complaining about LAWL's failure to hire qualified male applicants – was investigated by EEOC. Id. As part of its investigation, EEOC sent LAWL a bare document request for applications and resumes pertaining to Counselor vacancies, as well as a list of all hires from 1995 through May 10, 2000, the date of the correspondence ("Document Request"). See May 10, 2000, Document Request from EEOC to David Landau and Amy Miraglia, attached hereto as Exhibit YY. EEOC never informed LAWL that they were investigating anything other than Koch's allegation of retaliatory discharge. LAWL did not know the purpose of EEOC's Document Request, but assumed it was to investigate Koch's claim. In no way did the Document Request indicate that EEOC considered charging LAWL with a pattern or practice of discriminating against males in hiring. Id.

In response to the Document Request, LAWL produced several hundred pages of Counselor applicant materials and a list of all hires from 1997, the date LAWL began operation. In Spring 2000, EEOC conducted several LAWL employee interviews. See Sample Interview Cover Pages, attached hereto as Exhibit ZZ. Again, EEOC never informed the Company that it was investigating a pattern or practice of discrimination and never issued a Commissioner's Charge. Months later, on September 14, 2000, EEOC issued a Reasonable Cause Determination ("Determination") finding a basis to believe LAWL retaliated against Koch and that LAWL discriminates against males as a class with respect to selection and hiring. See Determination, attached hereto as Exhibit AAA.

### 2.    EEOC's Amended Complaint Contains Three Distinct Claims

On February 28, 2002, EEOC filed its first Complaint in this matter. See EEOC's Complaint, attached hereto as Exhibit BBB. In or around June 2004, EEOC, on its own behalf and on behalf of Kathy C. Koch, filed an Amended Complaint alleging three separate causes of

action: (a) violation of Sections 703(a) and 704(a) of Title VII of the Civil Rights Act of 1964,

as amended ("Title VII"), 42 U.S.C. § § 2000e-2(a) and 2000e-3(a), for allegedly retaliating

against former employee Koch on the basis of her opposition to a purportedly unlawful

employment practice; (b) violation of Section 707 of Title VII, 42 U.S.C. § 2000e-6, for

allegedly engaging in a pattern or practice of hiring that discriminates against men on the basis of

gender; and (c) violation of 29 C.F.R. § 1602.14 for supposedly failing to maintain or preserve

various personnel and employment records. See EEOC's Amended Complaint, attached hereto

as Exhibit CCC. EEOC's prayer contains eleven requests for injunctive relief, compensatory and

punitive damages, as well as an adverse inference. Id.

### a.    Kathy C. Koch

Koch, who intervened in the lawsuit on or around June 26, 2002, settled her claims

against LAWL in a confidential agreement dated November 21, 2005. See Stipulation and Order

of Dismissal, attached hereto as Exhibit DDD. Accordingly, retaliatory discharge or any other

claims pursuant to Sections 703(a) and 704(a) of Title VII are moot.

### b.    Pattern or Practice of Discrimination

EEOC contends that LAWL has and continues to systematically discriminate against

men. Exhibit CCC at p. 1. Specifically, it argues that the Company intentionally engages in a

nationwide pattern or practice of sexually discriminatory hiring by refusing to employ qualified

males, and that LAWL's alleged conduct deliberately deprives men as a class of equal

opportunity. Id. at ¶ ¶ 8,10. EEOC's prayer for relief requests a permanent injunction enjoining

LAWL from engaging in discriminatory hiring practices and an order requiring LAWL to

provide back and front pay, with prejudgment interest, to all class members, as well as to pay for

any past and future pecuniary losses and punitive damages. Id. at ¶ ¶ A-K. The undisputed facts

neither support EEOC's claim of disparate treatment nor the relief it seeks.

c.      **Preservation of Applicant and Hiring-Related Materials**

EEOC alleges that LAWL failed to preserve applicant and hiring-related materials as required by 29 C.F.R. § 1602.14.  Id. at ¶ 13.  By way of relief, EEOC seeks an order requiring compliance and charging the jury with an adverse inference instruction regarding records no longer available because of LAWL's purported misconduct.  Id. at ¶ I.  EEOC's allegation, however, is framed as a broad regurgitation of the statute without reference to specific documents or classes of documents that LAWL neglected to preserve.  Further, EEOC has no evidence of bad faith to support its request for relief.  Id.

3.      **The Parties Engaged in Exhaustive Discovery**

This Court bifurcated the discovery and trial into a liability/injunctive phase, followed by a remedial/damages phase.  See May 25, 2004 Order, attached hereto as Exhibit EEE.  Fact discovery lasted nearly four years from May 2002 through March 2006.  During that time, the parties propounded and responded to over 80 interrogatories and in excess of 100 document requests.  In total, LAWL produced nearly 300 CD's containing vast amounts of electronic documents, data and images.  The parties engaged in over 145 days of testimony in cities and towns across the country.  EEOC deposed nearly 45 LAWL managers, executives and former employees, some on multiple occasions.  LAWL deposed approximately 60 class claimants in at least 13 states, as well as a dozen former employees having knowledge of the claims or defenses in this case.

Expert discovery proceedings involved multiple reports, statistical analyses and models of LAWL's employment data and practices prepared by experts for all parties.  EEOC disclosed one expert who conducted a statistical analysis – Sisolak.  LAWL, on the other hand, revealed several experts who pointed out the absence of evidence in EEOC's statistical analysis, as well as provided affirmative reports concerning LAWL's hiring practices, procedures, policies and

qualifications for employment. Several experts were deposed before expert discovery closed on February 14, 2007. Now, LAWL moves this Court for summary judgment on all claims asserted by EEOC.

## III.    ARGUMENT

### A.    <u>Standard Applicable to Summary Judgment</u>

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In reviewing and ruling on a motion for summary judgment, courts are required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. <u>Williams v. Aluminum Co. of Am.</u>, 457 F. Supp. 2d 596, 605 (M.D.N.C. 2006). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

Once the movant has met its burden, the non-moving party must set forth *specific* facts, by evidence, showing the existence of a genuine issue of material fact. <u>Diamond v. Colonial Life & Accident Ins. Co.</u>, 416 F.3d 310, 318 (4th Cir. 2005). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

**B.     Summary Judgment is Proper Because EEOC Cannot Make Out a Prima Facie Case of a Nationwide Pattern or Practice of Intentional Discrimination**

**1.     The Analytic Framework and Burden of Proof**

Class actions alleging a pattern or practice of discrimination are governed by the analytic framework established by the Supreme Court in International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977).  Instead of focusing on individual employment decisions, pattern or practice cases center on "a pattern of discriminatory decisionmaking" against a protected class.  Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 (1984) (internal citation omitted).

To establish a prima facie case of disparate treatment in a class action, a plaintiff must prove that the defendant "*regularly* and *purposefully* treated members of the protected group less favorably, and that unlawful discrimination was the employer's *regular* procedure or policy." Teamsters, 431 U.S. at 335, 360 (emphasis added); Morgan v. UPS, 143 F. Supp. 2d 1143, 1147-48 (E.D. Mo. 2000), aff'd, 380 F.3d 459 (8th Cir. 2004).  "Proving isolated or sporadic discriminatory acts by the employer is insufficient...." Cooper, 467 U.S. at 875-76.  Rather, a plaintiff must establish by a *preponderance* of evidence that "discrimination was the company's *standard* operating procedure – the *regular* rather than the unusual practice." Teamsters, 431 U.S. at 336 (emphasis added).  "[D]emonstrating the existence of a discriminatory pattern or practice establishe[s] a presumption that the individual class members ha[ve] been discriminated against...." Cooper, 467 U.S. at 875.  See also Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 759-60 (4th Cir. 1998), vacated and remanded in part on other grounds, 527 U.S. 1031 (1999).

Typically, a plaintiff in a pattern or practice action will produce evidence showing statistical disparities between similarly situated protected and unprotected employees. Teamsters, 431 U.S. at 360.  That evidence alone, which can be rebutted as inaccurate or

insignificant, is not sufficient without anecdotal evidence.  <u>Coker v. Charleston County Sch.</u>

<u>Dist.</u>, No. 92-1589, 1993 U.S. App. LEXIS 20836, at *17-18 (4th Cir. Aug. 16, 1993), attached

hereto as Exhibit VVV (affirming district court's grant of summary judgment to defendant

because plaintiffs only proffered deposition testimony of three plaintiffs, which was not enough

to support usual practice).  Absent considerable individual testimony recounting specific

instances of discrimination, statistical evidence does not carry a plaintiff's burden of proof in a

disparate treatment case.  <u>See</u> <u>Chisholm v. United States Postal Serv.</u>, 665 F.2d 482, 495 (4th

Cir. 1981); <u>Coker</u>, 1993 U.S. App. LEXIS 20836, at *17-18, <u>citing</u> <u>King v. Gen. Elec. Co.</u>, 960

F.2d 617, 624 (7th Cir. 1992).  Where, as here, a plaintiff offers nothing more than a scintilla of

anecdotal evidence in support of its prima facie case, the defendant is entitled to summary

judgment.  <u>King</u>, 960 F.2d at 627 (citing <u>Graefenhain v. Pabst Brewing Co.</u>, 827 F.2d 13, 15 (7th

Cir. 1987), <u>overruled on other grounds</u>, <u>Coston v. Plitt Theatres</u>, 860 F.2d 834, 836 (7th Cir.

1988)).

> **2.      EEOC's Expert Evidence Does Not Establish a Prima Facie Case**

EEOC's approach to expert evidence is in keeping with its approach to fact discovery.

Based on a review of resumes and thin, inadmissible anecdotal evidence, EEOC advanced fact

discovery from the premise that a bottom line numerical disparity means LAWL discriminates.

EEOC never deposed LAWL's recruiters and never took any discovery to determine what factors

are used to screen or evaluate candidates, how they are applied and at which stages in the

application process.  It also neglected to depose LAWL's Area Managers, who interview and

decide which applicants should receive offers of employment.  EEOC's bottom line analysis also

drove it to the erroneous conclusion that the *absence* of a rigid scoring system renders the hiring

process impermissibly subjective and without criteria.  Exhibit Z at pp. 5-7.

It is against this backdrop that the primary support for EEOC's claim of company-wide gender discrimination in hiring – Sisolak's expert analysis – should be viewed. That analysis is lacking and does not provide evidence of company-wide discrimination, despite Sisolak's bald conclusion that "men were hired in numbers substantially below those that would have been expected given their applicant rates... the differences were statistically significant... [and] could not be expected to occur by chance." Exhibit M at pp. 16, 14. Based on a flawed approach that neither reflects LAWL's practice of interviewing and offering center-level employment on an area-by-area basis, nor offers any explanation for a disparity in female-male hiring ratios, Sisolak's conclusions are meaningless. Merely pointing out a disparity does not, without more, give rise to an inference of intentional gender discrimination.

> a.    **The Expert Evidence Does Not Reveal a Company-Wide Gender Disparity**

First, EEOC's statistical evidence is deficient because it fails to compare the treatment of similarly situated candidates. Exhibit CC at p. 3. The vast majority of Sisolak's analysis does not take into account factors such as time or location of application. Id. at 3-4; Exhibit Z at p.10. Indeed, much of Sisolak's statistical examination ignores the positions to which candidates applied. These factors are critical to any meaningful analysis of LAWL's hiring practices because center staff hiring decisions are made at the *local level* – that is, by Area Managers in the field. Exhibit O at pp. 139-40.

Sisolak does not even attempt to examine hiring at the local level. Exhibit Z at p.10. Rather, she aggregates data in a bottom line analysis and imputes to the Company as a whole a statistically significant female-male disparity. Exhibit DD at pp. 8-10. "In using statistics to infer whether the decision of an Area Manager to offer a Sales Counselor candidate employment is being made on the basis of their gender, it makes no sense to consider statistics for markets for

which the Area Manager is not responsible nor to aggregate the statistics... as Ms. Sisolak has done." Exhibit CC at p. 9. Aggregated statistics are not probative because they reveal nothing about the decisions made by persons with hiring authority. "The statistics that are informative about the hiring decisions made by a given Area Manager are those that relate to the Area Manger's specific market." Id. at 9. What do statistics for an Area Manager's hires in Las Angeles tell us about the hiring pattern or practice of an Area Manager in New York City? Absolutely nothing!

Further, Sisolak failed to perform any analysis of the female-male ratios on a recruiter-by-recruiter basis for the first two steps of the hiring process – namely, resume review and telephone pre-screen. LAWL's in-house recruiters, each of whom is charged with responsibility for a specific geographic territory, perform those functions. Exhibit O at pp. 186-87. The complete absence of any data suggesting a disparity per recruiter territory again undercuts EEOC's claim that it is LAWL's standard operating procedure to discriminate against men in hiring.

Sisolak also neglects the undisputed fact that from 1997 to 2000, all center-level hiring functions – resume review, telephone pre-screen and face-to-face interview – were handled exclusively by managers in the field. Exhibit S at pp. 68-69, 103-04; Exhibit O at pp. 103-04, 110-12. Sisolak did not even try to conduct an analysis of hiring on an Area Manager-by-Area Manager basis for this time period.

In a factually similar case, the Court of Appeals for the Eight Circuit affirmed the lower court's holding that a bottom line racial imbalance in the workforce was insufficient to establish that blacks were less likely to be promoted. Morgan v. UPS, 143 F. Supp. 2d 1143 (E.D. Mo. 2000), aff'd, 380 F.3d 459 (8th Cir. 2004). In Morgan, an employment class action alleging

company-wide discrimination on the basis of race, the district court found an *absence* of

discrimination in some hiring districts nationwide, which finding proved fatal at summary

judgment.  Id. at 1146-49.  See also Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51

(1989), superseded by statute on other grounds, Civil Rights Act of 1991, Pub. L. No. 102-166,

as recognized in Smith v. City of Jackson, Mississippi, 544 U.S. 228, 240 (2005).  Similar to

LAWL, the Morgan defendant was a nationwide company divided into geographic territories.

The territories were further divided into divisions, each with a division manager vested with

local hiring and promotion authority.  Id. at 1146-49.

Although in her Supplemental Report Sisolak purports to analyze job offers on an area-

by-area basis, she aggregates her results, obfuscating what is really happening in each location

and making it impossible to determine where, if at all, a significant gender disparity exists.

Exhibit BB at pp. 1, 3.  This approach tells us nothing about LAWL's *standard* operating

procedure.  Certainly, it fails to demonstrate a nationwide pattern or practice of discrimination.

When analyzed, Sisolak's data belies EEOC's pattern or practice claim.  Specifically, it

shows that there is little or no statistical disparity in the treatment of men and women in 158 of

160 "sets of decision" analyzed by Sisolak.  See Exhibit CC at pp. 7-8.

> Despite focusing on the markets with the largest number of job
> offers, we see that there are both some surpluses in the number of
> male job offers and some shortfalls in the number of male job
> offers.  Among the above markets having the 5 largest numbers of
> job offers for each position, there is *only one* market that has a
> statistically significant shortfall in job offers (i.e., Detroit has a
> marginally statistically significant disparity of 1.97 units of
> standard deviation for Assistant Manager).  However, from the
> above charts, it is noteworthy that Detroit has a slight surplus in
> job offers to males for both the Sales Counselor and Medical
> Assistant positions.

Id. at 8 (emphasis added).  That the pattern of hiring demonstrates a gender disparity in just two,

but not all or even most of LAWL's areas, is fatal to EEOC's claim that discrimination is the

*usual* practice. Id. That the pattern of hiring demonstrates no gender disparity in any of

LAWL's positions across 124 hiring markets tested, is equally fatal. Id. EEOC cannot support

an inference of discrimination on a national level absent evidence of a statistical disparity

throughout the Company and for all or even most subject positions. See Teamsters, 431 U.S. at

336 (plaintiffs must show discrimination was company's standard operating procedure).

### b.    The Expert Evidence Does Not Account for Hiring Criteria

Sisolak's analysis also lacks any evidentiary value because it neither analyzes nor takes

account of hiring criteria, making it impossible to compare those offered positions to those who

were *eligible* for hire – male or female. Exhibit Z at pp. 4-5. See EEOC v. Turtle Creek

Mansion Corp., No. 3:93-CV-1649-H, 1995 U.S. Dist. LEXIS 12788 (N.D. Tex. May 18, 1995)

at * 28, aff'd, 82 F.3d 414 (5th Cir. 1996), attached hereto as Exhibit WWW (rejecting Sisolak's

statistical analysis as "fatally flawed" because it did not consider the qualifications needed for

the positions at issue). It is undisputed that LAWL selects candidates for employment based

upon specific, objective factors. Exhibit Z at. pp. 6-7. Particularly significant is an applicant's

demonstrated ability to form an emotional connection. Exhibit X at p. 8.

Sisolak's statistical analysis is based in part upon a review of applications produced by

LAWL. Exhibit M at p. 12. Yet, it fails to consider whether applicants possessed any of the

qualifications LAWL seeks in making hiring decisions. Neither Sisolak's Report nor her

Supplemental Report account for the objective, measurable hiring criteria actually applied by

LAWL. Indeed, Sisolak did not even analyze the "subjective" factors she contends LAWL relies

upon in evaluating candidates for hire. See Deposition of Elvira Sisolak at pp. 173-74, attached

hereto as Exhibit FFF.

Even if the statistical disparity resulting from EEOC's ill-conceived bottom line analysis

could give rise to an inference of gender discrimination, which it cannot, any inference is

dispelled by LAWL's experts, whose findings and opinions are unrebutted. First, Dr. Adler opines that LAWL's hiring criteria is consistently applied in a gender-neutral fashion and that emotional connection is a core competency sought in all center-level positions. Exhibit Q at pp. 6-7. Second, Dr. Tanenbaum confirms the legitimate business reason for LAWL's focus on emotional connectedness. Exhibit G at pp. 3-4. Finally, Dr. Stockdale finds that the constellation of personality characteristics comprising emotional connectedness are not found equally in all members of the general population. Exhibit X at p. 6. To the contrary, they are exhibited predominantly by women. Id. at 7.

EEOC does not dispute Dr. Stockdale's opinion that the percentage of men LAWL hires is consistent with selection on the basis of emotional connectedness. Nor does EEOC dispute that Sisolak's reliance on sales worker-refined census data is misplaced because it fails to scrutinize the *actual* applicant pool from which the Company hires. Id. at 6-7. The census data Sisolak relies upon includes job categories – Electronic and Appliance Sales, Motor Vehicle and Parts Dealers and Building Material and Garden Equipment Supplies Dealers – that are irrelevant to an analysis of LAWL's hiring for any position. Exhibit M at p. 3. Those industries, however, are predominantly male. See Exhibit Y. The effect of Sisolak's approach is to create the *illusion* of a large disparity between the *available* male labor pool and the number of male hires at the Company.

Demonstrating a gender disparity in hiring on the basis of inappropriate and inapplicable census categories, as EEOC does, cannot evince an inference of intentional discrimination. See Turtle Creek Mansion Corp., 1995 U.S. Dist. LEXIS 12788, at *28-29. Not only is the gender mix precisely what one would expect to see on the basis of legitimate criteria, but EEOC's statistics avoid examination of relevant criteria. On these facts, no reasonable jury could find

that LAWL engages in a nationwide pattern or practice of intentional discrimination.  EEOC has not met its burden and LAWL is entitled to summary judgment.

### 3.    EEOC's Anecdotal Evidence is Insufficient to Establish a Prima Facie Case of Company-Wide Discrimination

Even if the statistical evidence was adequate, it is axiomatic that "statistics cannot alone prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the figures." Warren v. Halstead Industries, Inc., 802 F.2d 746, 753 (4th Cir. 1986).  See also Foster v. Tandy Corp., 828 F.2d 1052, 1057 (4th Cir. 1987).  To establish a prima facie pattern or practice of intentional discrimination, "there must be significant evidence of the alleged routine." King, 960 F.2d at 624.  In Teamsters, for example, the government first presented statistical evidence showing grave disparities between the percentages of blacks in the population at large, those employed by the defendant, and those employed in particular positions.  431 U.S. at 337-38.  In fact, no blacks were employed in some positions until after suit was filed. Id. at n. 17-18.  The government then supported this evidence with individual testimony recounting over forty specific instances of discrimination. Id.  The Court held that this evidence was sufficient to carry the government's burden of proof. Id. at 337.

Other courts considering what evidence is necessary to show that an employer routinely and intentionally discriminates have also required substantial proof of the practice.  Thus, in Chisholm v. United States Postal Service, 665 F.2d 482, 495 (4th Cir. 1981), twenty class members testified about individual discrimination to support the statistical evidence.

Absent abundant individual testimony to buttress statistics, courts refuse to find a pattern or practice of discrimination.  One court warned that "the definition of a pattern or practice is not capable of mathematical formulation…." Ste. Marie v. Eastern R. Ass'n, 650 F.2d 395, 406 (2d

Cir. 1981). In Ste. Marie, the court found seven individual discriminatory acts coupled with problematic statistical evidence *insufficient* to support a finding of a pattern or practice of discrimination. Id. See also EEOC v. Fed. Reserve Bank, 698 F.2d 633, 643-44 (4th Cir.) (finding 20 or 40 class members testifying of class discrimination adequate, but three or even seven incidents of discrimination over a period of years inadequate); Goff v. Continental Oil Co., 678 F.2d 593, 597 (5th Cir. 1982), overruled on other grounds, Carter v. South Cent. Bell, 912 F.2d 832, 840 (5th Cir. 1990) (even if all three witnesses' accounts of racial discrimination were true it is not enough to prove a pattern or practice of company-wide discrimination).

In this case, EEOC's admissible anecdotal evidence consists of the statements of thirteen witnesses formerly employed by LAWL and three class claimants who "believe" they were not hired because of their gender. The former employees, who worked for LAWL in a total of only five states and the District of Columbia between the years 1997 and 2000, unanimously testified that they were under the supervisory control of one manager – Stankunas – or her subordinates. They unanimously attributed to Stankunas and her charges any purported policy against hiring men. Their testimony does not, however, suggest an ongoing company-wide policy against hiring men. To the contrary, it suggests that a single supervisor in a single territory used her position to influence some hiring managers under her supervision. Indeed, the evidence shows that men were hired in Stankunas' territory. See Deposition of Eileen Stankunas, Vol. II, at pp. 253-54, attached hereto as Exhibit GGG. The class claimants' testimony, which is similarly limited by time and place, is mere speculation about why they were not offered employment with LAWL. Not one claimant can testify with certainty as to why he was not hired.

Even if EEOC's anecdotal evidence were enough to evince a discriminatory practice between 1997 and 2002, in specific hiring areas, it is scant support for EEOC's claim that LAWL

is engaged in an ongoing pattern of gender discrimination from coast-to-coast.  Indeed, EEOC does not have one shred of anecdotal evidence to buttress its allegation of discrimination from 2003 to the present in any area of the country.  The anecdotal testimony EEOC relies upon does not describe a uniform or wide-reaching policy of discrimination against men.  It does not describe a standard operating procedure in all, or even most, of the states in which LAWL has centers.  No jury could decide in EEOC's favor on the basis of this flimsy anecdotal evidence. Accordingly, LAWL's motion for summary judgment should be granted.

### C.    Summary Judgment as to Twelve Class Claimants is Proper Because they are Outside the Statutory Filing Period

#### 1.    Title VII's 180-Day Statutory Filing Limitation is Applicable

The language of Title VII itself makes decidely clear that a statutory limitations period applies to pattern or practice claims.  See EEOC v. Optical Cable Corp., 169 F. Supp. 2d 539, 546 (W.D. Va. 2001) (finding180-day limitations period applicable to pattern or practice cases). Specifically, Section 2000e-6(e) confers on EEOC the authority to investigate and act on a charge of a pattern or practice of discrimination.[8]  It further provides that "[a]ll such actions shall be conducted in accordance with the procedures set forth in section 2000e-5 of this title." Section 2000e-5, in turn, requires that a charge of discrimination be filed with EEOC within one 180 days of the alleged unlawful employment practice.[9]  By reference to the procedures of 42

---

[8]    LAWL does not dispute the propriety of EEOC's failure to file a charge specific to the class claims in this case.  See EEOC v. Gen. Elec. Co., 532 F.2d 359, 366 (4th Cir. 1976).

[9]    42 U.S.C. § 2000e-5 allows a charge to be filed with the EEOC within three hundred days of the alleged unlawful employment practice where the aggrieved individual initially instituted proceedings with the proper state or local agency.  Here, proceedings were never instituted with a state agency.  Accordingly, the 300-day limitation is inapplicable.

U.S.C. § 2000e-5, pattern or practice charges are subject to the same filing limits as all other types of discrimination charges.[10]

While there is little precedent within the Fourth Circuit addressing the filing limitations applicable to pattern or practice cases – the Court of Appeals for the Fourth Circuit has yet to speak on the issue – the court in Optical Cable Corp. held that the statutory 180-day filing limitations period applied to the class claims.  As in this case, the plaintiff in Optical Cable alleged systemic gender discrimination in violation of Title VII and did not institute proceedings with a state agency.  Id. at 542, 545.

### 2.    LAWL Received Notice of EEOC's Pattern or Practice Claims on September 14, 2000

Where no charge specific to the type of discrimination at issue has been filed, the "filing date" should be "the date on which the EEOC notified Defendant that it was expanding its investigation to encompass" the additional areas of discrimination.  Id. at 547.  See also EEOC v. Gen. Elec. Co., 532 F.2d 359, 372 (4th Cir. 1976) (finding that where no charge was filed specific to the type of discrimination at issue, EEOC's determination of reasonable cause provided notice to the employer of claimed discrimination).  In this case, the proper "filing date" for determining the statutory filing period is September 14, 2000, the date on which EEOC issued the Determination first informing LAWL it was pursuing a pattern or practice claim of discrimination on the basis of gender.

---

[10]    Apart from the clear import of the statutory language, the policy concerns behind Title VII's filing limitation support its application in the pattern or practice context.  The limitations period protects "employers from the burden of defending claims arising from employment decisions that are long past."  Delaware State College v. Ricks, 449 U.S. 250, 256-57 (1980).  Defending claims from the remote past might otherwise be impossible where records were not retained or decision-makers no longer employed.

**3.    Twelve Class Claimants are Time Barred and Should be Excluded**

Based on a September 14, 2000, filing date, all class claimants who applied to LAWL before March 17, 2000, must be excluded as beyond the mandatory 180-day limitations period. The following twelve claimants applied before March 17, 2000:

        **a.**    George F. Adkins (June 17, 1999) (<u>See</u> Applicant Materials attached hereto as Exhibit HHH);

        **b.**    Stuart Aron (January 25, 2000) (<u>See</u> Applicant Materials attached hereto as Exhibit III);

        **c.**    Timothy Baier (around April 7, 1998) (<u>See</u> Applicant Materials attached hereto as Exhibit JJJ);

        **d.**    James Clinton Todd Balthazar (July 23, 1998) (<u>See</u> Applicant Materials attached hereto as Exhibit KKK);

        **e.**    Ronald Chalhon (September 23, 1997) (<u>See</u> Applicant Materials attached hereto as Exhibit LLL);

        **f.**    Reginald Cooper (July 17, 1999) (<u>See</u> Applicant Materials attached hereto as Exhibit MMM);

        **g.**    James F. Dean (January 23, 1998) (<u>See</u> Applicant Materials attached hereto as Exhibit NNN);

        **h.**    Larry Allen Gor (September 3, 1996) (<u>See</u> Applicant Materials attached hereto as Exhibit OOO);

        **i.**    Quinton Lee (February 5, 1998) (<u>See</u> Applicant Materials attached hereto as Exhibit PPP);

        **j.**    Harvey Sitnick (September 21, 1997) (<u>See</u> Applicant Materials attached hereto as Exhibit QQQ);

        **k.**    Matthew Turley (February 7, 2000) (<u>See</u> Applicant Materials attached hereto as Exhibit RRR); and

        **l.**    Warren Walker (October 8, 1998) (<u>See</u> Applicant Materials attached hereto as Exhibit SSS).

### 4.    Excluded Class Members Cannot be "Recaptured" by Operation of the Doctrine of Continuing Violation

EEOC may argue that Title VII's filing limitation is inapplicable to this case because LAWL's purported conduct is a continuing violation. See Exhibit CCC at ¶ 8. EEOC would be mistaken. The continuing violation doctrine provides that "[i]ncidents outside of the statutory window are time-barred unless they can be related to a timely incident as a 'series of separate but related acts' amounting to a continuing violation." Optical Cable, 169 F. Supp. 2d at 547 (citing Beall v. Abbott Labs., 130 F.3d 614, 620 (4th Cir. 1997)). Discrete acts of discrimination, such as a refusal to hire, constitute unlawful employment practices that are actionable individually and that therefore must occur within the limitations period to provide a timely basis for relief. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002).[11]

Further, applying the continuing violation theory to pattern or practice cases of discrimination eviscerates the statutorily-mandated filing period by allowing employees with untimely claims to latch their claims to those of employees who were aggrieved within the limitations period. With this result, employers could find themselves facing the onerous burden of defending actions occuring years, even decades, in the remote past. See Domingo v. New England Fish Co., 727 F.2d 1429, 1443 (9th Cir. 1984) (noting plaintiff's argument in favor of applying continuing violation doctrine would "effectively read the limitation period out of [Title

---

[11]    Morgan offers the United States Supreme Court's most recent take on the continuing violation theory. The Morgan court, however, specifically noted that it did not address pattern or practice claims. 536 U.S. at 115 n.9. Other courts have indicated that the continuing violation theory is inapplicable in the pattern or practice context. See, e.g., Optical Cable, 169 F. Supp. 2d at 549-550 (withholding a ruling on the applicability of the continuing violation theory to pattern or practice cases, but noting that "[i]t seems obvious that if the continuing violation doctrine is applied, those members of the class must have suffered an adverse employment action within the given time period or else the limitation in the statute would be meaningless.").

VII]…"); <u>Lumpkin v. Coca-Cola Bottling Co. United, Inc.</u>, 216 F.R.D. 380, 385 (S.D. Miss. 2003) (noting courts considering the issue have concluded individuals not subject to adverse employment action within given limitations period may not be part of class challenging discrimination); <u>Sandoval v. Saticoy Lemon Ass'n</u>, 747 F.Supp.1373, 1386 (C.D. Cal. 1990) ("If mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful employment policy could be untimely."); <u>Rodriguez v. United States Dept. of Treasury</u>, 131 F.R.D. 1, 11 (D.D.C. 1990) (finding applicants for employment could only be class members "if they could show that they were aggrieved by the discriminatory policy within the charging period."). Accordingly, any attempt by EEOC to advance the argument of a continuing violation must fail.

**D.    Summary Judgment is Proper Because There is No Dispute That LAWL Complied With 29 C.F.R. § 1602.14**

EEOC's quest for relief for a purported violation of 29 C.F.R. § 1602.14 is baseless. Not only does EEOC fail to identify any missing documents, but even assuming documents are missing, EEOC cannot establish that LAWL acted with the bad faith required for an evidentiary sanction.

The plain language of 29 C.F.R. § 1602.14 obliges employers to keep personnel records for one year from the date the record was created, or one year from the personnel action involved, whichever is later. In the context of a charge of discrimination, an employer must preserve all personnel records relevant to the charge until final disposition. 29 C.F.R. § 1602.14. Personnel records relevant to a charge include "personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person

applied and was rejected." Id. The regulation does not, however, contain specific penalties for violation of its record retention requirements. Rather, courts have fashioned remedies guided by the particular factual circumstances before them. See, e.g., Lombard v. MCI Telecomm. Corp., 13 F. Supp. 2d 621, 627-28 (N.D. Ohio 1998) (noting that sanctions are only available "if the facts prove egregious enough"). These decisions are few in number and offer little direction.

Despite the paucity of caselaw, it is clear that EEOC must establish bad faith for imposition of an adverse inference. "[A]bsent bad faith, a violation of 29 C.F.R. § 1602.14, the EEOC record retention regulation, would not automatically trigger an adverse inference." Park v. City of Chicago, 297 F.3d 606, 616 (7th Cir. 2002). See also Mathis v. John Morden Buick, Inc., 136 F.3d 1153, 1155 (7th Cir. 1998) (indicating adverse inference applies only if documents destroyed in bad faith); Beniushis v. Apfel, No. 98 C 0395, 2001 U.S. Dist. LEXIS 3574, at *17-18 (N.D. Ill. Mar. 26, 2001), attached hereto as Exhibit XXX (indicating evidentiary sanction requires finding of bad faith or willfulness). See also Favors v. Fisher, 13 F.3d 1235, 1238-39 (8th Cir. 1994) (applying rebuttable presumption where documents destroyed in regular course of business and no bad faith indicated). Here, EEOC fails to satisfy its burden and any request for an adverse inference should be denied.

1.    **It is Undisputed That LAWL in Good Faith Preserved All Records Relevant to the Claims in This Case**

Although EEOC's allegation is devoid of particulars, there are two categories of documents that could serve as the basis for its assertion: (1) documents relating to Koch's retaliation claim; and (2) documents relating to the class pattern or practice claim.

a.    **Documents Relating to Kathy Koch**

Any claim that LAWL did not properly retain documents concerning Koch is moot. Koch's claim was settled on November 29, 2005. See Exhibit DDD. Documents relating to

Koch's performance and termination – training aids, flip charts, test scores, notes – are not relevant to the pattern or practice claim remaining in this case. Indeed, LAWL's obligation to maintain documents tied to Koch's allegation terminated with her settlement. 29 C.F.R. § 1602.14.[12]

### b.    Documents Relating to EEOC's Pattern or Practice Claim

EEOC fails to specify relevant records that have not been preserved by LAWL in violation of 29 C.F.R. § 1602.14 and therefore does not state a viable claim for relief. At no point over the course of discovery has EEOC laid bare evidence of a set or class of records – either as to type, time period or geographic area – that LAWL did not maintain. Had EEOC done so, however, it would still not be entitled to relief for failure to amass any evidence of bad faith destruction or willful failure to retain records. Indeed, the evidence belies any argument that LAWL acted in bad faith. To the contrary, it demonstrates that LAWL codified its document retention policy requiring all hiring documents be preserved, and that LAWL employees complied. Exhibit T at pp. 50, 57-58.

LAWL did not have notice of EEOC's intention to mount a class pattern or practice discrimination suit until September 14, 2000, the Determination date. LAWL could not, therefore, have been expected to retain documents indefinitely in anticipation of litigation before receipt of the Determination. See Exhibit AAA. Moreover, discovery demonstrates unequivocally that LAWL's document preservation protocol, which was disseminated in January

---

[12]    In a hearing on June 29, 2004, the Honorable Paul W. Grimm recommended an adverse inference instruction to the jury regarding LAWL's failure to preserve documents related to Koch's performance, including training aids, flip charts, test scores, and contemporaneous notes from Kristi O'Brien. See Hearing Transcript at pp. 40-43, attached hereto as Exhibit TTT. These documents are specific to Koch and are not relevant to EEOC's pattern or practice claim.

1999, and requires sending all hiring- and personnel-related documents to the HR Department for preservation, was followed. See Exhibit T at pp. 44-45, 72-73.

The undisputed deposition testimony of several key LAWL employees is illustrative. Christiane Burnard had minor involvement in LAWL's hiring process as a Center Manager beginning in July 1998, and substantial involvement as an Area Manager beginning in January 2000. Exhibit K at pp. 31-33, 43-45.[13] Burnard testified unequivocally that LAWL's document retention policy required employees to send "everything we have regarding an applicant... into our Human Resources, our Corporate Office." Id. at 14-15. Similarly, Joni Fabie, whose hiring responsibility as an Area Manager began in 2001, testified that all hiring materials should be routed to the HR Department. Exhibit C at pp. 121-123, 142. Marissa Favara, an Area Manager from December 2000 to October 2001, stated that she adhered to the document retention policy, which required "[a]ny and all applications, resumes... need to be stapled together and sent to corporate." Deposition of Marissa Favara at pp. 48-49, 248-49, attached hereto as Exhibit UUU.

The stark absence of any evidence suggesting systematic destruction of or failure to protect any class of documents is significant. The complete lack of evidence of egregious conduct, willfulness or bad faith on the part of LAWL is critical. All discovery points to the conclusion that LAWL endeavored to and did succeed in complying with 29 C.F.R. § 1602.14. EEOC's request for an adverse inference in the absence of bad faith or evidence of intentional misconduct is unsupported by the evidence. This Court should not countenance EEOC's unfounded demand and should grant summary judgment in LAWL's favor.

---

[13]    Center Managers typically play no role in the hiring process. See Exhibit O at p. 120; Exhibit P at p. 193.

## IV.    CONCLUSION

For all of the foregoing reasons, defendant LA Weight Loss Centers, Inc. respectfully requests that this Court grant summary judgment in its favor.

_____/s/_____
Elizabeth Torphy-Donzella (Bar # 10809)
Shawe & Rosenthall LLP
20 South Charles Street
Baltimore, MD 21201
Tel:  (410) 752-1040
Fax:  (410) 752-8861

David E. Landau
Jonathan D. Wetchler
Aliza R. Karetnick
Wolf, Block, Schorr and Solis-Cohen LLP
1650 Arch Street – 22nd Floor
Philadelphia, PA 19103
Tel:  (215) 977-2000
Fax:  (215) 405-3724

Date:  March 9, 2007

## CERTIFICATE OF SERVICE

I, Elizabeth Torphy-Donzella, hereby certify that I caused a true and correct copy of the

Memorandum of Law in Support of Defendant LA Weight Loss Centers, Inc.'s Motion for

Summary Judgment to be filed and served electronically on March 9, 2007.  I further certify that

a copy of the memorandum and all exhibits shall be served via first class mail upon:


Ronald L. Phillips
EEOC
Baltimore District Office
10 South Howard Street, 3rd Floor
Baltimore, MD 21201


_____/s/_____
Elizabeth Torphy-Donzella