# EXHIBIT R

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUAL EMPLOYMENT          :
OPPORTUNITY COMMISSION,   :
   Plaintiff            :
                        :
   and                  :
                        :
KATHY C. KOCH,            :
   Plaintiff-Intervenor,:
                        :
                        : Case No.
   vs.                  : WDQ-02-CV-648
                        :
LA WEIGHT LOSS,           :
   Defendant            :

------
December 21, 2005
------

      Oral Deposition of MICHELE M. BLUM, held in the offices of Equal Employment Opportunity Commission, 4th Floor, The Bourse Building, 21 South 5th Street, Philadelphia, Pennsylvania 19106, beginning at approximately 9:52 a.m., before Ann V. Kaufmann, a Registered Professional Reporter, Certified Realtime Reporter, Approved Reporter of the U.S. District Court, and a Notary Public of the Commonwealth of Pennsylvania.

------

ESQUIRE DEPOSITION SERVICES
1600 John F. Kennedy Boulevard
Four Penn Center, 12th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

Michele M. Blum

Page 86

1  A. Intermittently.
2  Q. Now, what instruction were
3 you given by Ms. Burnard regarding
4 interviewing applicants?
5  A. What to look for, what is
6 relevant, how to be fair, fair
7 questioning. All aspects.
8  Q. What were you told to look
9 for?
10  A. Energy, relevant experience
11 in the service or sales industry coupled
12 with genuine care and concern for our
13 clients and service.
14  Q. And what were you told was
15 relevant?
16  A. I don't remember.
17  Q. Were you given any manuals
18 or guidelines to follow by Ms. Burnard?
19  A. Do you mean in writing?
20  Q. Yes.
21  A. By Ms. Burnard? No.
22  Q. Were you given any manuals
23 or guidelines to follow by anyone at LA
24 Weight Loss?

Page 87

1  A. Yes.
2  Q. Who were you given those
3 by?
4  A. Karen Siegel.
5  Q. And did you, in fact,
6 follow them?
7  A. Yes.
8  Q. And when were you provided
9 with these manuals?
10  A. In training and in the area
11 of supervisor training.
12  Q. Okay. When was that?
13  A. My first week with the
14 company we were a given general fair
15 practices hiring outline. And then area
16 supervisor basics, I don't remember when
17 it was.
18  Q. And what were the names of
19 the manuals or guidelines that you were
20 given, do you recall?
21  A. I don't remember.
22  Q. Do you know where they are
23 located now?
24  A. Can you rephrase the

Page 88

1 question? I'm not sure I understand it.
2  Q. Did you receive a copy of
3 the manuals?
4  A. Yes.
5  Q. What did you do with them?
6  A. I don't remember.
7  Q. Do you know where they are
8 now?
9  A. No, I do not.
10  Q. Do you remember the last
11 time that you looked at it?
12  A. No, I do not.
13  Q. After receiving it, do you
14 recall how you used it or did you use
15 it?
16  A. Yes.
17  Q. And how did you use it?
18  A. To learn and to apply it to
19 my position and what I was responsible
20 for.
21  Q. And how did you apply it?
22  A. When I was first learning
23 to interview I referred to it.
24  Q. And which section

Page 89

1 specifically do you recall referring to?
2  A. From time to time, the
3 entire manual.
4  Q. Do you remember the topics
5 that were included within the manual?
6  A. Some of them.
7  Q. Okay. And can you tell us
8 what those topics are that you remember?
9  A. Interview questions that
10 are helpful, interview questions that
11 should be avoided. EEO practices and
12 policies and procedures.
13    There was some like
14 helpful – like relevant industries, the
15 successful people, you know, have
16 background in these certain companies.
17  Q. Which portions did you find
18 helpful in your interviewing?
19  A. All of them.
20  Q. Now, you said there was a
21 listing of industries. Was that
22 mandatory that you refer to those
23 industries?
24  A. No.

23 (Pages 86 to 89)

ESQUIRE DEPOSITION SERVICES

Page 118

1   A. No, she is not.
2   Q. What about Carolyn?
3   A. No, she is not.
4   Q. What about Toni?
5   A. No, she is not.
6   Q. Did Toni, Carolyn, and Lisa
7   all have responsibility -- also have
8   responsibility for hiring?
9   A. Yes.
10  Q. Did you provide them with
11  any training on how they were to select
12  candidates for their markets?
13  A. I provided ongoing
14  training, as well as the company.
15  Q. And what type of training
16  did you provide to them?
17  A. Area supervisor basic
18  training, EEO training, ongoing one-on-
19  one role-play with interviews training,
20  sitting in on interviews with them. Too
21  many -- conference calls. Too many
22  trainings to list, probably.
23  Q. Okay. What discussions did
24  you have with them regarding hiring?

Page 119

1   What instructions did you provide to
2   them with respect to hiring?
3   A. The same that I was given:
4   Be fair, ask these questions, make sure
5   you don't ask certain questions. I just
6   wanted them to be educated on, you know,
7   what was not appropriate. They were
8   very good studies.
9   Q. Okay.
10  A. You know, basic stuff.
11  Like act quickly or the applicant will
12  find another position or grab another
13  offer.
14      Just everything from basic
15  the process of hiring to what questions
16  to ask to get information that might
17  lead you to know if this person is a fit
18  for us.
19      (Ms. Siegel left the
20  deposition room.)
21  BY MS. SPICER:
22  Q. And what questions did you
23  suggest to them they should ask to
24  determine whether someone is a proper

Page 120

1   fit?
2   A. There was a guide. There
3   was a list of questions that I referred
4   to.
5   Q. Okay. Did you instruct
6   them to also use this guide, this list
7   of questions?
8   A. Not instruct them to only
9   use that list, but that that was a
10  helpful list to get started with.
11  Q. You indicated that you also
12  provided them with EEO training. What
13  type of training did you provide with
14  respect to EEO?
15  A. They were given the
16  policy. We were, you know, in many
17  different settings many different times,
18  either conference call meeting, one-on-
19  one, where we went over we have fair
20  hiring practices and we do not
21  discriminate based on anything:
22  religion, gender, ethnic background,
23  age, anything. The best person gets the
24  job.

Page 121

1   Q. What did you specifically
2   train the area supervisors on with
3   respect to EEO training? You said that
4   you provided them with training.
5   A. Yeah.
6   Q. What did you specifically
7   train them on?
8   A. Reading over that policy
9   and making sure they understood it.
10  Q. Did you discuss the policy
11  with them?
12  A. Sure.
13  Q. Did you do any role-playing
14  with respect to EEO issues?
15  A. Yes. Just in certain
16  questions or what not -- as it relates
17  to what questions not to ask.
18  Q. Did you do anything else
19  with respect to providing them training
20  on the EEO issues?
21  A. Conference calls relating
22  to hiring and -- they had conference
23  calls with the company, they had area
24  supervisor basics with the company.

Michele M. Blum

Page 266

1    Otherwise you can answer.
2    THE WITNESS: I'm not sure
3  if I understand you to mean including
4  the written comments you just referenced
5  or -- because it looks like someone said
6  he had poor communication skills when
7  they called him.
8  BY MS. SPICER:
9    Q.  I'm asking regarding the
10  experience that's listed there.
11    A.  Okay. I don't know -- it
12  looked like to me he had a lot of jobs
13  in a short amount of time. Like perhaps
14  he hadn't held any jobs for any length
15  of time, except for the High Altitude in
16  Vermont.
17    The two most recent
18  positions are sketchy, because I don't
19  know when Abercrombie & Fitch -- I don't
20  know when the present is. I'm not
21  sure. It says October 2002 to now, but
22  I don't know when now is, based on these
23  documents.
24    Q.  Doesn't now or present

Page 267

1  usually refer to at the time the person
2  has created the resume?
3    A.  Yeah, but you are asking me
4  if anything would disqualify him and I
5  don't know when he submitted this resume
6  because I don't remember him.
7    And then the next one down
8  just says September 1. It doesn't say
9  if that is when he started, that is when
10  he finished, if he was still there. I'm
11  not sure about the second position.
12    And then other than that,
13  it looks like he was involved in retail
14  pool supplies or something.
15    Again, I'm uncomfortable
16  with this question because I'd have to
17  meet him or talk to him on the phone or
18  tell you if anything excluded him or
19  enhanced his chances of employment
20  because I don't -- I don't know what
21  position he is applying for.
22    I don't know. I don't know
23  anything. I know very little. So
24  without a phone screen, I'm not

Page 268

1  comfortable answering that.
2    Q.  Now, Ms. Blum, as an
3  employee of LA Weight Loss, have you
4  ever received any training on EEO
5  antidiscrimination issues?
6    A.  Yes.
7    Q.  When did you receive this
8  training?
9    A.  I can't recall. Many, many
10  occasions in the forms of meetings,
11  written materials, conference calls,
12  supervisor basic training conferences
13  where we go to a conference and we're
14  trained on hiring issues and EEO.
15    Q.  On average how many such
16  trainings would you say that you have
17  attended?
18    MS. AUSTIN: Objection to
19  the form of the question.
20    THE WITNESS: I don't know.
21  BY MS. SPICER:
22    Q.  Do you recall where the
23  trainings were?
24    A.  Some of them.

Page 269

1    Q.  Okay. Tell me the ones
2  that you remember, where they were.
3    A.  Employee conferences. I
4  don't know the exact destination of the
5  conference; we've had many. Conference
6  calls that I have been a participant on.
7    Area supervisor basics in
8  Horsham, Pennsylvania, that one I know.
9  And many, many other times and trainings
10  and references to EEO practices and
11  procedures from my supervisor, HR
12  constantly.
13    Q.  Can you describe for me
14  what the content of the instruction was,
15  what the content of the training was?
16    A.  The content of the
17  instruction is that we will not tolerate
18  anything but fair hiring practices. We
19  do not discriminate based on age, race,
20  sex, ethnic origin, gender, ethnic
21  background.
22    I can't even think of all
23  of the subjects right now. But that we
24  hire fair and the best person gets the

68 (Pages 266 to 269)

ESQUIRE DEPOSITION SERVICES

Page 270

1  position, the most qualified person for
2  that position gets it.
3     Q.  And how much time was spent
4  at each of these trainings on that
5  topic?
6     A.  I think it's fair to say
7  the first part of the meeting or the
8  first part of the conference call or the
9  first part of whatever the subject was
10 in hiring that day.
11    Q.  How long would the
12 conference calls usually last?
13       MS. AUSTIN: Objection to
14 the form of the question.
15       THE WITNESS: I can't
16 speculate.
17 BY MS. SPICER:
18    Q.  Okay. How many minutes of
19 the conference call was devoted to EEO
20 issues?
21    A.  I didn't time it.
22    Q.  And when you attended the
23 area supervisor basic training, how much
24 time of that training was devoted to EEO

Page 271

1  issues?
2     A.  I don't know exactly how
3  much time was devoted to EEO issues,
4  although I do know one out of the whole
5  five days was dedicated to hiring and
6  hiring practices and procedures and our
7  policies regarding it, and that was like
8  basically a whole day; and I would say a
9  good portion of that day.
10    Q.  Okay. And during the
11 course of that day, what was discussed
12 regarding EEO issues?
13    A.  Again, fair hiring
14 practices, that we will not tolerate
15 unfair hiring or, you know, the best
16 qualified person gets the position.
17 What questions that would be recommended
18 to ask. What questions we never ask,
19 which questions would be inappropriate,
20 as I stated early this morning.
21       We role-played interviewing
22 and questioning situations, situational
23 questions with a partner at our training
24 table.

Page 272

1     Q.  Okay.
2     A.  The people in HR walked
3  around and listened to our questions to
4  make sure that we were asking them or
5  proposing them the right way.
6     Q.  Now, what portion of the
7  role-play was specifically the topic was
8  EEO issues?
9     A.  I think we hit on most
10 issues. I think we -- in this
11 instance -- I can't remember. There
12 were several different issues role-
13 played, so I'm not sure exactly which
14 one. Maybe we did one of each. Maybe
15 we did four out of eight; I have no way
16 of knowing.
17    Q.  Do you remember what the
18 role-play situation was that was part of
19 the training that dealt with EEO issues?
20    A.  I don't understand that
21 question.
22    Q.  You said that there were a
23 number of role-playing that were done.
24 Do you remember what the issues were in

Page 273

1  each of the role-plays?
2     A.  I would be speculating.
3     Q.  Did any of the role-plays
4  deal with diversity issues?
5     A.  The role-plays, as I
6  remember them, were ask your partner
7  questions and if there's something
8  inappropriate, you pick out the wrong
9  question; okay?
10    Q.  So the role-plays were
11 regarding what questions are appropriate
12 and not appropriate?
13    A.  Right.
14    Q.  Not specifically with
15 respect to any EEO issues?
16       MS. AUSTIN: Objection to
17 the form of the question.
18       THE WITNESS: No, they all
19 related to EEO issues, what questions
20 were inappropriate to ask based on these
21 issues.
22 BY MS. SPICER:
23    Q.  Okay. Well, my question is
24 not just on what's appropriate questions

Page 274

1 or what's not appropriate questions.
2          Were there any discussions
3 or role-play regarding any issues of
4 harassment?
5    A.   Absolutely.
6    Q.   And what was the role-play
7 specifically with respect to harassment?
8    A.   Can't remember.
9    Q.   Was there any role-play on
10 any other specific issue that is --
11   A.   Retaliation.
12   Q.   Okay. And what
13 specifically was the role-play on
14 retaliation?
15   A.   I can't remember.
16   Q.   What were you told
17 regarding retaliation?
18   A.   We don't tolerate it.
19   Q.   What does it mean?
20   A.   It means if an employee has
21 a situation that they feel they brought
22 to our attention and then for some
23 reason down the line they are
24 disciplined for performance or something

Page 275

1 else, they could view it as it is
2 because they brought that situation into
3 light.
4    Q.   Okay.
5    A.   Or it could be many
6 different things. It could be many
7 different things. Retaliation could be
8 regarded as a result of many different
9 issues in the workplace.
10   Q.   Now, what specifically were
11 you told that retaliation dealt with
12 with respect to EEO issues?
13   A.   I can't remember the
14 specific example.
15   Q.   Now, do you have an
16 independent understanding today as to
17 what retaliation applies to with respect
18 to EEO issues, what the definition of
19 retaliation would be in that situation?
20        MS. AUSTIN: Object to the
21 form of the question to the extent it
22 calls for a legal conclusion.
23 BY MS. SPICER:
24   Q.   Do you understand my

Page 276

1 question?
2    A.   No, I do not.
3    Q.   Do you understand what the
4 definition of retaliation is in the form
5 of antidiscrimination, in the context of
6 antidiscrimination?
7    A.   I don't understand your
8 question still.
9    Q.   Okay. Do you know what the
10 definition of retaliation is under the
11 antidiscrimination laws?
12        MS. AUSTIN: Same objection.
13        You can answer.
14        THE WITNESS: I still am not
15 clear what your question is.
16 BY MS. SPICER:
17   Q.   Has anyone ever told you
18 what the definition of retaliation is
19 with respect to antidiscrimination laws?
20   A.   Yes.
21   Q.   And who gave you that? Who
22 told you that definition?
23   A.   Karen Siegel.
24   Q.   What did Ms. Siegel tell

Page 277

1 you was the definition of retaliation
2 under the antidiscrimination laws?
3    A.   She handed me a piece of
4 paper and the definition was on it and
5 we read it aloud in a class.
6    Q.   What was the definition?
7    A.   I just answered that
8 question earlier. Like I said earlier,
9 retaliation would be to punish an
10 employee for bringing a situation to
11 light. It could be many different
12 things. It could be --
13   Q.   Okay.
14        MS. AUSTIN: Please let her
15 finish answering the question.
16 BY MS. SPICER:
17   Q.   What kind of situation are
18 you referring to? I'm sorry. Maybe I'm
19 having --
20   A.   I don't know because I
21 don't know what kind of situation you
22 are referring to. There's so many
23 different situations. You are asking me
24 for a definition that's clear-cut and

Page 282

1  taught that day or being refreshed or
2  reviewed with that day, we would get a
3  copy of a participant workbook.
4      Q.  Did you maintain a copy of
5  that?
6      A.  No.
7      (Below-described document
8  marked as Blum Exhibit 25.)
9  BY MS. SPICER:
10     Q.  Ms. Blum, do you recognize
11 this document?
12     A.  Yes, I do.
13     Q.  Did you receive a copy of
14 this document?
15     A.  Yes, I have.
16     Q.  And did you maintain a copy
17 of this document?
18     A.  No, I have not.
19     Q.  Do you recall when you
20 received a copy of this document?
21     A.  I can't remember.
22     Q.  Turning to Page 5 of this
23 document — I'm not going to use the
24 Bates stamp number. I think I will use

Page 283

1  the actual numbers of the document; I
2  think that would be easier.
3      A.  Right here; right?
4      Q.  Yes. Where it talks about
5  where to recruit and scout new
6  employees.
7      A.  Uh-huh.
8      Q.  Now, was this list a
9  mandatory list to use?
10     A.  No, it was not.
11     Q.  It was a suggested list?
12     A.  Yes. I mean I wouldn't
13 even say suggested. It was just a
14 reference.
15     Q.  On Page 9 there is a
16 referral log listed there. Do you see
17 that?
18     A.  Uh-huh.
19     Q.  Did you ever use this log?
20     A.  No, I have not.
21     Q.  Turn to Page 21, please.
22 You see the prescreening, preinterview
23 screening?
24     A.  Uh-huh.

Page 284

1      Q.  When you were responsible
2  for screening candidates, did you use
3  this document, this form?
4      A.  When I called the phone
5  line — no, I did not.
6      Q.  Looking at Page 22, which
7  is another prescreening form, when you
8  were responsible for screening
9  applicants, did you use this form?
10     A.  No, I did not.
11     Q.  Turning to Page 26, there's
12 a form there Selection Interview Guide.
13 Did you ever use this form?
14     A.  Never for practical
15 purposes; only for training purposes.
16     Q.  Turning to Page 29, there's
17 a form here for first interview
18 questions for center managers and
19 assistant managers. Did you ever use
20 this format?
21     A.  I used this sheet for
22 training purposes and suggesting
23 questions. I have never taken notes
24 during an interview, so I don't —

Page 285

1  unless it is a phone interview, so I
2  don't — I would never typically use
3  this.
4      Q.  Would it be fair to say
5  with the remainder of the guides, the
6  forms that are listed in this document,
7  that you did not use those in conducting
8  interviews?
9      A.  I would have to see all the
10 documents before I could say that.
11     Q.  Okay. Take a minute to
12 look at them and then tell me if there
13 were any of those interview forms that
14 you used.
15     MS. AUSTIN:  By "used" are
16 you referring to other than for training
17 purposes?
18     MS. SPICER:  Yes, other than
19 for training purposes.
20     THE WITNESS:  The LA Weight
21 Loss Interview Guide Answers.
22 BY MS. SPICER:
23     Q.  What page are you referring
24 to?

Michele M. Blum

Page 286

1  A.  33. I used that as a
2  reference at times, or used to.
3  Q.  Do you recall when it was
4  that you used that?
5  A.  No, I can't remember.
6  Q.  Do you recall for what
7  positions you were using this as a
8  guide?
9  A.  Center managers and
10 assistant managers.
11 Q.  Did you ever select center
12 managers and assistant managers without
13 referring to this guide?
14 A.  That guide wasn't always in
15 existence, so I'm not sure what you mean
16 by that.
17 Q.  Since the existence of this
18 guide have you ever selected anyone for
19 a center manager or assistant manager
20 without referring to this guide?
21 A.  Yes.
22    New Hire Information Roster.
23 Q.  What page are you --
24 A.  That's more of a training

Page 287

1  or of a --
2  Q.  What page?
3    MS. AUSTIN:  Page 42.
4    THE WITNESS:  I'm sorry.
5    MS. SPICER:  Thank you.
6    THE WITNESS:  That was for
7  basically training purposes, so scratch
8  that. I apologize.
9    (Below-described document
10 marked as Blum Exhibit 26.)
11 BY MS. SPICER:
12 Q.  Ms. Blum, do you recognize
13 this document?
14 A.  Yes, I do.
15 Q.  Did you receive a copy of
16 this document?
17 A.  You are going to have to
18 give me a minute for that one or I would
19 be speculating.
20 Q.  Okay.
21 A.  (Witness reviews document.)
22 I'm so sorry.
23 Q.  Take your time.
24 A.  Yes, I did.

Page 288

1  Q.  When did you receive a copy
2  of this document?
3  A.  Pieces of this document at
4  different times throughout my employment
5  as well as when it was updated different
6  times. I can't remember.
7  Q.  Do you recall who gave you
8  a copy of this document?
9  A.  Human Resources.
10 Q.  Did you have any
11 discussions with anyone at Human
12 Resources regarding this document, How
13 to Build a Winning Team?
14 A.  I can't remember.
15 Q.  Did you receive any
16 training on this document?
17 A.  I believe this was a
18 training, this piece of the document was
19 a training. I can't recall.
20 Q.  Did you maintain a copy of
21 it?
22 A.  No, I did not.
23 Q.  Do you remember what you
24 did with your copy?

Page 289

1  A.  No, I don't.
2  Q.  Did you ever refer to this
3  document when it was in your possession
4  when you were hiring or screening
5  applicants for employment?
6  A.  Can you rephrase the
7  question? I don't understand it.
8  Q.  When this document was in
9  your possession, did you ever use it as
10 a guide when you were screening or
11 hiring applicants for employment at LA
12 Weight Loss?
13 A.  I read the information. I
14 didn't use it for practical purposes
15 during interviews. I read it.
16 Q.  Were you instructed that
17 you were supposed to use it as a
18 practical guide?
19 A.  It was a tool. It was
20 provided as a tool, and I can't
21 remember.
22 Q.  Now, Ms. Blum, do you have
23 an opinion as to whether women make
24 better employees for LA Weight Loss?

73 (Pages 286 to 289)

ESQUIRE DEPOSITION SERVICES