# EXHIBIT LL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

- - -

| | |
|---|---|
| EQUAL EMPLOYMENT | : |
| OPPORTUNITY  COMMISSION | : |
| | : |
| and | : |
| | : |
| KATHY C. KOCH | : |
| | : |
| v. | : |
| | : Case No. |
| LA WEIGHT LOSS | : WDQ-02-CV-648 |

- - -

January 14, 2004

- - -

Videotape deposition of NINA

C. CATAGNUS, held in the offices of

Esquire Deposition Services, One

Montgomery Plaza, Suite 708, Norristown,

Pennsylvania, commencing at 10:56 a.m.,

on the above date, before Effie

Roussakis, a Professional Court Reporter

and Notary Public for the Commonwealth of

Pennsylvania.

- - -

                    ESQUIRE DEPOSITION SERVICES
                1880 John F. Kennedy Boulevard
                            15th Floor
                Philadelphia, Pennsylvania 19103
                        (215) 988-9191

Page 6

1        This deposition is being
2    taken on behalf of the plaintiff.
3    All counsel will be noted on the
4    stenographic record.
5        The court reporter's name is
6    Effie Roussakis and she will now
7    swear in the witness.
8            - - -
9        NINA C. CATAGNUS, after
10   having been duly sworn was
11   examined and testified as follows:
12           - - -
13        EXAMINATION
14           - - -
15   BY MR. PHILLIPS:
16   Q.    Good morning, Ms. Catagnus.
17   A.    Good morning.
18   Q.    Before I begin asking some
19   questions I just have a few sort of
20   instructions for you.
21        Have you ever given a
22   deposition before?
23   A.    No.
24   Q.    Okay.  Well, as you know, we

Page 7

1    have a court reporter here who has just
2    sworn you in and she is taking down what
3    we are saying.
4        If at any point you need a
5    break, please let me know.
6    A.    Okay.
7    Q.    And we will do that.  Also
8    when you're testifying if you could try
9    to give verbal responses to the extent
10   you can.  Although, the videographer
11   certainly can register facial gestures
12   and shaking of the head and that sort of
13   thing, the court reporter really can't
14   take down gestures so...
15   A.    Okay.
16   Q.    If at any point you're asked
17   a question by anyone and you don't
18   understand the question, please ask that
19   it be rephrased and that person will do
20   that.
21   A.    Okay.
22   Q.    And if at any point you, you
23   know, forget what the question was
24   because counsel has been arguing back and

Page 8

1    forth or if you didn't hear part of the
2    question, please ask that it be re-asked
3    and that person will do that.
4    A.    Okay.
5    Q.    And, obviously, if you do
6    answer questions, we will assume that you
7    understood the question.
8    A.    Okay.
9    Q.    It's also best for one
10   person to be speaking at a time, it just
11   makes for a clearer record and it makes
12   the court reporter's life a lot easier.
13   So if you could wait until whoever is
14   asking the question finishes their
15   question and then we will do everything
16   we can not to interrupt your answers.
17   A.    Okay.
18   Q.    Is there any reason,
19   physical or mental, why you're not able
20   to fully and truthfully answer questions
21   today?
22   A.    In my opinion, no.  In
23   others maybe, yes.  But, no, I don't
24   think so.

Page 9

1    Q.    But you feel well?
2    A.    Yes.
3    Q.    And you're able to
4    understand my questions right now?
5    A.    Absolutely.
6    Q.    Okay.  Could you state your
7    name for the record, please?
8    A.    Yes.  Nina C. Catagnus.
9    Q.    And what is your current
10   address, Ms. Catagnus?
11   A.    25 Raleigh Drive,
12   Downingtown, PA 19335.
13   Q.    Okay.  Ms. Catagnus, have
14   you ever worked for LA Weight Loss?
15   A.    Yes.
16   Q.    Where did you work for LA
17   Weight Loss?
18   A.    I was an area supervisor for
19   LA Weight Loss, meaning I was in charge
20   of several centers at one time.
21   Q.    And that was in the State of
22   Pennsylvania?
23   A.    Yes, it was.
24   Q.    And generally around the

Page 10

1    Philadelphia area?
2        A.    Yes.  That's correct.
3        Q.    And at some point you
4    managed centers -- well, let me ask you.
5    What centers did you manage as an area
6    manager at LA Weight Loss when you first
7    started?
8        A.    When I first started I
9    managed the Philadelphia market which
10   consisted of Exton -- I have to remember
11   all of them -- Springfield, oh gosh, very
12   difficult.
13       Q.    Is Bala --
14       A.    Bala Cynwyd was one,
15   correct.
16       Q.    How about Center City?
17       A.    Center City very briefly,
18   yeah.  I changed -- we continually
19   changed the areas that we were managing.
20   Pottstown, I managed.  And then I had the
21   Delaware centers, Brandywine, Dover, and
22   Newark, Delaware.
23       Q.    Is there a Springfield?
24       A.    Springfield, yes, was one of

Page 11

1    the original ones I managed, Exton,
2    Springfield, Bala.
3        Q.    Okay.  Can you describe for
4    me what your job consisted of as an area
5    manager or area supervisor?
6        A.    Okay.  Primarily I was to go
7    in and train the managers how and coach
8    the managers how to sell programs for
9    clients that would come in.  And I
10   oversaw the running in terms of
11   monetarily.  I would oversee what we did
12   in each center.  It was my position to
13   get financial numbers every day from all
14   the centers and then I would compile
15   those numbers and then send them to
16   headquarters every night, that was a big
17   part of the job.
18          So, again, overall managing
19   of the center, seeing that they were
20   running smoothly, hiring employees,
21   dismissing employees was part of my job
22   as well.  Again, coaching is a real big
23   part of that.
24       Q.    You mentioned hiring, what

Page 12

1    positions did you conduct hiring for at
2    LA Weight Loss?
3        A.    All positions within the
4    centers, management, manager, assistant
5    manager, counselors.
6        Q.    Medical assistants also?
7        A.    Yes, uh-huh, that's correct.
8        Q.    And just to go back, do you
9    recall when you started your employment
10   at LA Weight Loss?
11       A.    Yes.
12       Q.    When was that?
13       A.    Oh, the actual date, I'm
14   sorry, I don't remember that.
15       Q.    Does -- March 16th, 1998,
16   does that sound generally right?
17       A.    That sounds about right.
18       Q.    Okay.  And do you recall
19   when your employment ended at LA Weight
20   Loss?
21       A.    Again, I can't remember the
22   exact dates.
23       Q.    November 1999, does that
24   sound accurate?

Page 13

1        A.    I know it was around
2    Thanksgiving.  I'm sorry, of what year?
3        Q.    '99.
4        A.    No.  I was there for, I
5    believe, over two years, I believe.  I
6    have to think about this one.  Give me a
7    minute.  I believe it may have been
8    2000.  I'm not definite on that.  The end
9    of '99 or 2000.
10       Q.    In the -- just to let you
11   know -- pardon me -- the company records
12   do show the end of '99.
13       A.    Okay.
14       Q.    I mean, does that sound like
15   it may be correct?
16       A.    I thought I was there for at
17   least two years.
18       Q.    Okay.  Okay.  Well, we can
19   -- we can maybe go over that again here
20   in a second.
21          Now, you mentioned that as
22   an area supervisor you had hiring
23   authority?
24       A.    Yes.

Page 22

```
 1   opportunity to observe his work?
 2       A.   Yes.
 3       Q.   So you don't know of any
 4   complaints from clients regarding Mr.
 5   McCann?
 6       A.   Not at all.
 7       Q.   Now, earlier you mentioned
 8   that Eileen Stankunous had also made some
 9   statements to you about whether or not
10   you should hire men?
11       A.   Yes.
12       Q.   Do you recall what she told
13   you?
14       A.   Primarily, again, same
15   thing, along the same lines, that she
16   believed that females would not feel
17   comfortable with male counselors.
18       Q.   Did she say to you that you
19   should not hire men?
20       A.   No, she did not.
21       Q.   Okay.  But she did express
22   the view that females --
23       A.   In her opinion, correct.
24       Q.   -- would not feel
```

Page 23

```
 1   comfortable with a male counselor?
 2       A.   Yes, she did.
 3       Q.   Okay.  How did that subject
 4   come up, do you recall?
 5       A.   I believe we went out to
 6   lunch one day and we were talking about
 7   hiring practices and we talked a little
 8   bit at the time about men being hired for
 9   the center and for the company, and that
10   is when she told me that was her belief.
11   But, again, she did not tell me not to
12   hire men, that was Lesia Petrizio.
13       Q.   Thank you.
14       A.   You're welcome.
15       Q.   Other than Ms. Petrizio and
16   Ms. Stankunous, did you ever hear anyone
17   else make any remarks about the issue of
18   hiring men or not hiring men?
19       A.   I don't really recall
20   comments, but it was almost as a known
21   that men were not supposed to be hired.
22   But, again, no other comments that I can
23   recall at this time.
24       Q.   Did anyone ever make any
```

Page 24

```
 1   statements to you about what you should
 2   do if a man applied?
 3       A.   Let me think about that for
 4   a minute.  Because I was the first person
 5   that generally would interview, they
 6   wouldn't know until afterwards that a
 7   male applied and that is when the
 8   comments were made.
 9       Q.   Okay.  Do you know who made
10   the decision to transfer you to Lehigh
11   Valley?
12       A.   I do not know for sure.
13   Lesia is the one who told me.
14       Q.   I wanted to just ask you a
15   few questions about the company's
16   recordkeeping practices while you were
17   employed there.
18       A.   Okay.
19       Q.   Do you know -- did you ever
20   know if the company had a policy
21   regarding how long applications for
22   employment needed to be retained?
23       A.   We didn't have a policy at
24   the time that I know of, that I'm aware
```

Page 25

```
 1   of.
 2       Q.   And the same would be true
 3   for resumes, cover letters, things of
 4   that nature?
 5       A.   Generally, we kept the
 6   resumes ourselves, the area supervisor.
 7   There was no clear policy as to how long
 8   we had to keep them.
 9       Q.   Okay.  How long did you keep
10   them for?
11       A.   I actually still have them.
12       Q.   You still have some?
13       A.   Yes.
14       Q.   Okay.  Were there ever
15   occasions that you know of when you were
16   employed at LA Weight Loss when
17   applications or resumes for employment
18   were discarded or destroyed?
19       A.   What happened then the
20   procedure changed, the resumes did not
21   come to the area supervisors directly,
22   they now went to Lesia Petrizio and she
23   also placed ads in the papers as well and
24   people responded to her directly.
```