# EXHIBIT OO

UNITED STATES DISTRICT COURT

   DISTRICT OF MARYLAND

---------------------------------:

EQUAL EMPLOYMENT OPPORTUNITY  :

COMMISSION,                                          :

      Plaintiff                              : Case No:

  and                                                 : WDQ-02-CV-648

KATHY KOCH,                                       :

      Plaintiff-Intervenor           :

  vs.                                                    :

LA WEIGHT LOSS,                            :

      Defendant                          :

---------------------------------:

        Rockville, Maryland

        Tuesday, June 7, 2005

Deposition of

      MELINDA TEMPLE-PASSIN

the witness, was called for examination by

counsel for the plaintiff, at the Law Offices

of Hoffman & Rubin, 966 Hungerford Drive,

Suite 22, Rockville, Maryland, 20850,

commencing at 9:45 a.m., before Hedy D. Blau,

Page 6

1  that you're asked today, if you could ask that
2  it be rephrased, we will certainly do that,
3  either myself or Aliza.
4     A.   Okay.
5     Q.   Similarly, if you didn't hear part of
6  a question or if Aliza and I have been talking,
7  and you don't remember the question, if you
8  could ask that it be repeated, we will do that
9  for you.
10    A.   Okay.
11    Q.   If you do answer a question today, we
12 will assume that you understood it. Is that
13 fair?
14    A.   Yes.
15    Q.   It's best that we speak one person at
16 a time. It tends to cause problems if there's
17 two people speaking at once. So, if we can
18 both try to do that.
19    A.   Yes.
20    Q.   If either of the attorneys, myself or
21 Aliza, make an objection today, if you could
22 just wait for us to finish our objection before

Page 7

1  you answer the question?
2     A.   Okay.
3     Q.   And also, at the end of the
4  deposition, you will have an opportunity to
5  tell the court reporter whether or not you wish
6  to review the transcript of your deposition for
7  accuracy. You have a right as a witness to do
8  that, and she can make arrangements with you to
9  give you an opportunity to read the transcript
10 and see if everything is accurate.
11    A.   Okay.
12    Q.   So, at the end of the deposition just
13 let her know whether or not you wish to do
14 that.
15    A.   I will do that.
16    Q.   Just for the record, could you state
17 your full name, please?
18    A.   Melinda Temple-Passin.
19    Q.   What is your home address currently?
20    A.   13021 Birdale Lane, Gaithersburg,
21 Maryland.
22    Q.   Do you reside anywhere else for any

Page 8

1  part of the year?
2     A.   No.
3     Q.   Do you have any intention of moving
4  from that address, say, in the next
5  year-and-a-half?
6     A.   No.
7     Q.   Could you state your social security
8  number, please?
9     A.   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.
10    Q.   And your date of birth?
11    A.   4/5/62.
12    Q.   Are you currently employed?
13    A.   Yes.
14    Q.   Where are you employed?
15    A.   Roy Passin, Incorporated.
16    Q.   What is Roy Passin, Incorporated?
17    A.   It's a restaurant.
18    Q.   Where is that located?
19    A.   It's in Gaithersburg, Old Towne
20 Gaithersburg.
21    Q.   Is there like a trade name of the
22 restaurant?

Page 9

1     A.   Roy's Place.
2     Q.   Roy's Place?
3     A.   Yes.
4     Q.   Have you ever worked for LA Weight
5  Loss?
6     A.   Yes.
7     Q.   When did you begin working for LA
8  Weight Loss?
9     A.   It was in 2001. I take that back,
10 wrong, wrong. It was either at the end of '98
11 or the beginning of '99.
12    Q.   Has your last name always been
13 Temple-Passin?
14    A.   No, it hasn't. It was Temple when I
15 was working for LA Weight Loss.
16    Q.   The company records show that you were
17 hired on or about August 10th of 1998. Does
18 that date sound correct?
19    A.   Yes, it does.
20    Q.   What position were you hired to do
21 when you first started at LA Weight Loss.
22    A.   I was hired as a manager in the

MGB REPORTING, INC.
1-800-245-2528 or 301-983-9315

Page 10

1  Herndon location.
2    Q.  So, like a center manager of the
3  Herndon center?
4    A.  Correct.
5    Q.  In your capacity as a center manager
6  at the Herndon center, did you have any duties
7  or responsibilities relating to hiring of new
8  employees?
9    A.  Not really as a manager. If people
10 came in and applied for a job there or we
11 received faxes, then, I would give them to my
12 area supervisor or the regional supervisor at
13 that point.
14   Q.  Other than that duty, you did not have
15 any duties in the hiring process?
16   A.  No, I did not.
17   Q.  Did you also hold the position of area
18 supervisor at LA Weight Loss?
19   A.  Yes, I did. I was promoted.
20   Q.  Do you recall when you were promoted
21 to that position?
22   A.  Probably -- it's been so long ago,

Page 11

1  it's just really hard to remember. It was
2  within a year.
3    Q.  And again, the company records show
4  that you were promoted -- I'll represent to you
5  that they show you were promoted on or about
6  March 22, 1999. Does that sound accurate?
7    A.  Yes, it does.
8    Q.  As an area supervisor with LA Weight
9  Loss, which centers were under your
10 supervision?
11   A.  I had Herndon, Rockville,
12 Gaithersburg, Frederick, Hagerstown, and opened
13 D.C.
14   Q.  Do you recall when you opened D.C.?
15   A.  I would guess it was probably in 2000.
16   Q.  Do you recall when your employment at
17 LA Weight Loss ended?
18   A.  It would have been in -- I believe it
19 was April or May of 2001, I believe that's
20 when. I'm not good on dates. Really, I'm not.
21   Q.  And I'll try to help you out on that.
22 I'll represent to you that the company records

Page 12

1  show that your employment ended with LA Weight
2  Loss on or about May 10th of 2000. Does that
3  sound accurate?
4    A.  That's accurate. I was trying to get
5  it right with my marriage and when I was
6  married, how long after. And we were married
7  in 2001, so that's right. We had dated a year
8  before we were married.
9    Q.  Did you resign from your employment at
10 LA Weight Loss or were you discharged?
11   A.  I resigned.
12   Q.  Going back to when you were first
13 promoted to area supervisor, who was your
14 direct supervisor at that time?
15   A.  Christine Stone-Seifer (phonetic), it
16 was either she or Joy Freathy. Actually, it
17 would have been Christine, because Joy was
18 promoted to a regional at that point.
19   Q.  Did you report to Joy Freathy?
20   A.  I did. I had that wrong. It was
21 Christine Stone-Seifer was my area when I was a
22 manager, and Joy was the regional. And then,

Page 13

1  when I was promoted to area was when Christine
2  had been moved to a different area, so I
3  reported to Joy.
4    Q.  So, when you first started as area
5  supervisor, you reported to Joy Freathy.
6    A.  Yes.
7    Q.  And her title was regional supervisor?
8    A.  Yes, it was.
9    Q.  At some point, did an individual named
10 Colleen also serve as your direct supervisor?
11   A.  Yes, she did.
12   Q.  And this was while you were an area
13 supervisor?
14   A.  Yes.
15   Q.  And was Colleen's title regional
16 supervisor?
17   A.  Yes, it was.
18      MS. KARETNICK: Objection to form.
19      BY MR. PHILLIPS:
20   Q.  What was Colleen's title, to your
21 knowledge?
22   A.  She was a regional supervisor.

Page 18

1  Q. Who did you have those discussions
2  with?
3  A. Colleen.
4  Q. Anyone else that you recall?
5  A. No, not that I directly had.
6  Q. Do you recall how many times you had
7  discussions with Colleen, again, Colleen Peters
8  or Colleen McKinley, about the issue of whether
9  or not men should be hired?
10 A. One.
11 Q. Do you recall when that conversation
12 took place?
13 A. I believe it was the D.C. center that
14 I had taken an application from a guy that had
15 come in and who seemed perfectly qualified for
16 the job. I thought he would do great, and I
17 was pretty excited about hiring him. And when
18 Colleen came in and looked, because we had set
19 up the interview, the double interview, and
20 when she saw the application, she said, "You
21 can forget it." And I said, "Why," and she
22 said, "It's just not going to work." And she

Page 19

1  said, "Is he gay," and I said, "No. What does
2  that have to do with it?" And she said, "Well,
3  it's just not going to work. Men just don't
4  work in this job." And she left, she didn't
5  even stay for the interview.
6  Q. Do you recall anything else about that
7  conversation?
8  A. Not that one. The only other
9  conversation that I recall as far as hiring
10 practices with men were concerned was, one
11 time, I heard Colleen on the phone. I have no
12 idea who she was speaking with, only that she
13 said, "I don't care what you do with the
14 applications. You can throw them in the trash,
15 but don't send them to corporate. It's a waste
16 of time to send applications up that are from
17 men, because they're not going to hire them."
18 Q. Going back to the first face-to-face
19 discussion you had had with Colleen about the
20 issue of hiring or not hiring men, do you
21 recall the name of that applicant?
22 A. I don't. I do not.

Page 20

1  Q. So, you don't recall the name of the
2  male applicant you were referencing earlier?
3  A. No, I don't.
4  Q. Do you remember what job title he was
5  applying for?
6  A. I believe it was manager. It may have
7  been an assistant manager position.
8  Q. Do you know whether or not that
9  gentleman was hired?
10 A. No, he was not.
11 Q. How do you know that?
12 A. Well, I guess, I don't. He wasn't
13 hired in any of my centers, put it that way,
14 and he lived in D.C. I can't imagine him
15 commuting to another center. I guess, that's
16 speculation on my part, but to my knowledge,
17 no, he was not hired.
18 Q. Because you never observed this
19 applicant subsequently working in any of your
20 centers?
21 A. Correct, nor did I hear of him working
22 in any other center.

Page 21

1  Q. If it had been your final decision to
2  hire that applicant or not hire him, would you
3  have hired him?
4  A. Absolutely.
5  Q. And just to be clear, so the record is
6  clear, the statement you were referencing
7  earlier, regarding this male applicant, that
8  Colleen made, this was a statement that Colleen
9  made while she was your regional supervisor?
10 A. Correct.
11 Q. And this conversation you heard or
12 statements you heard made by Colleen on the
13 telephone, these statements were made while she
14 was serving as your regional supervisor?
15     MS. KARETNICK: Objection to form.
16     MR. PHILLIPS: Withdrawn. I'll
17 rephrase.
18     BY MR. PHILLIPS:
19 Q. With regard to the statements you
20 heard Colleen making on the telephone, that you
21 testified to earlier, was Colleen your regional
22 supervisor at the time she made those