# EXHIBIT WW

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MARYLAND

EQUAL EMPLOYMENT            )
OPPORTUNITY COMMISSION,     )
    PLAINTIFF,              )
                            )
    and                     )
KATHY C. KOCH,              )
    PLAINTIFF-INTERVENOR)
vs.                         )  CAUSE NO.  WDQ-02-CV-648
                            )
LA WEIGHT LOSS,             )
                            )
    DEFENDANT.              )

DEPOSITION OF JAMES PAUL
TAKEN BY THOMAS H. McDONOUGH, ESQ.
ON BEHALF OF THE DEFENDANT
FEBRUARY 10, 2005

REPORTED BY CINDY J. TAYLOR
REGISTERED PROFESSIONAL REPORTER
CERTIFIED SHORTHAND REPORTER
CERTIFIED COURT REPORTER

Page 18

1  you know, I had faxed my resume to Valerie, and I was
2  curious if and when they had scheduled an interview,
3  because that's -- that's kind of how the conversation
4  had ended with Valerie, the first phone call.
5       And the woman that I talked to the
6  second time she said no. She goes, we -- we will get
7  back to you. We've been very busy. We've received a
8  whole lot of resumes. We're kind of weeding through
9  them, but we -- we will get back to you. And I said,
10 okay, thank you, so. And that was a very brief
11 conversation.
12      Q.   And how long after the -- after
13 submitting your resume did you make that telephone
14 call?
15      A.   About a week, week and a half.
16      Q.   And you -- it was to the same number
17 that was on the ad?
18      A.   That's correct, yes.
19      Q.   Did you know if -- if Valerie or this
20 person was in the St. Louis area?
21      A.   I do -- Valerie and both the second
22 person I talked to was in the St. Louis area because
23 it was a local exchange. I didn't have to dial long
24 distance for it.
25      Q.   What happened next?

Page 19

1       A.   Okay. Well, then the next thing that
2  happened was the final contact I had. About a week
3  after that, approximately, I called again and this
4  time I was given to Valerie. And I said, you know,
5  this is Jim Paul. We talked a couple of weeks ago.
6  And she goes, oh, hi, how are you. And I said, well,
7  I was curious, you know, it's -- when -- when can I
8  come in to see you.
9       She goes, well, we've kind of made a
10 decision that, you know, based on your background
11 we're going to go with -- I believe what she said --
12 now, to get it as exact as I can, we kind of
13 determined that there's a woman that's more qualified
14 for the position. And based on your -- you being a
15 man that it's probably not as suitable or as
16 successful for you to -- to fill this job as it would
17 be for a woman, because most of our clientele are
18 women. I think -- I believe she said like 90 percent.
19      And I said, oh. And the first thing
20 that kind of went through my mind was, you know -- and
21 I think I did ask her. I said, well, I wish you would
22 have told me that, you know, the first time we talked.
23 I wouldn't have wasted your time or mine.
24      And she was very, very short answered,
25 you know, this time. Where the first time she was

Page 20

1  extremely friendly and outgoing. So it was almost
2  like personality wise it was like a -- it went from
3  being very warm and friendly, the first phone call, to
4  pretty cold and -- and at that point I -- I thought it
5  was kind of an odd response having been in banking,
6  you know, to say that to someone.
7       But, to be quite honest, you know,
8  after that phone call, I just pretty much forgot about
9  it and went on and continued my job search and totally
10 really forgot about the whole incident until I was --
11 I got a letter from the EEOC, I guess, about a year
12 ago or nine months ago, I believe so.
13      Q.   Did you have any other reaction to her
14 statements, other than finding it out?
15      A.   I was pretty shocked. Because I know,
16 like I was trained in the banking industry that, you
17 know, whether it is race, religion or sex or even in
18 most cases age, unless they're under 18, you -- you
19 shouldn't, you know, tell people that that's the
20 reason -- not the reason why you're going to interview
21 them is because of one of those specific issues.
22      So I was -- was a little surprised and
23 disappointed, too, because I thought it was going to
24 be a pretty, you know, fun opportunity if I was
25 selected. And based on her initial enthusiasm, I

Page 21

1  thought it would have been a pretty good fit.
2       I -- I guess my most -- most biggest
3  disappointment was the fact that they didn't even
4  bring me in for an interview. That -- that kind of
5  shocked me because most of the positions I had got to
6  that stage, as far as a dialogue, I at least got one
7  interview out of them, you know. So that was probably
8  my biggest disappointment.
9       Q.   Did you ever discuss with Valerie or
10 the other person you spoke to at LA Weight Loss
11 compensation?
12      A.   The first conversation I had with
13 Valerie, I asked her, you know, what would be the
14 range, I'm just curious, and she said, well, that's --
15 you know, that's something we wouldn't get to, you
16 know, until we kind of got further along on the
17 process. But she -- she mentioned it was somewhere in
18 the 40 to $50,000 base salary, then plus a commission
19 based on whatever the goals were.
20      And -- because I recall asking her --
21 is -- would it be possible to double that income wise.
22 And she said, oh, yeah, if you, you know, kind of blew
23 away your goals, it's possible to do that.
24      Q.   And was that -- that salary range for
25 the regional manager position?