# EXHIBIT WWW

LEXSEE



Analysis
As of: Mar 05, 2007

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff v. THE
TURTLE CREEK MANSION CORPORATION, d/b/a THE MANSION ON
TURTLE CREEK, Defendant

Civil No. 3:93-CV-1649-H

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
TEXAS, DALLAS DIVISION

*1995 U.S. Dist. LEXIS 12788; 70 Fair Empl. Prac. Cas. (BNA) 899*

May 18, 1995, Decided
May 18, 1995, FILED; May 23, 1995, ENTERED

**COUNSEL:** [*1] For EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, plaintiff: Katherine Elizabeth Bissell, Attorney at Law, Jeffrey Charles Bannon, Attorney at Law, Dallas, TX.

For TURTLE CREEK MANSION CORPORATION, dba Mansion on Turtle Creek, defendant: Steven L Rahhal, Attorney at Law, John Edward McFall, Attorney at Law, John Gray Harrison, Attorney at Law, McFall Law Firm, Preston Commons, Dallas, TX.

**JUDGES:** BAREFOOT SANDERS, UNITED STATES DISTRICT JUDGE, NORTHERN DISTRICT OF TEXAS

**OPINION BY:** BAREFOOT SANDERS

**OPINION:**

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Equal Employment Opportunity Commission ("EEOC") filed this sex discrimination suit pursuant to Title VII of the Civil Rights Act of 1964. Plaintiff alleges that Defendant Turtle Creek Mansion Corporation d/b/a The Mansion on Turtle Creek ("the Mansion") has engaged in a pattern or practice of failing or refusing to hire, transfer or promote women as waitpersons in the Mansion's main dining room and a pattern or practice of failing or refusing to hire women as waitpersons in the Mansion's private dining department Trial of this case began on January 9, 1995 and was completed on January 23, 1995. Thereafter, proposed findings and conclusions [*2] were filed and the matter submitted.

Upon consideration of the testimony and other evidence in this case, the Court makes the following findings of fact and conclusions of law. Any finding may be designated as a conclusion, and any conclusion may be designated as a finding.

I. Findings of fact

A. Procedural history

As an initial matter, the Court finds that all parties are properly before the Court and have been properly designated. The Court further finds that it has jurisdiction over the parties and the subject matter.

Plaintiff EEOC is an agency of the United States

Page 2

1995 U.S. Dist. LEXIS 12788, *2; 70 Fair Empl. Prac. Cas. (BNA) 899

charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action by Section 706(f)(1) of Title VII, *42 U.S.C. § 2000e-5*(f)(1). At all relevant times, Defendant was an employer engaged in an industry affecting commerce within the meaning of Section 701(b), (g), and (h) of Title VII, *42 U.S.C. § 2000e*-(b), (g), and (h).

The Court further finds that all conditions precedent to the institution of this lawsuit have been fulfilled. On November 9, 1990 EEOC Vice Chairman R. Gaull Silberman filed a charge of gender discrimination against Defendant. [*3] On February 25, 1992, following an administrative investigation, the EEOC issued a Commission-Decision finding reasonable cause to believe that a violation of Title VII had occurred. After attempts at conciliation proved unsuccessful, the EEOC filed this lawsuit on August 16, 1993.

### B. Defendant and its operations

Defendant operates a luxury hotel which contains restaurants. The hotel's fine dining restaurant is known variously as the Restaurant or the Main Dining Room ("Main Dining Room"). The hotel also operates the Private Dining Service, a fine dining department that is responsible for private functions at the hotel and other locations, and the Promenade, a more casual restaurant that serves breakfast, lunch, and tea. The Promenade is not a fine dining restaurant.

Defendant opened the hotel in 1979 or 1980; since the mid-1980s, both the hotel and the Main Dining Room have been highly rated and have enjoyed a national reputation for excellence. Defendant currently employs about 300 people, 100 of whom are women.

Employment decisions at the Mansion typically are made by the department managers and the Human Resources Department. Human Resources is a two-person department [*4] staffed by Defendant's Director of Human Resources, Cathy White, and her assistant, Kitty Hall. In the Main Dining Room, the department managers are the Maitre d'Hotel, Wayne Broadwell, and the Maitre d'Restaurant, Alex Jureeratana. In the Private Dining Service, the department manager is the Maitre d', Gonzalo Becerra.

### C. The positions at issue

In both the Main Dining Room and the Private Dining Service, members of the wait staff work in teams. In the Main Dining Room, these teams consist of a captain, a front waiter, a back waiter, and a busperson. Only the waitperson positions captain, front waiter, and back waiter -- are at issue in this lawsuit. Although testimony established that most positions in the Main Dining Room currently are full-time jobs, Defendant has employed and currently employs part-time wait staff in the Main Dining Room. The waitperson positions in the Private Dining Service are waiter and captain. Although waiters work as either a back waiter or a front waiter at particular events, all waiters in the Private Dining Service are cross-trained and can work as either a back waiter or a front waiter as needed. Defendant hires full-time, part-time, and "on [*5] call" wait staff to work in the Private Dining Service.

Defendant presented extensive evidence about the skills a qualified fine dining waitperson should possess. This evidence falls into two categories. First, there are the minimum qualifications: the skills and experience an applicant must have to be considered for a fine dining job. Second, there are the additional qualities that would allow an applicant to begin work with a minimum of additional training. n1

> n1 The Court places particular emphasis on determining the minimum qualifications for the jobs at issue because the qualifications are relevant to the validity of Plaintiff's statistical study.

### 1. The Main Dining Room

In setting forth the qualifications for a job in the Main Dining Room, Defendant presented two expert witnesses, Karen MacNeil and Bill Freeman, who testified regarding the skills needed to succeed as a waitperson in the fine dining industry. Based on their testimony, the Court finds that "fine dining" involves a sophisticated [*6] menu and wine list, a formally structured dining room, and a team of food servers who work in a hierarchy (typically a captain, front waiter, back waiter, and busperson). Working in this kind of environment, MacNeil testified, requires a "skill set" far greater than the skills required to work in a casual restaurant or coffee shop. MacNeil and Freeman both testified that few applicants, and fewer female applicants, possess the skills needed to succeed in fine dining. They

Page 3

1995 U.S. Dist. LEXIS 12788, *6; 70 Fair Empl. Prac. Cas. (BNA) 899

also testified that women are under-represented in the pool of qualified fine dining waitpersons for several reasons, among them the historical under-representation of women in the fine dining profession.

MacNeil and Freeman testified that the "skill sets" for fine dining waitpersons have both technical and behavior components. The technical components include such requirements as knowledge of food and wine and the ability to operate certain tools used in fine dining, such as a gueridon or rechaud. The behavioral skills relate to how the waitperson interacts with the guests; they include such personality traits as deportment, demeanor, diplomacy, respect for the guest's privacy, and the ability to intuit the guest's [*7] needs.

Defendant also maintains written job descriptions for the Main Dining Room positions, each of which contains a section detailing "minimum skill/experience requirements." See, e.g., Defendant's Ex. 4 (position description for front waitperson in the Main Dining Room). In general, the minimum qualifications set forth in the written job descriptions are as follows: at least one year of fine dining experience; the ability to communicate effectively with guests and employees; the ability to lift over the shoulder a minimum of forty pounds throughout the shift; the ability to stand for prolonged periods; basic math skills; and basic literacy skills. See id. The skill and experience requirements for a back waitperson and a front waitperson are almost identical. Compare Plaintiff's Ex. 6 (job description for back waitperson) with Plaintiff's Ex. 7 (job description for front waitperson). The captain's position, however, lists the following additional requirements: three years of fine dining experience; knowledge of food, wine, and service; and the ability to perform any wait function in the Main Dining Room. Plaintiff's Ex. 8 (job description for captain).

In their [*8] testimony, Defendant's representatives expanded on the skill and experience requirements listed in the written job descriptions. White listed successful completion of the interview process as a "minimum qualification" and testified that applicants for front and back waitperson must have a history of job stability, extensive knowledge of food and beverage, professional presentation, and good grooming. White also testified that applicants are not considered qualified unless they meet the Main Dining Room's scheduling requirements. Specifically, applicants must be available to work any day of the year and to work any schedule in a given week. Applicants also must be able to work a split shift, which runs from 11 a.m. to 2:30 p.m. and again from 5 p.m. until the Main Dining Room closes, generally at midnight or 1 a.m. White also testified that for external applicants, the minimum qualifications include a successful reference check; an applicant terminated from an earlier position is not considered qualified for a job at the Mansion.

Defendant's representatives also testified about additional qualities that they do not strictly require but consider highly desirable. Testimony established [*9] that for all positions in the Main Dining Room, Defendant prefers to hire applicants who have additional fine dining experience, whose experience is in comparable fine dining restaurants, who are career-oriented servers, and whose demeanor, presence and communication skills will be pleasing to Defendant's customers. Preference is also given to applicants who know the Mansion's service techniques and practices, can recognize the Mansion's return customers, and can recall the preferences of those customers; accordingly, internal candidates are preferred over equally qualified external applicants. See Plaintiff's Ex. 11 (employee handbook stating Defendant's policy of promoting from within whenever possible). In hiring captains for the Main Dining Room, Defendant prefers to hire applicants who have more than the required three years of fine dining experience, who have supervisory experience, and who demonstrate an ability to suggest and explain the Main Dining Room's food and beverage selections.

Based on the testimony and exhibits, the Court finds that the written job descriptions offer the most accurate listing of the minimum qualifications an applicant must have to be eligible [*10] for a job in the Main Dining Room. The Court does not, however, discount the testimony of Defendant's representatives regarding what they look for in interviews. Rather, the Court finds that Defendant's hiring process is partly subjective; although the written description identifies which applicants qualify for consideration, the additional qualifications discussed by Defendant's representatives and experts determine which applicant is ultimately hired.

One item in the written job description bears additional examination, however. The Court heard a great deal of conflicting testimony regarding Defendant's requirements that applicants for jobs in the Main Dining

Page 4

1995 U.S. Dist. LEXIS 12788, *10; 70 Fair Empl. Prac. Cas. (BNA) 899

Room have "fine dining" experience. Witnesses disagreed both about what constituted fine dining experience and about whether such experience was required. Fine dining experience is among the minimum qualifications listed in Defendant's written job descriptions for the Main Dining Room, and there was evidence that fine dining experience is required for all waitperson positions in the Main Dining Room. See, e.g., Plaintiff's Ex. 6 (job description for back waitperson in the Main Dining Room); see also Plaintiff's Ex. [*11] 97 (interrogatory answers listing fine dining experience as a minimum qualification); Transcript at 552-55. Plaintiff disputes the fine dining requirement, relying in large part on the August 1990 hire of Dean Mohlman, an external applicant who had no fine dining experience and minimal waitperson experience. See Plaintiff's Ex. 27 (application of Dean Mohlman). Taken alone, Mohlman's hiring has little probative value. The department managers for the Main Dining Room, however, testified that fine dining experience was desirable but not always required. See Transcript at 281-83 (testimony of Alex Jureeratana); Transcript at 276 (Testimony of Wayne Broadwell). Buspersons in the Main Dining Room, for example, can be promoted to a waitperson position although they lack experience as a fine dining waitperson. Similarly, Broadwell and Jureeratana both testified that work in the Mansion's Promenade restaurant would qualify an employee for transfer to the Main Dining Room even though the Promenade is not a fine dining restaurant. n2 Broadwell also testified that experience at a restaurant with a strong training program, such as Houston's or Chili's, would be considered good experience [*12] for a position in the Main Dining Room. Transcript at 683.

    n2 Defendant contends that its willingness to promote buspersons and Promenade employees does not undercut the requirement of fine dining experience. White testified that although external applicants must have one year of experience as a waitperson at a fine dining restaurant, the requirements for internal candidates are looser. Accordingly, she stated, a busperson in the Restaurant could become a back waitperson despite the lack of experience as a fine dining waitperson. Similarly, a Promenade waitperson could be promoted to back waitperson despite the lack of experience as a fine dining waitperson.

Defense witnesses discussed the characteristics of fine dining restaurants but offered few examples of restaurants that met the fine dining standard. Defendant's witnesses uniformly described the Main Dining Room as a "fine dining" establishment or even "a step above fine dining." See Transcript at 649 (testimony of Wayne Broadwell). They identified [*13] few other Dallas restaurants that met the standards of fine dining.

There is no set list of restaurants that will automatically qualify an applicant to work at the Mansion, but the quality of the applicant's prior experience weighs heavily in the hiring decision. The Court credits the testimony of Defendant's witnesses regarding which Dallas restaurants they consider to be "fine dining" establishments and notes that this testimony was largely uncontradicted; although individual applicants stated that they had fine dining experience, Plaintiff presented no expert to counter the testimony of White, MacNeil, and Freeman on this issue.

Acknowledging the difficulty of defining fine dining, the Court nonetheless concludes that Defendant's written job descriptions provide the appropriate definition of a qualified applicant for a position in the Main Dining Room. The labor pool for Main Dining Room positions, consequently, consists of internal and external candidates who meet the criteria set forth in the written job descriptions.

### 2. The Private Dining Service

Although most testimony focused on the Main Dining Room, the Court also heard testimony about the qualifications for waitpersons [*14] in the Private Dining Service. As it does for the Main Dining Room, Defendant maintains written job descriptions for the Private Dining Service; these descriptions include sections setting forth the "minimum skill/experience requirements" for the position.

The written job description states the requirements for a waitperson as follows:

> Previous wait experience required. Fine Dining exp. preferred. Ability to carry trays up to 50 lbs., ten to twelve times daily. Ability to take and place an order and to communicate with guests. Must be able to read and write and understand room diagrams. Ability to accurately add,

Case 1:02-cv-00648-WDQ   Document 177-73   Filed 03/09/2007   Page 6 of 12

1995 U.S. Dist. LEXIS 12788, *14; 70 Fair Empl. Prac. Cas. (BNA) 899

Page 5

subtract, multiply and divide numbers. Must have developed language skills to the point to be able to read and understand instructions, safety rules, etc. Requires walking/standing to a significant degree.

Plaintiff's Ex. 9. The captain's position has the following additional requirements: fine dining experience, outside catering experience, and the ability to read, write, and understand catering contracts. Defendant prefers that captain applicants have supervisory experience. See Plaintiff's Ex. 10 (job description for captain in the Private Dining Service). [*15]

In interrogatory answers, Defendant added availability and successful completion of the interview process as "minimum qualifications." See Plaintiff's Ex. 97. With regard to availability, the Court finds that positions in the Private Dining Service are designated as full-time, part-time or on-call, with the majority of openings occurring in on-call positions. Defendant's representatives testified that work schedules in the Private Dining Service may call for an employee to be scheduled on any day of the week and at any hour of the day. The Court also heard testimony that all applicants must be available to work split shifts and holidays. The qualities needed for successful completion of the interview process were the same for the Private Dining Service as for the Main Dining Room.

As evidenced by White's testimony, Defendant seeks the same qualities in Private Dining Service applicants that it seeks in applicants for Main Dining Room positions. White testified that Defendant prefers applicants who have fine dining experience, whose experience is in comparable fine dining restaurants, and whose demeanor and presence will be pleasing to Defendant's customers.

The Court's findings [*16] regarding the Private Dining Service parallel those regarding the Main Dining Room. The written job requirements provide the appropriate definition of a qualified candidate for employment. The Court finds that the labor pool for Private Dining Service positions consists of internal and external candidates who meet the criteria set forth in the written job descriptions.

**D. Defendant's hiring practices**

Cathy White, Defendant's Director of Human Resources since 1988, testified regarding Defendant's employment practices. White testified that Defendant's hiring and promotion practices have not changed since 1988; she did not testify regarding Defendant's hiring and promotion practices prior to 1988.

White testified that Defendant's hiring decisions are made by department managers in conjunction with the human resources department. When an employee leaves or is fired, the department manager notifies the human resources department of the vacancy; hotel management then decides whether to fill the job.

Although Defendant's policy is to fill jobs by promoting from within where possible, the Court finds that this policy is not rigidly followed. When deciding to fill a job, hotel management [*17] does not specify whether the job will be filled by promoting an existing employee or hiring a new one; although preference is given to internal candidates, internal and external candidates can be, and often are, considered at the same time. Accordingly, the decision to fill a vacancy can trigger several actions. According to White, internal applicants are sought by posting the job opening on an employee bulletin board. Testimony from external applicants established that many were walk-ins, while others learned of openings through newspaper ads placed by Defendant. In addition, White testified, Defendant maintains a job line and an employee referral program that allows current Mansion employees to recommend applicants.

White provided an overview of the hiring process for both internal and external candidates, much of which was uncontested. The Court finds that internal applicants apply for an opening by filling out a Career Advancement/Request for Transfer form and submitting it to the Human Resources Department. White testified that she and her assistant, Kitty Hall, review the transfer requests and interview all internal candidates. If White and Hall deem the employee qualified for [*18] the position sought, they contact the employee's current supervisor for a recommendation. Next, the employee interviews with the department manager who has the opening. Department managers interview only those employees who are referred to them by the Human Resources Department.

External applicants apply for an opening by filling out an application and submitting it to the Human Resources Department. White testified that she and Hall

Case 1:02-cv-00648-WDQ    Document 177-73    Filed 03/09/2007    Page 7 of 12

1995 U.S. Dist. LEXIS 12788, *18; 70 Fair Empl. Prac. Cas. (BNA) 899

Page 6

review the applications and interview applicants who meet the minimum requirements for an open position. The best external applicants then are referred for an interview with the department manager who has the opening. Department managers interview only those applicants who are referred to them by the Human Resources Department. Once the interviews are complete, the hiring decision is a collaborative one involving White, Hall, and the department manager.

White testified that outside applicants are considered only for positions they specify on their employment application. According to White and Hall, if an applicant expressed interest in a different position during an interview, Defendant's policy was to have the applicant write the additional positions [*19] sought on the application. Other evidence, however, indicated that Defendant sometimes considered applicants for positions that were not listed on their applications. See, e.g., Plaintiff's Ex. 28 (application of Bruce Price, listing position desired as "room service/wait staff"); Transcript at 617 (testimony that Bruce Price was hired as a part-time server in the Private Dining Department); Plaintiff's Ex. 26 (application of Barbara Pugliese, with position desired left blank); Transcript at 621 (indicating that Pugliese was hired); Defendant's Exhibit 17 (application of Heather Rogers, listing position desired as "waitress"); Transcript at 530 (testimony that Rogers was hired to work in the Main Dining Room). Accordingly, the Court finds that failure to specify a position desired did not disqualify an applicant from consideration.

White also testified that Defendant's policy was to keep applications active for only 30 days. See, e.g., Plaintiff's Ex. 33 (application including the following notice: "This application for employment will remain active for 30 days. Individuals who wish to be considered for an open position after that time will be required to reapply."). Plaintiff [*20] challenged White's testimony by providing evidence that many positions remained unfilled for more than 30 days and that several current employees were hired more than 30 days after they applied. Exhibits introduced by Plaintiff clearly indicate that personnel requisitions often went unfilled for more than 30 days. See, e.g., Plaintiff's Ex. 25, 154 (requisition dated February 2, 1991 was filled by Raul Sustaita on August 29, 1991). The Court finds, however, that the length of time a position went unfilled is immaterial; the relevant inquiry is whether applications were considered once 30 days had passed.

Personnel files for several employees show hire dates more than 30 days after the application date. See, e.g., Plaintiff's Ex. 132 (personnel file for Jorge Rosas, showing application date of January 16, 1991 and hire date of April 30, 1991); Plaintiff's Ex. 136 (personnel file for Toni Massengil, showing application date of June 20, 1991 and hire date of November 14, 1991). Defendant contends that the hire date is immaterial and that the Court's inquiry should focus on whether applications were considered within 30 days. The hire date, however, is the only date available [*21] through Defendant's employment records. Defendant kept no record of how soon applications were considered and offered no evidence that the above employees were actually considered for employment within 30 days of applying. The only evidence offered to rebut Plaintiff's assertion came from Heather Rogers, who testified that although her application was considered within 30 days, she opted to delay her start date so that she could visit her family. Transcript at 806-08.

Upon consideration, the Court finds that an employee's hire date provides the only credible evidence of how soon her application was considered. Based on the testimony and evidence presented, the Court finds that Defendant did not apply its "30-day" policy uniformly.

F. Statistical evidence of discrimination

The statistical evidence is at the heart of this pattern or practice case, and both parties presented expert testimony regarding that statistical evidence. Plaintiff's expert, Elvira Sisolak, is a labor economist; Defendant's expert, Dr. Cindy Ford, is a statistician.

1. Applicant flow

Both Sisolak and Ford testified that an applicant flow analysis, which compares the actual job applicants to the [*22] people hired, is the preferred method for obtaining statistical evidence in a pattern or practice case. Sisolak testified, and Ford acknowledged, that applicant flow data is not always available or reliable. Where applicant flow data is unavailable, unreliable, or skewed, the appropriate comparison is between the people hired and the people who make up the relevant labor market.

Sisolak and Ford testified that in order to perform a statistical analysis using applicant flow data, the analyst must have complete applicant flow data. That is, the analyst must be able to determine which applicants were

Case 1:02-cv-00648-WDQ    Document 177-73    Filed 03/09/2007    Page 8 of 12

1995 U.S. Dist. LEXIS 12788, *22; 70 Fair Empl. Prac. Cas. (BNA) 899

Page 7

considered for each position. Evidence in this case indicates that complete applicant flow data was not available, and neither Sisolak nor Ford conducted an applicant flow analysis. White testified that Defendant did not maintain an applicant flow log; she also testified that Defendant's records do not show the period when a particular job was open or the date when a job offer was made. Defendant's records also do not show which applicants were interviewed by the Human Resources Department or which applicants were referred for interviews with the department managers. As noted above, Defendant's [*23] records do not always indicate the position for which an applicant had applied. Finally, Defendant's application of its "30 day" policy makes it impossible to determine applicant flow.

The Court finds that no accurate applicant flow data exists for either the Main Dining Room or the Private Dining Service.

**2. Plaintiff's labor market analysis**

Having determined that Defendant's hiring is not susceptible to applicant flow analysis, the Court turns to Plaintiff's statistical analysis and Defendant's criticism of it.

Plaintiff's expert, Elvira Sisolak, conducted a study of Defendant's hiring patterns from 1984 through 1993. She testified that because applicant flow data was unavailable or was skewed, her analysis was based on an estimate of the available labor market. The labor market estimate, in turn, was based on the 1990 census data for the waiter/waitress job classification, which the Court finds is the best data available for a case involving waitperson positions. In the Dallas Standard Metropolitan Statistical Area, the census data showed that 62.2% of persons in the waiter/waitress job classification were women. With regard to the Private Dining Service, Sisolak made [*24] no attempt to refine the census data; she used the 62.2% as her estimate of applicant availability. With regard to the Main Dining Room, however, Sisolak did attempt to refine the census data by using earnings as a proxy for Defendant's minimum qualifications. n3 After using payroll records to determine the average salary of employees in the Main Dining Room, Sisolak focused on census data for waitpersons earning from $ 15,000 to $ 34,999 annually. In this income range, Sisolak stated, the proportion of women is 45.1%. No other refinements to the census data were made.

n3 Sisolak testified that the decision to use earnings as a proxy assumed that higher earnings evidenced an individual's experience level. Transcript at 207.

Using the census data, Sisolak analyzed hiring patterns in the Main Dining Room and the Private Dining Service. In each analysis, Sisolak calculated the probability that the disparity between the actual hires and the expected hires could have occurred by chance. Her calculations included [*25] the exact binomial test, which gives a probability value, and the normal approximation to the binomial probability test, which yields a "z" score or number of standard deviations.

Sisolak's initial calculations regarding the Main Dining Room and the Private Dining Service were as follows: Sisolak determined that from January 1984 through December 1993, there had been 95 "hiring opportunities" in the Main Dining Room and that women had been selected for two of the jobs. Comparing the percentage of women actually hired with the 45.1% labor market estimate, Sisolak's analysis yielded a probability value of $5.61 \times 10^{-22}$ and a "z score" of 8.3. See Plaintiff's Ex. 163. In the Private Dining Service, Sisolak determined that from January 1988 through December 1993, there had been 52 "hiring opportunities" and that women had been selected for seven of the jobs. Comparing the percentage of women actually hired with the 62.2% labor market estimate, Sisolak's analysis yielded a probability value of $5.14 \times 10^{-13}$ and a "z score" of 7.1. See Plaintiff's Ex. 165, 166.

Defendant's expert, Cindy Ford, attacked Sisolak's analysis on several grounds, among them that the study inaccurately [*26] used "hiring opportunities" as the measure of Defendant's hiring activity, that it failed to accurately model the labor pool from which Defendant hires, and that it was based on an insufficient sample size. The Court addresses the first two criticisms together, as they are related.

In performing her analysis, Sisolak assumed that a "hiring opportunity" occurred whenever Defendant could have hired a new employee, regardless of whether the position was actually filled by a new hire or by transferring or promoting an existing employee. Transcript at 148-49. Ford criticized the "hiring opportunity" theory on the ground that it inappropriately combined two distinct labor pools; according to Ford, the

Case 1:02-cv-00648-WDQ   Document 177-73   Filed 03/09/2007   Page 9 of 12

1995 U.S. Dist. LEXIS 12788, *26; 70 Fair Empl. Prac. Cas. (BNA) 899

Page 8

labor pool for new hires is external, while the labor pool for promotions and transfers consists of current employees who are qualified for the open position. Transcript at 900-01. Testimony established, however, that Defendant did not decide in advance whether a particular job opening would be filled internally or externally; Defendant's representatives testified that internal and external candidates could be considered at the same time. Accordingly, the Court finds that Sisolak's "hiring [*27] opportunities" analysis reflected Defendant's actual employment practices.

Thereafter, however, Sisolak's analysis does not fare as well. After combining internal and external hires to determine the number of "hiring opportunities," Sisolak used an exclusively external estimate of the labor pool. Ford testified that Sisolak should have developed a methodology that incorporated the probability that Defendant would look to an internal or external pool when filling a particular vacancy. Transcript at 901-03. In response to this criticism, Sisolak performed a modified analysis that deleted internal promotions. See Plaintiff's Ex. 168. Ford also argued that Sisolak's model inappropriately aggregated hiring decisions for the captain and waitperson positions; in support of her criticism, she pointed to testimony that the qualifications for a captain differ significantly from those for a front waitperson or back waitperson. In response to this criticism, Sisolak performed a modified analysis that excluded the hiring of captains. See Plaintiff's Ex. 169, 170. Ford contended that Sisolak's revised analyses failed to address her concerns.

Regardless of whether the revised analyses constituted [*28] an improvement, the Court finds that Plaintiff's statistical study is fatally flawed for a more fundamental reason: the census data fails to reflect the qualifications needed for the positions at issue. The Court acknowledges Sisolak's testimony that no further refinements in the census data are possible. Nonetheless, the Court finds that the census data includes job categories, such as cocktail waitresses and room service waitresses, that are irrelevant to an analysis of Defendant's hiring in the Main Dining Room and Private Dining Service. Similarly, the Court finds that the census data does not reflect the length of time an individual has worked as a waiter or waitress or the type of establishment where the individual works. Plaintiff contends that income can accurately serve as a proxy for the varied skills Defendant requires. Defendant's expert, Karen MacNeil, rebutted this contention based on the existence of a growing number of casual but expensive restaurants. The Court credits MacNeil's testimony, which indicated that an individual's earnings are not an accurate predictor of whether that individual has fine dining skills. Transcript at 752. Finally, the Court notes that Sisolak [*29] failed to make an adjustment that was possible: a geographic adjustment to account for the commuting patterns of Defendant's employees. See Transcript at 209, 216.

Because the census data does not reflect the labor pool from which Defendant hired, the Court finds that Plaintiff's statistical comparisons lack probative value and will not be considered in determining whether a pattern or practice of discrimination exists.

### G. Anecdotal evidence of discrimination

The Court's rejection of Plaintiff's statistical evidence does not end its inquiry. Even in the absence of valid statistical evidence, the Court may take notice of what has been called the inexorable zero in Defendant's hiring. No women were hired to work as waitpersons in the Main Dining Room from January 1984 through May 1992, and no women were hired to work as waitpersons in the Private Dining Service from January 1988 through December 1993. At first glance, the lack of women appears damning. The Court notes, however, that Defendant's total number of hiring decisions was relatively small. In addition, the Court credits the largely unrebutted testimony of MacNeil and Freeman, who testified that women remain under-represented [*30] in the pool of waitpersons who possess fine dining skills. Accordingly, the Court finds that the "inexorable zero" does not, in this case, require the Court to conclude that discrimination has occurred.

Plaintiff also offered testimony from two witnesses who said they had been told that women were not hired for evening shifts in the Main Dining Room. Dawn Shaw testified that she applied for a waitperson position at the Mansion in 1989 and was interviewed by a woman she later identified as Kitty Hall, the Mansion's human resources administrator. Shaw testified that Hall told her Defendant hired only men to work in the Main Dining Room in the evening; Hall denies making the statement. Kathleen Johnson also testified that she applied for a waitperson job at the Mansion in 1989 and was interviewed by a woman she could not identify. During her interview, Johnson said, the interviewer told her that

1995 U.S. Dist. LEXIS 12788, *30; 70 Fair Empl. Prac. Cas. (BNA) 899

Page 9

only male waiters were hired to work evenings in the Main Dining Room. Both Hall and White denied ever telling applicants that only men were hired to work in the Main Dining Room. The Court finds that the testimony of Shaw and Johnson is too remote and too imprecise to be credible.

Upon consideration, [*31] the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Defendant had any pattern or practice of discriminating against women in the Main Dining Room or the Private Dining Service.

## II. Conclusions of law

1. The Court has jurisdiction over the parties and over the subject matter of the lawsuit.

2. The Court rejects Defendant's contention that this litigation is barred by laches. Although the doctrine of laches can bar suits by the EEOC, in this case the Court finds that Defendant has failed to establish delay by the EEOC or undue prejudice caused by any delay. See *Bernard v. Gulf Oil Co.*, 596 F.2d 1249 (5th Cir. 1979), reh'g en banc, 619 F.2d 459 (5th Cir. 1980), aff'd, 452 U.S. 89, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981).

3. The EEOC properly conciliated the claim in this litigation and that all conditions precedent to the filing of this litigation were met. See *EEOC v. Massey Ferguson, Inc.*, 622 F.2d 271, 277 (7th Cir. 1980).

4. The applicable model of proof for this pattern and practice case is the one set forth by the Supreme Court in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977). [*32] The plaintiff's burden in such a case is to "establish by a preponderance of the evidence that discrimination was the company's standard operating procedure, the regular rather than the unusual practice." *Id. at 336; Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 800 (5th Cir. 1982).

5. Statistical evidence of a gross disparity between the actual and expected participation of a statutorily protected group in an employer's work force may alone raise an inference of intentional discrimination and establish a prima facie case. See *Teamsters*, 431 U.S. at 339-40; see also *Hazelwood School Dist. v. United States*, 433 U.S. 299, 307-08, 53 L. Ed. 2d 768, 97 S. Ct. 2736 (1977); *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 190 (5th Cir. 1983).

6. An applicant flow analysis is the preferred method for presenting statistical evidence. *EEOC v. Olson's Dairy Queens*, 989 F.2d 165, 169 (5th Cir. 1993). However, the Court finds that applicant flow data is unavailable and, if available, would be unacceptably skewed. See *Dothard v. Rawlinson*, 433 U.S. 321, 330, 53 L. Ed. 2d 786, 97 S. Ct. 2720 (1977). Accordingly, a statistical analysis based on demographic data is appropriate [*33] in this case.

7. Because statistical evidence alone can carry the day, "there is perhaps no determination more critical" to the resolution of a pattern or practice suit than the definition of the relevant labor pool. *Rivera v. City of Wichita Falls*, 665 F.2d 531, 540 (5th Cir. 1982). Statistical evidence "must compare the relevant portion of the employer's work force with the qualified population in the relevant labor market." *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277 (5th Cir. 1994), cert. denied, 115 S. Ct. 1099, 130 L. Ed. 2d 1066, 63 U.S.L.W. 3625 (February 21, 1995); see also *Olson's Dairy Queens*, 989 F.2d at 168 (noting that the evidence must be "finely tuned" to reflect the proportion of qualified individuals in the relevant labor market). The Court proceeds with caution in light of the Fifth Circuit's warning that "the cases do not yet specify what level of qualification for employment is sufficient to undergird such a statistical case." *EEOC v. American Airlines, Inc.*, 48 F.3d 164, 1995 WL 102897 n.9 (5th Cir. 1995). In dicta, however, the Circuit has stated that "intuitively, the level of qualification must be correlated to the sophistication of the job duties; the job of corporate chief financial [*34] officers, for instance, would not readily yield a statistical case for discrimination by pattern and practice." Id. (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501-02, 102 L. Ed. 2d 854, 109 S. Ct. 706 (1989), for the proposition that "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task."). The Court concludes that the EEOC's statistical analysis did not define the relevant labor pool correctly. Accordingly, the conclusions reached by Plaintiff's expert, Elvira Sisolak, have no probative value.

8. Even where statistical analysis is inadequate, Courts are skeptical of attempts to explain away the "inexorable zero" in hiring. See *Capaci v. Katz &*

Case 1:02-cv-00648-WDQ   Document 177-73   Filed 03/09/2007   Page 11 of 12

1995 U.S. Dist. LEXIS 12788, *34; 70 Fair Empl. Prac. Cas. (BNA) 899

Page 10

*Besthoff, Inc.*, 711 F.2d 647, 662 (5th Cir. 1983). Such an "inexorable zero" exists in this case and is of concern to the Court. Upon consideration, however, the Court concludes that Defendant has presented credible explanations for the under-representation of female waitpersons in the Main Dining Room and Private Dining Service.

9. Plaintiff's remaining anecdotal [*35] evidence is insufficient to establish a pattern or practice of discrimination by Defendant.

10. Plaintiff has failed to establish by a preponderance of the evidence that Defendant maintained a pattern or practice of discriminating against women with regard to hiring and promotion in the Main Dining Room and Private Dining Service.

### III. Conclusion

Plaintiff has failed to prove that Defendant engaged in a pattern or practice of discrimination. Judgment will be entered accordingly.

SO ORDERED.

DATED: May 18, 1995.

BAREFOOT SANDERS

UNITED STATES DISTRICT JUDGE

NORTHERN DISTRICT OF TEXAS

**JUDGMENT**

This Judgment is entered pursuant to the Court's Findings of Fact and Conclusions of Law filed May 18, 1995.

IT IS ORDERED, ADJUDGED AND DECREED by the Court that Plaintiff Equal Employment Opportunity Commission take nothing by its suit against Defendant Turtle Creek Mansion Corporation, d/b/a The Mansion on Turtle Creek, and that this suit be, and it is hereby, **DISMISSED** on the merits at Plaintiff's cost.

SIGNED this 18th day of May, 1995.

BAREFOOT SANDERS, JUDGE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

LEXSEE



Analysis
As of: Mar 05, 2007

# EEOC v. Turtle Creek Mansion

## 95-10637

### UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

*82 F.3d 414; 1996 U.S. App. LEXIS 9399; 71 Fair Empl. Prac. Cas. (BNA) 1408*

**March 7, 1996, Decided**

**NOTICE:** [*1] RULES OF THE FIFTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** United States District Court for the Northern District of Texas. 3:93-CV-1649.

**OPINION:**

Affirmed