# EXHIBIT P

Page 1

```
      IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MARYLAND
            NORTHERN DIVISION
                  - - -
EQUAL EMPLOYMENT        : CIVIL NO.
OPPORTUNITY COMMISSION :
       AND              :
KATHY C. KOCH           :
   INTERVENOR/PLAINTIFF :
         V              :
L.A. WEIGHT LOSS        :
CENTERS, INC.           :
         DEFENDANT      : WDQ-02-CV-648

                  - - -
            MARCH 31, 2005
                  - - -

              VOLUME II
                  - - -
     ORAL DEPOSITION OF KAREN SIEGEL,
```

TAKEN PURSUANT TO NOTICE, WAS HELD AT THE

LAW OFFICES OF THE EQUAL EMPLOYMENT

OPPORTUNITY COMMISSION, THE BOURSE

BUILDING, 4TH FLOOR, PHILADELPHIA, PA,

BEGINNING AT 1:00 P.M., ON THE ABOVE

DATE, BEFORE NANCY D. RONAYNE, A

PROFESSIONAL COURT REPORTER AND NOTARY

PUBLIC IN THE COMMONWEALTH OF

PENNSYLVANIA.

                  - - -

         ESQUIRE DEPOSITION SERVICES
                15TH FLOOR
       1880 JOHN F. KENNEDY BOULEVARD
        PHILADELPHIA, PENNSYLVANIA 19103
                (215) 988-9191

Esquire Deposition Services

Page 42

1  SPECIFICALLY?
2      A.  I DON'T REMEMBER, IT MAY
3  HAVE.
4      Q.  DO YOU RECALL RECEIVING
5  REQUESTS FOR INFORMATION REGARDING HIRING
6  PROCEDURES AND POLICIES FROM JUDY NAVARRO
7  AT ANY TIME?
8      A.  I BELIEVE SO, YES.
9      Q.  DO YOU RECALL WHAT YEAR YOU
10 RECEIVED THOSE REQUESTS?
11     A.  I DON'T.
12     Q.  DURING THE INVESTIGATION OF
13 AND I DON'T WANT TO KNOW YOUR
14 COMMUNICATION WITH COUNSEL BUT DURING THE
15 INVESTIGATION OF THE KOCH CHARGE, LA
16 WEIGHT LOSS WAS REPRESENTED BY WOLF
17 BLOCK, CORRECT?
18     A.  YES.
19     Q.  AND THAT WAS SINCE AT AROUND
20 THE TIME, IF NOT THE DAY THEN SHORTLY
21 THEREAFTER THAT YOU RECEIVED THE CHARGE
22 OF DISCRIMINATION REGARDING MS. KOCH,
23 CORRECT?
24     A.  YOU LOST ME, I'M SORRY.

Page 43

1      Q.  WHEN DID LA WEIGHT LOSS
2  BEGIN USING WOLF BLOCK AS THEIR LEGAL
3  REPRESENTATIVE REGARDING THE KOCH CHARGE?
4      A.  OH, IN WHEN WE RECEIVED THE
5  -- WE HAD GOTTEN A LETTER, AN ATTORNEY'S
6  LETTER, FROM KOCH'S LAWYER, I DON'T KNOW
7  IF THAT WAS PRIOR TO THE EEOC CHARGE OR
8  AFTER THE EEOC CHARGE.
9      Q.  I'LL REPRESENT TO YOU IT WAS
10 PRIOR TO THE EEOC CHARGE.
11     A.  SO IT WAS AT THAT POINT IN
12 TIME THAT WE WOULD HAVE HAD WOLF BLOCK.
13     Q.  SO EVEN PRIOR TO RECEIVING
14 NOTICE OF THE KOCH CHARGE LA WEIGHT LOSS
15 WAS USING WOLF BLOCK AS THEIR COUNSEL IN
16 RELATION TO THE KOCH EMPLOYMENT ISSUE?
17     A.  YES.
18         (A DISCUSSION OFF THE RECORD
19         OCCURRED.)
20 BY MR. PHILLIPS:
21     Q.  NOW, MY UNDERSTANDING OF
22 YOUR PREVIOUS TESTIMONY IN THE 30(B)(6)
23 DEPOSITION WHERE YOU WERE THE DESIGNEE
24 FOR LA WEIGHT LOSS, IS AS FOLLOWS, AND I

Page 44

1  WANT YOU TO CORRECT ME IF THIS IS NOT
2  CONSISTENT WITH YOUR RECOLLECTION TODAY.
3  THAT YOU INSTITUTED A POLICY OF RECORD
4  KEEPING SPECIFICALLY REGARDING
5  APPLICATIONS AND RESUMES AT LA WEIGHT
6  LOSS IN 1999; DOES THAT SOUND CORRECT?
7      A.  WE HAD -- WE HAVE, WE
8  CURRENTLY HAVE AND CONTINUE TO HAVE, THE
9  POLICY ON RECORD RETENTION, IT WAS
10 INITIALLY FORMULATED IN 1998, IN OCTOBER/
11 NOVEMBER OF '98, SO SAY '99.
12     Q.  WAS IT PERHAPS THAT THE
13 POLICY WAS DISSEMINATED IN 1999?
14     A.  LIKE THE BEGINNING OF -- DID
15 YOU GIVE A MONTH?
16     Q.  NO, I DID NOT GIVE A MONTH.
17     A.  OKAY, SO IT WOULD BE FAIR TO
18 SAY THAT, I WOULD SAY LATE 1998 EARLY
19 1999, I THINK BY JANUARY OF 1999 THE
20 POLICY HAD IN FACT BEEN DISSEMINATED.
21     Q.  IT'S MY UNDERSTANDING THAT
22 THERE WAS, AGAIN, FROM YOUR 30(B)(6)
23 TESTIMONY THAT THERE WAS NO WRITTEN
24 POLICY REGARDING RECORD KEEPING

Page 45

1  DISSEMINATED TO THE FIELD UNTIL 2000;
2  DOES THAT SOUND CORRECT?
3      A.  THAT'S NOT ACCURATE.
4      Q.  THAT IS NOT ACCURATE?
5      A.  NO.
6      Q.  SO WHEN WAS IT DISSEMINATED
7  TO THE FIELD?
8      A.  RIGHT AFTER IT WAS PUT
9  TOGETHER IN '98, SO SHORTLY THEREAFTER,
10 SO IN 1999 AS PART OF THE RECRUITMENT AND
11 ENGAGEMENT OF PERSONNEL HANDBOOK OR
12 GUIDELINES OR WHATEVER YOU WANT TO REFER
13 TO IT AS.
14     Q.  DOES LA WEIGHT LOSS KEEP ANY
15 LOGS OR ANY RECORDS WHATSOEVER OF
16 APPLICATIONS AND RESUMES THAT HAVE BEEN
17 RECEIVED FROM THE FIELD, THE RECRUITMENT
18 FILES?
19     A.  GIVE ME A TIME FRAME.
20     Q.  CURRENTLY?
21     A.  YES.
22     Q.  THEY DO, OKAY.  HOW LONG HAS
23 THAT PRACTICE BEEN IN PLACE?
24     A.  THERE'S DIFFERENT -- WELL,

Page 50

1  KNOWLEDGE OF SUCH A TRACKING SYSTEM?
2      A.  NO. I KNOW THAT FILES CAME
3  BACK, I KNOW THAT RESUMES CAME BACK, I
4  KNOW THAT APPLICATIONS CAME BACK.
5      Q.  SO IS IT YOUR TESTIMONY THAT
6  IN THIS PERIOD PRIOR TO ESG, THE PERIOD
7  WHERE THE COMPANY WAS DOING A RECRUITING
8  FOR COUNSELORS AND ESG WAS DOING
9  RECRUITING FOR THE OTHER POSITIONS --
10     A.  OKAY.
11     Q.  -- THAT THE PERIOD PRIOR TO
12 THE START OF THAT, THAT THE COMPANY KEPT
13 THE RESUMES OF EVERY SINGLE CANDIDATE IN
14 HR, THOSE WERE KEPT?
15     A.  WE RETAINED THOSE, YES.
16     Q.  SO THERE WAS A RECRUITMENT
17 FILE AND THEN THERE WAS A SEPARATE HR
18 FILE AND THEY CONTAINED THE SAME
19 DOCUMENTS?
20     A.  SOMETIMES THEY -- WELL, THE
21 RECRUITMENT FILE CONTAINED THE
22 APPLICATIONS AND THE INTERVIEW NOTES AS
23 WELL AS ANY RESUMES THAT THE FIELD WOULD
24 SEND BACK TO US. THEY NEEDED TO SEND

Page 51

1  BACK THEIR APPLICATIONS AND THE NOTES.
2  AGAIN, WE HAD COPIES, WE HAD PRINTED OUT
3  AND RETAINED COPIES OF ALL THE RESUMES,
4  SO THEY TYPICALLY WOULD COME BACK WITH
5  THE RECRUITMENT FILES AS YOU STATED, I
6  MEAN, THAT WAS THE TRAINING, THAT WAS THE
7  PROCEDURE, THAT'S WHAT THEY WERE SUPPOSED
8  TO DO. SO YES, YOU'RE POSSIBLY GOING TO
9  FIND DUPLICATES ON THAT.
10     Q.  HOW LONG WAS IT THE
11 COMPANY'S PROCEDURE TO KEEP ALL OF THE --
12 FIRST OF ALL, LET ME BACK IT UP.
13         HOW LONG OF A TIME PERIOD
14 WAS IT WHERE THIS SORT OF DUAL RECORD
15 KEEPING WAS TAKING PLACE WHERE YOU HAD HR
16 KEEPING COPIES OF ALL THE RESUMES AND
17 THEN YOU HAD THE FIELD COMPILING
18 RECRUITMENT FILES THAT WERE ROUTED TO HR
19 WHEN THEY WERE DONE WITH THEM, HOW LONG
20 OF A TIME FRAME WAS THAT TAKING PLACE?
21     A.  IT WOULD HAVE BEEN WHEN WE
22 WERE SENDING ALL OF THE COUNSELOR RESUMES
23 OUT TO THE FIELD.
24     Q.  AND WHEN WAS THAT?

Page 52

1      A.  THAT WOULD HAVE BEEN THAT'S
2  -- UNFORTUNATELY, THAT'S THE TIME FRAME
3  WHEN ESG WAS DOING THE RECRUITMENT.
4  YOU'RE GOING TO HAVE DUPLICATION ANY TIME
5  WE WERE IN A SITUATION -- ANY TIME WE
6  WERE IN A SITUATION WHERE WE WERE SENDING
7  LEADS TO THE FIELD THEN WE WEREN'T
8  PRE-SCREENING.
9      Q.  WHAT I'M TRYING TO
10 UNDERSTAND IS, LET ME ASK IT THIS WAY.
11 WAS THIS PROCEDURE WHERE HR WOULD KEEP
12 ALL OF THE RESUMES AND ONCE IN A WHILE
13 THEN ROUTE COPIES OUT TO THE FIELD, WHICH
14 WOULD THEN BE PUT LATER IN RECRUITMENT
15 FILES, WAS THIS PROCEDURE IN PLACE IN
16 1998?
17     A.  NO, IT WOULDN'T -- THE END
18 OF 1998 EARLY 1999. BUT THE DUPLICATION
19 ONLY OCCURRED IF WE WERE NOT INVOLVED
20 SPECIFICALLY IN THE RECRUITMENT PROCESS.
21     Q.  AND CAN YOU EXPLAIN TO ME
22 WHAT OCCASION THAT WOULD ARISE?
23     A.  BEFORE WE HAD FIELD
24 RECRUITERS, BEFORE WHEN WE HAD INHOUSE

Page 53

1  RECRUITERS IT WOULDN'T HAVE HAPPENED, AND
2  THEN JUST DURING THE TIME FRAME OF THE
3  COUNSELOR PIECE.
4      Q.  YOU'RE SAYING THIS IS 1999,
5  EARLY -- LATE '98 OR EARLY '99 IS WHEN
6  THIS STARTED?
7      A.  WELL, THAT'S WHEN THE POLICY
8  WAS INSTITUTED AS FAR AS WHEN WE WERE --
9  WE HIRED FIELD RECRUITERS, SOME WERE
10 HIRED IN 2000, WE MIGHT HAVE HAD ONE OR
11 TWO IN 2000 AND THEN 2001 WERE FIELD
12 RECRUITERS THEN WE WENT INHOUSE AND THEN
13 WE WENT TO UTILIZING ESG. SO YOU'RE LIKE
14 THE TIME FRAME WHERE YOU WOULD HAVE
15 DUPLICATIONS WAS THAT 2003 TIME FRAME OF
16 LIKE MAY, WHENEVER WE STARTED WITH THEM,
17 I DON'T REMEMBER EXACTLY, '03 TO THE
18 PRESENT, SO LIKE JULY OF '04. AND THEN
19 THE ONLY OTHER TIME WOULD HAVE BEEN THE
20 -- I'M TRYING TO THINK WHAT WE WOULD HAVE
21 SENDING STUFF OUT, I CAN'T THINK OF ANY
22 OTHER SPECIFIC INSTANCES WHERE WE WERE
23 SENDING EVERYTHING TO THEM WITHOUT DOING
24 ANY PRE-SCREENING.

Page 54

1   Q.  BUT EVEN IN A SITUATION
2  WHERE THE COMPANY WAS DOING
3  PRE-SCREENING, WOULD THE COMPANY RETAIN A
4  COPY OF WHAT WAS SENT OUT TO THE FIELD?
5   A.  YES.
6   Q.  WHO WAS IN CHARGE OF KEEPING
7  THOSE RECORDS?
8   A.  THE HR DEPARTMENT.
9   Q.  IS THERE ANYONE IN
10 PARTICULAR WHO WAS DESIGNATED AS THE
11 CUSTODIAN FOR THOSE RECORDS?
12  A.  MYSELF, NICKY FRYER.
13  Q.  WHERE WERE THEY KEPT?
14  A.  WE HAD THEM IN THE LATERAL
15 FILES OUTSIDE OF MY OFFICE, OUTSIDE OF
16 HER OFFICE.
17  Q.  THAT'S A LOT OF FILES.
18  A.  YOU'RE DARN STRAIGHT, YES.
19 AND WE HAD WHATEVER WE PRODUCED TO YOU
20 GUYS, 45 BOXES, 50 BOXES OF RESUMES,
21 THAT'S A LOT. I PROBABLY HAVE I COULDN'T
22 TELL YOU HOW MANY LATERAL FILES I HAVE
23 BUT AT ANY RATE, FORTUNATELY WE DIDN'T
24 HAVE TO ULTIMATELY BOX THEM AND SEND THEM

Page 55

1  TO THE WAREHOUSE, WE HAD TO BOX THEM AND
2  SEND THEM TO YOU. BUT WE NOW HAVE NEW
3  ONES SO YOU CAN HAVE THOSE AS WELL.
4   Q.  SO TO YOUR KNOWLEDGE IS THIS
5  A FAIR STATEMENT, TO YOUR KNOWLEDGE
6  YOU'RE NOT SURE WHETHER THERE WAS ANY
7  TRACKING OR LOGGING SYSTEM IN PLACE PRIOR
8  TO ESG FOR DETERMINING IF WHAT WAS COMING
9  BACK FROM THE FIELD IN THE RECRUITMENT
10 FILES?
11  A.  I CANNOT SAY SPECIFICALLY
12 ONE WAY OR ANOTHER, EXACTLY.
13  Q.  I GUESS MS. FRYER MIGHT KNOW
14 THAT?
15  A.  NICKY MAY KNOW THAT, YES.
16  Q.  IS THERE ANYBODY ELSE THAT
17 MIGHT KNOW THAT?
18  A.  NO.
19  Q.  NOW, WE TALKED I THINK
20 PREVIOUSLY ABOUT PERSONNEL FILES OR
21 EMPLOYEE FILES AND WHEN I USE THOSE TWO
22 TERMS I'M USING THEM INTERCHANGEABLY,
23 EMPLOYEE AND PERSONNEL FILES.
24       HAS THERE EVER BEEN ANY

Page 56

1  SYSTEM IN PLACE AT ANY TIME AT LA WEIGHT
2  LOSS FOR CHECKING THE FILES TO DETERMINE
3  WHETHER THEY'RE COMPLETE WHEN A NEW
4  EMPLOYEE HAS BEEN FIRST HIRED?
5   A.  YES.
6   Q.  WHEN WAS THAT SYSTEM IN
7  PLACE?
8   A.  IT'S ONGOING. IT'S -- WE'VE
9  DONE RECENTLY, WHEN I SAY RECENTLY, IN
10 THE LAST YEAR AND A HALF TO TWO YEARS WE
11 DO AUDITS OF THE EMPLOYEE FILES TO MAKE
12 SURE THAT THEY ARE COMPLETE. AND PRIOR
13 TO THAT IT'S ONGOING RESPONSIBILITY OF
14 EACH INDIVIDUAL PAYROLL COORDINATOR TO
15 ENSURE THAT THE FILE IS COMPLETE.
16  Q.  ACCORDING TO L. A. WEIGHT
17 LOSS POLICY A COMPLETE PERSONNEL FILE
18 WOULD INCLUDE THE APPLICATION AND RESUME
19 OF THE PERSON WHO WAS HIRED; IS THAT
20 CORRECT?
21  A.  IT WOULDN'T NECESSARILY HAVE
22 TO INCLUDE, WHAT IT -- SO I WOULD SAY NO
23 TO THAT.
24  Q.  WELL, ISN'T THERE A

Page 57

1  DESCRIPTION IN THE RECRUITING AND HIRING
2  MANUALS AT LA WEIGHT LOSS THAT SPECIFIES
3  THE CONTENT OF AN EMPLOYEE FILE WHEN IT'S
4  FIRST PUT TOGETHER WHEN AN EMPLOYEE IS
5  FIRST HIRED; ISN'T THERE SUCH A LIST?
6   A.  YES.
7   Q.  AND DO YOU RECALL THAT THAT
8  LIST INCLUDES THE APPLICATION OR RESUME?
9   A.  YES -- WELL, I'M TRYING TO
10 THINK. SPECIFICALLY, I MEAN IT'S OUR
11 INTENTION THAT IT'S INCLUDED, I DON'T
12 KNOW IF THAT -- I'M VISUALIZING THE FORM
13 IN MY HEAD.
14  Q.  IS THAT THE COMPANY POLICY,
15 THAT THE APPLICATION AND RESUME GO IN THE
16 EMPLOYEE'S FILE?
17  A.  WELL THE POLICY IS TWOFOLD,
18 ONE, THAT THE HIRING SUPERVISOR MAINTAIN
19 A RECRUITMENT FILE THAT HAS ALL THE
20 APPLICATIONS, INTERVIEW NOTES, RESUMES
21 FOR ANY PARTICULAR JOB THAT THEY'RE
22 ATTEMPTING TO FILL, THEY ARE SUPPOSED TO
23 SEND TO US SEPARATELY AND WE DO RECEIVE
24 THEM, ANYBODY THAT THEY'VE HIRED. BUT

Page 58

1   SOMETIMES THOSE APPLICATIONS AND RESUMES
2   GET SENT ALONG WITH ALL THE OTHER
3   APPLICATIONS AND RESUMES OF PEOPLE THAT
4   THEY DIDN'T HIRE SO THEY'RE INCLUDED. I
5   MEAN THEY'RE SENT TO CORPORATE BUT THEY
6   DON'T NECESSARILY ALWAYS GET INTO AN
7   EMPLOYMENT FILE.
8       Q.   HAS THERE EVER BEEN ANY
9   SYSTEM IN PLACE TO SPECIFICALLY TRACK
10  WHETHER THE APPLICATION AND RESUME
11  MATERIALS REGARDING A NEW HIRE HAVE BEEN
12  RETURNED TO CORPORATE?
13      A.   WE DO TRY TO TRACK THAT.
14      Q.   HOW LONG -- HOW DO YOU TRY
15  TO TRACK THAT?
16      A.   THE INDIVIDUAL IN PAYROLL,
17  IT'S A PAYROLL COORDINATOR WHO DOES THE
18  EMPLOYEE FILE AUDIT, IF YOU WILL, WILL
19  TRY AND TRACK DOWN THE RESUME AND/OR
20  APPLICATION WHILE MAKING SURE EVERYTHING
21  ELSE IS COMPLETE, THE W-2 FORM, THE I9,
22  THAT THAT'S BEEN FILLED OUT PROPERLY, THE
23  NEW PERSONNEL CONTACT INFORMATION SHEET.
24      Q.   HOW LONG HAS LA WEIGHT LOSS

Page 59

1   BEEN CONDUCTING THESE EMPLOYEE FILE
2   AUDITS?
3       A.   LIKE I SAID, PROBABLY THE
4   LAST YEAR AND A HALF, TWO YEARS.
5       Q.   SO IT'S FAIR TO SAY THEN
6   THAT PRIOR TO A YEAR AND A HALF OR
7   TWO YEARS AGO THERE WAS NO SYSTEM IN
8   PLACE FOR MAKING SURE THAT THE PERSONNEL
9   FILES WERE COMPLETE?
10      A.   NO. NO, THE PERSON THAT'S
11  DOING THE AUDITING THAT'S A YEAR AND A
12  HALF TO TWO YEARS, PRIOR TO THAT IT'S
13  EACH INDIVIDUAL PAYROLL COORDINATOR WAS
14  RESPONSIBLE INDIVIDUALLY AS THEY SET UP A
15  NEW PERSONNEL FILE TO MAKE SURE THAT IT
16  WAS COMPLETE, NOW THAT'S SOMEONE ELSE'S
17  RESPONSIBILITY, THAT'S THE ONLY
18  DIFFERENCE.
19      Q.   HOW LONG IN THIS PRIOR
20  SYSTEM WHERE EACH INDIVIDUAL PAYROLL
21  COORDINATOR'S JOB WAS TO MAKE SURE THAT
22  THE PERSONNEL FILE WAS COMPLETE, HOW LONG
23  WAS THAT SYSTEM IN PLACE?
24      A.   THAT'S FOR AS LONG AS I'VE

Page 60

1   BEEN THERE.
2       Q.   AND BY MAKING SURE THE
3   EMPLOYEE FILE IS COMPLETE THAT INCLUDED
4   THE RESUME OR THE APPLICATION?
5       A.   TO BE HONEST I DON'T KNOW
6   THAT THE PAYROLL COORDINATORS
7   SPECIFICALLY EACH INDIVIDUAL ONE IS
8   THINKING ALONG THOSE LINES, NO.
9       Q.   WERE THEY EVER SPECIFICALLY
10  INSTRUCTED TO MAKE SURE THAT THAT, THOSE
11  MATERIALS WERE IN THE FILE; DO YOU KNOW?
12      A.   I DON'T KNOW.
13      Q.   WHO IS THE PAYROLL
14  COORDINATOR CURRENTLY?
15      A.   THE PAYROLL MANAGER.
16      Q.   PERSON WHO CONDUCTS THE
17  AUDITS?
18      A.   OH, I'M SORRY, JAMIE
19  SCHOELL, S-C-H-O-E-L-L.
20      Q.   IS THAT A FEMALE?
21      A.   YES.
22      Q.   HOW LONG HAS SHE BEEN IN
23  THAT POSITION?
24      A.   PROBABLY ABOUT TWO YEARS.

Page 61

1       Q.   SO TO YOUR KNOWLEDGE SHE'S
2   THE ONLY PERSON WHO'S CONDUCTED THESE
3   AUDITS?
4       A.   THERE'S BEEN OTHER PEOPLE
5   THAT HAVE HELPED HER.
6       Q.   SHE'S TAKEN THE LEAD ON
7   THIS?
8       A.   YES. SO, I'M ACTUALLY GOING
9   TO CHANGE MY RESPONSE THERE, I MEAN, I'M
10  IN PAYROLL ALL THE TIME TALKING WITH
11  THOSE -- WITH THE INDIVIDUALS AND TALKING
12  WITH JAMIE ABOUT THE EMPLOYEE FILES AND
13  ABOUT JUST IN REGARDS TO THIS CASE IN
14  TERMS OF GATHERING DOCUMENTS AND
15  APPLICATIONS AND THAT SORT OF THING, SO I
16  WOULD SAY THAT I PROBABLY HAVE
17  COMMUNICATED TO THE PAYROLL DEPARTMENT
18  THAT THINGS LIKE APPLICATIONS AND RESUMES
19  SHOULD IN FACT BE IN THE FILE. AND IN
20  LOOKING AT FILES IT'S THERE'S SOMETIMES
21  IT'S THERE, SOMETIMES IT'S NOT, SO.
22      Q.   NOW, I WILL REPRESENT TO YOU
23  THAT I HAVE LOOKED AT SOME OF THESE
24  BOXES, PERSONNEL FILES, AS I'M SURE

KAREN SIEGEL

Page 70

1  ALL, ARE YOU AWARE OF LA WEIGHT LOSS EVER
2  HAVING POSSESSION OF APPLICATIONS OR
3  RESUMES PERTAINING TO CANDIDATES FOR JOBS
4  IN TENNESSEE?
5      A.  WE WOULD HAVE THEM DURING
6  THE TIME FRAME THAT WE OPERATED THOSE
7  CENTERS AS CORPORATE CENTERS.
8      Q.  BUT I GUESS WHAT I'M ASKING
9  IS DO YOU HAVE RECOLLECTION OF EVER
10 SEEING SUCH DOCUMENTS?
11     A.  FOR SOME REASON NASHVILLE
12 STICKS OUT IN MY HEAD, I FEEL LIKE I MAY
13 HAVE BUT I CAN'T BE CERTAIN.
14     Q.  DID ANYONE EVER DISCUSS WITH
15 YOU SUCH RECORDS?
16     A.  NO.
17     Q.  DO YOU KNOW WHERE THOSE
18 RECORDS ARE NOW?
19     A.  I WOULD ASSUME THAT THEY ARE
20 WITH THE REST OF THE COMPANY, I MEAN
21 INCLUDING WITH, INCORPORATED WITH
22 EVERYTHING ELSE.  I DON'T KNOW OF ANY
23 REASON WHY THEY WOULD HAVE BEEN EVER
24 SEPARATED OUT, I'M NOT AWARE OF THAT.

Page 71

1      Q.  BUT SITTING HERE TODAY DO
2  YOU HAVE SPECIFIC RECOLLECTION THAT THE
3  COMPANY HAS POSSESSION OF SUCH RECORDS?
4      A.  I COULDN'T SAY ONE WAY OR
5  ANOTHER.
6      Q.  ARE YOU AWARE OF ANY
7  APPLICATIONS OR RESUMES BEING DISCARDED
8  AT ANY TIME?
9      A.  NO.
10     Q.  AT ANY TIME, AT ANY POINT IN
11 YOUR TENURE AT LA WEIGHT LOSS?
12     A.  NO.
13     Q.  DO YOU KNOW OF ANY
14 APPLICATIONS OR RESUMES BEING DESTROYED
15 AT ANY TIME?
16     A.  NO.
17     Q.  SAME THING WITH THE
18 PERSONNEL FILES?
19     A.  NO.
20     Q.  IS IT YOUR TESTIMONY THAT --
21 I'M TRYING TO GET A SENSE OF WHAT THE
22 POLICY IS.  IT IS YOUR TESTIMONY THAT THE
23 POLICY ON RECORD KEEPING SPECIFICALLY
24 REGARDING EMPLOYEE FILES SINCE IT HAS

Page 72

1  BEEN FORMULATED IN I BELIEVE YOUR
2  TESTIMONY WAS 1998 IT WAS FORMULATED,
3  CORRECT?
4      A.  THAT IS IN REGARDS TO --
5      Q.  APPLICATIONS?
6      A.  THAT'S RIGHT, EMPLOYMENT --
7  RECRUITMENT, EMPLOYEE FILE RETENTION FROM
8  THE VERY BEGINNING, FROM I MEAN AS LONG
9  AS I'VE BEEN WITH THE COMPANY.
10     Q.  WHAT HAS BEEN THE POLICY
11 SINCE YOU STARTED?
12     A.  WE'VE KEPT EVERY -- WE'VE
13 KEPT EVERY EMPLOYMENT FILE.
14     Q.  THAT'S THE POLICY?
15     A.  YES.
16     Q.  BUT WE DON'T KNOW WHETHER
17 THAT'S TRUE OR NOT, YOU HAVE TO LOOK AT
18 THE PAYROLL RECORDS?
19     A.  I HAVE NO REASON TO BELIEVE
20 THAT'S NOT TRUE.
21     Q.  WITH REGARD -- SO THERE IS
22 NO DESTRUCTION DATE OR DISCARD DATE ON
23 PERSONNEL FILES?
24     A.  NO.

Page 73

1      Q.  APPLICATIONS OR RESUMES, YOU
2  MENTIONED A POLICY FORMULATED IN 1998,
3  HAS THAT POLICY CHANGED SINCE 1998?
4      A.  IN TERMS OF REGULAR RECORD
5  RETENTION ON EMPLOYMENT YES AND NO, IT'S
6  THREE YEARS BUT WITH THIS LAWSUIT IT'S,
7  WE HAVEN'T DESTROYED ANY DOCUMENTS, I
8  MEAN IF IT'S FROM 1998 OR 2000 WE STILL
9  HAVE THEM.
10     Q.  YOU BELIEVE?
11     A.  YES.
12     Q.  THAT'S THE POLICY?
13     A.  YES.
14         MR. LANDAU:  WHEN IT'S A
15 GOOD POINT TO TAKE A BREAK.
16         MR. PHILLIPS:  GIVE ME A
17 COUPLE OF MINUTES HERE.
18         MR. LANDAU:  OKAY.
19 BY MR. PHILLIPS:
20     Q.  THE LAST TIME WE SPOKE IN A
21 DEPOSITION WE DISCUSSED THE ISSUE OF
22 ELECTRONIC APPLICATIONS VIA INTERNET
23 PROVIDERS, HOT JOBS, MONSTER.COM AND
24 CAREERBUILDER.COM.  SITTING HERE TODAY DO

Page 74

1  YOU KNOW WHETHER OR NOT THE RESUMES --
2  WELL, WHETHER OR NOT THE ELECTRONIC
3  RESPONSES BY CANDIDATES TO POSTINGS ON
4  MONSTER.COM, AND LET'S TAKE THEM ONE AT A
5  TIME, MONSTER FIRST, WHETHER THOSE ARE
6  ALL CURRENTLY ACCESSIBLE FOR ANY TIME
7  FRAME?
8      A.  WELL, THAT'S -- THERE'S A
9  TWOFOLD ANSWER. ONE, YES, AS FAR AS
10 BEING ABLE TO VIEW THEM ELECTRONICALLY.
11 AND THEN TWO, THE MAJORITY OF THOSE WERE
12 PRINTED DOWN AT THE TIME OF --
13     Q.  HOW DID YOU DETERMINE THAT
14 THE MAJORITY WERE PRINTED DOWN FROM
15 MONSTER?
16     A.  NO, JUST AS WELL IN
17 REFERENCE TO THE WHOLE ISSUE WITH THE
18 RETENTION OF DOCUMENTS AND RESUMES THE
19 POLICY BEING COMMUNICATED AND BEING
20 TRAINED IN TERMS OF SOMEONE CONSIDERED AS
21 A -- SOMEONE BEING CONSIDERED AS A
22 CANDIDATE, THE PRESERVATION OF THAT AND
23 THE RETENTION OF THAT DOCUMENT, SO IT'S
24 PRINTED FOR THE RECRUITERS TO UTILIZE

Page 75

1  FROM THE PRE-SCREENING PROCESS AND/OR
2  SEND OUT TO THE HIRING SUPERVISOR. SO IT
3  COULD BE VIEWED ONE OF TWO WAYS,
4  ELECTRONICALLY OR THERE'S A PAPER COPY OF
5  IT AS WELL.
6      Q.  THE QUESTION THAT WAS SORT
7  OF OPEN THE LAST TIME I THINK WAS WHETHER
8  THE EEOC HAD RECEIVED A COPY OF ALL OF
9  THE SUBMISSIONS TO MONSTER; DO YOU NOW
10 KNOW WHETHER WE HAVE OR HAVE NOT RECEIVED
11 ALL OF THEM?
12     A.  I BELIEVE YOU HAVE RECEIVED
13 EVERYTHING FROM MONSTER.
14     Q.  AND WHAT HAS OCCURRED SINCE
15 THE DATE OF YOUR LAST DEPOSITION,
16 NOVEMBER 10TH OF 2004 THAT NOW CAUSES YOU
17 TO BELIEVE THAT WE RECEIVED ALL OF THEM?
18     A.  WELL, I THOUGHT THAT AT THAT
19 TIME, I NEVER THOUGHT DIFFERENTLY ABOUT
20 MONSTER. THE ONLY ISSUE I EVER HAD WAS
21 WITH HOT JOBS.
22     Q.  HAVE YOU CONDUCTED ANY
23 INVESTIGATION SINCE YOUR LAST DEPOSITION
24 ON NOVEMBER 10TH TO DETERMINE WHETHER OR

Page 76

1  NOT THE EEOC HAS RECEIVED COPIES OF ALL
2  OF THE ELECTRONIC SUBMISSIONS THROUGH
3  MONSTER.COM?
4      A.  NO, I ALWAYS THOUGHT THAT
5  YOU HAD GOTTEN EVERYTHING. IT WAS MY
6  BELIEF AND IT STILL IS MY BELIEF THAT
7  YOU'VE GOTTEN ALL THE SUBMISSIONS FROM
8  MONSTER AND THEN GOING FORWARD.
9  ACTUALLY, PRIOR TO THAT WE STARTED
10 MAINTAINING ALL OF THEM ACTUALLY IN AN
11 ELECTRONIC FORM EVEN SEPARATE FROM THE
12 JOB BOARD WHICH YOU'VE GOTTEN CD ROMS
13 THAT INDICATE THAT AS WELL. SO I NEVER
14 WENT BACKWARDS BECAUSE WE HAD ALREADY
15 PRODUCED ALL OF THAT.
16     Q.  AND WHAT CAUSES YOU TO
17 BELIEVE THAT YOU'VE PRODUCED IT ALL?
18     A.  THE HUNDREDS AND THOUSANDS
19 OF RESUMES THAT WE SENT TO YOU.
20     Q.  WAS THERE ANY PROCEDURE IN
21 PLACE THAT WAS COMMUNICATED TO PEOPLE
22 THAT REQUIRED PRINTING OUT OF EVERY
23 SINGLE SUBMISSION THROUGH MONITOR.COM?
24     A.  WELL, AGAIN, I MEAN FROM A

Page 77

1  TRAINING ASPECT AND IN TRAINING THE
2  RECRUITERS AND IN TRAINING ANYBODY THAT
3  WAS INVOLVED WITH THAT, THEY WOULD HAVE
4  PRINTED DOWN ANY RESUMES THAT THEY WOULD
5  HAVE CONSIDERED FOR AN APPLICANT.
6      Q.  WHAT ABOUT RESUMES THAT THEY
7  DID NOT CONSIDER FOR AN APPLICANT?
8      A.  IF THEY REVIEWED IT, STILL
9  IF THEY REVIEWED IT THEY WOULD STILL HAVE
10 PRINTED IT.
11     Q.  WHY DO YOU BELIEVE THAT'S
12 TRUE?
13     A.  BECAUSE THAT'S -- WELL,
14 THAT'S PART OF THE TRAINING.
15     Q.  OH, SO YOU BELIEVE THAT'S
16 TRUE BECAUSE THAT IS HOW THE RECRUITERS
17 WERE TRAINED TO HANDLE --
18     A.  YES.
19     Q.  -- THE DOCUMENTS?
20     A.  YES.
21     Q.  WHO CONDUCTED THAT TRAINING?
22     A.  MYSELF AND NICKY FRYER.
23     Q.  WHEN WAS IT CONDUCTED?
24     A.  WELL, EACH INDIVIDUAL

KAREN SIEGEL

### Page 78

1  RECRUITER AS THEY'RE HIRED. SO THEY
2  WEREN'T ALL HIRED AT ONCE, PRETTY MUCH
3  EVERY ONE OF THEM WAS ONE ON ONE.
4      Q.  WERE THERE ANY RECRUITERS
5  WHOSE DUTIES INVOLVED MONSTER.COM AND
6  RESPONSES TO MONSTER.COM, WHO DID NOT
7  RECEIVE SUCH TRAINING?
8      A.  NO.
9      Q.  WERE THERE ANY RECRUITERS
10 WHO BEGAN THEIR DUTIES WITH RESPECT TO
11 MONSTER.COM WHO DID NOT RECEIVE THE
12 TRAINING UNTIL AFTER THEY BEGAN THEIR
13 DUTIES?
14     A.  NO.
15     Q.  WHEN DID THE TRAINING TAKE
16 PLACE, THE FIRST?
17     A.  RIGHT, THEIR VERY FIRST DAY.
18     Q.  IS THAT ALSO TRUE WITH
19 RESPECT TO CAREER BUILDER?
20     A.  YES.
21     Q.  DO YOU BELIEVE THAT THE EEOC
22 HAS RECEIVED ALL ELECTRONIC RESPONSES TO
23 CAREER BUILDER?
24     A.  YES.

### Page 79

1      Q.  THAT BELIEF BASED ON THE
2  SAME THING YOU JUST TESTIFIED TO?
3      A.  YES.
4      Q.  WHEN DID LA WEIGHT LOSS
5  START USING CAREER BUILDER?
6      A.  WE STARTED WITH CAREER
7  BUILDER IN 2000 AFTER HOT JOBS, MAYBE
8  AUGUST 2000, SOMEWHERE IN THERE.
9      Q.  WHAT ABOUT MONSTER?
10     A.  WE DIDN'T START USING
11 MONSTER UNTIL 2003.
12     Q.  WHEN IN 2003?
13     A.  I WANT TO SAY SOMETIME IN
14 JULY. AGAIN, THAT'S SORT OF THE SUMMER
15 JULY/AUGUST OF '03.
16     Q.  WERE THERE RECRUITERS IN
17 2000?
18     A.  THERE WERE FIELD RECRUITERS
19 IN 2000.
20     Q.  DID YOU TRAIN FIELD
21 RECRUITERS ON THE USE OF ELECTRONIC JOBS,
22 JOB POSTINGS?
23     A.  YES. THAT WAS DIFFERENT
24 THOUGH, WE WERE PRINTING THE RESUMES DOWN

### Page 80

1  AT CORPORATE, ACTUALLY, THERE'S ANOTHER
2  TIME WHERE YOU MIGHT HAVE DUPLICATION.
3  WE WERE PRINTING RESUMES DOWN AT
4  CORPORATE AND SUBMITTING THEM OUT TO
5  FIELD RECRUITERS.
6      Q.  WAS THE PRACTICE TO PRINT
7  THEM ALL OUT?
8      A.  YES.
9      Q.  EVEN THE ONES THAT DIDN'T
10 LOOK LIKE LA WOULD BE INTERESTED?
11     A.  WE WEREN'T PRE-SCREENING
12 THEM BUT THEY WERE PRE-SCREENING THEM OUT
13 IN THE FIELD. THEY HAD ACCESS AS WELL TO
14 VIEW ON LINE BUT WE ALSO SENT THEM THE
15 RESUMES.
16     Q.  AND THEN FINALLY WITH
17 RESPECT TO HOT JOBS, WE DISCUSSED HOT
18 JOBS AT YOUR LAST DEPOSITION, HAVE YOU
19 SUBSEQUENTLY CONDUCTED ANY INVESTIGATION
20 OF WHETHER THE EEOC HAS RECEIVED ALL OF
21 THE HOT JOBS SUBMISSIONS FROM CANDIDATES?
22     A.  NOT SPECIFICALLY. WE'RE --
23 WHAT WE'RE -- ON THE ISSUE WITH HOT JOBS
24 WAS THE ELECTRONIC SUBMISSION TO YOU, SO

### Page 81

1  WE HAVE BEEN -- WE'VE BEEN WORKING ON
2  THAT ASPECT AND IN TERMS OF GETTING THE
3  ELECTRONIC VERSION BUT I'M NOT QUITE SURE
4  WHERE WE'RE AT WITH THAT, COUNSEL HAS
5  BEEN HANDLING THAT.
6      Q.  SO AT THE PRESENT YOUR
7  UNDERSTANDING -- FIRST OF ALL LET'S JUST
8  ESTABLISH THIS.
9          AS WE SIT HERE YOU DON'T
10 KNOW WHETHER OR NOT THE EEOC HAS RECEIVED
11 ALL OF THE SUBMISSIONS THROUGH HOT JOBS
12 EVER?
13     A.  I'M NOT EXACTLY SURE ON
14 THAT, NO.
15     Q.  SO YOUR UNDERSTANDING THEN
16 IS NO DIFFERENT THAN WHAT IT WAS BACK IN
17 NOVEMBER 10TH WHEN YOU TESTIFIED ON THIS?
18     A.  THAT'S CORRECT.
19         MR. PHILLIPS: LET'S TAKE A
20 BREAK.
21         (A DISCUSSION OFF THE RECORD
22 OCCURRED AND A BREAK WAS TAKEN.)
23 BY MR. PHILLIPS:
24     Q.  MS. SIEGEL, I'M GOING TO