# EXHIBIT T

Page 1

UNITED STATES DISTRICT COURT

   DISTRICT OF MARYLAND

------------------------------:

EQUAL EMPLOYMENT OPPORTUNITY   :

COMMISSION,                    :

      Plaintiff          : Case No:

  and                         : WDQ-02-CV-648

KATHY KOCH,                    :

    Plaintiff-Intervenor   :

  vs.                         :

LA WEIGHT LOSS,               :

     Defendant          :

------------------------------:

       Rockville, Maryland

       Tuesday, June 7, 2005

Deposition of

      MELINDA TEMPLE-PASSIN

the witness, was called for examination by

counsel for the plaintiff, at the Law Offices

of Hoffman & Rubin, 966 Hungerford Drive,

Suite 22, Rockville, Maryland, 20850,

commencing at 9:45 a.m., before Hedy D. Blau,

Page 6

1 that you're asked today, if you could ask that
2 it be rephrased, we will certainly do that,
3 either myself or Aliza.
4    A.   Okay.
5    Q.   Similarly, if you didn't hear part of
6 a question or if Aliza and I have been talking,
7 and you don't remember the question, if you
8 could ask that it be repeated, we will do that
9 for you.
10    A.   Okay.
11    Q.   If you do answer a question today, we
12 will assume that you understood it.  Is that
13 fair?
14    A.   Yes.
15    Q.   It's best that we speak one person at
16 a time.  It tends to cause problems if there's
17 two people speaking at once.  So, if we can
18 both try to do that.
19    A.   Yes.
20    Q.   If either of the attorneys, myself or
21 Aliza, make an objection today, if you could
22 just wait for us to finish our objection before

Page 7

1 you answer the question?
2    A.   Okay.
3    Q.   And also, at the end of the
4 deposition, you will have an opportunity to
5 tell the court reporter whether or not you wish
6 to review the transcript of your deposition for
7 accuracy.  You have a right as a witness to do
8 that, and she can make arrangements with you to
9 give you an opportunity to read the transcript
10 and see if everything is accurate.
11    A.   Okay.
12    Q.   So, at the end of the deposition just
13 let her know whether or not you wish to do
14 that.
15    A.   I will do that.
16    Q.   Just for the record, could you state
17 your full name, please?
18    A.   Melinda Temple-Passin.
19    Q.   What is your home address currently?
20    A.   13021 Birdale Lane, Gaithersburg,
21 Maryland.
22    Q.   Do you reside anywhere else for any

Page 8

1 part of the year?
2    A.   No.
3    Q.   Do you have any intention of moving
4 from that address, say, in the next
5 year-and-a-half?
6    A.   No.
7    Q.   Could you state your social security
8 number, please?
9    A.   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.
10    Q.   And your date of birth?
11    A.   4/5/62.
12    Q.   Are you currently employed?
13    A.   Yes.
14    Q.   Where are you employed?
15    A.   Roy Passin, Incorporated.
16    Q.   What is Roy Passin, Incorporated?
17    A.   It's a restaurant.
18    Q.   Where is that located?
19    A.   It's in Gaithersburg, Old Towne
20 Gaithersburg.
21    Q.   Is there like a trade name of the
22 restaurant?

Page 9

1    A.   Roy's Place.
2    Q.   Roy's Place?
3    A.   Yes.
4    Q.   Have you ever worked for LA Weight
5 Loss?
6    A.   Yes.
7    Q.   When did you begin working for LA
8 Weight Loss?
9    A.   It was in 2001.  I take that back,
10 wrong, wrong.  It was either at the end of '98
11 or the beginning of '99.
12    Q.   Has your last name always been
13 Temple-Passin?
14    A.   No, it hasn't.  It was Temple when I
15 was working for LA Weight Loss.
16    Q.   The company records show that you were
17 hired on or about August 10th of 1998.  Does
18 that date sound correct?
19    A.   Yes, it does.
20    Q.   What position were you hired to do
21 when you first started at LA Weight Loss.
22    A.   I was hired as a manager in the

3 (Pages 6 to 9)

Page 10

1   Herndon location.
2       Q.   So, like a center manager of the
3   Herndon center?
4       A.   Correct.
5       Q.   In your capacity as a center manager
6   at the Herndon center, did you have any duties
7   or responsibilities relating to hiring of new
8   employees?
9       A.   Not really as a manager.  If people
10  came in and applied for a job there or we
11  received faxes, then, I would give them to my
12  area supervisor or the regional supervisor at
13  that point.
14      Q.   Other than that duty, you did not have
15  any duties in the hiring process?
16      A.   No, I did not.
17      Q.   Did you also hold the position of area
18  supervisor at LA Weight Loss?
19      A.   Yes, I did.  I was promoted.
20      Q.   Do you recall when you were promoted
21  to that position?
22      A.   Probably -- it's been so long ago,

Page 11

1   it's just really hard to remember.  It was
2   within a year.
3       Q.   And again, the company records show
4   that you were promoted -- I'll represent to you
5   that they show you were promoted on or about
6   March 22, 1999.  Does that sound accurate?
7       A.   Yes, it does.
8       Q.   As an area supervisor with LA Weight
9   Loss, which centers were under your
10  supervision?
11      A.   I had Herndon, Rockville,
12  Gaithersburg, Frederick, Hagerstown, and opened
13  D.C.
14      Q.   Do you recall when you opened D.C.?
15      A.   I would guess it was probably in 2000.
16      Q.   Do you recall when your employment at
17  LA Weight Loss ended?
18      A.   It would have been in -- I believe it
19  was April or May of 2001, I believe that's
20  when.  I'm not good on dates.  Really, I'm not.
21      Q.   And I'll try to help you out on that.
22  I'll represent to you that the company records

Page 12

1   show that your employment ended with LA Weight
2   Loss on or about May 10th of 2000.  Does that
3   sound accurate?
4       A.   That's accurate.  I was trying to get
5   it right with my marriage and when I was
6   married, how long after.  And we were married
7   in 2001, so that's right.  We had dated a year
8   before we were married.
9       Q.   Did you resign from your employment at
10  LA Weight Loss or were you discharged?
11      A.   I resigned.
12      Q.   Going back to when you were first
13  promoted to area supervisor, who was your
14  direct supervisor at that time?
15      A.   Christine Stone-Seifer (phonetic), it
16  was either she or Joy Freathy.  Actually, it
17  would have been Christine, because Joy was
18  promoted to a regional at that point.
19      Q.   Did you report to Joy Freathy?
20      A.   I did.  I had that wrong.  It was
21  Christine Stone-Seifer was my area when I was a
22  manager, and Joy was the regional.  And then,

Page 13

1   when I was promoted to area was when Christine
2   had been moved to a different area, so I
3   reported to Joy.
4       Q.   So, when you first started as area
5   supervisor, you reported to Joy Freathy.
6       A.   Yes.
7       Q.   And her title was regional supervisor?
8       A.   Yes, it was.
9       Q.   At some point, did an individual named
10  Colleen also serve as your direct supervisor?
11      A.   Yes, she did.
12      Q.   And this was while you were an area
13  supervisor?
14      A.   Yes.
15      Q.   And was Colleen's title regional
16  supervisor?
17      A.   Yes, it was.
18          MS. KARETNICK:  Objection to form.
19          BY MR. PHILLIPS:
20      Q.   What was Colleen's title, to your
21  knowledge?
22      A.   She was a regional supervisor.

4 (Pages 10 to 13)

Page 50

```
1    when I was just a manager and not hiring.  So,
2    I didn't pay a whole lot of attention to them
3    at all, then.
4        Q.    Now, while you were employed with LA
5    Weight Loss, there was a policy, was there not,
6    of retaining applications or resumes?
7        A.    Yes.
8        Q.    Did you comply with this policy?
9        A.    Yes, I did.
10       Q.    After receiving an application or
11   resume, irrespective of whether the person was
12   interviewed or hired, you sent those resumes to
13   corporate; did you not?
14       A.    Yes, I did.
15            MR. PHILLIPS:  Object to the form.
16            THE WITNESS:  Yes.
17            MS. KARETNICK:  I'll rephrase the
18   question just in case there's an issue.
19            BY MS. KARETNICK:
20       Q.    What did you do with those
21   applications?
22       A.    They were put in a mailer and sent to
```

Page 51

```
1    corporate.
2        Q.    Now, you mentioned earlier that -- for
3    sake of clarity, I'm just going to call her,
4    Colleen -- that Colleen said to you that she
5    doesn't care what you do with the applications,
6    "Put them in the trash, if you want.  They're
7    not going to be hired anyway?"
8            MR. PHILLIPS:  Objection.
9    Mischaracterizes her prior testimony, "said to
10   you."
11            BY MS. KARETNICK:
12       Q.    That Colleen said something to the
13   effect of, "I don't care what happens to these
14   applications.  You don't have to send them to
15   corporate.  One doesn't have to send them to
16   corporate," does that roughly characterize your
17   testimony, fairly characterize your testimony?
18       A.    I heard her make that comment to a
19   person on the phone.  She didn't say it to me.
20       Q.    Did you ever throw any applications
21   away?
22       A.    No, I did not.
```

Page 52

```
1        Q.    Did you ever throw any applications
2    away, because you believed the person would
3    never be interviewed or hired?
4        A.    No.
5        Q.    Did you ever see anyone else throw any
6    applications away?
7        A.    No.
8        Q.    Now, you also testified that you had
9    one conversation with Colleen regarding hiring
10   policies, specifically with respect to men.  Is
11   that right?
12       A.    (Nodded head.)
13       Q.    Sorry, you need to verbalize your
14   answer.
15       A.    Yes, yes.
16       Q.    I understand you, but the court
17   reporter may not.
18       A.    I know, as soon as I did it, I
19   realized that.
20       Q.    You're doing fine.
21            MR. PHILLIPS:  You're doing great.
22            BY MS. KARETNICK:
```

Page 53

```
1        Q.    During the course of that
2    conversation, did Colleen ever tell you that
3    that was a company policy?
4            MR. PHILLIPS:  Objection.  Asked and
5    answered.  I'll withdraw the objection.  Go
6    ahead.
7            THE WITNESS:  No.
8            BY MS. KARETNICK:
9        Q.    Did anyone else at the company ever
10   tell you that it was a company policy not to
11   hire men?
12       A.    No.
13       Q.    You also testified that you heard
14   Colleen on the phone and that specifically what
15   you heard related, at least, in part, to hiring
16   or not hiring men.  Is that correct?
17       A.    Yes.
18       Q.    Who was Colleen talking to?
19       A.    I have no idea.
20       Q.    Do you recall when you overheard that
21   phone call?
22       A.    I know it was in the Herndon office,
```

14 (Pages 50 to 53)