# EXHIBIT X

```
       IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MARYLAND
             NORTHERN DIVISION
                   -  -  -
EQUAL EMPLOYMENT        : CIVIL NO.
OPPORTUNITY COMMISSION  :
        and             :
KATHY C. KOCH           :
   INTERVENOR/PLAINTIFF :
        v               :
L.A. WEIGHT LOSS        :
CENTERS, INC.           :
        Defendant       : WDQ-02-CV-648

                   -  -  -
             NOVEMBER 11, 2004
                   -  -  -
```

Oral deposition of KAREN SIEGEL, taken pursuant to notice, was held at the law offices of the EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, The Bourse Building, 4th Floor, Philadelphia, PA, beginning at 9:35 a.m., on the above date, before Nancy D. Ronayne, a Court Reporter and Notary Public in the Commonwealth of Pennsylvania.

                   -  -  -

```
         ESQUIRE DEPOSITION SERVICES
                 15th Floor
       1880 John F. Kennedy Boulevard
       Philadelphia, Pennsylvania 19103
                (215) 988-9191
```

Page 66

1  A. Okay, I do-- I remember. I
2  remember doing a 30(b)(6).
3  Q. You do generally remember
4  that?
5  A. Yes.
6  Q. What I want to ask you about
7  is the hiring process at L.A. Weight
8  Loss. And we can start by talking about
9  what process has been in place since your
10 30(b)(6) testimony in August and
11 September of 2002. Then what I'm going
12 to ask you to do as we go step by step
13 through that process is to tell me if
14 there's any differences between that
15 process in the last two years or so and
16 the process in place prior to that time,
17 '98, '99, 2000, 2001.
18       So let me start by asking
19 you this, say I'm Jane or Joe six pack
20 out on the street, I want a job at L.A.
21 Weight Loss, it's my dream job. L.A.
22 Weight Loss is looking to fill a vacancy.
23 What is the first step, how do I go about
24 getting a job; how do you go about

Page 67

1  getting me to apply for a job?
2  A. Okay. And we're talking
3  2002?
4  Q. I want to talk about fall of
5  2002 since your last 30(b)(6)-- well,
6  since that 30(b)(6) testimony to now.
7  A. Okay. We advertise our jobs
8  in a couple of different ways. We
9  utilize the Internet and in that point in
10 time in 2002 we would have been utilizing
11 Hot Jobs and Career Builder. And if we
12 had a vacancy for a particular position
13 we would advertise on one of those two
14 sites. In addition, we may have used
15 newspaper, but we generally our initial
16 posting for a job would have been on the
17 Internet. So you as a candidate would
18 have applied through the job posting on
19 the Internet and/or faxed your resume to
20 the human resources department.
21 Q. Would that have been in the
22 newspaper ad?
23 A. That's correct.
24 Q. Would that have also been in

Page 68

1  the Hot Jobs or Career Builder posting?
2  A. We do have an 800-number
3  yes, that you can fax your resume to.
4  Q. That is listed on the Hot
5  Jobs or Career Builder?
6  A. Postings, that's correct.
7  And at that point in time in 2002, we
8  would have received the resume, we would
9  have reviewed the resume for
10 qualifications depending on the position
11 that you're applying to.
12 Q. I just want to stop you
13 there but I want to keep going but I want
14 to sort of take this step by step.
15 A. Okay.
16 Q. So that's, that's back in
17 2002 that's how I find out about a job at
18 L.A. Weight Loss, on the Internet or
19 maybe in a newspaper ad?
20 A. That's correct.
21 Q. You said generally it's
22 going to be on the Internet?
23 A. That's correct.
24 Q. Do you know what percentage

Page 69

1  or what fraction of the recruitment was
2  done on the Internet as opposed to in a
3  newspaper ad at that time?
4  A. No, I couldn't tell you
5  specifically. Although, the majority
6  would have been done via Internet.
7  Q. Now, you said that that's
8  true of 2002, how has that changed, if at
9  all, since 2002?
10 A. 2003 we contracted out or we
11 utilized the services of Executive Search
12 Group.
13 Q. Sandy Fox?
14 A. That's correct. And as far
15 as the avenue for we still utilized
16 Internet and newspaper but we were no
17 longer getting those leads, those leads
18 were going to Executive Search Group for
19 assistant managers and above and we were
20 still getting counselor submissions to
21 corporate. And I'm going to take a step
22 back for one second because in 2002 the
23 upper level management position areas,
24 regionals, they were going through ESG as

Page 70

```
 1  well. We might have gotten ones here and
 2  there but we were sort of peripherally
 3  involved in that process.
 4       Q.  When in 2002 did the areas
 5  and regionals go through ESG?
 6       A.  I'm not exactly sure. I'm
 7  not exactly sure. Early 2002.
 8       Q.  Now, I want to make sure my
 9  understanding of this and we'll talk
10  about this more in depth later but I want
11  to make sure my understanding of this ESG
12  arrangement is correct. ESG does not go
13  out and head hunt for L.A. Weight Loss,
14  do they?
15           MR. LANDAU:  Object to the
16       form.
17           MR. PHILLIPS:  I'll rephrase
18       the question.
19  BY MR. PHILLIPS:
20       Q.  Does ESG advertise for L.A.
21  Weight Loss for jobs at L.A. Weight Loss?
22  Do they place the ads, do they do the
23  Internet recruiting?
24           MR. LANDAU:  Object to the
```

Page 71

```
 1       compound nature of that question.
 2           MR. PHILLIPS:  You can
 3       answer.
 4           THE WITNESS:  They-- we
 5       place the ad for them.
 6  BY MR. PHILLIPS:
 7       Q.  They do the screening?
 8       A.  They do the screening. And
 9  they utilize our Internet capability and
10  again, they do the screening. Like the
11  cost of the Internet, obviously it's very
12  expensive as we had hundreds of job
13  postings, so if there was a position that
14  they were recruiting for we would post
15  that position for them but the leads and
16  the resumes would come in to them.
17       Q.  Understand, okay.
18       A.  And that's the same for the
19  newspaper advertisement as well.
20       Q.  L.A. Weight Loss places the
21  ad, ESG initially receives the lead?
22       A.  That's correct. And that
23  happened-- in the beginning they placed
24  their own ads, they were utilizing an
```

Page 72

```
 1  agency to place ads. From a cost
 2  standpoint we took that over because we
 3  can place our own ads without paying any
 4  of the additional agency fees. And we
 5  were getting charged a fee for placing
 6  the ad when we were-- when Sandy Fox was
 7  placing it through his ad agency, so from
 8  a cost control, not that it makes a
 9  difference in terms of I'm not sure that
10  necessarily makes a difference but there
11  was a point where he was placing his own
12  ads.
13       Q.  Who determined the content
14  of those ads?
15       A.  He did, I mean he created
16  the ads.
17       Q.  How long did this
18  arrangement exist where ESG or Sandy Fox
19  were placing their own ads through
20  separate agents?
21       A.  A couple of months, not a
22  long time.
23       Q.  So a couple months in 2002?
24       A.  A couple months in more
```

Page 73

```
 1  2003. Like he-- when he was doing the
 2  areas and the regionals he was doing the
 3  ads. When he overtook the entire process
 4  of assistant managers it was at that
 5  point where we're seeing a larger amount
 6  of ads being placed and we overtook the
 7  process of placing those ads for him,
 8  still his content, just us placing the
 9  ad.
10       Q.  So who determined the
11  content of those ads.
12       A.  Sandy Fox.
13       Q.  Did L.A. Weight Loss have
14  any-- conduct any review before those ads
15  were placed?
16       A.  Not to my knowledge. It's
17  like using an outside search firm you
18  know, agency, which is exactly what he is
19  saying, here we have a position to fill
20  and --
21       Q.  Was he also the owner of the
22  ad agency?
23       A.  Yes.
24       Q.  What's the name of the ad
```

Page 74

1  agency?
2      A.  And actually-- oh, the ad
3  agency, I'm sorry.  No, I'm sorry, search
4  firm, no, not in charge of the ad agency.
5      Q.  Who was the ad agency that
6  use to use him?
7      A.  I don't remember but I can
8  get you that information.  It wasn't a
9  logical ad agency.
10     Q.  It wasn't Alston?
11     A.  No, no, we used Alston.
12     Q.  So when you referred to a
13 change in 2003, you were referring not so
14 much to use of Internet and newspaper as
15 you were what's happening to the leads
16 after they come in?
17     A.  That's correct.
18     Q.  So then in 2003 the leads go
19 to ESG for assistant manager and above,
20 correct?
21     A.  That's correct.
22     Q.  Has that changed since 2003,
23 both who places the ads, where they are
24 placed and the use of ESG?

Page 75

1      A.  Yes.
2      Q.  What has changed?
3      A.  Just recently in the last
4  two months, we have actually brought the
5  recruitment back in-house.  So ESG is
6  doing-- we're doing all the recruitment.
7  They're not -- they may do a position
8  here and they're separate from the field,
9  like they might recruit for a corporate
10 position but not for anything field
11 related at this point.
12     Q.  So just within the last few
13 months then ESG has stopped doing any
14 recruiting for field positions at L.A.
15 Weight Loss, correct?
16     A.  That's correct.
17     Q.  And there's an HR is a
18 recruiting I guess group or recruiters in
19 the HR department at L.A. Weight Loss who
20 have now undertaken that responsibility,
21 correct?
22     A.  That's correct.
23     Q.  And back in 2003 the leads
24 for positions below assistant manager,

Page 76

1  for example med tech or counselor, were
2  not going to ESG they were going directly
3  to L.A. Weight Loss personnel, correct?
4      A.  That's correct.
5      Q.  Who were they going to?
6      A.  They would come in and the
7  recruitment assistant slash
8  administration administrator, and/or
9  myself or Nicky Fryer, and those-- so
10 that's who they came in to.
11     Q.  Now again I want to stay
12 just on the posting function for now and
13 we'll come back to some of these other
14 things.  Have your Internet sources
15 changed since 2002?
16     A.  Yes.
17     Q.  You mentioned Hot Jobs and
18 Career Builder?
19     A.  Correct.  And we added
20 Monster.
21     Q.  When did you add Monster?
22     A.  Sometime in 2003.
23     Q.  Referring to Monster.com?
24     A.  Yes.

Page 77

1      Q.  Any reason for that change?
2      A.  Just to add to the exposure
3  that we had.
4      Q.  Now prior the your 30(b)(6)
5  testimony in the fall of 2002, let's take
6  that period from the start of 2002 to
7  when you gave your 30(b)(6) in the fall
8  of 2002.  Was the process the same then
9  as you previously described it, Internet
10 and newspaper postings?
11     A.  That's correct.
12     Q.  Was ESG being used during
13 that period?
14     A.  They may have been involved
15 at the-- in the higher level, the
16 assistant and regional at that point in
17 time.
18     Q.  Now let's look at 2001.
19 What's the difference between, if
20 anything, between what the company was
21 doing as far as posting jobs in 2002 as
22 compared to 2001?
23     A.  2001 we were still utilizing
24 Internet, but we were probably, it was

Page 82

1  department, yes.
2      Q.  But now the difference is
3  that everything comes through the HR
4  department currently?
5      A.  That's correct.
6      Q.  Lead comes to the HR
7  department, comes to you, Nicky Fryer,
8  recruiting assistant, what is done with
9  the lead?
10     A.  Give me a time frame; 2003?
11     Q.  Yes. Let's deal with that
12 first.
13     A.  Okay. 2003 it would come
14 in, we would separate it by area or
15 regional, if there wasn't an area in
16 place. And those resumes were sent out
17 to the field two times a week.
18     Q.  Is there any initial
19 screening out that's done at this stage
20 in the process? Essentially what I'm
21 asking is, do you send all of the
22 resumes, we'll call them resumes but I'm
23 referring to basically anything
24 indicating an interest in employment, a

Page 83

1  resume, an Internet application I guess
2  you could call it, a response to an
3  Internet posting by e-mail or whatever,
4  faxed note on a cocktail napkin,
5  anything, is there any screening out at
6  this point or is it all sent out to the
7  field?
8      A.  It's all sent out to the
9  field.
10     Q.  It doesn't matter what it is
11 if it's an indication of interest in
12 employment it is sent out to the region
13 or area that it applies to?
14     A.  That's correct. As long as
15 there's contact information for the
16 person, speaking to your cocktail napkin,
17 but yes.
18     Q.  Unless it's I want a job
19 signed Joe it goes out to the field?
20     A.  Yes. And if it says Joe and
21 215.
22     Q.  Understood. Understood,
23 okay.
24     A.  That's correct.

Page 84

1      Q.  Has that ever been
2  different? Other than the use of
3  Executive Search Group has that process
4  ever been different, HR receives the
5  leads, HR disseminates them to the area
6  region?
7      A.  Yes.
8      Q.  When was it different?
9      A.  Okay. Prior to 2003-- prior
10 to 2003 and in different phases there
11 were different, we had recruitment
12 inhouse that we were doing and we also
13 had field recruiters at one point.
14     Q.  This is prior to 2003?
15     A.  That's correct.
16     Q.  Did you have, were the
17 recruiters inhouse working during the
18 same time frame as the field recruiters?
19     A.  No.
20     Q.  They were not?
21     A.  No.
22     Q.  Who was the most recent
23 inhouse during that time frame, prior to
24 2003, who was the most recent inhouse or

Page 85

1  field recruiters?
2      A.  Inhouse.
3      Q.  At that time were the leads
4  going to the inhouse recruiters?
5      A.  At the time that there were
6  inhouse recruiters?
7      Q.  Yes.
8      A.  Yes.
9      Q.  And what were they doing
10 with the leads when they got them?
11     A.  They were sorting them and
12 prescreening them.
13     Q.  So prior to 2003 at this
14 stage of the process the receipt of the
15 lead there was screening that was taking
16 place by the inhouse recruiters?
17     A.  That's correct.
18     Q.  How long did the company
19 have inhouse recruiters prior to 2003?
20     A.  We had inhouse recruiters
21 probably for close to a year and a half.
22     Q.  Can you give me a general
23 time frame?
24     A.  Let me think about this.

Page 86

1  Late 2001 I want to say to 2003 to ESG
2  taking over, it might have been late 2001
3  early 2002, so it was probably a year
4  maybe a little longer?
5      Q.  How many inhouse recruiters
6  were there at that time?
7      A.  There were three.
8      Q.  Who were they?
9      A.  Kim Stanziani,
10 S-T-A-N-Z-I-A-N-I. Zoya-- I'm not even
11 going to attempt, I don't even know how
12 to pronounce her last name, it's like
13 Urkavitch or something and Nancy
14 O'Malley.
15     Q.  Who was their direct
16 supervisor?
17     A.  Nicole Fryer.
18     Q.  And Ms. Fryer reports to
19 you?
20     A.  That's correct.
21     Q.  Do you know how they were
22 prescreening, what they were prescreening
23 for?
24     A.  Yes.

Page 87

1      Q.  What was it?
2      A.  Again, it gets back to the
3  aspect of what we do as a company. So
4  the person who in their previous job
5  history, someone in a related field, when
6  I say a related field, someone who has
7  had a lot of customer interaction, shown
8  an ability to or had the experience in a
9  consultative sale. It's that whole
10 trying to find that person who has the
11 ability to connect with our clients on an
12 emotional level, shows empathy.
13     Q.  And let me stop you there.
14     A.  Okay.
15     Q.  Because I don't want to
16 duplicate. I am going to discuss with
17 you as I'm sure you anticipate, the
18 prescreening policies and process
19 generally later.
20         Is it accurate to say that
21 Kim, Zoya and Nancy were using the
22 company prescreening process described in
23 the company hiring guides; is that what
24 they were doing?

Page 88

1      A.  Yes. In addition to you
2  know just discussions as a department as
3  far as what are we looking for.
4      Q.  So what was the nature of
5  those discussions?
6      A.  What are their related
7  fields that we would draw from. You
8  know, looking at a resume there's some
9  what I would call general recruitment,
10 the red flag issues, you're job hopping,
11 gaps in your resume, those type of
12 things, they're obvious in any business.
13 But looking at experience, talking about
14 the experience that we were looking for
15 in terms of the previous jobs.
16     Q.  Were these discussions about
17 related fields to draw from a previous
18 experience, were these discussions
19 recorded in any way in writing, in a
20 memo, anything of that nature, e-mail?
21     A.  Well, we discussed in the
22 recruitment handbook or guidebook the
23 different specific things, retail
24 cosmetics. So that I mean, in terms of

Page 89

1  that there is documentation relative to
2  that. But sort of let's talk about okay,
3  well we have, we're looking for retail
4  but what specific to retail, are we
5  looking for cosmetics, what's specific.
6  You and I might have a conversation about
7  cosmetics, Avon salespeople, Mary Kay,
8  cosmetic counter, sort of expanding on
9  what is in fact in writing in different
10 manuals, you'll see it, it's in the
11 training and that sort of thing.
12     Q.  What was done with, this is
13 again late 2001 to 2003 when inhouse
14 recruiters were doing prescreening, what
15 was done with the resumes or applications
16 or whatever you want to call them that
17 were screened out?
18     A.  When you say screened out
19 you mean not they wouldn't --
20     Q.  Not referred to the field?
21     A.  They would be kept in a
22 folder specific to that region. We
23 stored things by area.
24     Q.  Sitting here today is there

Page 174

1  about them.
2      Q.  Did you retain any documents
3  pertaining to that go-between function
4  you were serving at that time?
5      A.  No.  It would have been
6  verbal communication.  And/or-- and/or
7  directing them to here's where Eileen is
8  today give her a call here.
9      Q.  So is it your testimony that
10 you generated no documents during the
11 course of performing that go-between
12 function you just testified about?
13     A.  That's correct.
14     Q.  Did anyone at L.A. Weight
15 Loss generate any documents pertaining to
16 that go-between function?
17     A.  It was only me that was
18 doing that and it was for a very brief
19 period of time.
20     Q.  So it's your testimony that
21 from Elaine Bussoletti or Eileen
22 Stankunus's mouth to your ear to your
23 mouth to Sandy Fox's ear?
24     A.  That's correct.

Page 175

1      Q.  All verbal?
2      A.  That's correct.
3      Q.  You testified earlier that
4  you communicated to ESG to what the
5  company was looking for; how was that
6  communicated?
7      A.  Verbally, by phone.
8      Q.  Any e-mail?
9      A.  No.  I may have sent them
10 the job descriptions for those positions.
11 I can't be certain to that but I may have
12 to assist.
13     Q.  To your knowledge did anyone
14 at L.A. Weight Loss give ESG instructions
15 on document retention?
16     A.  They were really-- they were
17 an independent-- they are an independent
18 agency, so I mean --
19     Q.  Did anyone at L.A. Weight
20 Loss to your knowledge give ESG
21 instructions on retaining documents that
22 they were generating or receiving during
23 this, the services they were providing to
24 L.A. Weight Loss?

Page 176

1      A.  What I can-- what I can
2  speak to for myself and my department we
3  wanted the resumes-- we wanted all the
4  resumes that were being submitted to ESG
5  in this 2003 time frame when they were
6  doing all the recruitment because I
7  wanted to make sure that there wasn't a
8  candidate who may have been qualified for
9  a counselor position but they were only
10 looking at managers and assistant
11 managers and/or the same reason that they
12 may have been overlooking someone that we
13 in fact would want to interview.  We
14 wanted all of those candidates from them.
15 I never received that.
16     Q.  To your knowledge did anyone
17 at L.A. Weight Loss ever give
18 instructions to Executive Search Group to
19 retain the documents they were receiving
20 or generating as part of providing
21 recruitment services to L.A. Weight Loss?
22     A.  No, because-- no.  They were
23 an independent-- they were a separate
24 business from us, we had nothing to do

Page 177

1  with them specifically other than-- other
2  than us requesting the information from
3  them which would have been all the
4  documents.  We-- I personally never gave
5  them any direction and I don't know
6  whether anybody else has or hasn't.
7      Q.  Is there a contract between
8  L.A. Weight Loss and ESG in writing?
9      A.  Not to my knowledge.
10     Q.  Is there anything in writing
11 commemorating this arrangement between
12 ESG and L.A. Weight Loss to your
13 knowledge?
14     A.  I do not know.
15     Q.  Do you know of anyone who
16 might know other than yourself?
17     A.  Vahan Karian.
18     Q.  So sitting here today you
19 have no way of telling me one way or
20 another whether Executive Search Group
21 retained all the resumes that they
22 received performing recruiting functions
23 for L.A. Weight Loss during the period
24 that they were doing that?

KAREN SIEGEL

Page 182

1  just applications, but all the documents
2  in response to EEOC's request for that
3  information?
4     A.   That's correct.
5     Q.   What was the response to
6  those requests?
7     A.   We never got anything.
8     Q.   No response at all?
9     A.   We-- they never sent us
10 anything.
11    Q.   So did they tell you they
12 had all, some or none of the documents in
13 response to your request or did they just
14 silence?
15    A.   No, again, I did not speak
16 to them personally.
17    Q.   Who did?
18    A.   Nicky Fryer and I believe
19 Elaine Bussoletti. But I know for a fact
20 that Nicky Fryer did in fact speak to
21 them.
22    Q.   Do you know what was said?
23    A.   That we in fact needed--
24 that this was a request by the EEOC for

Page 183

1  all of these documents and that we needed
2  to produce them and that they need to
3  send them to us. It was my understanding
4  that I don't know-- I don't know
5  specifically whether David ever agreed
6  yes, I'll get them to you or no, it's too
7  much work or it would be overly
8  burdensome to do so.
9       MR. LANDAU: David Fox?
10      THE WITNESS: David Fox, I'm
11   sorry.
12      MR. PHILLIPS: Right. I
13   understood that but thank you for
14   clarifying.
15      THE WITNESS: David Fox.
16   And we never received anything.
17   And we made numerous, numerous
18   requests to them.
19 BY MR. PHILLIPS:
20    Q.   Did the company L.A. Weight
21 Loss start using ESG before or after
22 February 2002?
23    A.   They may have been doing
24 some of their upper level supervisory

Page 184

1  management prior to that, prior to 2002.
2     Q.   But you don't know that for
3  sure?
4     A.   Let me think about this.
5  (Pause).
6       I can say pretty definitely
7  that sometime in 2001 we utilized them to
8  a certain degree. Again, for the upper
9  level management positions.
10    Q.   Were you privy to any
11 discussions regarding the decision to use
12 ESG?
13    A.   I was not.
14    Q.   Were you privy to any
15 discussions regarding the decision to
16 expand ESG's service to L.A. Weight Loss
17 beyond upper level management positions?
18    A.   I was not.
19    Q.   Do you know who was other
20 than you said Mr. Karian earlier, anyone
21 else?
22    A.   Not to my knowledge I don't
23 have any knowledge to that.
24    Q.   We talked earlier about the

Page 185

1  use of electronic job services, Monster,
2  Hot Jobs, Career Builder. Other than
3  those three has L.A. Weight Loss used any
4  other Internet recruiting services?
5     A.   We may have used as a search
6  function like with the capability to
7  search, for a brief period of time I
8  think we signed up for, it might have
9  been a month, sixfigures.com to search
10 applicants but I don't know if we ever
11 actually utilized them or if we looked
12 into like just was a let's research and
13 see if we might use them.
14    Q.   Do you know whether any
15 documents exist regarding sixfigures.com?
16    A.   If there are any documents
17 in terms of like resumes downloaded or
18 something like that?
19    Q.   Correct.
20    A.   Anything that we've had
21 literally, anything and everything we
22 have turned over to counsel.
23    Q.   I want to get a sense of
24 what happens when you're using these

47 (Pages 182 to 185)

ESQUIRE DEPOSITION SERVICES

Page 198

```
 1  applications we're referring to, Hot
 2  Jobs, Monster, Career Builder?
 3      A.  The initial request was made
 4  to me and I then had Nicky Fryer
 5  interfacing with the Internet providers
 6  to attempt to get copies of any and all
 7  resumes that had been submitted to any of
 8  the job postings.
 9      Q.  When was that done?
10      A.  Whenever your initial
11  request was made.
12      Q.  During the investigation of
13  this matter or during the litigation?
14      A.  I don't know exactly.
15      Q.  The lawsuit was filed in
16  February 2002.
17      A.  I believe that's when we
18  would have-- when the request was made.
19      Q.  Do you know what the
20  response was from the providers?
21      A.  Specifically I don't know.
22  I know more information from Hot Jobs
23  because that was our largest data base at
24  that point in time and they were unable
```

Page 199

```
 1  to according to what they were telling
 2  us, they were unable to make an
 3  electronic copy of all of the resumes
 4  that had been submitted.  And it had
 5  something to do with a platform issue and
 6  I honestly, I'm not very well versed in
 7  IT so I don't necessarily know what that
 8  means.
 9      Q.  So what was the resolution,
10  if they could not make an electronic
11  copy?
12      A.  I don't -- I don't know if
13  there's been a resolution at this point.
14      Q.  Did you get hard copies of
15  all of this?
16      A.  In order to get hard copies
17  you literally would have to go into each
18  individual posting and download each
19  individual application separately and
20  then print that.  And I don't believe
21  that's ever been done.
22      Q.  By anyone?
23      A.  It would not as far as my--
24  not from my side of things.  The time
```

Page 200

```
 1  involved to do that would be astronomical
 2  but we've never done it on our end.
 3      Q.  So to your knowledge L.A.
 4  Weight Loss has never actually gone
 5  through every single job posting, looked
 6  at all the responses and printed those
 7  out?
 8      A.  No.  Not to my knowledge.
 9      Q.  Has L.A. Weight Loss ever
10  gone through every posting, looked at
11  every response and downloaded it?
12      A.  That has happened.  I mean
13  yes, they do that when they go through--
14  when they're reviewing a position like
15  when they're reviewing to hire for a
16  position, they look at every single
17  applicant.
18      Q.  But what happens to the file
19  after it's downloaded, where is it
20  stored?
21      A.  It's stored on it's like a
22  web based, you're dealing with a web
23  based recruitment board job posting.
24      Q.  So it's stored on the
```

Page 201

```
 1  service provider's site basically?
 2      A.  Yes.
 3      Q.  In their server or whatever?
 4      A.  Wherever they, yes.
 5      Q.  The files after they've been
 6  reviewed by the recruiters, they're-- to
 7  your knowledge they're kept on the
 8  provider's site but they're not stored
 9  electronically in anything at L.A. Weight
10  Loss?
11      A.  That's correct.
12      Q.  They're not downloaded onto
13  a C-drive or onto your server or onto a
14  disk or anything of that nature?
15      A.  That's correct.
16      Q.  Is there any requirement
17  that the recruiter prints out everything
18  they look at?
19      A.  No, they print out-- they
20  print out the resumes that are
21  prescreened and any resume that is set up
22  for an interview.  But again, at this
23  point in time going forward.  So what
24  we've done now for 2004 is we've created
```

51 (Pages 198 to 201)

Page 234

1   you just don't know what?
2       A.   That's correct.
3       Q.   And it's also a fair
4   statement of your testimony that to your
5   knowledge nobody has actually
6   successfully gone through and printed out
7   or downloaded, anyone at L.A. Weight
8   Loss, every single response to a Hot Jobs
9   job posting?
10      A.   To my knowledge
11  specifically, no. Other than what we
12  talked about, other than the counselor
13  resumes.
14      Q.   To your knowledge has anyone
15  at L.A. Weight Loss attempted to do that?
16      A.   I honestly don't know.
17      Q.   Have you ever instructed
18  anyone to do that?
19      A.   Basically, we've insofar as
20  getting information that you requested
21  and working with Nicky and working with
22  Hot Jobs, yes, we attempted to get it--
23  get you the information that you needed.
24  As far as being successful at that, I

Page 235

1   honestly sitting here today I don't
2   believe that we were successful in doing
3   that.
4       Q.   Same question with respect
5   to Monster?
6       A.   Different.
7       Q.   To your knowledge has anyone
8   at L.A. Weight Loss or anyone with any
9   entity ever gone back and attempted to
10  recover or get all the responses to all
11  job postings that L.A. Weight Loss has
12  ever done on Monster?
13      A.   That with regards to Monster
14  and Career Builder, again, it's a little
15  different, we hadn't been using either of
16  those as long as Hot Jobs nor to the
17  extent that we were using Hot Jobs. And
18  I do believe that that in fact you have
19  all that information from Monster and
20  Career Builder.
21      Q.   What do you base that belief
22  on?
23      A.   In collecting documents and
24  submitting documents, during that aspect

Page 236

1   of things. The only one that I remember
2   having problems with was Hot Jobs.
3       Q.   But you testified earlier
4   that there was no procedure or process in
5   place requiring people reviewing
6   responses to print out or download every
7   single response with respect to Monster
8   or Career Builder?
9       A.   That's different than
10  production of documents relative to this
11  case. It's a different question.
12      Q.   I don't think it is a
13  different question, but let's be clear.
14      A.   Okay.
15      Q.   Let's be clear. Until the
16  last couple of months where you hired
17  inhouse recruiters there has never been a
18  process-- my understanding of your
19  testimony, correct me if I'm wrong, is
20  that there's never been a process or
21  procedure or policy in place requiring
22  people to save everything, all the
23  responses that they look at either by
24  downloading it or by printing it out; is

Page 237

1   that a correct statement of your
2   testimony?
3           MR. LANDAU: Object to the
4       form.
5   BY MR. PHILLIPS:
6       Q.   Is that true?
7       A.   There's never been a policy,
8   a written policy versus procedure of
9   downloading every-- well, no because they
10  do, they download. In order to look at
11  an applicant you have to download and
12  what that means, download, you're opening
13  the file.
14      Q.   But it's not saved?
15      A.   Right, said differently,
16  right, it's not saved. And I've -- the
17  second part of your question I don't
18  remember -- oh, and the save part.
19  Right, it's not saved.
20      Q.   So again, until very
21  recently no one, there has not been, and
22  I'm talking written or verbally
23  communicated, any policy, procedure or
24  practice in place at L.A. Weight Loss

Page 254

1  there was an administrative investigation
2  of L.A. Weight Loss by the EEOC, correct,
3  concerning hiring issues, correct?
4      A.  In regards to the Koch
5  claim?
6      Q.  In regards specifically to
7  the issue of not hiring males because
8  they're male, you recall there was an
9  investigation of that issue before this
10 litigation, correct?
11     A.  In specific to this lawsuit
12 or specific to another?
13     Q.  Specific to this lawsuit.
14     A.  Yes.
15     Q.  And do you recall that
16 during that investigation that the EEOC
17 had requested applications, resumes,
18 things of that nature, correct?
19     A.  Yes.
20     Q.  Who was responsible for
21 routing those resumes and applications--
22 first of all, they were routed through
23 counsel to the EEOC; is that correct?
24     A.  That's correct.

Page 255

1      Q.  And I'm talking again about
2  the documents produced to the EEOC during
3  the investigation of this matter, right?
4      A.  Yes.
5      Q.  Who was responsible for
6  routing those documents to counsel?
7      A.  I was.
8      Q.  You were.  Did you provide
9  at that time to the EEOC, all the resumes
10 and applications and interview notes and
11 prescreening forms then existing
12 pertaining to all positions company wide?
13     A.  Yes.
14     Q.  Have you subsequently
15 located any additional documents
16 concerning that time period up to the
17 time where you submitted those documents
18 to the EEOC?
19         MR. LANDAU:  I'm going to
20     object to the question.  Let's go
21     off the record for a second.
22         (A discussion off the record
23     occurred.)
24         THE WITNESS:  Could you

Page 256

1  repeat the question.
2      MR. LANDAU:  I also want to
3  note my objection on the record to
4  repeating testimony he's been
5  given in the 30(b)(6) as the
6  document search is prior to the
7  summer of 2002 when this witness
8  was a 30(b)(6) witness.
9      MR. PHILLIPS:  Could you
10 repeat the last question.
11     (The court reporter read the
12 pertinent part of the record.)
13     MR. PHILLIPS:  And I don't
14 think that's a repetitive question
15 because I'm asking up until the
16 day of this deposition which is
17 two years after her last
18 deposition, have you located any
19 documents for the time period up
20 to the time where you produced
21 documents to the EEOC during the
22 investigation and I'm talking
23 resumes, applications, prescreens,
24 any hiring related documents for

Page 257

1  that period?
2      THE WITNESS:  For the period
3  prior to 2002?  We made a document
4  production to you since 2002 of
5  resumes and interview notes and
6  applications.  The document
7  production up to 2002 I don't
8  believe that there was anything
9  else that was submitted from that
10 time frame but I will testify a
11 hundred percent that any and all
12 documents and resumes and any of
13 the prescreens that has since
14 subsequently been produced to you
15 I don't believe that there's
16 anything in there that's prior to
17 2002.  So the search of documents
18 to whatever date we're talking
19 about, 2000, 2002, I don't even
20 know at this point, but there was
21 a exhaustive search taken in the
22 very beginning for any and all
23 documents that might have been
24 maintained out in the field or

Page 258

```
 1    that were housed in corporate,
 2    they were submitted to you and
 3    then since then there's been a
 4    subsequent production of
 5    documents.
 6         MR. PHILLIPS: I'm going to
 7    go ahead and move on at this
 8    point. We're going to mark this
 9    as K. Siegel since the 30(b)(6)
10    exhibits were marked Siegel.
11         (K.Siegel-1 marked for
12    identification.)
13  BY MR. PHILLIPS:
14    Q.   Take a look at that series
15  of documents for a moment and let me know
16  when you're done.
17    A.   (Witness complies.)
18         Okay.
19    Q.   Do you recognize this
20  document marked K.Siegel Exhibit 1?
21    A.   Yes.
22    Q.   What is it?
23    A.   It is a compilation of the
24  job descriptions for different positions,
```

Page 259

```
 1  different field positions for the
 2  company.
 3    Q.   When was it created?
 4    A.   I don't know exactly when
 5  this was created.
 6    Q.   Who created it?
 7    A.   Actually, I did. It was--
 8  it was a document that was I guess like
 9  it could have been-- actually, this could
10  have been the first one or it could have
11  been a revision. There's-- we've revised
12  it several times so I don't know exactly
13  which one but I was involved in the
14  initial creation of the document.
15    Q.   Was anyone else involved in
16  the initial creation of K.Siegel
17  Exhibit 1?
18    A.   There was some input -- this
19  actually -- this actually-- this is from
20  the franchise manual it looks like. So
21  this would have been a revision of the
22  original job descriptions. As far as
23  additional input there was an initial
24  like job description prior to me
```

Page 260

```
 1  overtaking the HR department that I then
 2  revised so input would have come at that
 3  point or through-- through operations
 4  really.
 5    Q.   Who had input beyond
 6  yourself?
 7    A.   On the initial job
 8  description I don't know.
 9    Q.   Who had input into this
10  version?
11    A.   I would have consulted with
12  at the time the people in supervisory
13  capacity of these different positions and
14  what their-- what their job
15  responsibilities were.
16    Q.   What is the purpose or the
17  function for these documents marked
18  K.Siegel Exhibit 1?
19    A.   Just to kind of give a
20  guideline to each different position and
21  sort of an outline of what their job
22  description would be.
23    Q.   You mentioned the term
24  guideline, what do you mean by guideline?
```

Page 261

```
 1    A.   Well, you know each-- each
 2  position within the organization you have
 3  to be very flexible and you have to have
 4  the ability to take on additional
 5  responsibility, so these were the basic
 6  responsibilities and accountability that
 7  each position but I wouldn't say that
 8  there wasn't a situation where a
 9  counselor might not do something that an
10  assistant manager would do. Or an
11  assistant manager what a manager would
12  do. So I kind of-- we use these loosely
13  in the sense that I would say these are
14  minimum responsibilities for the
15  positions. But they obviously in number
16  eight where were talk about special
17  projects, perform any specialty project
18  assigned by the center manager. Employee
19  must be flexible with respect to job
20  duties relative to the needs of the
21  business. You know, it was I say
22  guideline in the sense that I don't
23  believe, I don't feel that these are all
24  encompassing as far as what each and
```