# EXHIBIT C

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MARYLAND
               NORTHERN DIVISION
                   -   -   -
EQUAL EMPLOYMENT        : CIVIL NO.
OPPORTUNITY COMMISSION:
        and            :
KATHY C. KOCH          :
  INTERVENOR/PLAINTIFF:
            v          :
L.A. WEIGHT LOSS       :
CENTERS, INC.          :
          Defendant    :  WDQ-02-CV-648
```

                   -   -   -

                NOVEMBER 11, 2004

                   -   -   -

        Oral deposition of KAREN SIEGEL,

taken pursuant to notice, was held at the

law offices of the EQUAL EMPLOYMENT

OPPORTUNITY COMMISSION, The Bourse

Building, 4th Floor, Philadelphia, PA,

beginning at 9:35 a.m., on the above

date, before Nancy D. Ronayne, a Court

Reporter and Notary Public in the

Commonwealth of Pennsylvania.

                   -   -   -

            ESQUIRE DEPOSITION SERVICES
                   15th Floor
           1880 John F. Kennedy Boulevard
           Philadelphia, Pennsylvania 19103
                 (215) 988-9191

KAREN SIEGEL

Page 330

1 for 1997?
2    A.   No.
3    Q.   Have you retained any
4 calendars for 1997?
5    A.   No.  I mean I was in seven
6 of '97 I had been with the company three
7 months and I was helping marketing and
8 franchise at that point in time.  I mean
9 I wasn't involved in any --
10    Q.    Ignoring the handwriting do
11 you recognize, again, not withstanding
12 the handwriting, do you recognize this
13 particular type of form?
14    A.    In the same capacity as the
15 last form that you showed me.
16    Q.   It's a form, where do you
17 believe you received this form from?
18    A.    Since Karol Stadler's name
19 is on here and testifying previously I
20 thought it might have come from a
21 training that Karol in fact conducted,
22 it's possible that it would have come
23 from Karol.
24    Q.   Possible it also came from

Page 331

1 Mr. Moyer, Scott Moyer?
2    A.   That's possible as well.
3    Q.   Possible it also came from
4 Vahan Karian?
5    A.   Probably more less likely at
6 this point.
7    Q.   But possible?
8    A.   Possibly.
9    Q.   Do you have any samples of
10 your handwriting with you today?
11    A.   Do you have anything that I
12 signed as far as you know-- I mean I can
13 give you a handwriting sample.  I mean
14 I'm wondering maybe this was part of the
15 actual training, I just don't remember,
16 you know, like if it was part of a
17 training that I was sitting in on for
18 some unknown reason.  The only other
19 thing that I can think of and it's pure
20 speculations --
21    MR. LANDAU:  We don't want
22 you to speculate.
23    THE WITNESS:  I don't want
24 to speculate then.

Page 332

1 BY MR. PHILLIPS:
2    Q.   I'll let you speculate.
3    A.   Are you going to let me
4 speculate, I'm not going to--
5    Q.   We'll note it as
6 speculation.  Go ahead, speculate.
7    MR. LANDAU:  Well, the
8 witness doesn't have to speculate
9 if she doesn't want to.
10    MR. PHILLIPS:  Well she
11 has--
12    THE WITNESS:  Can I discuss
13 it off the record with you?
14    MR. PHILLIPS:  She has an
15 idea in her mind of where--
16    THE WITNESS:  Well here, let
17 me point something out to you in
18 the document, okay.  It says:  We
19 are growing very quickly within
20 the industry and are looking for a
21 minority partner to run our
22 business and share the profits
23 with no investment.  You can
24 expect to earn within 75,000 to

Page 333

1 $100,000 range.  You will be
2 trained on our highly successful
3 business methods at our corporate
4 offices.
5    My thought is that there is
6 a possibility that they were
7 looking to franchise the Salisbury
8 market which is the only reason
9 that I could see that I would be
10 involved in any prescreening for
11 somebody who would apply in that
12 respect.  So if they were looking
13 to franchise the Salisbury market
14 it makes sense that I would be
15 involved in the prescreening
16 potential of people that would
17 apply and maybe they were looking
18 at it from the standpoint of
19 financing this particular market
20 but looking for somebody who would
21 be sort of an owner operator, you
22 know, as they suggest in that
23 paragraph.
24    It's pure speculation.  I

84  (Pages 330 to 333)

ESQUIRE DEPOSITION SERVICES

KAREN SIEGEL

Page 342

1      A.   Actually, I think it is.  If
2  it's not the same computer anything
3  that's on my computer is definitely
4  stored, there's nothing-- there's nothing
5  that's not on my computer.
6      Q.   Is this form on that
7  computer?
8      A.   I will look for you.  I did
9  not create this form.  I will swear to
10  anybody in the court of law, anywhere you
11  want to put me--
12      Q.   You are in a court of law
13  and you are under oath.
14      A.   And I will swear to you that
15  I did not create this form.  And I will
16  swear to you that I do not know who
17  created this form.
18      Q.   Did the company have e-mail
19  back in 1997?
20      A.   They did not.
21      Q.   When did the company first
22  have e-mail?
23      A.   I do not know.  It's been
24  testimony previous and whatever, I mean,

Page 343

1  I don't remember when we first had
2  e-mail.
3      Q.   Other than people that you
4  previously mentioned, possibly Mr.
5  Karian, possibly Mr. Moyer, possibly at a
6  training held by Karol Stadler or Kristi
7  O'Brien, did you receive forms of this
8  type from anyone else back in 1997?
9      A.   No.
10      Q.   And by forms of this type I
11  don't mean this specific form I mean
12  interview guides, I mean prescreening
13  guides, anything of that nature?
14      A.   No.  And in '97 you're to
15  remember there weren't that many people
16  employed at the company that would have
17  been involved in at this level.  Again,
18  you have to understand I don't
19  specifically know what the purpose of
20  interviewing for Salisbury, Maryland was.
21  So it's not something that I was familiar
22  with other than my assumption based on
23  this paragraph that it could have been in
24  regards to some type of franchise

Page 344

1  situation in selling the franchise and
2  financing that piece of it.
3      Q.   And Ms. Siegel, if you
4  could, you could go ahead and stop--
5      A.   Let me just go take a step
6  back.  If this is seven of '97 it could
7  not have come from Kristi O'Brien because
8  Kristi O'Brien wouldn't have been in the
9  capacity to do a training at that point
10  in time.  The only person it possibly
11  could have been in that arena would have
12  been Karol Stadler and as far as Vahan
13  goes in seven of '97-- well, I don't
14  know.  Vahan or Scott would still have
15  potential as far as this, I would think
16  more Scott or possibly Karol Stadler but
17  Kristi O'Brien wouldn't especially not in
18  seven of '97, she wouldn't have been in
19  any kind of capacity to have done that.
20      Q.   Can you skip down to the
21  heading Proceed bold, Proceed if
22  applicant qualifies on 6664?
23      A.   I'm sorry.
24      Q.   6664 almost the middle of

Page 345

1  the page, bold and underlined:  Proceed
2  if applicant qualifies?
3      A.   Okay, I'm sorry.  Yes, I
4  have it.
5      Q.   And if you could look down
6  below the first line, do you have
7  experience in the service industry,
8  there's a next question there.  Could you
9  read that for me?
10      A.   Tell me about it.
11      Q.   Just read that for me
12  please?
13      A.   Do you have experience.
14      Q.   No, the next line after
15  that?
16      A.   Okay.  Have you ever been
17  exposed to working for a company that was
18  predominately woman.
19      Q.   Do you know who's
20  responsible for writing that?
21      A.   I do not.  Nor do I
22  necessarily understand that question in
23  terms of if they mean as far as their
24  clientele or if they mean the people that

87  (Pages 342 to 345)

KAREN SIEGEL

Page 346

1  work for the company. So I don't
2  understand that question.
3      Q.   You mean you don't
4  understand the question on 6664?
5      A.   That's correct.
6      Q.   Ms. Siegel, is this
7  document, this type of form, Exhibit
8  K.Siegel Exhibit 6, or the previous
9  version K.Siegel Exhibit 5, were either
10  of those documents used by you to draft
11  the interviewing or prescreening guides
12  that we previously discussed in for
13  example the K.Siegel Exhibit 3?
14      A.   I stated to you before that
15  there was something similar, again, I
16  don't know if you have any prescreenings
17  from Florida time frame, if this is the
18  same form, I don't remember it in this
19  format. But there was-- there was a
20  prescreen form that I used to put
21  together our current prescreening form.
22  Now, sitting here and looking at this and
23  thinking about the whole situation I'm
24  not changing my testimony in any way, but

Page 347

1  the interview, the hiring and
2  interviewing guide, personnel guide, that
3  was initially put together in October,
4  November of '98, part of-- I mean that
5  was in conjunction with Wolf Block and
6  it's possible that the prescreening form
7  that was actually put together had to do
8  with questions relative to this but this
9  particular form I don't have a specific
10  recollection of. But yes, there's a form
11  similar to this that asks these questions
12  on the first page and then talking about
13  I do remember this piece of it, you know,
14  that there's-- that we want to get back
15  to the person within 24 to 48 hours.
16  Other than that as I said before, I don't
17  remember.
18      Q.   I'll show you another
19  document that we'll mark K.Siegel Exhibit
20  10.
21          (K.Siegel-10 marked for
22      identification.)
23          MR. PHILLIPS: Again, not
24      Bates numbered but it was produced

Page 348

1  to you at your request, I will
2      provide you with the specific EEOC
3      Bates number for this document.
4      But it is identical to what was
5      produced to you with the exception
6      of the Bates numbers not being on
7      there.
8  BY MR. PHILLIPS:
9      Q.   If you take a look at this,
10  Ms. Siegel, and let me know when you're
11  done?
12      A.   I'm finished.
13      Q.   Ms. Siegel, do you recognize
14  this document marked K.Siegel Exhibit 10?
15      A.   I don't but it is my
16  handwriting, looks, appears to be my
17  handwriting.
18      Q.   Appears to be your
19  handwriting. Okay. Do you know what--
20  do you know what this document is?
21      A.   I don't.
22      Q.   It says at the top, could
23  you read the first line on I guess the
24  very first line on the left, what does

Page 349

1  that say?
2      A.   Initial interview form.
3      Q.   Was this document used as a
4  draft or an outline for an initial
5  interview form?
6      A.   No, I don't-- I don't
7  believe so. Because again, I didn't
8  create that form. But having said that,
9  it almost looks like if I was the person
10  that was using the form like taking the
11  phone calls for this ad that was placed
12  in Salisbury, it looks like somebody--
13  like somebody going over with me possibly
14  qualifications in terms of responses.
15      Q.   Do you know who went over
16  this with you?
17      A.   I just don't have a
18  recollection of this entire project, I
19  really don't.
20      Q.   Ms. Siegel, if you could
21  skip down to the-- first of all, look to
22  the right hand side of the page and I'll
23  point out, I'll point it out to you.
24  First page and I am going to mark on the

88  (Pages 346 to 349)

KAREN SIEGEL

Page 354

1  remember your voice but that's fine.
2      A.   Okay.  I don't remember that
3  one because if I'm not in person I don't
4  have a clear memory of it but.
5      Q.   First let's look at that,
6  call it K.Siegel Exhibit 11?
7          (K.Siegel-11 marked for
8      identification.)
9  BY MR. PHILLIPS?
10     Q.   Take a look at that, Ms.
11 Siegel, K.Siegel Exhibit 11 and let me
12 know when you're done.
13     A.   I'm done.
14     Q.   Ms. Siegel, do you recognize
15 this type of form notwithstanding the
16 handwriting?
17     A.   It's similar to the first
18 page of the form that you showed me
19 previously.
20     Q.   Do you recognize the
21 handwriting, Ms. Siegel?
22     A.   I don't recognize the
23 handwriting.
24     Q.   Look at the line marked your

Page 355

1  telephone number, do you see the
2  telephone number there?
3      A.   Yes.
4      Q.   Do you recognize the area
5  code?
6      A.   317 I believe is Indiana.
7      Q.   Do you recall who was
8  conducting hiring activities in Indiana
9  in 1997 or what about 1998?
10     A.   Uh-uh.  We possibly were
11 interviewing then, but I --
12     Q.   Do you know who?
13     A.   No, I don't.
14     Q.   Do you know where the second
15 page of this form is?  I will represent
16 to you that in the documents that were
17 produced to the EEOC there is no second
18 page to this form; do you know where that
19 second page is?
20     A.   I would make the assumption
21 that we weren't using a second page at
22 that point.
23     Q.   But you don't know that for
24 a fact?

Page 356

1      A.   I would-- this as I said to
2  you before looks familiar to me.  The
3  information that was on page two of this
4  form did not look familiar to me.  Now
5  it's obvious it's my handwriting is on
6  these forms so I had to have seen them at
7  one point but I would think that beyond
8  this Salisbury project I don't believe
9  that that second page was ever used.
10     Q.   But you don't know that for
11 a fact?
12     A.   I don't know that for a fact
13 but I believe it to be true.
14     Q.   If you could look now at
15 K.Siegel Exhibit 12.
16          (K.Siegel-12 marked for
17     identification.)
18 BY MR. PHILLIPS:
19     Q.   If you could review that and
20 let me know when you're done.
21     A.   (Witness complies.)  Okay.
22     Q.   Ms. Siegel, do you recognize
23 this exhibit, K.Siegel Exhibit 12?
24     A.   Yes.

Page 357

1      Q.   What is this Exhibit?
2      A.   This is a summary that
3  either I had put together or I believe I
4  put it together.  I don't know if someone
5  else typed it but at any rate.  It was a
6  summary that I put together of the people
7  that had called in regarding an ad we had
8  placed prior to opening the Fort
9  Lauderdale market.
10     Q.   For what job?
11     A.   For the supervisor position.
12     Q.   Area supervisor?
13     A.   I believe so, yes.
14     Q.   You'll note on there that
15 there are handwritten notations?
16     A.   Yes.
17     Q.   At the top of EEOC 3142 it
18 says Marlene Katz, would you agree?
19     A.   Yes.
20     Q.   And there's also a notation
21 there a number symbol also on resume, do
22 you see that?
23     A.   That's correct, yes.
24     Q.   And you also see that there

90  (Pages 354 to 357)