```
                                                              1

 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
 2                 NORTHERN DIVISION
                       - - -
 3   EQUAL EMPLOYMENT         : CIVIL NO.
     OPPORTUNITY COMMISSION:
 4           and              :
     KATHY C. KOCH             :
 5     INTERVENOR/PLAINTIFF:
               v              :
 6   L.A. WEIGHT LOSS          :
     CENTERS, INC.             :
 7           Defendant   :  WDQ-02-CV-648
 8                     - - -
                NOVEMBER 11, 2004
 9
                       - - -
10       Oral deposition of KAREN SIEGEL,
11   taken pursuant to notice, was held at the
12   law offices of the EQUAL EMPLOYMENT
13   OPPORTUNITY COMMISSION, The Bourse
14   Building, 4th Floor, Philadelphia, PA,
15   beginning at 9:35 a.m., on the above
16   date, before Nancy D. Ronayne, a Court
17   Reporter and Notary Public in the
18   Commonwealth of Pennsylvania.
19
20
21                     - - -
22        ESQUIRE DEPOSITION SERVICES
                  15th Floor
23      1880 John F. Kennedy Boulevard
         Philadelphia, Pennsylvania 19103
24              (215) 988-9191
```

78
1  probably more newspaper advertisement at
2  that point in time, not necessarily a
3  substantial amount more than 2002 but we
4  definitely because we were just sort of
5  getting involved with Internet we were
6  still relying somewhat on newspaper.
7      Q.  Who was posting the
8  newspaper ads at that time, 2001?
9      A.  I believe we were-- we were
10 actually posting them. It was either, we
11 utilized Alston Advertising and after
12 utilizing Alston Advertising we did it
13 internally where we dealt directly with
14 the newspapers, whenever that transition
15 occurred, those were the only two, it was
16 either us or them as far as doing the
17 postings.
18     Q.  What about 2000?
19     A.  I believe in 2000 we were
20 utilizing Alston but I don't remember
21 exactly when we transitioned from them.
22     Q.  But newspaper ads?
23     A.  I'm sorry, newspaper and it
24 might have been the very end of 2000 that

79
1  we started to utilize Hot Jobs.
2      Q.  You weren't using Career
3  Builder at that time?
4      A.  No, it was a couple months
5  later that we started to use Career
6  Builder.
7      Q.  Is it fair to say that when
8  the company does a job posting either by
9  Internet or by newspaper that there is a
10 specific vacancy that the company wishes
11 or vacancies that the company wishes to
12 fill? I'm juxtaposing that with
13 companies who solicit applications to
14 have a pool to draw from but that there
15 may not necessarily be a vacancy open at
16 that time. Do vacancies actually exist
17 when the company posts an ad either on
18 the Internet or in the newspaper?
19     A.  Yes and no. Generally
20 speaking if there's a vacancy we're
21 definitely going to post for that
22 position. We may-- there are some areas
23 where we may recruit for a pool of
24 applicants like we might do constant

80
1  recruiting because we know there's going
2  to be growth in the area so we might over
3  hire for a center in anticipation of
4  opening another center. So there's not
5  necessarily an opening that exists but
6  generally speaking we're going to
7  advertise for a position that's available
8  at that given time.
9      Q.  When you say over hiring
10 what do you mean by that?
11     A.  Well, you might have more
12 counselors in the center than you need in
13 anticipation of opening another center.
14     Q.  Okay. So in that situation
15 you're actually, you're filling vacancies
16 but you're advertising to fill many more
17 vacancies than what are actually open at
18 that time in anticipation of future
19 openings; correct?
20     A.  That's correct.
21     Q.  Back in '99 is it fair to
22 say that all of L.A. Weight Loss's
23 postings of jobs or if you can find a
24 better term for that let me know, but all

81
1  of L.A. Weight Loss's posting of jobs was
2  done by newspaper ads?
3      A.  In '99, yes.
4      Q.  And is that also true for
5  1998?
6      A.  Yes.
7      Q.  Do you know if that's true
8  for '97?
9      A.  I believe that to be true
10 for '97.
11     Q.  Earlier you mentioned in the
12 context of 2003 that leads for counselor
13 and med tech job, anything below
14 assistant manager that wasn't being
15 handled by ESG were flowing directly to
16 your department, the recruiting
17 assistant -- recruitment assistant, Nicky
18 Fryer or yourself, correct?
19     A.  That's correct.
20     Q.  And was that also true for
21 2004?
22     A.  Today?
23     Q.  Yes.
24     A.  It comes through the HR

KAREN SIEGEL

198

1  applications we're referring to, Hot
2  Jobs, Monster, Career Builder?
3      A.   The initial request was made
4  to me and I then had Nicky Fryer
5  interfacing with the Internet providers
6  to attempt to get copies of any and all
7  resumes that had been submitted to any of
8  the job postings.
9      Q.   When was that done?
10     A.   Whenever your initial
11 request was made.
12     Q.   During the investigation of
13 this matter or during the litigation?
14     A.   I don't know exactly.
15     Q.   The lawsuit was filed in
16 February 2002.
17     A.   I believe that's when we
18 would have-- when the request was made.
19     Q.   Do you know what the
20 response was from the providers?
21     A.   Specifically I don't know.
22 I know more information from Hot Jobs
23 because that was our largest data base at
24 that point in time and they were unable

199

1  to according to what they were telling
2  us, they were unable to make an
3  electronic copy of all of the resumes
4  that had been submitted. And it had
5  something to do with a platform issue and
6  I honestly, I'm not very well versed in
7  IT so I don't necessarily know what that
8  means.
9      Q.   So what was the resolution,
10 if they could not make an electronic
11 copy?
12     A.   I don't -- I don't know if
13 there's been a resolution at this point.
14     Q.   Did you get hard copies of
15 all of this?
16     A.   In order to get hard copies
17 you literally would have to go into each
18 individual posting and download each
19 individual application separately and
20 then print that. And I don't believe
21 that's ever been done.
22     Q.   By anyone?
23     A.   It would not as far as my--
24 not from my side of things. The time

200

1  involved to do that would be astronomical
2  but we've never done it on our end.
3      Q.   So to your knowledge L.A.
4  Weight Loss has never actually gone
5  through every single job posting, looked
6  at all the responses and printed those
7  out?
8      A.   No. Not to my knowledge.
9      Q.   Has L.A. Weight Loss ever
10 gone through every posting, looked at
11 every response and downloaded it?
12     A.   That has happened. I mean
13 yes, they do that when they go through--
14 when they're reviewing a position like
15 when they're reviewing to hire for a
16 position, they look at every single
17 applicant.
18     Q.   But what happens to the file
19 after it's downloaded, where is it
20 stored?
21     A.   It's stored on it's like a
22 web based, you're dealing with a web
23 based recruitment board job posting.
24     Q.   So it's stored on the

201

1  service provider's site basically?
2      A.   Yes.
3      Q.   In their server or whatever?
4      A.   Wherever they, yes.
5      Q.   The files after they've been
6  reviewed by the recruiters, they're-- to
7  your knowledge they're kept on the
8  provider's site but they're not stored
9  electronically in anything at L.A. Weight
10 Loss?
11     A.   That's correct.
12     Q.   They're not downloaded onto
13 a C-drive or onto your server or onto a
14 disk or anything of that nature?
15     A.   That's correct.
16     Q.   Is there any requirement
17 that the recruiter prints out everything
18 they look at?
19     A.   No, they print out-- they
20 print out the resumes that are
21 prescreened and any resume that is set up
22 for an interview. But again, at this
23 point in time going forward. So what
24 we've done now for 2004 is we've created

202
1  these files that we in fact are now
2  saving on our end the rejected--
3      Q.   Now you are printing out or
4  saving every single response?
5      A.   Yes.
6      Q.   Hereto for though, that has
7  not happened?
8      A.   That's correct-- well, not
9  on own end.
10     Q.   Right.  If it has happened
11 it's with Hot Jobs, career Builder or
12 Monster?
13     A.   That's correct.
14     Q.   So sitting here today
15 testifying you cannot tell me that the
16 EEOC has received every single response
17 to any postings with Hot Jobs, Career
18 Builder or Monster.com, you cannot tell
19 me that?
20     A.   I would agree with that
21 statement.  I cannot tell you that.
22     Q.   And you also have testified
23 that you are unsuccessful in getting
24 electronic copies of all of that material

203
1  from the providers; correct?
2      A.   As far as my-- I believe
3  that's correct.  I may be wrong on that
4  but as far as I know, I don't believe
5  that they were able to provide that.
6      Q.   And you also have not been
7  provided by the service providers, Hot
8  Jobs, Monster or Career Builder, with
9  hard copies of all of the responses to
10 L.A. Weight Loss's job postings?
11     A.   That's correct -- as far as
12 I understand that's correct.
13         MR. PHILLIPS:  Off the
14     record for a second.
15         (A discussion off the record
16     occurred.)
17 BY MR. PHILLIPS:
18     Q.   We were off the record for a
19 minute, we were having a discussion about
20 this issue and you stated that off the
21 record that L.A. Weight Loss has printed
22 out the counselor resumes or electronic
23 applications or basically what was the
24 response submitted to a Hot Jobs ad or --

204
1      A.   That's correct.
2      Q.   --for every counselor, every
3  response for a counselor position in the
4  year 2003?
5      A.   Yes.
6      Q.   Is that your testimony?
7      A.   Yes.
8      Q.   How do you know that's true?
9      A.   Because we were responsible
10 for submitting the counselor resumes out
11 to the field and we made copies of all of
12 that so anything that we sent out to the
13 field for a counselor, that applied to
14 the counselor position, and we weren't
15 doing any prescreening at that point on
16 those, we were printing them out and
17 sending them out to the field, we made
18 copies of all that.  And all of that was
19 then submitted to counsel at well.  So I
20 can-- I can testify very-- what is it
21 called-- confidently that you have all
22 the counselor submissions.
23     Q.   You can testify that's the
24 process that was in place was to print

205
1  out all of the responses?
2      A.   Yes.  Yes, that's correct.
3      Q.   You can't, obviously you
4  can't testify that was done in every
5  single case?
6      A.   That's correct.
7      Q.   You're not standing over the
8  shoulder of recruiters?
9      A.   No.  No.
10     Q.   Can you testify that during
11 any period in which L.A. Weight Loss has
12 used Monster, Hot Jobs or Career Builder,
13 that all of the responses for any other
14 position other than counselor were
15 printed out?
16     A.   I cannot.
17     Q.   And you did testify earlier
18 that if there was a prescreening done or
19 interview set up then it was printed out,
20 that a response was to an Internet
21 posting was printed out by L.A. Weight
22 Loss?
23     A.   Yes.
24     Q.   Do you know what happened if